FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

DEC 2 3 2004 ₂.₄⁵

Betty A. Griess, Clerk
Cheyenne

Reed Zars (Wyo. Bar No. 6-3224)
Attorney at Law
910 Kearney Street
Laramie, Wyoming 82070
307-745-7979
307-745-7999 (FAX)

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| **BIODIVERSITY CONSERVATION**<br>**ALLIANCE and SIERRA CLUB,** | ) )<br>) |
| **Plaintiffs,** | )<br>) |
| v. | )<br>) |
| **MOUNTAIN CEMENT COMPANY** | )<br>) |
| **Defendant.** | )<br>) |

0 4 C V 3 6 1 - B

Case No. _____

## COMPLAINT

## I. STATEMENT OF THE CASE, JURISDICTION AND VENUE

1.     This is a federal Clean Air Act citizen suit enforcement action brought by

plaintiffs Biodiversity Conservation Alliance and Sierra Club ("plaintiffs") against defendant

Mountain Cement Company ("Mountain Cement") to address significant and ongoing violations

of air pollution permit emission limits at Mountain Cement's Laramie Plant located in Albany

Receipt # _305424_
Summons:__X__ issued
_____not issued

County, Wyoming. This complaint seeks declaratory and injunctive relief and the imposition of

civil penalties (payable to the federal Treasury) under the federal Clean Air Act, 42 U.S.C. §§

7401 through 7671q.

2.      This court has subject matter jurisdiction over the claims set forth in this

complaint pursuant to 42 U.S.C. § 7604(a) (citizen suit provision of Clean Air Act) and 28

U.S.C. § 1331 (federal question statute). Jurisdiction also exists under 28 U.S.C. § 1331 because

this action is brought to address defendant's violations of its federally enforceable Title V

Operating Permit issued pursuant to 42 U.S.C. §§ 7661-61f, and Wyoming's EPA-approved Title

V permit program. 64 Fed. Reg.8523 (Feb. 22, 1999). The relief requested is authorized

pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 7413 and 7604.

3.      Pursuant to 42 U.S.C. § 7604(c) and 28 U.S.C. §§ 1391(b) and (c), venue lies in

the District of Wyoming because Albany County is located in Wyoming.

4.      To the extent required by 42 U.S.C. § 7604(b)(1)(A), on October 22, 2004,

plaintiffs notified in writing the Administrator of the EPA, the Wyoming Department of

Environmental Quality ("WDEQ"), and the defendant of the alleged violations set forth in this

complaint and plaintiffs' intent to sue. A true and accurate copy of plaintiffs' notice letter to

Mountain Cement is attached hereto as **Exhibit A**.

5.      More than sixty days have passed since notice was served by U.S. Mail.

Defendant has violated, and remains in violation of, its operating permit and the Clean Air Act.

6.    On December 17, 2004 the State of Wyoming filed a complaint against Mountain

Cement in Albany County District Court, alleging violations of the twenty percent opacity limit

at Kiln #2 in Permit 30-098 during the second, third and fourth quarters of 2001, and the first and

second quarters of 2002.  Wyoming's complaint does not allege violations of the twenty percent

opacity limit at Kiln #2 in Permit 30-098 during the fourth quarter of 1999, any of 2000, the first

quarter of 2001, the third and fourth quarters of 2002, and any of 2003 or 2004.  Wyoming's

complaint does not allege violations of the twenty percent opacity limit at Kiln #2 in Permit 31-

098 during 2004.  Wyoming's complaint does not allege violations of the 29.30 lb/hr. particulate

matter limit at Kiln #2 in Permits 30-098 and 31-098.  Wyoming's complaint does not allege

violations of the ten percent opacity limit at Clinker Coolers 1 and 2 in Permits 30-098 and 31-

098.

7.    Neither the State of Wyoming or EPA has commenced or diligently prosecuted a

court action to require compliance with all of the emission limits that Mountain Cement is

alleged to have violated, and to be in violation of, in this complaint.

## II. PARTIES

8.    Biodiversity Conservation Alliance ("BCA") is a Laramie, Wyoming-based

nonprofit conservation organization dedicated to the protection of wildlife, fish, and plants, and

unpolluted land, air and water upon which wildlife, fish and plants depend.  BCA brings this

action on behalf of its adversely affected members.  BCA has members residing throughout

-3-

southeastern Wyoming, including in the town of Laramie. BCA members regularly engage in

wildlife viewing, outdoor recreation, scientific study, and other activities in southeastern

Wyoming. Protection of clean air, clean water, healthy vegetation, and productive soils are of

paramount concern to BCA and its members as they all support healthy populations of wildlife,

fish, and plants. Clean air allows BCA and its members to enjoy viewing, studying, and

otherwise appreciating the native species that BCA is dedicated to protecting. The educational,

scientific, aesthetic, and conservation interests of BCA and its members have been, are being

and, unless this Court grants the requested relief, will continue to be adversely affected by

Mountain Cement's ongoing violations of the Clean Air Act.

       9.     The Sierra Club, a national citizens organization, is dedicated to protecting natural

resources, including clean air and water. On behalf of its members, including its members in

Wyoming, Sierra Club works to protect and enhance the quality of air in the Wyoming, including

the air around Laramie that is impacted by the excessive emissions from Mountain Cement. The

Sierra Club brings this action on behalf of its adversely affected members. The educational,

scientific, aesthetic, and conservation interests of Sierra Club and its members have been, are

being and, unless this Court grants the requested relief, will continue to be adversely affected by

Mountain Cement's ongoing violations of the Clean Air Act.

      10.    Members of BCA and Sierra Club reside in, work in, or regularly visit and use the

resources of the Laramie Valley, the airshed most immediately impacted by Mountain Cement's

violations of the Clean Air Act. The aesthetic, recreational, environmental, spiritual, economic and health-related interests of plaintiffs' members have been injured by Mountain Cement's illegal and excessive emissions of pollutants into the airshed of the Laramie Valley and Southeastern Wyoming. The interests of plaintiffs' members that are directly injured by defendant's excessive and illegal discharge of pollutants from the Laramie Plant include, but are not limited to: (1) breathing air in the Laramie Valley and surrounding areas free from Mountain Cement's excessive pollutant discharges, (2) viewing the sky, natural scenery and wildlife unimpaired by ugly pollution plumes and haze caused, in whole or in part, by Mountain Cement, and (3) protecting the natural ecology of the region from air pollution related impacts. The interests of plaintiffs' members have been, and unless the relief requested herein is granted, will continue to be, adversely affected by Mountain Cement's violations of the Clean Air Act.

11.     Plaintiffs' members could bring this action in their individual capacity. None of the claims asserted or relief requested, however, requires that plaintiffs' members bring such an action in their individual capacity.

12.     Mountain Cement is a wholly-owned subsidiary of Eagle Materials, Inc., a Dallas, Texas based corporation. Eagle Materials, with over $500,000,000 in sales in 2004, also owns cement manufacturing plants in Nevada, Texas and Illinois.

13.     Mountain Cement is a Nevada Corporation, authorized to do business in Wyoming. Mountain Cement is the operator and owner of the Laramie Plant. The Laramie Plant

-5-

produces portland cement.  Mountain Cement is the named permittee in WDEQ Operating

Permits 31-098 (March 15, 2004) and 30-098 (June 2, 1998).  Mountain Cement has overall

responsibility for ensuring that the Laramie Plant complies with its air pollution permits and

applicable laws and regulations, and Mountain Cement has the authority to correct violations of

air pollution permits and applicable laws and regulations at the Laramie Plant.

## III. STATEMENT OF FACTS

### The Laramie Plant

14.     Mountain Cement's Laramie Plant is located approximately three miles south of

Laramie, Wyoming.  Mountain Cement purchased the Laramie Plant from Monolith Portland

Cement Company in 1986.  The Laramie Plant manufactures portland cement using two coal-

fired kilns and associated equipment.  At the Laramie Plant, limestone is blended with shale or

clay and iron and then ground to a fine powder called raw meal.  The raw meal is fed into a coal-

fired rotary kiln that achieves temperatures of approximately 2,800° F.  The raw meal undergoes

a chemical reaction in the kiln to form clinker.  Clinker is mixed with gypsum and ground to a

fine powder to create portland cement.

15.     Kiln #1 has a rated production capacity of 600 tons of product per day.  Kiln #2

has a rated production capacity of 1,500 tons of product per day.

16.     In the process of manufacturing cement, pollution is generated.  Pollution from the two kilns is discharged into the air of southeastern Wyoming through separate smokestacks. Pollution is also discharged into the air from the clinker coolers, and other sources.

17.     According to Mountain Cement's March 15, 2004 Operating Permit No. 31-098, the Laramie Plant emits into the air of Albany County on an annual basis 382 tons of respirable particulate matter ($PM_{10}$), 2,886 tons of nitrogen oxides ($NO_x$), and 876 tons of sulfur dioxide ($SO_2$).

18.     The annual $NO_x$ emissions from Mountain Cement are equivalent to the emissions of over 150,000 vehicles each driven 12,500 miles per year.  According to the U.S. Environmental Protection Agency, an average vehicle emits 38.2 pounds of $NO_x$ per year. Mountain Cement emits 5,772,000 pounds of $NO_x$ per year.  Thus $5,772,000 \div 38.2 = 151,099$ vehicles.

19.     According to Mountain Cement's 2002 toxic release inventory report, the Laramie Plant also emits on an annual basis listed hazardous air pollutants, including 65,869 pounds of formaldehyde, 53,422 pounds of hydrochloric acid, 353 pounds of lead and 110 pounds of mercury.  Hazardous air pollutants from cement plants, identified by EPA pursuant to Section 112 of the Clean Air Act, 42 U.S.C. § 7412, include those that are associated with carcinogenic, respiratory, nervous system, dermal, developmental, and/or reproductive health effects.

20.     The amount of mercury that Mountain Cement discharges into Laramie's airshed every year is equivalent to the mercury in approximately 71,000 household thermometers. 110 pounds X 453.5 grams/lb. = 49,885 grams ÷ 0.7 grams per thermometer = 71,264. The amount of mercury in one household thermometer (0.7 g) is enough to contaminate all of the fish in a lake with a surface area of 15 acres.

21.     Particulate matter of the size and type emitted from the Laramie Plant's smokestacks is visible as a plume when it leaves the smokestacks, and contributes to a haze or loss of visibility in the atmosphere. Particulate matter of the size and type emitted from the Laramie Plant's smokestacks is transported by winds for many miles. If breathed, fine particulate matter may be lodged deep in the lungs and has been linked to increased human illness and mortality. Particulate matter emitted from the Laramie Plant includes hazardous air pollutants.

22.     $SO_2$ and sulfate ($SO_4$) emissions also contribute to visual haze in the atmosphere. Sulfur dioxide emitted from coal combustion transforms into sulfate particles that are damaging to lungs, visibility, forests and property.

### Clean Air Act Title V Operating Permit Requirements

23.     The objective of the federal Clean Air Act is "to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population." Section 101(b), 42 U.S.C. § 7401(b).

-8-

24.     Section 502(b) of the Clean Air Act, 42 U.S.C. § 7661a(b), required EPA to promulgate regulations establishing an operating permit program for stationary sources of air pollution.  The regulations EPA promulgated, found at 40 C.F.R. Part 70, presently govern the establishment of federal operating permit programs.

25.     Pursuant to EPA's Part 70 regulations, the State of Wyoming created a Title V operating permit program to which EPA gave final approval on February 22, 1999.  64 Fed. Reg. 8523.

26.     Each Title V permit issued pursuant to this program must contain "enforceable emission limitations and standards" necessary to assure compliance with applicable requirements of the Clean Air Act.  Furthermore, the Clean Air Act specifically prohibits any permittee from violating any requirement of a Title V permit.  42 U.S.C. § 7661a(a).

27.     Section 304(a) of the Clean Air Act, 42 U.S.C § 7604(a), authorizes any person to commence a civil action on his own behalf against any person "who is alleged to have violated (if there is evidence that alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter. . ."  The Clean Air Act's citizen suit provision was passed by Congress in 1970 to afford citizens "very broad opportunities to participate in the effort to prevent and abate air pollution."  1 Legislative History of the Clean Air Act Amendments of 1970, Ser. No. 93-18, p. 138.

-9-

28.     The Clean Air Act at 42 U.S.C §§ 7604(f)(1),(3), and (4) defines "Emission

standard or limitation under this Act" to mean:

> (1) a schedule or timetable of compliance, emission limitation, standard of
> performance or emission standard . . . or (3) any condition or requirement under
> an applicable implementation plan relating to transportation control measures, air
> quality maintenance plans, vehicle inspection and maintenance programs or vapor
> recovery requirements, or any requirement under section 7411 or 7412 of this title
> (without regard to whether such requirement is expressed as an emission standard
> or otherwise); or (4) any other standard, limitation, or schedule established under
> any permit issued pursuant to subchapter V of this chapter or under any applicable
> State implementation plan approved by the Administrator, any permit term or
> condition, and any requirement to obtain a permit as a condition of operations
> which is in effect under this chapter or under an applicable implementation plan.

29.     A permit condition in a Title V permit issued by WDEQ is an enforceable

"Emission standard or limitation" as defined by 42 U.S.C §7604(f)(1), (3), and (4), and therefore

violations of permit conditions are the proper subject of a citizen enforcement under 42 U.S.C.

§ 7604(a)(1).

### Mountain Cement's Title V Operating Permits

30.     On June 2, 1998, the Wyoming Department of Environmental Quality (WDEQ)

issued Operating Permit No. 30-098 to Mountain Cement.  Operating Permits in Wyoming are

issued for a period of no more than five years.  42 U.S.C. § 7661a(b)(5)(B).  On March 15, 2004,

WDEQ issued a second operating permit to Mountain Cement, Operating Permit No. 31-098.

Each operating permit regulates the emission of air pollutants from the Laramie Plant.

31.    Mountain Cement did not object to, or otherwise appeal any provision of, Operating Permit Nos. 30-098 or 31-098.

32.    Pursuant to both of Mountain Cement's Operating Permits, "[a]ll terms and conditions of the permit[s], except those designated as not federally enforceable, are enforceable by EPA and citizens under the Act."

33.    Pursuant to condition (F3)(a) in Mountain Cement's Operating Permit No. 30-098, and condition (F3)(b) in Mountain Cement's Operating Permit No. 31-098, the opacity of emissions from the Kiln #2 smokestack is limited to 20 percent.

34.    In the air pollution context, percentage opacity is the degree to which the transmittance of light is reduced by air pollutants.

35.    The 20 percent opacity limit applicable to Kiln #2 in Mountain Cement's operating permits is an "emission standard or limitation" within the meaning of 42 U.S.C. § 7604(a)(1) and (f).

36.    The 20 percent opacity limit applicable to Kiln #2 in Mountain Cement's operating permits is federally enforceable.

37.    Mountain Cement's operating permits do not provide an exception to the 20 percent opacity limit at Kiln #2 for each of the following conditions: (1) Kiln startup or shutdown, (2) raw mill startup or shutdown, (3) starting up auxiliary equipment, (4) erratic feed rate, (5) erratic fuel rate, (6) plugged system, (7) broken dust collector bag(s), (8) electrical

malfunction in precipitator, (9) mechanical malfunction in precipitator, (10) lost auxiliary equipment, (11) lost spray tower exit temperature control, (12) working in/on process system, (13) working in/on pollution control equipment, (14) fan output ramping up or down, (15) process/ID fan malfunction or shutdown, (16) malfunction of sprays at spray tower, (17) process gas temperature out of optimum range, (18) electrical surge or outage or power bump, or (19) unknown cause.

38.     Pursuant to condition (F5) in Mountain Cement's Operating Permit No. 30-098, and condition (F5)(a) in Mountain Cement's Operating Permit No. 31-098, particulate matter emissions from Kiln #2 may not exceed 29.30 pounds per hour.

39.     The 29.30 lb./hr. particulate matter limit applicable to Kiln #2 in Mountain Cement's operating permits is an "emission standard or limitation" within the meaning of 42 U.S.C. § 7604(a)(1) and (f).

40.     The 29.30 lb./hr. particulate matter limit applicable to Kiln #2 in Mountain Cement's operating permits is federally enforceable.

41.     Pursuant to condition (F7) in Mountain Cement's Operating Permit No. 30-098, and condition (F12)(b) in Mountain Cement's Operating Permit No. 31-098, the opacity of emissions from the clinker coolers at the Laramie Plant is limited to 10 percent.

42.     The 10 percent opacity limit applicable to Clinker Cooler #1 and #2 in Mountain

Cement's operating permits is an "emission standard or limitation" within the meaning of 42

U.S.C. § 7604(a)(1) and (f).

43.     The 10 percent opacity limit applicable to Clinker Cooler #1 and #2 in Mountain

Cement's operating permits is federally enforceable.

44.     Mountain Cement's operating permits do not provide an exception to the 10

percent opacity limit at the clinker coolers for each of the following conditions: (1) Kiln startup

or shutdown, (2) raw mill startup or shutdown, (3) starting up auxiliary equipment, (4) erratic

feed rate, (5) erratic fuel rate, (6) plugged system, (7) broken dust collector bag(s), (8) electrical

malfunction in precipitator, (9) mechanical malfunction in precipitator, (10) lost auxiliary

equipment, (11) lost spray tower exit temperature control, (12) working in/on process system,

(13) working in/on pollution control equipment, (14) fan output ramping up or down, (15)

process/ID fan malfunction or shutdown, (16) malfunction of sprays at spray tower, (17) process

gas temperature out of optimum range, (18) electrical surge or outage or power bump, or (19)

unknown cause.

**Continuous Monitoring of Pollutants Discharged From Mountain Cement**

45.     Pursuant to condition (F15) in Mountain Cement's Operating Permit No. 30-098,

and conditions (F11) and (F12) in Mountain Cement's Operating Permit No. 31-098, Mountain

Cement is required to monitor the opacity of emissions discharged from Kiln #2 and the two

clinker coolers on a continuous basis.

46.     The opacity of emissions from Kiln #2 and the clinker coolers is monitored and

recorded on a continuous basis by continuous opacity monitors (COMs).  The opacity data from

the COMs is reported in six-minute averages.

47.     The COMs at the Laramie Plant consist of transmissometers that continuously

measure, except for periods of downtime, the amount of light that can pass through the exhaust

from Kiln #2 and the clinker coolers before such exhaust is emitted into the atmosphere.  The

less light that is able to pass through the exhaust gas due to the density of pollution, the greater

the opacity.

48.     The COMs that measure the opacity of emissions from Kiln #2 and the two

clinker coolers at the Laramie Plant are located and certified consistent with the requirements

found at  40 C.F.R. § 60, App. B, Performance Specification 1.

49.     The opacity data collected by the COMs is retained in a computer at Mountain

Cement.

50.     The data from the COM in the Kiln #2 smokestack show that emissions have

exceeded 20 percent every calendar quarter over the last five years.  In fact, the opacity of

emissions from Kiln #2 have exceeded 20 percent at Kiln #2 thousands of times in the last five

years. During these times, Mountain Cement's COMs show opacity readings that exceed 20 percent over four times the limit, or that are over 80 percent opacity.

51.     The data from the COM in the Kiln #2 smokestack show that emissions of particulate matter exceed 29.30 lb./hr. when the average opacity of emissions in an hour exceed 25 percent opacity. Particulate matter emissions greater than 29.30 lb./hr. from Kiln #2 have been exceeded on numerous occasions.

52.     The data from the COMs for Clinker Coolers #1 and #2 show that emissions have exceeded 10 percent opacity hundreds of times in the last five years.

53.     The COMs in the smokestacks at the Laramie Plant monitor visible pollutants that can be seen by the naked eye after the pollutants exit the stack. The pollutants identified by the COMs at Mountain Cement can contribute to a visible plume emanating from the smokestacks, and these pollutants can also contribute to a reduction in visibility in the area.

**The Reporting of Excess Emissions from Mountain Cement**

54.     Pursuant to Mountain Cement Operating Permit No. 30-098, condition (F31), and Operating Permit No. 31-098, condition (F25), Mountain Cement is required to submit on a quarterly basis a written report to WDEQ that discloses each six-minute period of time in which emissions of pollutants from Kiln #2 and the two clinker coolers exceed the applicable opacity standard ("excess emission reports").

55.     Mountain Cement has certified as true, accurate, and complete its excess emission reports regarding the Laramie Plant.

56.     The opacity data in each of Mountain Cement's excess emission reports for the Laramie Plant between 1999 to the present is true, accurate, and complete.

### Excess Emissions Impacts and Remedies

57.     The opacity readings in excess of 20 percent from the COM at Kiln #2, the opacity readings in excess of 10 percent from the COMs at the two clinker coolers, and the particulate matter emissions in excess of 29.30 pounds per hour from Kiln #2, represent an increase in the amount of pollution discharged into the air compared to what the discharge would have been if the emissions had been less than 20 and 10 percent opacity, and less that 29.30 pounds per hour of particulate matter.

58.     The amount of pollution represented by opacity readings greater than 20 percent at Kiln #2, greater than 10 percent at the clinker coolers, and in excess of 29.30 pounds per hour at Kiln #2 could have been significantly reduced or eliminated altogether through the use of a fabric filter dust collector or "baghouse" at Kiln #2. The opacity of emissions could also have been reduced by using natural gas as a fuel rather than coal, and also by lowering production rates.

## IV. CAUSES OF ACTION

59.     Plaintiffs incorporate by reference and reallege the allegations contained in paragraphs 1 through 58 for all causes of action stated below.

### FIRST CAUSE OF ACTION

#### Emissions From Kiln #2 in Violation of 20 Percent Opacity Limit
#### in Operating Permits 30-098 and 31-098
#### (From October 1999 to the present)

60.     Mountain Cement Operating Permits Nos. 30-098, condition (F3)(a), and 31-098, condition (F3)(b), prohibit the emission of visible pollutants from Kiln #2 that exhibit greater than 20 percent opacity.

61.     A 20 percent opacity limit applicable to Kiln #2 has applied at all times between October 1, 1999 and the date of this complaint.

62.     Between October 1, 1999 and the date of this complaint, Mountain Cement has repeatedly violated Operating Permit No. 30-098, condition (F3)(a), and Operating Permit 31-098, condition (F3)(b), and the Clean Air Act, by emitting from Kiln #2 visible emissions in excess of 20 percent opacity.  Such violations are demonstrated by Mountain Cement's continuous opacity monitor data.

63.     Mountain Cement continues to violate Operating Permit No. 31-098, condition (F3)(b), and the Clean Air Act, by emitting from Kiln #2 visible emissions in excess of 20 percent opacity.

## SECOND CAUSE OF ACTION

**Emissions From Kiln #2 in Violation of Particulate Matter Limit
in Operating Permits 30-098 and 31-098
(From October 1999 to the present)**

64.     Mountain Cement Operating Permit No. 30-098, condition (F5), and Operating

Permit 31-098, condition (F5)(a), prohibit the emission of particulate matter from Kiln #2 greater

than 29.30 lb./hr.

65.     A 29.30 lb./hr. particulate matter limit applicable to Kiln #2 has applied at all

times between October 1, 1999 and the date of this complaint.

66.     Between October 1, 1999 and the date of this complaint, Mountain Cement has

repeatedly violated Operating Permit No. 30-098, condition (F5), and Operating Permit 31-098,

condition (F5)(a), and the Clean Air Act, by emitting from Kiln #2 particulate matter in excess of

29.30 lb./hr.  Such violations are demonstrated each hourly period when the average opacity of

emissions from Kiln #2 are at or above 25 percent.

67.     Mountain Cement continues to violate Operating Permit No. 31-098, condition

(F5)(a), and the Clean Air Act, by emitting from Kiln #2 particulate matter emissions in excess

29.30 lb./hr.

-18-

## THIRD CAUSE OF ACTION

### Emissions From Clinker Coolers in Violation of Opacity Limit
### in Operating Permits 30-098 and 31-098
### (From October 1999 to the present)

68.     Mountain Cement Operating Permit No. 30-098, condition (F7), and Operating Permit No. 31-098, condition (F12)(b), prohibit the emission of visible pollutants from Clinker Cooler #1 and #2 that exhibit greater than 10 percent opacity.

69.     A 10 percent opacity limit applicable to Clinker Cooler #1 and #2 has applied at all times between October 1, 1999 and the date of this complaint.

70.     Between October 1, 1999 and the date of this complaint, Mountain Cement has repeatedly violated Operating Permit No. 30-098, condition (F7), and Operating Permit 31-098, condition (F12)(b), and the Clean Air Act, by emitting from Clinker Cooler #1 and #2 visible emissions in excess of 10 percent opacity.  Such violations are demonstrated by Mountain Cement's continuous opacity monitor data.

71.     Mountain Cement continues to violate Operating Permit No. 31-098, condition (F12)(b), and the Clean Air Act, by emitting from Clinker Cooler #1 and #2 visible emissions in excess of 10 percent opacity.

## V. RELIEF REQUESTED

WHEREFORE, plaintiffs respectfully request that this Court grant the following relief to correct defendant's significant and ongoing violations of law:

A.      DECLARE that defendant has violated and continues to violate Operating Permits 30-098

and 31-098, and the Clean Air Act, by allowing emissions from Kiln #2 and the two clinker

coolers at the Laramie Plant to exceed the applicable opacity and particulate matter limits;

B.      ISSUE A PERMANENT INJUNCTION enjoining defendant to prepare and submit to the

court and to plaintiffs a comprehensive plan, including interim and final deadlines, that describes

how defendant proposes to achieve full and continuing compliance with Operating Permit 31-

098, and the Clean Air Act in the most expeditious and effective manner possible. After

allowing plaintiffs to respond to defendant's plan, Order defendant to:

      1.      Perform all work necessary to bring the Laramie Plant into prompt, strict and

           continuous compliance with the provisions of its Operating Permit;

      2.      Operate the Laramie Plant in strict compliance with its Operating Permit; and

      3.      Maintain the equipment and a trained workforce sufficient to ensure prompt,

           continuous and consistent compliance with the court's order;

D.      ORDER defendant to pay to the federal Treasury a civil penalty of $32,500 per day for

each of defendant's violations of the Clean Air Act. 40 U.S.C. § 7413(b); 28 U.S.C. § 2461, as

amended by 31 U.S.C. § 3701; 40 C.F.R. § 19.2. The penalties should be directed to finance

EPA air compliance and enforcement activities, as provided for by 42 U.S.C. § 7604(a) and 42

U.S.C. § 7604(g)(1);

E.    ORDER defendant to pay up to $100,000 for beneficial mitigation projects, as provided

for by 42 U.S.C. § 7604(g)(2), consistent with the purposes of the Clean Air Act;

F.    ORDER defendant to pay plaintiffs their costs of litigation, including but not limited to

reasonable attorney and expert witness fees, as authorized in Section 304 of the Act, 42 U.S.C.

§ 7604(d); and

G.    GRANT such other relief as the Court deems necessary and proper.

DATED this 23rd day of December, 2004.

BIODIVERSITY CONSERVATION ALLIANCE and
SIERRA CLUB, Plaintiffs


Reed Zars
Wyoming Bar No. 6-3224
Attorney at Law
910 Kearney Street
Laramie, WY 82070
307-745-7979
307-745-7999 (fax)

Attorney for Plaintiffs

Biodiversity Conservation Alliance
215 South Third Street, Suite 114
Laramie, WY 82070

Sierra Club
247 Coffeen Avenue
Sheridan, WY 82801

Sierra Club
85 Second Street
San Francisco, CA 94105.

## EXHIBIT TO PLAINTIFFS' COMPLAINT

Exhibit A:     October 22, 2004 notice letter from BCA and Sierra Club to Mountain Cement
               Company.

**Reed Zars**
Attorney at Law
910 Kearney St., Laramie, WY 82070
Office: 307/745-7979 Fax: 307/745-7999

October 22, 2004

**VIA CERTIFIED MAIL: RETURN RECEIPT REQUESTED**

Bruce Ballinger, President
Mike Meysing, Plant Manager
Mountain Cement Company
5 Sand Creek Road
Laramie, WY 82070

RE:     Sierra Club and Biodiversity Conservation Alliance Notice of Intent to Sue for
        Violations of the Clean Air Act at the Mountain Cement facility in Albany
        County, Wyoming.

Dear Mountain Cement:

        I am writing on behalf of Sierra Club and Biodiversity Conservation Alliance (BCA) to
notify you of their intent to file suit to address significant and ongoing violations of the Clean Air
Act at the Mountain Cement facility in Albany County, Wyoming.  The Mountain Cement
facility is a Portland cement plant with two kilns and associated smoke stacks, located
approximately two miles south of Laramie, Wyoming.

        Pursuant to the Clean Air Act, 42 U.S.C. § 7604(a)(1), and the operating permit for the
Mountain Cement facility, citizens are entitled to bring suit to enjoin violations of an emission
standard or limitation, including the new source performance standards (NSPS), and to seek civil
penalties for such violations.  The Clean Air Act provides for civil penalties of up to $32,500 for
each violation per day.  42 U.S.C. § 7413(e); 40 C.F.R. § 19.2; 40 U.S.C. § 7413(b); 28 U.S.C. §
2461, as amended by 31 U.S.C. § 3701; 69 Fed.Reg. 7121 (Feb. 13, 2004).  To the extent
required by § 7604(a)(1) of the Clean Air Act, and  Wyo. Stat. 35-11-904, we therefore are
writing to notify you that Sierra Club and BCA intend to file suit in the applicable federal district
court anytime 60 days after the postmark date of this letter to enjoin and penalize the violations
described below.

        Mountain Cement is responsible for the violations alleged in this letter as both operator
and owner of the Mountain Cement facility.

-1-

I.      **Background**

According to Mountain Cement's March 15, 2004 Operating Permit 31-098, the facility emits into the air of Albany County on an annual basis 382 tons of respirable particulate matter ($PM_{10}$), 2,886 tons of nitrogen oxides ($NO_x$), and 876 tons of sulfur dioxide ($SO_2$).

The annual $NO_x$ emissions from Mountain Cement are equivalent to the emissions of over 150,000 cars each driven 12,500 miles per year. (According to EPA, an average vehicle emits 38.2 pounds of $NO_x$ per year. Mountain Cement emits 5,772,000 pounds of $NO_x$ per year. Thus 5,772,000 ÷ 38.2 = 151,099.) http://www.epa.gov/otaq/consumer/f00013.htm.

According to Mountain Cement's 2002 toxic release inventory report, the facility also emits on an annual basis listed hazardous air pollutants, including 65,869 pounds of formaldehyde, 53,422 pounds of hydrochloric acid, 353 pounds of lead and 110 pounds of mercury.

The amount of mercury that Mountain Cement discharges into Laramie's airshed every year is equivalent to the mercury in approximately 71,000 household thermometers. (110 pounds X 453.5 grams/lb. = 49,885 grams ÷ 0.7 grams per thermometer = 71,264.) The amount of mercury in one household thermometer (0.7 g) is enough to contaminate all of the fish in a lake with a surface area of 15 acres. (According to Health Care Without Harm, www.noharm.org. )

II.     **The Violations**

Mountain Cement has violated, and continues to violate: **(1)** at Kiln #2 the 20percent opacity limit in condition (F3)(a) in Mountain Cement's Operating Permit No. 30-098, issued by the Wyoming Department of Environmental Quality (DEQ) on June 2, 1998 and the 20 percent opacity limit in condition (F3)(b) in Mountain Cement's Operating Permit No. 31-098, issued by DEQ on March 15, 2004; **(2)** the 29.30 lb/hr. particulate matter emission rate for Kiln #2 in condition (F5) of Mountain Cement's Operating Permit No. 30-098, and the 29.30 lb/hr. particulate matter emission rate for Kiln #2 in condition (F5)(a) of Mountain Cement's Operating Permit No. 31-098; **(3)** the 10 percent opacity limit for clinker coolers in condition (F7) in Mountain Cement's Operating Permit No. 30-098 and the same 10 percent opacity limit in condition (F12)(b) in Mountain Cement's Operating Permit No. 31-098.

A.      Violations of the 20 Percent Opacity Limit at Kiln #2.

Mountain Cement regularly violated at Kiln # 2 the 20 percent opacity limit in condition (F3)(a) of Permit No. 30-098 (1998), and has often violated and continues to violate that same limit in condition (F3)(b) in Permit No. 31-098 (2004). The evidence of each 20 percent opacity limit violation at Mountain Cement Kiln #2 for each day is set forth in Mountain Cement's Continuous Emissions Monitoring Reports that have been filed with DEQ on a quarterly basis. Each 6-minute average continuous opacity monitor reading in excess of 20 percent as described in each of Mountain Cement's quarterly reports that contain the opacity data from Mountain

Cement's continuous stack opacity monitors between October 1, 1999 to the date of this letter, constitutes a violation of the 20 percent limit for which you are liable to pay a civil penalty. Each opacity reading in excess of this limit after the date of this letter constitutes an additional violation for which you are also liable to pay a civil penalty.

The opacity violations include, but are not limited to, continuous opacity monitor readings in excess of 20 percent that Mountain Cement stated in its quarterly reports were caused by: (1) Kiln startup or shutdown, (2) raw mill startup or shutdown, (3) starting up auxiliary equipment, (4) erratic feed rate, (5) erratic fuel rate, (6) plugged system, (7) broken dust collector bag(s), (8) electrical malfunction in precipitator, (9) mechanical malfunction in precipitator, (10) lost auxiliary equipment, (11) lost spray tower exit temperature control, (12) working in/on process system, (13) working in/on pollution control equipment, (14) fan output ramping up or down, (15) process/ID fan malfunction or shutdown, (16) malfunction of sprays at spray tower, (17) process gas temperature out of optimum range, (18) electrical surge or outage or power bump, (19) unknown cause, (20) other cause, and (21) any other reason for which no exception to the limit exists. In any event, to the extent Mountain Cement has any federally-applicable defense to any reading in excess of 20 percent, it would be Mountain Cement's burden to prove.

### B. Violations of the particulate matter limit at Kiln #2.

Mountain Cement has violated on numerous occasions the 29.30 lb/hr. particulate matter emission limit for Kiln #2 in condition (F5) of Permit No. 30-098, and has violated and continues to violate on numerous occasions the same limit in condition (F5)(a) of Mountain Cement's Operating Permit No. 31-098.

The evidence of each hourly particulate matter emission limit violation at Mountain Cement Kiln #2 for each day is set forth in Mountain Cement's Continuous Emissions Monitoring Reports that have been filed with DEQ on a quarterly basis. Mountain Cement's compliance Assurance Monitoring plan establishes that when opacity exceeds 25 percent the emissions from the stack exceed the particulate matter emission rate of 29.30 lb./hr. Therefore each hourly period where the average opacity from the stack of Kiln #2 was in excess of 25 percent as shown by Mountain Cement's quarterly reports between October 1, 1999 to the date of this letter constitutes a violation of the particulate matter emission limit for which you are liable to pay a civil penalty. Each hour in excess of this limit after the date of this letter constitutes an additional violation for which you are also liable to pay a civil penalty. The particulate matter emission limit violations include all those events described in the discussion of opacity violations above.

### C. Violations of the 10 percent opacity limit at Clinker Coolers 1 & 2.

Mountain Cement regularly violated the 10 percent opacity limit for clinker coolers in condition (F7) in Permit No. 30-098, and has violated and continues to violate the same 10 percent opacity limit in condition (F12)(b) in Permit No. 31-098. The evidence of each 10 percent opacity limit violation at Mountain Cement Clinker Coolers 1 & 2 for each day is set

forth in Mountain Cement's quarterly Continuous Emissions Monitoring Reports. Each 6-minute average continuous opacity monitor reading in excess of 10 percent as described in each of Mountain Cement's quarterly reports that contain the opacity data from Mountain Cement's continuous stack opacity monitors between October 1, 1999 to the date of this letter, constitutes a violation of the 10 percent limit for which you are liable to pay a civil penalty. Each opacity reading in excess of this limit after the date of this letter constitutes an additional violation for which you are also liable to pay a civil penalty.

The opacity violations include, but are not limited to, continuous opacity monitor readings in excess of 10 percent that Mountain Cement stated in its quarterly reports were caused by: (1) Kiln startup or shutdown, (2) raw mill startup or shutdown, (3) starting up auxiliary equipment, (4) erratic feed rate, (5) erratic fuel rate, (6) plugged system, (7) broken dust collector bag(s), (8) electrical malfunction in precipitator, (9) mechanical malfunction in precipitator, (10) lost auxiliary equipment, (11) lost spray tower exit temperature control, (12) working in/on process system, (13) working in/on pollution control equipment, (14) fan output ramping up or down, (15) process/ID fan malfunction or shutdown, (16) malfunction of sprays at spray tower, (17) process gas temperature out of optimum range, (18) electrical surge or outage or power bump, (19) unknown cause, (20) other cause, and (21) any other reason for which no exception to the limit exists. In any event, to the extent Mountain Cement has any federally-applicable defense to any reading in excess of 20 percent, it would be Mountain Cement's burden to prove.

## III.    Offer to review information.

To the extent you have evidence that shows, contrary to the allegations in this letter, that Mountain Cement is in full compliance with all applicable requirements we urge you to provide it to us so that we may potentially avoid, or at least limit, litigation on these issues.

IV.    **Conclusion**

Mountain Cement is currently operating the Mountain Cement facility in violation of the Clean Air Act, the Wyoming SIP and applicable permits. Its civil penalty liability for past violations extends at least for the last five years.

The address of the Sierra Club in Wyoming is 247 Coffeen Avenue, Sheridan, WY 82801, and the national headquarters of Sierra Club is located at 85 Second Street, San Francisco, California 94105. The address of Biodiversity Conservation Alliance is P.O. Box 1512, Laramie, Wyoming 82073. Sierra Club and BCA have individual members who have been, and continue to be, injured by the excessive and unlawful emissions from the Mountain Cement facility. If you have any questions regarding the allegations in this notice, believe any of the foregoing information to be in error, wish to discuss the exchange of information consistent with the suggestion above, or would otherwise would like to discuss a settlement of this matter prior to the initiation of litigation, please contact the attorney below.

Yours sincerely,

Reed Zars

pc: by certified mail:

Michael O. Leavitt
Administrator
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, D.C.  20460

Robert Roberts
Regional Administrator
EPA Region 8
999 18th Street, Suite 300
Denver, CO 80202-2466

Governor Dave Freudenthal
Office of the Governor
State Capitol
200 West 24th Street
Cheyenne, WY  82002-0010

Dan Olson
Air Quality Division
Wyoming DEQ
122 West 25th Street
Cheyenne, WY  82002

Registered Agent
Mountain Cement
Prentice-Hall Corp.
Oration System, Inc.
1821 Logan Ave.
Cheyenne, WY 82001