Reed Zars (Wyo. Bar No. 6-3224)
Attorney at Law
910 Kearney Street
Laramie, Wyoming 82070
307-745-7979
307-745-7999 (FAX)

Attorney for Plaintiffs

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

MAR 3 1 2005
12:13 pm
Betty A. Griess, Clerk
Cheyenne

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

BIODIVERSITY CONSERVATION                 )
ALLIANCE and SIERRA CLUB,                 )
                                          )
      Plaintiffs,                         )
                                          )
v.                                        )     Case No.  04CV 361-B
                                          )
MOUNTAIN CEMENT COMPANY,                  )
                                          )
      Defendant.                          )

## PLAINTIFFS' COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM TO ESTABLISH PLAINTIFFS' STANDING

Plaintiffs Biodiversity Conservation Alliance and Sierra Club ("plaintiffs")

respectfully submit this motion, memorandum and accompanying exhibits in support of

their motion for partial summary judgment to establish their standing to bring this Clean

Air Act citizen suit enforcement action.

-1-

## I. INTRODUCTION

Plaintiffs' Clean Air Act citizen suit seeks an order that requires Mountain Cement Company ("Mountain Cement") to comply with its federally enforceable air pollution permit at its Laramie Cement Plant ("Laramie Plant") in southeastern Wyoming. In particular, plaintiffs' action seeks to enjoin and penalize Mountain Cement's practice of exceeding the pollution emission limits in its permit on thousands of occasions.

As demonstrated below, plaintiffs have standing to bring this action because: (1) their members have been and continue to be injured by pollution plumes, foul odors, brown haze, and health concerns due to pollutant emissions from the Laramie Plant, (2) these injuries are fairly traceable to the Laramie Plant's excessive pollutant emissions caused by the violations alleged in plaintiffs' complaint, and (3) if plaintiffs prevail their injuries will at least be partially redressed by an order requiring Mountain Cement to comply with its permit by reducing its pollutant emissions and by paying a civil penalty to the Federal Treasury. Accordingly, plaintiffs respectfully request the entry of partial summary judgment in their favor finding that they have standing to bring this air pollution enforcement action against Mountain Cement.

## II. FACTS

### Statement of Undisputed Material Facts

1.      Mountain Cement's Laramie Plant is located approximately three miles south of

Laramie, Wyoming. The Laramie Plant manufactures portland cement using two coal-fired kilns and associated equipment. Answer, ¶ 14.

2.     Mountain Cement's Kiln #1 has a rated production capacity of 600 tons of product per day. Kiln #2 has a rated production capacity of 1,500 tons of product per day. Answer, ¶ 15.

3.     Mountain Cement is a wholly-owned subsidiary of Eagle Materials, Inc., a Dallas, Texas based corporation. Eagle Materials, with over $500,000,000 in sales in 2004, also owns cement manufacturing plants in Nevada, Texas and Illinois. Answer, ¶ 12.

4.     Sierra Club member and Laramie resident resident Connie Wilbert regularly sees, and breathes, the pollution plume coming from the smokestacks of the Laramie Plant. Wilbert Decl. ¶ 4. **Exhibit A.** A picture of what the pollution plume from the Laramie Plant sometimes looks like is attached to Ms. Wilbert's declaration. Id., Attachment 1.

5.     According to Ms. Wilbert, "[t]he interest of Sierra Club in protecting and restoring the quality of our air is furthered by Sierra Club's lawsuit to stop Mountain Cement's pollution discharges that exceed the limits in its permit." Wilbert Decl. ¶ 2.

6.     Ms. Wilbert's recreational, health and aesthetic interests are injured by the impact of this pollution plume. According to Ms. Wilbert:

> I always notice the cement plant as I pass by it. From the car, I can see a visible plume coming from the stacks of the plant. The plume looks bad and smells bad, and when the breeze is blowing it across the highway, I always roll up the car windows so I don't have to breathe it in.

Wilbert Decl. ¶ 4. Ms. Wilbert reports that when she is riding her bicycle and she sees the

pollution coming from the Laramie Plant, she either gives up the ride or goes somewhere else

to avoid "breathing in the nasty smelling smoke." Wilbert Decl. ¶ 5.

7.      Ms. Wilbert is adversely affected by the visible pollution from the Laramie Plant.

According to Ms. Wilbert,

> [t]he smoke looks dirty, unpleasant and like something I don't want to be
> around, and certainly something I don't want to breathe. It's startling and
> depressing to see these layers of dirty pollution spreading into the otherwise
> clear blue skies of the Laramie valley.

Wilbert Decl. ¶ 7.

8.      Ms. Wilbert is also concerned about the health and environmental impacts of the

pollution from the Laramie Plant:

> It concerns me that my children may be breathing unhealthy pollutants when
> the wind drifts the plant's smoke plume across town or when we pass near the
> plant.

Wilbert Decl. ¶ 8. Ms Wilbert is also concerned about the effect of Mountain Cement's

"pollution fallout" on Hutton Lake and other lakes near Laramie that provide critical habitat

for migrating waterfowl and other wildlife." Wilbert Decl. ¶ 9.

9.      Bob Strayer is a Laramie resident and Board member of Biodiversity Conservation

Alliance ("BCA"). Mr. Strayer lives within three miles of the Laramie Plant.

10.     According to Mr. Strayer, "[O]ne of BCA's purposes is to protect natural ecological

systems in the Laramie valley and surrounding mountains. Air pollution can be harmful to

plants and animals, and to the members of BCA who wish to observe plants and animals.

Requiring Mountain Cement to reduce its emissions of air pollutants is consistent with the

purpose of BCA." Strayer Decl., ¶ 1, **Exhibit B.**

11.     Mr. Strayer is adversely affected by the pollution from the Laramie Plant.  According

to Mr. Strayer,

> I recreate along the Laramie River to view and enjoy wildlife, including birds
> and deer, often within sight of the plant.  During these times I often see a
> visible pollution plume coming from the stacks of Mountain Cement
> Company's cement plant, and at times smell a stench of pollution in the air.
> When the plume of pollution from Mountain Cement is blown directly to the
> greenbelt I avoid the area because of concerns over my health.

Strayer Decl. ¶ 2.

12.     Mr. Strayer corroborates the picture attached to Ms. Wilbert's declaration when he

states:

> The pollution from Mountain Cement Company's cement plant sometimes
> forms in brown clouds that then are streaked across the sky by the wind.  The
> color of these clouds of pollution can also be blackish.  On colder days, the
> pollution from the stacks is almost impossible not to notice.

Strayer Decl. ¶ 3.

13.     Mr. Strayer's health, recreational and aesthetic interests are injured by the pollution

that he knows comes from the Laramie Plant:

> The pollution plume from Mountain Cement is ugly and depressing to see and
> inhibits my outdoor activities.  The smell is obnoxious.  It concerns me to
> know that sometimes I am forced to breathe this pollution.  I do not enjoy these
> activities when having to see and/or smell this pollution.  I know the pollution
> is coming from Mountain Cement because of its distinct look and smell.  I
> have not observed any other similar source of pollution within the area.

Strayer Decl. ¶ 4.

14.    The pollution from Mountain Cement's Laramie Plant also injures Mr. Strayer's

enjoyment of areas outside of Laramie.  According to Mr. Strayer:

> The pollution from Mountain Cement also affects my enjoyment of the
> environment elsewhere in the Laramie area.  For instance, the wind sometimes
> blows pollution from Mountain Cement to the east over the Sherman
> Mountains.  I can often see a long, brown cloud of pollution coming from the
> cement plant and trailing all the way to the mountains.  I frequently hike in the
> Sherman Mountains, especially the Medicine Bow National Forest, but I avoid
> going to areas that are being polluted by the plume from Mountain Cement.

15.    Laramie resident Michele Barlow, a Sierra Club and BCA member, is adversely

affected by the pollution coming from the Laramie Plant.  According to Ms. Barlow:

> The visual pollution coming from the Mountain Cement plant is very troubling
> to me.  It degrades the tremendous beauty of the Laramie Valley and is an
> affront to the quality of our environment and the quality of the air that I
> breathe.

Barlow Decl., ¶ 4, **Exhibit C.**

16.    Ms. Barlow states that Mountain Cement's emissions of pollutants above permitted

levels "means there is more pollution in our air than necessary for legal and safe operations."

According to Ms. Barlow, "I am concerned that these higher-than-permitted concentrations of

pollutants pose an increased risk to my health."  Mountain Cement's discharge of hazardous

air pollutants such as formaldehyde, hydrochloric acid, lead and mercury are also "a

significant cause of concern to me."  Barlow Decl., ¶¶ 5-6.

17.    Ms. Barlow is familiar with the pollution from Mountain Cement's Laramie Plant

"because it has a very distinctive and unpleasant smell." According to Ms. Barlow, "[w]hen the pollution from Mountain Cement is visible in large plumes, I avoid running or bicycling within sight of the plant, because I worry about the effects on my otherwise good health." Barlow Decl., ¶¶ 3, 7.

18. Laramie resident and Sierra Club member Martha Martinez del Rio lives downwind of the Laramie Plant and has been concerned about its air pollution "for some time." According to Ms. Martinez del Rio:

> I am now even more concerned after learning that Mountain Cement is dumping pollution into our air in larger amounts than its permit allows. I see plumes of pollution coming from the stacks of the cement plant constantly, and I worry when we are directly downwind of the plant. The pollution is especially bad when the wind is coming from the south, which it often is. We are frequently outside and I am very concerned that the pollution from the Mountain Cement plant is harmful to our health.

Martinez del Rio Decl., ¶ 2, **Exhibit D**.

19. The visible pollution from the Laramie Plant diminishes Ms. Martinez del Rio's aesthetic appreciation of the area. "As helpful as it is to know which direction and how strong the wind is blowing by watching the smoke plumes, I am stressed when I see pollution coming from the Mountain Cement stacks. The stacks and plumes of pollution are an eyesore." Martinez del Rio Decl., ¶ 4.

20. Ms. Martinez del Rio is also concerned for the health of her family and the surrounding environment.

> I am gravely concerned that Mountain Cement's excessive discharge of these

pollutants immediately upwind of where I and my family live will adversely affect our health.

* * *

If the pollution from Mountain Cement is being blown directly in our direction I worry about what we are breathing and avoid going outside around the house or down to the Laramie River next to our home. I also worry that the water and all the plants and animals that are downwind of Mountain Cement's pollution are being harmed.

Martinez del Rio Decl., ¶¶ 3 & 5.

21.     In 2002 the Laramie Plant discharged into the air hazardous air pollutants, including 65,869 pounds of formaldehyde, 53,422 pounds of hydrochloric acid, 353 pounds of lead and 110 pounds of mercury.  Answer, ¶ 19.

22.     The Wyoming Department of Environmental Quality classifies formaldehyde, hydrochloric acid, lead and mercury as hazardous air pollutants.  WAQSR Chapter 5, Section 3(d)(ii)(A)(I).  Hazardous air pollutants are those "known to cause or may reasonably be anticipated to cause adverse health or adverse environmental effects." 42 U.S.C. § 7412(b). This includes adverse health effects from substances known or reasonably anticipated to be "carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic," and adverse environmental effects "whether through ambient concentrations, bioaccumulation, deposition, or otherwise." Id.

23.     Mountain Cement admits that the continuous opacity monitors (COMs) located in the smokestacks at the Laramie Plant monitor visible pollutants that can be seen by the naked eye

after the pollutants exit the stack. Mountain Cement also admits that the pollutants identified by the COMs at the Laramie Plant can contribute to a visible plume emanating from the smokestacks, and these pollutants can also contribute to a reduction in visibility in the area. Answer, ¶ 53.

24.     Mountain Cement admits that the data from the COM in the Kiln #2 smokestack show that emissions have exceeded 20 percent every calendar quarter over the last five years. Mountain Cement also admits that the opacity of emissions from Kiln #2 have exceeded 20 percent at Kiln #2 thousands of times in the last five years. During these times, Mountain Cement's COMs show opacity readings that exceed 20 percent over four times the limit, or that are over 80 percent opacity. Answer, ¶ 50.

25.     The judicial relief sought by plaintiffs, on behalf of their members, includes (1) an injunction requiring Mountain Cement to stop exceeding the pollution limits in its permit, (2) an assessment of civil penalties payable to the Federal Treasury for Mountain Cement's past and ongoing violations of the Clean Air Act, and (3) the payment of up to $100,000 for beneficial mitigation projects, as authorized by the Act. Complaint, Section V.

26.     When electrostatic precipitators similar to those at Mountain Cement's Kiln #2 were replaced by baghouses at the Hayden Station in Colorado the opacity of emissions was significantly reduced. 62 Fed. Reg. 2305, 2307 (January 16, 1997). **Exhibit E.**

27.     As a result of opacity violations at Kiln #1 Mountain Cement installed a baghouse at that kiln in 1996. Mountain Cement has not installed a baghouse on Kiln #2. **Exhibit F.**

## III. ARGUMENT

A. <u>Summary Judgment Standard.</u>

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Reynolds v. School Dis. No. 1, Denver, Colo.*, 59 F.3d 1523, 1531 (10th Cir. 1995); *Concrete Works, Inc. v. City and County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). Summary judgment is not a "disfavored procedural shortcut, but an integral part of the federal rules as a whole." *Celotex*, 477 U.S. at 317.

The party moving for summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact, by showing an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325. "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518. In meeting this burden, the nonmoving party cannot rest on allegations or denials of pleadings, but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

A plaintiff's standing to bring an environmental enforcement action may properly be decided at summary judgment. *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445 (10th Cir. 1996); *St. Bernard Citizens for Envt'l Quality, et al. v. Chalmette Refining, L.L.C.*, 2005 U.S. Dist. LEXIS 1605 at *26 (E.D. La. 2005); *New Mexico Cattle Growers Assoc. v.*

*United States Fish and Wildlife Serv.*, 1999 U.S. Dist. LEXIS 19096 (D.N.M. 1999); *Sierra Club v. Tri-State Generation & Transmission Assoc., Inc.*, 173 F.R.D. 275 (D. Colo. 1997); *Beartooth Alliance v. Crown Butte Mines*, 904 F. Supp. 1168, 1171 (D. Mont. 1995). This Court should grant plaintiffs' motion because it is undisputed that plaintiffs fulfill all of the factual elements of standing. Accordingly, plaintiffs are entitled to judgment on this issue as a matter of law.

B.    The Legal Requirements of Standing.

Plaintiffs have standing to bring this Clean Air Act enforcement action against Mountain Cement because their members have been directly injured by excessive pollutant discharges from the Laramie Plant, because such injuries are fairly traceable to such discharges, and because the injuries to plaintiffs' members will be redressed, at least in part, by the issuance of injunctive and civil penalty relief.[1] *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180, 120 S. Ct. 693, 704, 145 L. Ed. 2d 610, 627 (2000) (plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and

---

[1] Organizations such as Biodiversity Conservation Alliance and the Sierra Club have "standing to bring suit on behalf of [their] members when [their] members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization[s'] purpose[s], and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181, 120 S. Ct. at 704, 145 L. Ed.2d at 627, citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L.3d.2d 383 (1977). This enforcement action is consistent with the purposes of Sierra Club and BCA, and does not require the participation of individual members. Wilbert Decl. ¶ 2; Strayer Decl. ¶ 1. BCA and Sierra Club members have standing to bring this action in their own right, as shown below.

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is

fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision."). *See also,*

*Catron County Bd. of Comm'ns v. United States Fish and Wildlife Serv.*, 75 F.3d 1429, 1432

(10th Cir. 1996), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 112 S. Ct. 2130 119

L. Ed. 2d 351 (1992), and *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1450 (10th Cir. 1994).

Moreover, the citizen suit provision of the Clean Air Act provides that:

> any person may commence a civil action on his own behalf (1) against any
> person . . . who is alleged to have violated (if there is evidence that the alleged
> violation has been repeated) or to be in violation of (A) an emission standard
> or limitation under this Act.

42 U.S.C. § 7604(a). According to *Sierra Club v. Morton*, 405 U.S. 727, 734-35, 92 S. Ct.

1361, 1366, 31 L. Ed. 2d 636, 643 (1972), "all persons or associations of persons have an

interest sufficient to confer standing if they allege that they have been or will be harmed by

the challenged action."

C.      Plaintiffs have Standing to Bring this Action against Mountain Cement.

1.      **Plaintiffs' Members Have Been "Injured In Fact."**

It is well established that in the air pollution context, actual or potential harm to

health, aesthetic or recreational interests is sufficient to satisfy the injury-in-fact prong of the

standing analysis. For example, in an analogous air pollution case for opacity permit

violations, an allegation "that defendants' actions have impaired the ability of [plaintiff's]

members who live, work, and recreate in the Yampa Valley to breathe clean air and view natural scenery and wildlife" was sufficient to establish injury-in-fact. *Sierra Club v. Tri-State Generation and Transmission Assoc., Inc.*, 173 F.R.D. 275, 280 (D. Colo. 1997).

In *St. Bernard Citizens for Environmental Quality et al. v. Chalmette Refining, L.L.C.*, 2005 U.S. Dist. LEXIS 1605, *10-12 (E.D. La., 2005), the court held at summary judgment that obnoxious smells, health fears and pollution fallout from a nearby refinery were sufficient to establish injury-in-fact. According to the court in *St. Bernard*, "plaintiffs can demonstrate a cognizable injury by showing that they breathe and smell polluted air." *Id.* at *13.

In *Texans United for a Safe Economy v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000), the court held at summary judgment that breathing and smelling sulfurous fumes at home or while traveling was sufficient to establish injury. Likewise, in *L.E.A.D. Group of Berks v. Exide Corp.*, 1999 U.S. Dist. LEXIS 2672, *41-44 (E.D. Pa. 1999), complaints of "odors and visibility problems" caused by a lead smelting facility were sufficient at summary judgment to establish injury. *See also, Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S. Ct. 1361, 1366, 31 L. Ed. 2d 636, 643 (1972) (allegations of adverse affects to "scenery, natural and historic objects and wildlife" constitute cognizable injury); *Natural Resources Defense Council v. United States EPA*, 507 F.2d 905, 910 (9th Cir. 1974) (finding sufficient injury for standing if plaintiff is "compelled to breathe air less pure than that

mandated by the Clean Air Act").[2]

In determining whether injury has occurred in the environmental context, courts have relied on expressions of reasonable concern about the presence of pollution. For example, in *Laidlaw*, 528 U.S. at 181-85, 120 S. Ct. at 704-06, 145 L. Ed. 2d at 627-30, the Supreme Court found sufficient injury when one of plaintiff's members avoided visiting a river due to pollution concerns.

Numerous courts have followed the 'reasonable concern' standard articulated in *Laidlaw* to find that plaintiffs in environmental cases had established standing. The court in *Hall v. Norton* relied on *Laidlaw* in finding that the plaintiff had standing because he had curtailed his activities out of a reasonable concern that increased air pollution would adversely impact his health. 266 F.3d 969, 976 (9th Cir. 2001). Similarly a plaintiff was found to have met the injury requirement because its members were concerned about exposure to polluted air. *1000 Friends of Maryland v. Browner*, 265 F.3d 216, 225 (4th Cir.

---

[2] Neither the magnitude of the injury nor the nature of the injury is important in the determination of standing. An "identifiable trifle" is sufficient. In *Sierra Club v. Cedar Point Oil*, 73 F.3d 546, 557 (5th Cir. 1996), plaintiff brought an action for the illegal discharge of chemically-contaminated water into Galveston Bay. The court found standing existed because plaintiff's members used the Bay for recreational activities that were dependent on good water quality and they "expressed fear" that the contaminated discharges would impair their enjoyment of these activities. *See also Public Interest Research Group v. Powell Duffryn Terminals*, 913 F.2d 64, 71 (3rd Cir. 1990), *cert. denied*, 498 U.S. 1109 (1991) (standing established where plaintiff's member affirmed that he hiked and birdwatched several times a year in a park adjacent to a polluted waterway, was offended by the waterway's bad color and foul odor, and would birdwatch more and enjoy it more if the water were cleaner).

2001). *See also, Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149,

156 (4th Cir. 2000) (injury adequately established where plaintiff testified that his use of lake

was constrained by "fears of pollution from [the defendant's] permit exceedences"); *Sierra*

*Club v. United States E.P.A.*, 129 F.3d 137, 139 (D.C. Cir. 1997) (interest in being free from

increased auto emissions confers standing); *Cedar Point Oil*, 73 F.3d at 556 (plaintiffs had a

"direct stake in the outcome" because they feared defendant's pollution discharges would

impair their enjoyment of activities that depended on good water quality.).

As shown below, plaintiffs' members have suffered, and continue to suffer, numerous

air pollution related injuries sufficient to meet the injury-in-fact requirement.  These injuries

include (a) visibility, odor, aesthetic and recreational impacts, and (b) health-related concerns.

     a.    <u>Odor, Visibility and Recreational Injuries.</u>

As demonstrated in the factual section above, plaintiffs' members have suffered, and

continue to suffer, aesthetic and recreational injuries as a result of Mountain Cement's

pollution discharges from the Laramie Plant.

Unsightly, foul smelling pollutants coming from the Laramie Plant are a common

complaint.  So is the visible haze in the Laramie Valley that pollution from the Laramie Plant

causes.  That visible pollution is discharged from the stacks of the Laramie Plant, and that it

degrades the air quality in the Laramie area, is indisputably demonstrated by the declarations

attached hereto.  That this pollution injures the recreational and aesthetic interests of

plaintiffs' members is also indisputable.

-15-

Ms. Wilbert states that "[t]he plume looks bad and smells bad, and when the breeze is blowing it across the highway, I always roll up the car windows so I don't have to breathe it in." Wilbert Decl. ¶ 4. According to Mr. Strayer, "I recreate along the Laramie River to view and enjoy wildlife, including birds and deer, often within sight of the plant. During these times I often see a visible pollution plume coming from the stacks of Mountain Cement Company's cement plant, and at times smell a stench of pollution in the air." Strayer Decl. ¶ 2. Ms. Barlow also complains that the "visual pollution coming from the Mountain Cement plant is very troubling to me. It degrades the tremendous beauty of the Laramie Valley and is an affront to the quality of our environment and the quality of the air that I breathe." Barlow Decl., ¶ 4. Ms. Martinez del Rio agrees: "As helpful as it is to know which direction and how strong the wind is blowing by watching the smoke plumes, I am stressed when I see pollution coming from the Mountain Cement stacks. The stacks and plumes of pollution are an eyesore." Martinez del Rio Decl., ¶ 4.

Without question, both Sierra Club and BCA members are being injured by visible pollution coming from the Laramie Plant, and visible haze and pollution in the sky near the plant. Impaired visibility, unnatural sky colors and a reduction in view all diminish these members' aesthetic appreciation of the landscape and constitute "injury-in-fact" sufficient to establish standing. *Sierra Club v. Tri-State Generation and Transmission Assoc., Inc.*, 173 F.R.D. 275, 280 (D. Colo. 1997). Additionally, plaintiffs' members also report that they dislike the smell of the pollution from the Laramie Plant, and have curtailed their recreational

-16-

activities in an attempt to minimize the health risks and discomfort when forced to breathe

pollution coming from the plant.  These plaintiffs also have demonstrated injury-in-fact

sufficient to establish the first prong of the standing inquiry.  *Texans United for a Safe*

*Economy v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792-93 (5th Cir. 2000).

     b.  Health-Related Concerns.

    Plaintiffs' members also are reasonably concerned about the impacts of the Laramie

Plant on the health of their families and to themselves.[3]  For example, Ms. Martinez del Rio

states that she is "gravely concerned that Mountain Cement's excessive discharge of these

pollutants immediately upwind of where I and my family live will adversely affect our

health."  Martinez del Rio Decl., ¶ 3.

    According to Ms. Barlow, "I am concerned that these higher-than-permitted

concentrations of pollutants [from Mountain Cement] pose an increased risk to my health."

She also states that the emission of hazardous air pollutants such as formaldehyde,

hydrochloric acid, lead and mercury are "a significant cause of concern to me."  Barlow Decl.,

¶¶ 5-6.  Mr. Strayer also finds that the "pollution plume from Mountain Cement is ugly and

depressing to see and inhibits my outdoor activities.  The smell is obnoxious.  It concerns me

to know that sometimes I am forced to breathe this pollution."  Strayer Decl. ¶ 4.

---

    [3] This is not an action for personal injury or damages.  Plaintiffs' members'
health-related concerns due to pollution from the Laramie Plant are presented to the
Court here to show plaintiffs have standing to enforce the emission limits in Mountain
Cement's permit.

Finally, Ms. Wilbert is also concerned "that my children may be breathing unhealthy pollutants when the wind drifts the plant's smoke plume across town or when we pass near the plant." Wilbert Decl. ¶ 8.

Plaintiffs members' health related concerns are reasonable. The pollutants emitted by Mountain Cement include highly toxic chemicals that are harmful to human health. Portland Cement plants are subject to more stringent emission limits precisely because they emit significant quantities of hazardous air pollutants. According to EPA,

> Some of the hazardous air pollutants (HAPS) released from Portland cement manufacturing facilities include, but are not limited to, acetaldehyde, arsenic, benzene, cadmium, chromium, chlorobenzene, dibenzofurans, formaldehyde, hexane, hydrogen chloride, lead, manganese, mercury, naphthalene, nickel, phenol, polycyclic organic matter, selenium, styrene, 2,3,7,8-tetrachlorodibenzo-p-dioxin, toluene, and xylenes. Exposure to these HAPS can cause reversible or irreversible health effects including carcinogenic, respiratory, nervous system, developmental, reproductive and/or dermal health effects.

Final National Emission Standards for Hazardous Air Pollutants from Portland Cement Plants, 64 Fed. Reg. 31,898 (June 14, 1999). Particulate matter that is discharged by Mountain Cement, and that is regulated by the opacity limits plaintiffs allege are being violated in this case, is associated with:

> premature mortality, aggravation of respiratory and cardiovascular disease (as indicated by increased hospital admissions and emergency room visits, school absences, work loss days, and restricted activity days), changes in lung function and increased respiratory symptoms, changes to lung tissues and structure, and altered respiratory defense mechanisms.

National Ambient Air Quality Standards, 62 Fed. Reg. 38,651, 38,656 (July 18, 1997). *See*

-18-

*also*, Proposed National Emission Standards for Hazardous Air Pollutants from Portland Cement Plants, 63 Fed. Reg. 14,182, 14,185 (March 24, 1998).

EPA has also found that "sensitive subpopulations . . . appear to be at greater risk to such effects, specifically individuals with respiratory disease and cardiovascular disease and the elderly (premature mortality and hospitalization), children (increased respiratory symptoms and decreased lung function), and asthmatic children and adults (aggravation of symptoms)." *Id. See also, American Trucking Associations Inc., et al. v. Environmental Protection Agency*, 283 F.3d 355, 359 (D.C. Cir. 2002).

Plaintiffs' health-related concerns, in light of their direct exposure to harmful pollutants emitted by the Laramie Plant, are therefore also sufficient to establish injury-in-fact. *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. at 181-85, 120 S. Ct. at 704-06, 145 L. Ed. 2d at 627-30 (2000).

Plaintiffs here have established the injury-in-fact requirement for purposes of standing. Plaintiffs' members have suffered aesthetic and recreation-related injuries as a result of air pollution emissions from the Laramie Plant. Plaintiffs' members also have reasonable health-related concerns regarding such emissions.

2. **The Injuries to Plaintiffs' Members are "Fairly Traceable" To Pollution From the Laramie Plant.**

There is also no question but that the injuries to plaintiffs' members are fairly traceable to the pollutants from the Laramie Plant that are the subject of plaintiffs' action.

*Laidlaw*, 528 U.S. 167, 180, 120 S. Ct. 693, 704, 145 L. Ed. 2d 610, 627 (2000). In fact,

plaintiffs have demonstrated not just that their injuries are <u>fairly</u> traceable to the pollution

from the Laramie Plant, but also that their injuries are <u>directly</u> traceable to the plant. Here,

plaintiffs' members regularly see and smell an ugly plume of pollution being discharged

directly from the stacks of the Laramie Plant. **Exhibit A**, Wilbert Decl. ¶ 4, and Attachment 1

thereto; **Exhibit B**, Strayer Decl. ¶¶ 2, 4-5; **Exhibit C**, Barlow Decl. ¶¶ 3-4; **Exhibit D**,

Martinez del Rio Decl., ¶¶ 3-4. Plaintiffs' members also find that the haze caused by the

pollutants coming from the Laramie Plant negatively affect their aesthetic and recreational

appreciation of the area. **Exhibit A**, Wilbert Decl. ¶ 4-7, 9; **Exhibit B**, Strayer Decl. ¶¶ 2, 4-

6; **Exhibit C**, Barlow Decl. ¶¶ 3-4, 7; **Exhibit D**, Martinez del Rio Decl., ¶¶ 2-4.

In *Texans United for a Safe Economy v. Crown Cent. Petroleum Corp.*, 207 F.3d 789,

792-93 (5th Cir. 2000), a citizen suit under the Clean Air Act, "direct observations of smoke"

and exposure to sulfurous odors was sufficient to link the defendant's challenged air pollutant

emissions with the plaintiff's injuries. The linkage in *Texans United*, however, did not need

to be exact. "No relevant case law supports Crown's argument that Texans United must

connect the exact time of their injuries with the exact time of an alleged violation by Crown."

*Id.* at 793. In the Clean Air Act case of *Sierra Club v. Tri-State Generation and Transmission*

*Assoc., Inc.*, 173 F.R.D. 275, 280 (D. Colo. 1997), the court likewise held that causation was

established if it is shown that air pollution "emissions impair [plaintiff's] members' ability to

breathe clean air and view natural scenery and wildlife."

In other words, to establish the "fairly traceable" element of standing, plaintiffs here need only show that the challenged pollutants discharged from Mountain Cement's Laramie Plant cause or contribute to the types of injuries alleged by plaintiffs' members. As the Court noted in *Laidlaw*:

> We see nothing "improbable" about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms.

528 U.S. at 184-5, 120 S. Ct. at 706, 145 L. Ed. 2d at 629. *See also Sierra Club v. Cedar Point Oil*, 73 F.3d 546, 558 (5th Cir. 1996) ("Given the number of entities discharging chemicals into Galveston Bay, it would be virtually impossible for any of plaintiff's members to trace his injuries to [defendant's] discharge in particular. Rather, it is sufficient for plaintiffs to show that [defendant's] discharge of produced water <u>contributes</u> to the pollution that impairs [plaintiff's] use of the bay.").

Similarly, the court in *Powell Duffryn Terminals*, 913 F.2d at 72, held that: "the 'fairly traceable' requirement . . . is not equivalent to a requirement of tort causation." Accordingly, the plaintiffs in that case had standing by showing that "a defendant has 1) discharged some pollutant in concentrations greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs." *See also Natural Resources Defense Council v. Texaco, Inc.*, 800 F. Supp. at 9 (to meet the traceability

test, a plaintiff does not need to show that defendant's "unlawful discharges specifically caused or contributed to the particular pollution" observed by plaintiffs).

Mountain Cement admits that "the pollutants identified by the COMs at the Laramie Plant can contribute to a visible plume emanating from the smokestacks, and these pollutants can also contribute to a reduction in visibility in the area." Answer, ¶ 53. Accordingly, because the plume and haze-related injuries suffered by plaintiffs' members are directly traceable to Mountain Cement's pollutant discharges and are of the type related to excess opacity violations, they are therefore sufficient to establish the causation element of standing.

**3.     The Relief Sought By Plaintiffs Will Redress the Injuries to Their Members.**

A decision in their favor will redress, at least in part, plaintiffs' members' injuries. Therefore, plaintiffs meet the redressability element of standing.

Plaintiffs' complaint seeks declaratory, injunctive, and civil penalty relief to prevent future opacity and PSD permit violations at the Laramie Plant. Preventing excess pollutant discharges will certainly redress, at least in part, plaintiffs' injuries, thereby meeting the redressability element of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Catron County Bd. of Comm'ns v. United States Fish and Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996); *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996). Unlike the "fairly traceable" requirement, which addresses the connection between the plaintiff's injury and the defendant's conduct, redressability focuses on the

connection between the plaintiff's injury and the judicial relief sought. *Public Interest Research Group v. Powell Duffryn Terminals*, 913 F.2d 64, 73 (3d Cir. 1990).

An injunction to halt excess emissions will, at least in part, redress plaintiffs' injuries. *See Texans United for a Safe Economy v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792-94 (5th Cir. 2000) (an injunction to stop excessive emissions of sulfur dioxide, causing odor and visibility impairment provides some redress). In another case where similar opacity violations were alleged, the court found that "it necessarily follows that a reduction in the emissions would reduce the impairments plaintiff's members allegedly suffer. As a decision favorable to plaintiff would redress its alleged injury, plaintiff has satisfied the redressability requirement." *Sierra Club v. Tri-State*, 173 F.R.D. at 281.

The elimination of all pollution is not necessary to satisfy the redressability prong on the standing inquiry. As noted in the water pollution case of *Natural Resources Defense Council v. Texaco*:

> Where [] plaintiffs complain of harm to the waters in which they have cognizable interest, an injunction barring further permit violations will at least partially redress their injury. . . . Plaintiffs need not show the waterway will be restored to pristine condition in order to satisfy the minimal requirements of Article III.

800 F. Supp. 1, 11 (D. Del. 1992), *rev'd in part on other grounds in Natural Resources Defense Council v. Texaco Ref. & Mktg.*, 2 F.3d 493 (3d Cir. 1993). To meet the redressability requirement, a plaintiff "must only show that the injunctive relief required would 'decrease' pollution," not that it would return a polluted system to "pristine condition."

*Center for Biological Diversity v. Abraham*, 218 F. Supp. 2d 1143, 1156 (N.D. Cal. 2002).

Thus, although an injunction requiring Mountain Cement to comply with its opacity limits

may not remove all air pollution related problems in the Laramie Valley, it will redress the

Laramie Plant's opacity-related contribution to those problems.

      Where coal-burning facilities like the Laramie Plant have been retrofitted with modern

pollution control equipment to correct opacity violations, significant air quality benefits have

resulted.  To resolve excessive opacity emissions at the Hayden Station in Colorado, for

example, a consent decree and an associated state implementation plan revision required the

owners to install fabric filter dust collectors (known as a baghouses or FFDCs) on each unit.[4]

This control strategy significantly reduced visible emissions.  62 Fed. Reg. 2305, 2307

(January 16, 1997), **Exhibit E**.  EPA and the state of Colorado formally concluded that

Hayden Station's opacity and sulfur dioxide reductions were sufficient to resolve that facility's

contribution to local and regional air pollution.  *Id.*

      Furthermore, plaintiffs' request for civil penalties will redress its members' injuries by

providing a specific deterrent to Mountain Cement, and a general deterrent to others to abide

by established air pollution control requirements.  According to the Supreme Court,

> It can scarcely be doubted that, for a plaintiff who is injured or faces the threat
> of future injury due to illegal conduct ongoing at the time of suit, a sanction
> that effectively abates the conduct and prevents its recurrence provides a form
> of redress.  Civil penalties can fit that description.

---

    [4] Mountain Cement has only installed baghouse controls on Kiln #1, not Kiln #2.
Plaintiffs do not allege opacity violations at Kiln #1.

-24-

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185-86, 120 S. Ct. 693, 707, 145 L. Ed. 2d 610, 630 (2000). *See also National Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002). In other words, "the judicial relief of civil penalties, even if payable only to . . . the Treasury, is causally connected to a citizen-plaintiff's injury. Such penalties can be an important deterrence against future violations." *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1113 (4th Cir. 1988). *See also Powell Duffryn Terminals*, 913 F.2d at 73 ("Penalties will deter both [defendant] specifically and other NPDES permit holders generally. Thus [plaintiffs'] members' injuries may be redressed by a favorable decision . . .").

An assessment of civil penalties in a Clean Air Act citizen suit can directly redress the injuries of plaintiffs' members because up to $100,000 of any penalty may be used to fund "beneficial mitigation projects" in the impacted area where plaintiffs' members live and breathe. 42 U.S.C. § 7604(g)(1) and (2).

## V. CONCLUSION

There is no dispute of material fact that BCA and Sierra Club members have been and continue to be injured by Mountain Cement's excess emissions of air pollutants at the Laramie Plant, that those injuries are fairly traceable to the challenged pollutant discharges from the Laramie Plant, and that such injuries will be redressed, at least in part, by the issuance of an injunction and the assessment of a civil penalty, partial summary judgment should be granted to plaintiffs on the issue of standing.

DATED this *30TH* day of March, 2005.

Respectfully submitted,

BIODIVERSITY CONSERVATION ALLIANCE
and SIERRA CLUB, Plaintiffs

*Reed Zars*

Reed Zars
Attorney at Law
910 Kearney St.
Laramie, WY 82070
307-745-7979
307-745-7999 (fax)

**Exhibits to Plaintiffs' Combined Motion and Memorandum
For Partial Summary Judgment
To Establish Plaintiffs' Standing**

Exhibit A:    Declaration of Connie Wilbert

Exhibit B:    Declaration of Bob Strayer

Exhibit C:    Declaration of Michele Barlow

Exhibit D:    Declaration of Martha Martinez del Rio

Exhibit E:    62 Fed. Reg. 2305, 2307 (January 16, 1997)

Exhbit F:    Mountain Cement permit excerpt.

-26-

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 30th day of March 2005, I caused to be hand delivered to Mr. Nicholas, and mailed to Mr. Harris and the Court, a copy of Plaintiffs' Combined Motion for Partial Summary Judgment and Supporting Memorandum to Establish Plaintiffs' Standing, and Plaintiffs' Proposed Findings of Fact and Conclusions of Law regarding such motion, at the following addresses:

Clerk's Office
U.S. District Court
2120 Capitol Avenue
Cheyenne, WY 82001

Philip Nicholas
Anthony, Nicholas et al.
170 N. 5th Street
P.O. Box 0928
Laramie, WY 82073

James Harris
Thompson & Knight, LLP
1700 Pacific, Suite 3300
Dallas, TX 75201

Reed Zars

-27-

# EXHIBIT A

To Plaintiffs' Combined Motion for Partial Summary Judgment
and Supporting Memorandum to Establish Plaintiffs' Standing

*Biodiversity Conservation Alliance and Sierra Club v. Mountain Cement Co.*,
Case No. 04CV 361-B.

### Declaration of Connie J. Wilbert

I, Connie J. Wilbert, declare that the following statements are true and correct to the best of my knowledge, and that they are based on my personal experience.

1.  I have been a member of the Sierra Club since 1981. I live in Laramie, Wyoming, about two and one-half miles northeast of Mountain Cement Company's cement plant. My husband and I have two young children.

2.  The Sierra Club has a strong interest in protecting the quality of our air for this and future generations. The interest of Sierra Club in protecting and restoring the quality of our air is furthered by Sierra Club's lawsuit to stop Mountain Cement's pollution discharges that exceed the limits in its permit.

3.  I frequently travel by the cement plant. In the spring and summer, I like to visit a local garden center (Windmill Hill Greenhouse) located just across Fort Sanders Road from the plant, and throughout the year I periodically drive south on U.S. Hwy. 287 to visit Colorado or other southern destinations. I like to ride my bicycle for exercise, and I sometimes ride on a loop that goes south on Fort Sanders Road right by the cement plant, across U.S. Hwy. 287 on Howe Road, and back to town on the Soldier Springs Road.

4.  I always notice the cement plant as I pass by it. From the car, I can see a visible plume coming from the stacks of the plant. The plume looks bad and smells bad, and when the breeze is blowing it across the highway, I always roll up the car windows so I don't have to breathe it in. I am attaching a picture that shows what the pollution plume from the cement plant sometimes looks like. Attachment 1.

5.  If I'm starting on a bike ride and I see that the pollution from the plant is drifting east across my route, sometimes I give up riding in that direction and either postpone my ride or go somewhere else. I don't like having to give up this bike route, because it's one of my favorite rides around Laramie, but I dislike biking through and breathing in the nasty-smelling smoke from the cement plant even more.

6.  When I've been at the garden center, there have been times when the smell from the cement plant was so unpleasant that I've had to stop shopping and leave. This is frustrating, because Windmill Hill is the only locally-owned garden center in Laramie and I like to shop there. But I don't like to shop there when the air smells so bad, and such tangible evidence of polluted air spoils my pleasure in gardening.

7.  I often notice the pollution plume from Mountain Cement's plant as I drive into town. The smoke looks dirty, unpleasant and like something I don't want to be around, and certainly something I don't want to breathe. It's startling and depressing to see these layers of dirty pollution spreading into the otherwise clear blue skies of the Laramie valley. On cold days, the pollution cloud often accumulates and hugs the ground.

8.     It's pretty common for the wind to blow from Mountain Cement across Laramie, and the smell from the plant is detectable in town sometimes. It concerns me that my children may be breathing unhealthy pollutants when the wind drifts the plant's smoke plume across town or when we pass near the plant.

9.     My family and I often visit the Hutton Lake National Wildlife Refuge south of the cement plant, to view migrating birds and other wildlife. The only route to the Wildlife Refuge from town is by way of Sand Creek Road, which we reach by driving right by the cement plant. We always notice and sometimes smell the pollution coming from the stacks. We make a point of rolling up the car windows when we're in the smell zone, so we don't have to breathe or smell the smoke from the plant. It does reduce our pleasure in visiting the Wildlife Refuge when we have to pass by such visible and smelly pollution to get there. I also wonder what affect the pollution fallout from the cement plant is having on Hutton Lake and other lakes near Laramie that provide critical habitat for migrating waterfowl and other wildlife.

10.    My family has chosen to live in Laramie in part because of the quality of life here. We love the wide-open spaces, clean air and clear blue skies of our valley. We want it to be a healthy place to bring up our children. The pollution coming from Mountain Cement diminishes the beauty of the Laramie Valley, and I am concerned that it is also diminishing the health of all of us who live in the valley.

I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information and belief.

*Connie J. Wilhelm*

Dated: _3/1/05_

ATTACHMENT 1 TO WILBERT DECLARATION



# EXHIBIT B

To Plaintiffs' Combined Motion for Partial Summary Judgment
and Supporting Memorandum to Establish Plaintiffs' Standing

*Biodiversity Conservation Alliance and Sierra Club v. Mountain Cement Co.,*
Case No. 04CV 361-B.

Declaration of Bob Strayer

I, Bob Strayer, declare that the following statements are true and correct to the best of my knowledge, information and belief, and are based on my personal knowledge.

1.     I am a member of the Board of Biodiversity Conservation Alliance ("BCA"). One of BCA's purposes is to protect natural ecological systems in the Laramie valley and surrounding mountains. Air pollution can be harmful to plants and animals, and to the members of BCA who wish to observe plants and animals. Requiring Mountain Cement to reduce its emissions of air pollutants is consistent with the purpose of BCA.

2.     I am a resident of Laramie, Wyoming, an outdoorsman, and an amateur nature photographer. I live not more than 3 miles north of Mountain Cement Company's cement plant south of Laramie. I frequently travel by and observe the Mountain Cement Company's plant on my way to a cabin I own south of Laramie. I recreate along the Laramie River to view and enjoy wildlife, including birds and deer, often within sight of the plant. During these times I often see a visible pollution plume coming from the stacks of Mountain Cement Company's cement plant, and at times smell a stench of pollution in the air. When the plume of pollution from Mountain Cement is blown directly to the greenbelt I avoid the area because of concerns over my health.

3.     The pollution from Mountain Cement Company's cement plant sometimes forms in brown clouds that then are streaked across the sky by the wind. The color of these clouds of pollution can also be blackish. On colder days, the pollution from the stacks is almost impossible not to notice.

4.     The pollution plume from Mountain Cement is ugly and depressing to see and inhibits my outdoor activities. The smell is obnoxious. It concerns me to know that sometimes I am forced to breathe this pollution. I do not enjoy these activities when having to see and/or smell this pollution. I know the pollution is coming from Mountain Cement because of its distinct look and smell. I have not observed any other similar source of pollution within the area.

5.     The pollution from Mountain Cement also affects my enjoyment of the environment elsewhere in the Laramie area. For instance, the wind sometimes blows pollution from Mountain Cement to the east over the Sherman Mountains. I can often see a long, brown cloud of pollution coming from the cement plant and trailing all the way to the mountains. I frequently hike in the Sherman Mountains, especially the Medicine Bow National Forest, but I avoid going to areas that are being polluted by the plume from Mountain Cement. I am also concerned that the pollution from Mountain Cement may be harming people and wildlife.

6.      As a resident of Laramie, it also concerns me that I have observed pollution sometimes being blown over my community by winds coming from the south. The quality of the air in the City of Laramie is very important to me and is one reason I have chosen to reside here. I do not desire to live in an area with this kind of industrial pollution. With pollution from Mountain Cement being blown directly over Laramie, the quality of my life is being degraded.


        I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


Dated: 3-2-05                          _Bob Strayer_
                                       Bob Strayer

# EXHIBIT C

To Plaintiffs' Combined Motion for Partial Summary Judgment
and Supporting Memorandum to Establish Plaintiffs' Standing

*Biodiversity Conservation Alliance and Sierra Club v. Mountain Cement Co.*,
Case No. 04CV 361-B.

## DECLARATION OF MICHELE BARLOW

I, Michele Barlow, declare that the following statements are true and correct to the best of my knowledge.

1.     I am a resident of Laramie, Wyoming, and a member of the Sierra Club and Biodiversity Conservation Alliance (BCA). I have been a member of the Sierra Club since 1999 and a member of BCA (formerly Biodiversity Associates) since 2002.

2.     The Sierra Club and BCA represent my interest in a healthy environment in the Laramie area, including my interest in clean air.

3.     I am shocked by the large volume of air pollution emitted by the Mountain Cement plant immediately south of Laramie. During my daily morning jogs, I usually see an ugly plume of pollution from Mountain Cement that snakes across sky. When I am riding my bicycle downwind from Mountain Cement plant, I am forced to breathe its noxious pollution. I know the pollution comes from Mountain Cement because it has a very distinctive and unpleasant smell.

4.     The visual pollution coming from the Mountain Cement plant is very troubling to me. It degrades the tremendous beauty of the Laramie Valley and is an affront to the quality of our environment and the quality of the air that I breathe.

5.     Mountain Cement's violations of the pollution limits in its permit means there is more pollution in our air than necessary for legal and safe operations. I am concerned that these higher-than-permitted concentrations of pollutants pose an increased risk to my health.

6.     I also know that Mountain Cement emits hazardous air pollutants such as formaldehyde, hydrochloric acid, lead and mercury. According to EPA, hazardous air pollutants are those pollutants that cause or may cause cancer or other serious health effects, such as reproductive effects or birth defects, or adverse environmental and ecological effects. Mountain Cement's excessive discharge of these pollutants immediately upwind of where I live and work is a significant cause of concern to me.

7.     When the pollution from Mountain Cement is visible in large plumes, I avoid running or bicycling within sight of the plant, because I worry about the effects on my otherwise good health.

Signed under the penalties of perjury,

_____Jan. 23, 2005_____
Date

_Michele Barlow_
Michele Barlow

1

# EXHIBIT D

To Plaintiffs' Combined Motion for Partial Summary Judgment
and Supporting Memorandum to Establish Plaintiffs' Standing

*Biodiversity Conservation Alliance and Sierra Club v. Mountain Cement Co.,*
Case No. 04CV 361-B.

## Declaration of Martha Martinez del Rio

I, Martha Martinez del Rio, declare that the following statements are true and correct to the best of my knowledge.

1.   I live with my family in southwest Laramie, Wyoming.  My husband and I have two young children.  Our home is about 2 miles to the north of the Mountain Cement plant.  I am a member of the Sierra Club, and I support its efforts to protect the quality of our air.

2.   I have been concerned about the air pollution coming from the Mountain Cement plant for some time.  I am now even more concerned after learning that Mountain Cement is dumping pollution into our air in larger amounts than its permit allows. I see plumes of pollution coming from the stacks of the cement plant constantly, and I worry when we are directly downwind of the plant.  The pollution is especially bad when the wind is coming from the south, which it often is.  We are frequently outside and I am very concerned that the pollution from the Mountain Cement plant is harmful to our health.

3.   I also know that Mountain Cement emits hazardous air pollutants.  These pollutants, including formaldehyde, hydrochloric acid and lead, are known to cause significant health problems.  I am gravely concerned that Mountain Cement's excessive discharge of these pollutants immediately upwind of where I and my family live will adversely affect our health.

4.   As helpful as it is to know which direction and how strong the wind is blowing by watching the smoke plumes, I am stressed when I see pollution coming from the Mountain Cement stacks. The stacks and plumes of pollution are an eyesore.

5.   If the pollution from Mountain Cement is being blown directly in our direction I worry about what we are breathing and avoid going outside around the house or down to the Laramie River next to our home.  I also worry that the water and all the plants and animals that are downwind of Mountain Cement's pollution are being harmed.

Signed under the penalties of perjury,

_____
Date

_____
Martha Martinez del Rio

# EXHIBIT E

To Plaintiffs' Combined Motion for Partial Summary Judgment
and Supporting Memorandum to Establish Plaintiffs' Standing

*Biodiversity Conservation Alliance and Sierra Club v. Mountain Cement Co.,*
Case No. 04CV 361-B.

section 150 (b)(3), (b)(4), or (b)(5) to apply to an issue, the bonds of the issue allocable to that portion under section 150(c)(3) are the same as the nonqualified bonds determined for purposes of §§ 1.142–1, 1.144–1, and 1.145–1, except that bonds allocable to all common areas are also allocated to that portion.

(2) *Special rule when remedial action is taken.* If an issuer takes a remedial action with respect to an issue of private activity bonds under §§ 1.142–2, 1.144–2, or 1.145–2, the bonds of the issue allocable to a portion of property are the same as the nonqualified bonds determined for purposes of those sections.

(d) *Effective dates.* For effective dates of this section, see § 1.141–16.

## PART 602—OMB CONTROL NUMBERS UNDER THE PAPERWORK REDUCTION ACT

Par. 14. The authority citation for part 602 continues to read as follows:

Authority: 26 U.S.C. 7805.

Par. 15. In § 602.101, paragraph (c) is amended by adding entries in numerical order to the table to read as follows:

### § 602.101  OMB Control numbers.

\* \* \* \* \*

(c) \* \* \*

| CFR part or section where identified and described | Current OMB control No. |
|---|---|
| \* \* \* \* \* | |
| 1.141–1 ............................... | 1545–1451 |
| 1.141–12 ............................. | 1545–1451 |
| 1.142–2 ............................... | 1545–1451 |
| \* \* \* \* \* | |
| 1.148–6 ............................... | 1545–1451 |
| \* \* \* \* \* | |

Margaret Milner Richardson,
*Commissioner of Internal Revenue.*
Approved: December 30, 1996.
Donald C. Lubick,
*Acting Assistant Secretary of the Treasury.*
[FR Doc. 97–710 Filed 1–10–97; 8:45 am]
BILLING CODE 4830–01–U

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[CO–001–0007; FRL–5669–5]

### Clean Air Act Approval and Promulgation of Air Quality Implementation Plan Revision for Colorado; Long-Term Strategy of State Implementation Plan for Class I Visibility Protection, Part I: Hayden Station Requirements

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** EPA is approving a revision to the long-term strategy portion of Colorado's State Implementation Plan (SIP) for Class I Visibility Protection, contained in Section VI of the document entitled "Long-Term Strategy Review and Revision of Colorado's State Implementation Plan for Class I Visibility Protection, Part I: Hayden Station Requirements," as submitted by the Governor with a letter dated August 23, 1996. The revision incorporates into the SIP, among other things, emissions reduction requirements for the Hayden Station (a coal-fired steam generating plant located near the town of Hayden, Colorado) that are based on a consent decree addressing numerous air pollution violations at the plant. The SIP revision is expected to remedy Hayden Station's contribution to visibility impairment in the Mt. Zirkel Wilderness Area and, therefore, make reasonable progress toward the Clean Air Act National visibility goal with respect to such contribution. On October 3, 1996, EPA published a notice of proposed rulemaking that proposed to approve this SIP revision and provided a thirty-day period for public comment. EPA received one set of generally supportive comments regarding the proposed revision, and is therefore finalizing the proposal without modification.

**EFFECTIVE DATE:** This action is effective February 18, 1997.

**ADDRESSES:** Copies of the State's submittal and other information are available for inspection during normal business hours at the following locations: Air Program, Environmental Protection Agency, Region VIII, 999 18th Street, Suite 500, Denver, Colorado 80202–2405; Colorado Department of Public Health and Environment, Air Pollution Control Division, 4300 Cherry Creek Drive South, Denver, Colorado 80222–1530; and The Air and Radiation Docket and Information Center, 401 M Street, SW, Washington, D.C. 20460.

**FOR FURTHER INFORMATION CONTACT:** Vicki Stamper at (303) 312–6445.

**SUPPLEMENTARY INFORMATION:**

I. Background

Section 169A of the Clean Air Act (CAA or Act),[1] 42 U.S.C. section 7491, establishes as a National goal the prevention of any future, and the remedying of any existing, anthropogenic visibility impairment in mandatory Class I Federal areas[2] (referred to herein as the "National goal" or "National visibility goal"). Section 169A calls for EPA to, among other things, issue regulations to assure reasonable progress toward meeting the National visibility goal, including requiring each State with a mandatory Class I Federal area to revise its State Implementation Plan (SIP) to contain such emission limits, schedules of compliance and other measures as may be necessary to make reasonable progress toward meeting the National goal. CAA section 169A(b)(2). Section 110(a)(2)(J) of the CAA, 42 U.S.C. section 7410(a)(2)(J), similarly requires SIPs to meet the visibility protection requirements of the CAA.

EPA promulgated regulations that require affected States to, among other things, (1) coordinate development of SIPs with appropriate Federal Land Managers (FLMs); (2) develop a program to assess and remedy visibility impairment from new and existing sources; and (3) develop a long-term (10–15 years) strategy to assure reasonable progress toward the National visibility goal. See 45 FR 80084, December 2, 1980 (codified at 40 CFR 51.300–307). The regulations provide for the remedying of visibility impairment that is reasonably attributable to a single existing stationary facility or small group of existing stationary facilities. These regulations require that the SIPs provide for periodic review, and revision as appropriate, of the long-term strategy not less frequently than every three years, that the review process include consultation with the appropriate FLMs, and that the State provide a report to the public and EPA that includes an assessment of the State's progress

[1] The Clean Air Act is codified, as amended, in the U.S. Code at 42 U.S.C. 7401 *et seq.*

[2] Mandatory class I Federal areas include international parks, national wilderness areas, and national memorial parks greater than five thousand acres in size, and national parks greater than six thousand acres in size, as described in section 162(a) (42 U.S.C. 7472(a)). Each mandatory Class I Federal area is the responsibility of a "Federal land manager" (FLM), the Secretary of the department with authority over such lands. See section 302(i) of the Act, 42 U.S.C. 7602(i).

toward the National visibility goal. See 40 CFR 51.306(c).

On July 12, 1985 (50 FR 28544) and November 24, 1987 (52 FR 45132), EPA disapproved the SIPs of states, including Colorado, that failed to comply with the requirements of the provisions of 40 CFR 51.302 (visibility general plan requirements), 51.305 (visibility monitoring), and 51.306 (visibility long-term strategy). EPA also incorporated corresponding Federal plans and regulations into the SIPs of these states pursuant to section 110(c)(1) of the CAA, 42 U.S.C. section 7410(c)(1).

The Governor of Colorado submitted a SIP revision for visibility protection on December 21, 1987, which met the criteria of 40 CFR 51.302, 51.305, and 51.306 for general plan requirements, monitoring strategy, and long-term strategies. EPA approved this SIP revision in an August 12, 1988 Federal Register document (53 FR 30428), and this revision replaced the Federal plans and regulations in the Colorado Visibility SIP.

The Governor of Colorado submitted a subsequent SIP revision for visibility protection with a letter dated November 18, 1992. This revision was made to fulfill the requirements to periodically review and, as appropriate, revise the long-term strategy for visibility protection. EPA approved that long-term strategy revision on October 11, 1994 (59 FR 51376).[3]

Since Colorado's 1992 long-term strategy review, the U.S. Forest Service (USFS) certified visibility impairment in Mt. Zirkel Wilderness Area (MZWA) and named the Hayden and Craig Generating Stations in the Yampa Valley of Northwest Colorado as suspected sources. The USFS is the FLM for MZWA. This certification was issued on July 14, 1993.

Hayden Station, which is the focus of this SIP revision, is located 19 miles upwind from MZWA. The facility consists of two units as follows: Unit 1 is a 180 megawatt steam generating unit completed in 1965 and Unit 2 is a 260 megawatt steam generating unit completed in 1976. The facility is currently uncontrolled for sulfur dioxide ($SO_2$) and nitrogen oxides ($NO_X$) and operates electro-static precipitators to control particulate pollution. The 1995 emissions inventory for Hayden

Station indicated that the plant emitted 16,000 tons of $SO_2$ and 14,000 tons of $NO_X$. Particulate emissions have been more difficult to estimate due to control equipment malfunction.

On August 18, 1993, the Sierra Club sued the owners of the Hayden Station in United States District Court, alleging over 16,000 violations of the State's opacity standards and arguing that the alleged violations resulted in a number of air quality impacts in MZWA. On July 21, 1995, the Court found the Hayden Station owners liable for over 19,000 violations of the opacity standards between 1988 and 1993. See Sierra Club v. Public Service Company of Colorado, et al., 894 F. Supp. 1455 (D. Colo. 1995). In October 1995, the Sierra Club, the Colorado Air Pollution Control Division (APCD), and the Hayden Station owners entered into negotiations to try to reach a "global settlement" of the various issues facing the power plant. These issues included the Sierra Club lawsuit and the USFS certification of impairment in MZWA. In January 1996, EPA issued a Notice of Violation (NOV) to the owners of the Hayden Station for continuing opacity violations and joined in the settlement negotiations.

On May 22, 1996, the parties to the negotiations (EPA, Sierra Club, State of Colorado, and the Hayden Station owners) filed a signed Consent Decree with the United States District Court for the District of Colorado, in Civil Action No. 93–B–1749. The United States published notice of the settlement in the Federal Register and provided a thirty-day public comment period. The United States responded to comments in a motion to the Court to approve the Consent Decree. The Court approved the Consent Decree on August 19, 1996. The Consent Decree resolves a number of issues, including the Sierra Club and EPA enforcement actions, and, as part of that resolution, requires substantial reductions in air pollutants that are intended to resolve Hayden Station's contribution to visibility impairment in MZWA. The Consent Decree contemplates incorporation into the SIP of the visibility protection-related requirements of the Consent Decree. The terms "Hayden Consent Decree" or "Consent Decree" are used herein to refer to this judicially-enforceable settlement.

## II. Revision Submitted August 23, 1996

With a letter dated August 23, 1996, the Governor of Colorado submitted a revision to the long-term strategy portion of Colorado's SIP for Visibility Protection; this revision is contained in Section VI of the August 15, 1996

document entitled "Long-Term Strategy Review and Revision of Colorado's State Implementation Plan for Visibility Protection, Part I: Hayden Station Requirements" (referred to below as "Long-Term Strategy Document"). The revision was made to fulfill, with respect to Hayden Station's contribution to visibility impairment in MZWA, the Federal and Colorado requirements to revise the long-term strategy as appropriate following the three-year periodic review.[4] The State reviewed the long-term strategy in light of the USFS's certification of visibility impairment, the results of the Mt. Zirkel Visibility Study[5] and other technical data, and the Hayden Consent Decree. Based on this review, the State concluded that a revision to the long-term strategy was necessary to remedy Hayden Station's contribution to visibility impairment at MZWA and to ensure reasonable progress toward the National visibility goal.

Only Part C of Section VI of the Long-Term Strategy Document contains provisions that are enforceable against the Hayden Station owners. Part C incorporates relevant portions of the Hayden Consent Decree into the long-term strategy. The remainder of the SIP revision contains provisions that are explanatory and analyses that are required by section 169A of the CAA, Federal visibility regulations (40 CFR 51.300 to 51.307), and/or the Colorado Visibility SIP.

On October 3, 1996, EPA published a notice of proposed rulemaking in the Federal Register (61 FR 51659) that proposed to approve the revision to the long-term strategy portion of Colorado's SIP for Visibility Protection that the Governor submitted on August 23, 1996. EPA provided a thirty-day public comment period and received one set of comments on the proposal. These comments and EPA's responses to them are provided in section III. of this document.

---

[1] As a matter of clarification to EPA's October 11, 1994 action, please note that the September 1 due date referred to by EPA as the reporting deadline for Colorado's long-term strategy three-year reviews applies to the Colorado Air Pollution Control Division's responsibility to provide its review, and revision as appropriate, of the long-term strategy to the Colorado Air Quality Control Commission, with a submittal to EPA made by November 1 of each three year cycle.

[4] The report resulting from this review was specific to Hayden Station, and the State reviewed the components of the Long-Term Strategy as they relate to Hayden Station only. According to a November 14, 1996 letter from Margie Perkins, Colorado Air Pollution Control Division, to Richard Long, EPA, the State intends to address Colorado's remaining visibility issues in "Part II" of the long-term strategy review and report, to be considered by the Colorado Air Quality Control Commission (AQCC) at a public hearing in March 1997. The State had previously projected a December 1996 AQCC public hearing on "Part II," but found this schedule impossible to meet.

[5] This collaborative study was spearheaded by the State to collect additional information regarding visibility conditions in the Mt. Zirkel Wilderness Area and to identify potential sources of impairment. The final report is available at the addresses listed in the beginning of this document. The study was completed on July 15, 1996.

## A. Part C of Section VI: Provisions from the Hayden Consent Decree

The State incorporated into its Visibility SIP revision provisions of the Hayden Consent Decree pertinent to visibility, including Definitions, Emission Controls and Limitations, Continuous Emission Monitors, Construction Schedule, Emission Limitation Compliance Deadlines, and Reporting.[6] Such provisions must be met by the Hayden Station owners and are enforceable. The Consent Decree numbering scheme was retained to avoid confusion between the SIP and the Consent Decree, but only those sections pertinent to visibility, necessary to ensure enforceability of the requirements related to visibility, and necessary to assure reasonable progress in remedying Hayden Station's contribution to visibility impairment at MZWA were adopted into the SIP. Some changes were made to Consent Decree language to conform to a SIP framework. Finally, changes were made to the force majeure provisions of the Consent Decree to ensure that a demonstration of reasonable progress could be made at this time. Provisions of particular interest incorporated from the Hayden Consent Decree are summarized below.[7]

### SO₂ Emission Limitations

As described below, the $SO_2$ emission limitations will result in at least an 82% reduction in $SO_2$ from Hayden Station. The Hayden Station owners must install a Lime Spray Dryer (LSD) system to meet the emissions limitations. The following emissions limitations apply:
—No more than 0.160 lbs $SO_2$ per million Btu heat input on a 30 boiler operating day rolling average basis;
—No more than 0.130 lbs $SO_2$ per million Btu heat input on a 90 boiler operating day rolling average basis;
—At least an 82% reduction of $SO_2$ on a 30 boiler operating day rolling average basis (to make sure that substantial reductions occur and that control equipment is run optimally even if lower sulfur coal is used); and
—A unit cannot operate for more than 72 consecutive hours without any $SO_2$

[6] The Consent Decree also includes requirements for $NO_X$ emission controls and limitations; however, since these controls and limits do not have a direct relationship to visibility, they are not being incorporated into this Visibility SIP revision nor will any detailed discussion be provided. The $NO_X$ requirements were included in the Consent Decree to address acid deposition concerns.

[7] Pursuant to the provisions of the Hayden Consent Decree and the SIP, the Hayden Station owners have elected to continue burning coal at Hayden Station. Thus, although the Consent Decree and the SIP contain provisions applicable to a switch to natural gas, the summary contained herein only addresses Consent Decree requirements applicable to coal combustion.

emissions reductions; that is, it must shut down if the control equipment is not working at all for three days (to prevent the build-up of $SO_2$ emissions that may lead to visibility impairment events).

Since $SO_2$ is a chemical precursor to visibility-impairing sulfate particles or aerosols, the State concluded that these $SO_2$ emissions limitations will help remedy the facility's contribution to visibility impairment in MZWA.

### Particulate Emission Limitations

The Hayden Station owners must install and operate a Fabric Filter Dust Collector (known as a baghouse or FFDC) on each unit. Particulate emissions should be virtually eliminated. Particulate emission limitations for each unit are:
—No more than 0.03 lbs of primary particulate matter per million Btu heat input; and
—No more than 20.0% opacity, with certain limited exceptions, as averaged over each separate 6-minute period within an hour as measured by continuous opacity monitors.

### Compliance with Emissions Limits

All required controls must be designed to meet enforceable emission limits. Compliance with the $SO_2$ and opacity emission limits shall be determined by continuous emission monitors.

### Schedule—Coal as Primary Fuel

The schedule for constructing control equipment is as follows:
Unit 1
—Commencement of physical, on-site construction of control equipment by 6/30/97
—Commencement of start-up testing of FFDC and $SO_2$ control equipment by 12/31/98
Unit 2
—Commencement of physical, on-site construction of control equipment by 6/30/98
—Commencement of start-up testing of FFDC and $SO_2$ control equipment by 12/31/99
The schedule for commencement of compliance with the emissions limitations is as follows:
$SO_2$
—For Unit 1, within 180 days after flue gas is passed through the $SO_2$ control equipment, or by July 1, 1999, whichever date is earlier.
—For Unit 2, within 180 days after flue gas is passed through the $SO_2$ control equipment, or by July 1, 2000, whichever date is earlier.
Particulates

—For Unit 1, within 90 days after flue gas is passed through the FFDC control equipment, or by April 1, 1999, whichever date is earlier.
—For Unit 2, within 90 days after flue gas is passed through the FFDC control equipment, or by April 1, 2000, whichever date is earlier.

These construction deadlines and emission limitation compliance deadlines are subject to the "force majeure" provisions of the Consent Decree, which are being included in this SIP revision. A force majeure event refers to an excused delay in meeting construction deadlines or in meeting emission limitation compliance deadlines due to certain limited circumstances wholly beyond the control of the Hayden Station owners.

To help ensure that reasonable progress continues to be made, the State has committed to reopen the SIP (with public notice and hearing) as soon as possible after it is determined that a construction schedule or an emission limitation schedule has been, or will be, delayed by more than 12 months as a result of a force majeure determination or determinations. The State will re-evaluate the SIP at that time to determine whether revisions are necessary to continue to demonstrate reasonable progress. Necessary revisions may include the adoption of new construction or compliance deadlines as necessary to ensure that the emission limitations are met. In addition, the SIP also contains a clarification that the force majeure provisions are not to be construed to authorize or create any preemption or waiver of the requirements of State or Federal air quality laws, or of the requirements contained in the SIP or Consent Decree.

EPA believes that the language of the SIP should assure reasonable progress toward the National visibility goal with respect to Hayden Station's contribution to visibility impairment in the MZWA. In general, if deadlines extend more than twelve months, EPA fully expects the State to revise the SIP.

### B. Remainder of SIP Revision

#### 1. Analysis of Reasonable Progress

Congress established as a National goal "the prevention of any future, and the remedying of any existing" anthropogenic visibility impairment in mandatory Class I Federal areas. The statute does not mandate that the national visibility goal be achieved by a specific date but instead calls for "reasonable progress" toward the goal. Section 169A(b)(2) of the CAA requires EPA to issue implementing regulations requiring visibility SIPs to contain such

"emission limits, schedules of compliance and other measures as may be necessary to make reasonable progress toward the National goal."

EPA's implementing regulations provided for an initial round of visibility SIP planning which included a long-term strategy to make reasonable progress toward the National goal. See 40 CFR 51.302(c)(2)(I) and 51.306. The regulations also provide that the affected FLM may certify to a State at any time that visibility impairment exists in a mandatory Class I Federal area. See 40 CFR 51.302(c)(1). Recognizing the need to periodically evaluate the effectiveness of the long-term strategy in protecting visibility, EPA required States to review their long-term strategies at least every three years. See 40 CFR 51.306(c). This requirement ensures that States will periodically assess their visibility-related air quality planning in light of a certification of impairment from the FLM, information about visibility conditions and sources gathered from the visibility monitoring requirements, or other relevant information. A central aspect of the periodic assessment is to evaluate "[a]dditional measures, including the need for SIP revisions, that may be necessary to assure reasonable progress toward the national goal." See 40 CFR 51.306(c)(4).

Section 169A(g)(1) of the CAA specifies factors that must be considered in determining reasonable progress including: (1) the costs of compliance; (2) the time necessary for compliance; (3) the energy and non-air quality environmental impacts of compliance; and (4) the remaining useful life of the source. Protection of visibility in a mandatory Class I Federal area is the objective.

In this unique case, the Hayden Station owners have agreed in the context of a judicially-enforceable Consent Decree to meet emissions limitations that are expected to reduce Hayden Station's contribution to visibility impairment in MZWA to below perceptible levels. The State analyzed the emission reductions provided for in the Consent Decree in light of the statutory factors for determining reasonable progress and the ultimate objective of protecting visibility. The State concluded that the measures assure reasonable progress by remedying Hayden Station's contribution to perceptible visibility impairment in MZWA and submitted a visibility SIP revision containing these measures.

Further, in a June 24, 1996 letter from Elizabeth Estill, USFS, Rocky Mountain Region, to Margie Perkins, APCD, the

USFS concluded that the magnitude of the emission reductions for particulates and sulfur oxides contained in the Consent Decree should effectively address the USFS's concerns with visibility impairment in MZWA associated with the Hayden Station. Based on this letter, the State concluded that the pertinent provisions of the Hayden Consent Decree, as embodied in the SIP revision, effectively resolve the USFS certification of impairment in MZWA in relation to Hayden Station.

EPA has reviewed the State's SIP revision and supporting information in light of the statutory and regulatory requirements and is approving it. EPA believes the State has reasonably concluded that the emission reduction measures at Hayden Station required in the judicially-enforceable Consent Decree and contained in this visibility SIP revision will remedy Hayden Station's contribution to perceptible visibility impairment at MZWA [8], with reasonable costs, an expeditious compliance schedule, and no significant adverse energy or non-air quality environmental impacts. The State's August 15, 1996 SIP revision and accompanying information, available at the addresses listed at the beginning of this document, provide a detailed analysis of each of the "reasonable progress" considerations. EPA's summary and evaluation of the State's analysis can be found in EPA's October 3, 1996 notice of proposed rulemaking (see 61 FR 51662–51664).

2. Six Factors Considered in Developing the Long-Term Strategy

The State considered the six factors contained in 40 CFR 51.306(e) when developing this revision to its long-term strategy. Please refer to EPA's October 3, 1996 notice of proposed rulemaking for a discussion of these six factors (see 61 FR 51664–51665).

C. Additional Requirements

The State met the requirements for FLM consultation prior to adopting the SIP. The SIP also meets EPA requirements related to enforceability. Please refer to EPA's October 3, 1996 notice of proposed rulemaking for a discussion of these requirements (see 61 FR 51665).

---

[8] It should be noted that current Hayden Station emissions are not expected to contribute to visibility impairment under all meteorological conditions and that regional haze from outside Colorado, emissions from sources outside Colorado, and emissions from other Colorado sources could also be contributing to visibility impairment in MZWA.

III. Public Comments and EPA Responses

EPA received only one set of comments—from the Hayden Station owners. A summary of their comments, and EPA's responses, are provided below.

Comment: The Hayden Station owners indicate their strong support for EPA's proposed approval of the August 23, 1996 revision of the Colorado State Implementation Plan incorporating the requirements for Hayden Station and urge EPA to act quickly in granting final approval of the proposed rule.

Response: EPA notes the Hayden Station owners' support for the proposed action.

Comment: The Hayden Station owners take issue with some of EPA's statements in the discussion accompanying the proposed SIP revision. Although the Hayden Station owners indicate these statements do not impact the Hayden Station owners' support for the proposed rule, EPA is providing responses to the Hayden Station owners' comments. The Hayden Station owners made the following comments that fall in this category:

1. The Hayden Station owners take issue with EPA's statement in the notice of proposed rulemaking that if a force majeure delay lasts more than 12 months, EPA fully expects the State to revise the SIP. The Hayden Station owners claim that EPA has misstated the necessary consequences of a reopening of the SIP in the event that a force majeure delay lasts more than 12 months, and that the State may take action other than revising the SIP in response to a delay greater than 12 months.

Response: In making this statement in the notice of proposed rulemaking, EPA was indicating its expectation that, in general, a delay greater than 12 months will require a SIP revision to ensure reasonable progress. EPA acknowledges that there may be situations—for example, where the delay is not likely to last much longer than 12 months—in which a SIP revision may not be necessary.

2. The Hayden Station owners state that EPA has alleged that malfunctions of existing opacity control equipment have caused primary particulate matter plumes which have degraded visibility in the MZWA. Although the Hayden Station owners do not object to the inclusion of opacity and particulate matter standards in the SIP revision, they state that they are unaware of any data that indicate that primary particulate matter has caused any perceptible change in visibility in the

MZWA. They further state that the MZWA visibility study confirms that primary particulate matter is not a source of visibility impairment in the MZWA.

*Response:* The Hayden Station owners have mischaracterized EPA's statements in the notice of proposed rulemaking. In the relevant section of the notice of proposed rulemaking, EPA summarizes conclusions made by the State (see 61 FR 51663–51664). The State indicates that particulate plumes may be a source of visibility impairment in the MZWA. EPA agrees with this conclusion and believes the MZWA visibility study supports it. Referring to an episode during which a primary particulate plume emanated from the Hayden Station, the study states, "On one occasion in 1995, a clearly defined, coherent plume from the Hayden generating station could be seen in a west-facing video view from a camera on Storm Peak (which is south of the Wilderness boundary). The plume was moving toward Storm Peak at nearly the same elevation as the camera. The extent to which the plume reached or rose over the Continental Divide could not be determined because it could not be seen in views to the north. However, it is clear that the potential existed for the plume to reach the Storm Peak area. This was the only occasion when a clearly-defined, coherent generating station plume was documented coming close to the Wilderness." This episode shows that particulate plumes are capable of moving from Hayden Station to a distance as far away as the Wilderness boundary. Under the right meteorological and plant operating conditions, EPA believes it is reasonable to expect that particulate plumes may occasionally impair visibility within MZWA. Given the limited duration of the MZWA visibility study and the relatively sparse monitoring network, EPA believes it is unreasonable to conclude, as the Hayden Station owners have suggested, that "the MZWA visibility study confirms that primary particulate matter is not a source of visibility impairment in the MZWA."

3. The Hayden Station owners assert that EPA's analysis of rate impacts is oversimplified and probably inaccurate.

*Response:* In its notice of proposed rulemaking, EPA was summarizing the State's analysis of the potential impact on rates, not performing its own analysis (see 61 FR 51663). EPA believes the State's analysis was adequate to estimate the potential costs of controls for purposes of this action. Given that the calculation of rates is a complex process, EPA does not assert that the

ultimate impact on rates will be exactly consistent with the State's analysis.

## IV. Final Action

EPA has reviewed the adequacy of the State's revision to the long-term strategy portion of Colorado's SIP for Class I Visibility Protection, contained in Section VI of the August 15, 1996 document entitled "Long-Term Strategy Review and Revision of Colorado's SIP for Class I Visibility Protection, Part I: Hayden Station Requirements," as submitted by the Governor with a letter dated August 23, 1996. EPA is approving this revision, which includes the incorporation of certain requirements from the Hayden Consent Decree. This SIP revision replaces the previous existing impairment portion of the long-term strategy as it relates to the MZWA.

Nothing in this action should be construed as permitting or allowing or establishing a precedent for any future request for revision to any SIP. Each request for revision to a SIP shall be considered separately in light of specific technical, economic, and environmental factors and in relation to relevant statutory and regulatory requirements.

## V. Administrative Requirements

### A. Executive Order 12866

This action has been classified as a Table 3 action for signature by the Regional Administrator under the procedures published in the Federal Register on January 19, 1989 (54 FR 2214–2225), as revised by a July 10, 1995 memorandum from Mary Nichols, Assistant Administrator for Air and Radiation. The Office of Management and Budget (OMB) has exempted this regulatory action from E.O. 12866 review.

### B. Regulatory Flexibility Act

Under the Regulatory Flexibility Act, 5 U.S.C. 600, *et seq.*, EPA must prepare a regulatory flexibility analysis assessing the impact of any proposed or final rule on small entities. 5 U.S.C. 603 and 604. Alternatively, EPA may certify that the rule will not have a significant economic impact on a substantial number of small entities. Small entities include small businesses, small not-for-profit enterprises, and government entities with jurisdiction over populations of less than 50,000.

SIP approvals under section 110 and subchapter I, part D of the Clean Air Act do not create any new requirements, but simply approve requirements that the State is already imposing. Therefore, because the Federal SIP approval does not impose any new requirements, I

certify that it does not have a significant impact on any small entities affected. Moreover, due to the nature of the Federal-state relationship under the Act, preparation of a regulatory flexibility analysis would constitute Federal inquiry into the economic reasonableness of state action. The Act forbids EPA to base its actions concerning SIPs on such grounds. *Union Electric Co.* v. *U.S. E.P.A.*, 427 U.S. 246, 256–66 (1976); 42 U.S.C. 7410(a)(2).

### C. Unfunded Mandates

Under Section 202 of the Unfunded Mandates Reform Act of 1995 ("Unfunded Mandates Act"), signed into law on March 22, 1995, EPA must prepare a budgetary impact statement to accompany any proposed or final rule that includes a Federal mandate that may result in estimated costs to State, local, or tribal governments in the aggregate; or to the private sector, of $100 million or more. Under Section 205, EPA must select the most cost-effective and least burdensome alternative that achieves the objectives of the rule and is consistent with statutory requirements. Section 203 requires EPA to establish a plan for informing and advising any small governments that may be significantly or uniquely impacted by the rule.

EPA has determined that the approval action proposed does not include a Federal mandate that may result in estimated costs of $100 million or more to either State, local, or tribal governments in the aggregate, or to the private sector. This Federal action approves pre-existing requirements under State or local law, and imposes no new requirements. Accordingly, no additional costs to State, local, or tribal governments, or to the private sector, result from this action.

### D. Submission to Congress and the General Accounting Office

Under 5 U.S.C. 801(a)(1)(A) as added by the Small Business Regulatory Enforcement Fairness Act of 1996, EPA submitted a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the General Accounting Office prior to publication of this rule in today's Federal Register. This rule is not a "major rule" as defined by 5 U.S.C. 804(2).

### E. Petitions for Judicial Review

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the

appropriate circuit by March 17, 1997. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this rule for the purposes of judicial review nor does it extend the time within which a petition for judicial review must be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements (see section 307(b)(2)).

List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen dioxide, Particulate matter, Reporting and recordkeeping requirements, Sulfur oxides.

Dated: December 10, 1996.

Kerrigan Clough,

*Acting Regional Administrator.*

Chapter I, title 40 of the Code of Federal Regulations is amended as follows:

## PART 52—[AMENDED]

1. The authority citation for part 52 continues to read as follows:

Authority: 42 U.S.C. 7401–7671q.

## Subpart G—Colorado

2. Section 52.320 is amended by adding paragraph (c)(79) to read as follows:

### §52.320   Identification of plan.
*       *       *       *       *

(c) * * *

(79) On August 23, 1996, the Governor of Colorado submitted a revision to the long-term strategy portion of Colorado's State Implementation Plan (SIP) for Class I Visibility Protection. The revision was made to incorporate into the SIP, among other things, emissions reduction requirements for the Hayden Station (a coal-fired steam generating plant located near the town of Hayden, Colorado) that are based on a consent decree addressing numerous air pollution violations at the plant. This SIP revision replaces the previous existing impairment portion of the long-term strategy as it relates to the Mt. Zirkel Wilderness Area.

(i) Incorporation by reference.

(A) Long-Term Strategy Review and Revision of Colorado's State Implementation Plan for Class I Visibility Protection Part I: Hayden Station Requirements, as follows:

Section VI., effective on August 15, 1996.

[FR Doc. 97–1043 Filed 1–15–97; 8:45 am]

BILLING CODE 6560–50–P

## 40 CFR Part 82

### Protection of Stratospheric Ozone

*CFR Correction*

In title 40 of the Code of Federal Regulations, parts 81 to 85, revised as of July 1, 1996, § 82.32 (e)(1) and (2) was incorrectly revised. The corrected text should read as follows.

### §82.32   Definitions.
*       *       *       *       *

(e)(1) Properly using means using equipment in conformity with Recommended Service Procedures and Recommended Practices for the Containment of R–12 (CFC–12) set forth in appendix A or appendix B to this subpart, as applicable. In addition, this term includes operating the equipment in accordance with the manufacture's guide to operation and maintenance and using the equipment only for the controlled substance for which the machine is designed. For equipment that extracts and recycles refrigerant, properly using also means to recycle refrigerant before it is returned to a motor vehicle air conditioner. For equipment that only recovers refrigerant, properly using includes the requirement to recycle the refrigerant on-site or send the refrigerant off-site for reclamation.

(2) Refrigerant from reclamation facilities that is used for the purpose of recharging motor vehicle air conditioners must be at or above the standard of purity developed by the Air–conditioning and Refrigeration Institute (ARI 700–93) (which is codified at 40 CFR part 82, subpart F, appendix A, and is available at 4301 North Fairfax Drive, Suite 425, Arlington, Virginia 22203). Refrigerant may be recycled off-site only if the refrigerant is extracted using recover only equipment, and is subsequently recycled off-site by equipment owned by the person that owns both the recover only equipment and owns or operates the establishment at which the refrigerant was extracted. In any event, approved equipment must be used to extract refrigerant prior to performing any service during which discharge of refrigerant from the motor vehicle air conditioner can reasonably be expected. Intentionally venting or disposing of

refrigerant to the atmosphere is an improper use of equipment.

*       *       *       *       *

[FR Doc. 97–55573 Filed 1-15-97; 8:45 am]

BILLING CODE 1505-01-D

## DEPARTMENT OF ENERGY

**48 CFR Parts 904, 906, 908, 915, 923, 925, 945, 952, and 970**

**RIN 1991–AB34**

### Acquisition Regulation; Technical Amendments

**AGENCY:** Department of Energy (DOE).

**ACTION:** Final rule, technical amendments.

**SUMMARY:** The Department of Energy (DOE) is amending the Department of Energy Acquisition Regulation (DEAR) to perform "housekeeping" duties such as conforming certain sections of the DEAR to recent Federal Acquisition Regulation changes, updating organizational and other references, correcting dates in contract clauses, and clarifying certain text. These corrections and changes are technical in nature and none of them raises substantive issues or represents changes in policy.

**EFFECTIVE DATE:** This final rule will be effective February 18, 1997.

**FOR FURTHER INFORMATION CONTACT:** P. Devers Weaver, Office of Policy (HR–51), Office of Procurement and Assistance Management, U.S. Department of Energy, 1000 Independence Avenue, SW., Washington, DC 20585–0705, 202–586–8250.

**SUPPLEMENTARY INFORMATION:**

I. Explanation of Revisions
II. Procedural Requirements
  A. Procedural Determinations
  B. Review Under Executive Order 12612
  C. Review Under Executive Order 12866
  D. Review Under Executive Order 12988
  E. Review Under the National Environmental Policy Act
  F. Review Under the Paperwork Reduction Act
  G. Review Under the Small Business Regulatory Enforcement Fairness Act of 1996
  H. Review Under the Unfunded Mandates Reform Act of 1995

I. Explanation of Revisions

None of the revisions in this rule is substantive. However, readers may benefit from an explanation of some of the revisions.

The authority citations for Parts 925 and 952 have been conformed to those used for all other parts of the regulation

# EXHIBIT F

To Plaintiffs' Combined Motion for Partial Summary Judgment
and Supporting Memorandum to Establish Plaintiffs' Standing

*Biodiversity Conservation Alliance and Sierra Club v. Mountain Cement Co.,*
Case No. 04CV 361-B.

# AIR QUALITY DIVISION
## CHAPTER 6, SECTION 3
# OPERATING PERMIT

## WYOMING DEPARTMENT OF
## ENVIRONMENTAL QUALITY
### AIR QUALITY DIVISION
### 122 West 25th Street
### Cheyenne, Wyoming 82002



### PERMIT NO. 31-098

Issue Date: **March 15, 2004**
Expiration Date: **June 2, 2008**
Effective Date: **March 15, 2004**
Replaces Permit No.: **30-098**

In accordance with the provisions of W.S. §35-11-203 through W.S. §35-11-212 and Chapter 6, Section 3 of the Wyoming Air Quality Standards and Regulations,

**Mountain Cement Company**
**Section 17, Township 15 North, Range 73 West**
**Albany County, Wyoming**

is authorized to operate a stationary source of air contaminants consisting of emission units described in this permit. The units described are subject to the terms and conditions specified in this permit. All terms and conditions of the permit are enforceable by the State of Wyoming. All terms and conditions of the permit, except those designated as not federally enforceable, are enforceable by EPA and citizens under the Act. A copy of this permit shall be kept on-site at the above named facility.

_____
Dan Olson, Administrator
Air Quality Division

_____3/15/04_____
Date

_____
John V. Corra, Director
Department of Environmental Quality

_____3/16/04_____
Date

## SOURCE EMISSION POINTS
This table may not include any or all insignificant activities at this facility.

| SOURCE ID# | SOURCE DESCRIPTION | SIZE | CH. 6, SEC. 2 PERMITS |
|---|---|---|---|
| R-111A | Raw Material Belt Discharge | 200 TPH | CT-1137 |
| R-230 | Raw Silo #3 Bin | 46 TPH | CT-1137 |
| K-207-1 | No. 1 Blending Silo | 170 TPH | CT-1137 |
| K-207-2 | No. 2 Blending Silo | 170 TPH | CT-1137 |
| K-553 | Coal Tunnel | 75 TPH | CT-1137 |
| K1-710 | Kiln #1 Baghouse | 65 TPH | CT-1137, MD-245, 2/2/96 Waiver AP-D66 7/31/03 Waiver AP-0819 |
| K-401 | Kiln #2 Precipitator with ESP | 130 TPH | CT-1137, MD-245, 2/2/96 Waiver AP-D66 7/31/03 Waiver AP-0819 |
| K1-880A/B | Clinker Cooler #1 | 29 TPH | CT-1137 |
| K-515/K-541-1 | Clinker Cooler #2 | 62.5 TPH | CT-1137 |
| CKD | Cement Kiln Dust Spout | N/A | 10/22/96 Waiver AP-437 |
| K-410 | Cement Kiln Dust Storage Silo | 30 TPH | 10/22/96 Waiver AP-437 |
| K1-783 | Clinker Conveyor from Kiln #1 | 29 TPH | CT-1137 |
| K-224 | Kiln #2 Feed Scale* | 180 TPH | CT-1137 |
| K-438 | Kiln #2 Dust Return Weigh Scale* | 50 TPH | None |
| K-551 | Coal Belt Dust Collector * | 75 TPH | None |
| K-521 | Kiln #2 Coal Bin Dust Collector * | 30 TPH | None |
| K-274 | Kiln #1 Feed Transfer* | 65 TPH | None |
| F-405 | Clinker Storage Load-in | 150 TPH | CT-1137 |
| F-406 | Clinker Reclaim Transfer Tower | 150 TPH | 12/8/99 Waiver AP-S10 |
| F-531 | Finish Mill "A" System | 36 TPH | CT-1137 |
| F-641 | Finish Mill "B" Feed | 70 TPH | CT-1137 |
| F-631 | Finish Mill "B" Vent | 70 TPH | CT-1137 |
| F-636 | Finish Mill "B" Discharge | 70 TPH | CT-1137 |
| None | Finish Mill "C" | 70 TPH | CT-1137 |
| B-808 | Bulk Cement Bucket Elevator, F-K Pump | 200 TPH | CT-1137 |
| F-580 | East Cement Storage Silos Load-in | 140 TPH | CT-1137 |
| F-694 | West Cement Storage Silos Load-in | 140 TPH | CT-1137 |
| B-875 | East Packhouse, East Silos Load-out | 100 TPH | CT-1137 |