U.S. _____ ____T
D_____ _____ ___NG
J__ 13 2__5

Stephan Harris, Clerk
Cheyenne

Philip A. Nicholas
Jason M. Tangeman
Anthony, Nicholas, Tangeman & Yates, LLC
170 N. Fifth Street
P.O. Box 0928
Laramie, WY 82073
(307) 742-7140
(307) 742-7160 Fax

James B. Harris
Becky L. Jolin
Steven R. Baggett
Thompson & Knight, L.L.P
1700 Pacific, Suite 3300
Dallas, TX 75201
214-969-1102
214-880-3274 Fax

Attorneys for Defendant Mountain Cement Company

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Biodiversity Conservation Alliance and Sierra Club, | ) ) ) | |
| Plaintiffs, | ) | Case No. 04CV 361-B |
| vs. | ) ) | |
| Mountain Cement Company, | ) ) | |
| Defendant. | ) | |

### DEFENDANT'S BRIEF IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT TO ESTABLISH STANDING

In accordance with the Court's Order of May 2, 2005, Defendant Mountain Cement Company

("MCC") submits this Brief in Response to the Motion for Partial Summary Judgment to Establish

Standing (the "Summary Judgment Motion") filed by Plaintiffs Biodiversity Conservation Alliance

and Sierra Club (collectively referred to as "BCA").[1]  As discussed below, BCA has not, in the Summary Judgment Motion, demonstrated as a matter of law that it has standing.

## I.
## PROCEDURAL HISTORY

On March 30, 2005, BCA filed its Motion for Partial Summary Judgment to Establish Standing (the "Summary Judgment Motion").  The Summary Judgment Motion is based almost exclusively on self-serving declarations of four member representatives of BCA concerning their alleged injuries purportedly due to emissions from MCC's Laramie cement plant (the "Plant").

Under the local rules of this Court, MCC had ten days to respond to the Motion, and was unable to schedule depositions of the member representatives of BCA and fully respond to the Motion within that ten-day time period.  As a consequence, MCC filed a Motion to Allow Additional Discovery Pursuant to Rule 56(f), requesting that the Court grant an extension of the response deadline to enable MCC to depose those member representatives.  Despite the fact that BCA had disclosed the identities of its member representatives to MCC only 27 days before filing its Summary Judgment Motion, BCA opposed MCC's requested relief.  On May 2, 2005, the Court issued an Order granting MCC's requested relief and extending to June 13, 2005 MCC's deadline for responding to the Summary Judgment Motion.

---

[1] BCA's Summary Judgment Motion does not address whether the Court has subject matter jurisdiction of this case under citizen suit provision of the Clean Air Act. 42 U.S.C.A. § 7604 (West 2003). As MCC understands it, the only issue that is the subject of BCA's Summary Judgment Motion is Article III standing. MCC will be filing, very shortly, its motion for summary judgment establishing the Court does not have subject matter jurisdiction in this case.

## II.
## OBJECTIONS TO BCA'S SUMMARY JUDGMENT EVIDENCE

MCC hereby incorporates by reference all objections previously made to BCA's summary

judgment evidence as set forth in Exhibit A to Defendant's Motion to Allow Additional Discovery

Pursuant to Rule 56(f) in Response to Plaintiffs' Motion for Summary Judgment on Standing. For

the Court's convenient reference, these objections are attached hereto as Exhibit A.

## III.
## DISPUTED FACTS

MCC disputes the following material facts:[2]

A.     The existence of any permit violations. BCA's Summary Judgment Motion contains

no evidence of permit violations. As a consequence, BCA has failed to establish the requirement

that its representatives' alleged injuries are "fairly traceable" to any challenged conduct of MCC, and

has failed to show that its representatives' alleged injuries are redressable by civil penalties or by

injunctive relief.

B.     The existence of any injury. BCA's representatives admit that they have suffered no

personal injuries as a result of any alleged air emissions from the Plant.[3] The injuries they do claim

to have suffered are aesthetic, and based on the appearance of a plume coming out of the stacks at the

---

[2]   Why these facts are material is set forth in the "Arguments and Authorities" section of this Brief.

[3]   *See* Deposition of Connie Wilbert ("Wilbert Deposition"), p. 29; Deposition of Michele Barlow ("Barlow Deposition"), p. 25; Deposition of Bob Strayer ("Strayer Deposition"), p. 32; Deposition of Martha Martinez del Rio ("del Rio Deposition"), pp. 16, 22. True and correct copies of pertinent pages from the Wilbert Deposition, Barlow Deposition, Strayer Deposition and del Rio Deposition are attached to this Response as Exhibits B, C, D and E, respectively.

Plant and smells supposedly associated with Plant operations.[4] These alleged aesthetic injuries are challenged in a Declaration of Michael D. Seaton (the "Seaton Declaration") attached to this response as Exhibit F. In his Declaration, Mr. Seaton states that he has not seen or smelled anything offensive from the Plant, and that the Plant's operations do not interfere with his enjoyment of any of the natural surroundings in the area, nor do they give him any concern about potential health issues.[5]

The inconsistencies of the BCA's representatives' deposition testimony and the Seaton Declaration raise issues concerning the reasonableness of the member representatives' complaints and concerns related to the Plant, and raise issues concerning the credibility of the declarations of BCA's representatives.

C.     A connection between alleged permit violations and BCA's alleged injury. There is no summary judgment evidence connecting any alleged injury of BCA to alleged violations of MCC's permit authorizing emissions to the atmosphere.

## IV.
## ARGUMENTS AND AUTHORITIES

### A.
### BCA'S BURDEN OF PROOF

As the plaintiff in this case, BCA bears the burden of establishing every element of federal jurisdiction, which includes standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). At the pleading stage and in response to a motion to dismiss, mere allegations are sufficient to satisfy

---

[4]  *See generally* the Declarations of these representatives, which are attached to BCA's Summary Judgment Motion as Exhibits A through D.

[5]  Seaton Declaration, ¶¶ 5-8.

this burden. *Glover River Org. v. United States Dep't of Interior*, 675 F.2d 251, 254 n.3 (10th Cir.

1982); *Colorado Manufactured Housing Ass'n v. Board of County Comm'rs*, 946 F. Supp. 1539,

1543 (D. Colo. 1996). In the context of a motion for summary judgment, however, a plaintiff must

prove standing with specific facts by affidavits or other evidence. *Glover River Org.*, 675 F.2d at

254 n.3.

In most cases where there is an issue of standing, it is the *defendant* who files a motion for

summary judgment seeking to establish a *lack* of standing. *See, e.g., Friends of the Earth, Inc. v.

Laidlaw Envtl Servs. (TOC), Inc.*, 528 U.S. 167, 177 (2000); *Texans United for a Safe Economy v.

Crown Cent. Petroleum Corp.*, 207 F.3d 789, 791 (5th Cir. 2000). To defeat such a defensive

motion, the plaintiff is only required to provide *some* evidence to support all of the required elements

of standing. The situation in this case is different. In making an offensive motion for summary

judgment on standing, BCA must show that there are no genuine issues of material fact *and* that it is

entitled to judgment on standing *as a matter of law. See* FED. R. CIV. P. 56(c); *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322-23 (1986).

Using an offensive summary judgment to *establish* standing is particularly problematic,

because an initial conclusion of standing is always subject to reexamination, particularly if later

evidence proves to be inconsistent with any initial conclusion. *See Gladstone Realtors v. Village of

Bellwood*, 441 U.S. 91, 115 n.31 (1979); *see also Wyoming v. Oklahoma*, 502 U.S. 437, 446 (1992). [6]

---

[6] As MCC has previously stated, BCA's burden to establish standing is a function of how and when the issues arises. It is easier for a plaintiff to establish standing in response to a motion to dismiss at the beginning of a lawsuit than at trial. Here, by asking the Court to find standing in its favor as a matter of law at the beginning of the case, BCA must conclusively demonstrate that *all* elements of standing exist. BCA has not and cannot do so.

In ruling on BCA's Summary Judgment Motion, the Court must accept MCC's summary judgment evidence as true and indulge all reasonable inferences in favor of MCC. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burtnieks v. City of New York*, 716 F.2d 982, 985 (2d Cir. 1983); *Bruce v. Martin-Marietta Corp.*, 544 F.2d 442, 445(10th Cir. 1976). BCA cannot meet its burden of proof by providing vague and conclusory "evidence." *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990) (refusing to find standing based on the "conclusory allegations of an affidavit"); *Bruce*, 544 F.2d at 445 (stating that "[c]onclusionary allegations do not establish an issue of fact under Rule 56"). Further, evidence of discrepancies or inconsistencies in the sworn testimony of BCA's representatives may be sufficient to raise fact issues as to the credibility of the testimony and preclude summary judgment. *See, e.g., Stepanischen v. Merchants Dispatch Transp. Corp*, 722 F.2d 922, 931 (1st Cir. 1983) (deposition testimony contained disputed facts); *Greenlow v. California Dep't of Benefit Payments*, 413 F. Supp. 420, 427 (E.D. Cal. 1976) (inconsistencies in summary judgment evidence).

## B.
### ELEMENTS OF ARTICLE III STANDING

Where, as here, the plaintiffs are associations, the Supreme Court has recognized that an association has standing to bring suit on behalf of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). To satisfy Article III's standing requirements, a plaintiff must show (1) he or she has

suffered an "injury-in-fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

BCA has designated four member representatives in this case — Connie Wilbert, Bob Strayer, Michele Barlow and Martha Martinez del Rio. Through these representatives, BCA must establish each element of standing as a matter of law to prevail on summary judgment. BCA cannot meet its burden in this case.

**C.**

**BCA HAS NOT CONCLUSIVELY ESTABLISHED THE "INJURY-IN-FACT" REQUIREMENT**

The first element of Article III standing that BCA must prove as a matter of law is that its member representatives have suffered "injuries-in-fact." To satisfy this requirement, it is not enough to make broad, generalized or hypothetical allegations. Instead, the evidence of injury must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560-561.

Essentially, the "injuries" of BCA's representatives are aesthetic.[7] They do not like to see occasional plumes from smoke stacks at the Plant, and they do not like the smells they believe originate at the Plant. Interestingly, however, they are unable to differentiate between the aesthetic effects of plumes and smells allowed by the Plant's air permit and those not allowed. There is also a

---

[7] The representatives admit that they have suffered no illnesses as a result of any alleged emissions from the Plant, and that they have never consulted a doctor about any health issues related to the Plant. *See* Wilbert Deposition, p. 29; Barlow Deposition, p. 25; Strayer Deposition, p. 32; del Rio Deposition, pp. 16, 22.

lack of consistency on when aesthetic impacts exist, their duration, their severity, and their connection, if any, to violations of the Plant's air permits.

These types of highly subjective aesthetic concerns may, in some instances, provide evidence of "injury-in-fact." Courts are not required, however, to accept them at face value.[8] *See Stepanischen*, 722 F.2d at 928 (stating that, "[i]n cases where...the state of mind of one of the parties is crucial to the outcome of the case,...courts are particularly cautious about granting summary judgment"); *Conrad v. Delta Air Lines, Inc.*, 494 F.2d 914, 918 (7th Cir. 1974) (questions of affiants' bias precluded summary judgment); *Turner and Boisseau v. Nationwide Mut. Ins. Co.*, 989 F. Supp. 1359, 1363-64 (D. Kan. 1997) (stating that a court should be "cautious" in granting summary judgment on issues turning on a party's state of mind); *Schultz v. Heritage Mut. Ins. Co.*, 902 F. Supp. 1051, 1057 (D. S.D. 1995) (stating that summary judgment is "not proper" where a state of mind is involved). Numerous courts have recognized that there must be at least some level of "reasonable concern" to satisfy the "injury-in-fact" requirement. *See Friends of the Earth, Inc.*, 528 U.S. at 181-85; *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001). This "reasonable concern" standard necessarily has an objective component that enables a court to find no injury-in-fact where

---

[8] Based on the testimony of these representatives, a reasonable inference can be drawn that they were "recruited" to participate in this lawsuit, and they did not have any serious concerns about the Plant before they were approached by other representatives of BCA to assist in pursuing BCA's claims. *See, e.g.*, del Rio Deposition, pp. 15-16. Where a motion for summary judgment is based on the affidavit or declaration testimony of interested witnesses, that testimony must be clear, direct, and free of contradiction or doubt. The circumstances of the representatives' involvement in this case cast doubt on the credibility of their injury claims. *See Thomas v. Great Atl. & Pac. Tea Co.*, 233 F.3d 326, 330-31 (5th Cir. 2000) (finding genuine issue of material fact to preclude summary judgment where interested parties' affidavits supported motion).

the plaintiffs' complaints are so undifferentiated as to be unreasonable.[9] *See Defenders of Wildlife*, 504 U.S. at 564.

The requirement of reasonableness makes sense in light of the nature and purpose of the citizen's suit provision of the Clean Air Act. *See* 42 U.S.C.A. § 7604 (West 2003). By invoking that provision, a citizen becomes a "private attorney-general" effectively standing in the shoes of the government. The Clean Air Act exists to impose and enforce certain standards of air quality — not to prevent all emissions that any person may find to be unpleasant. As a consequence, a private citizen should not be able to substitute his or her personal views for those that might more objectively reflect the nature and purpose of the Clean Air Act.

Under the summary judgment record, BCA has not established, as a matter of law, that the alleged aesthetic "injuries" of its member representatives are reasonable. Interestingly, BCA's representatives admitted in their depositions that others around them did not appear to share their concerns about, or alleged "injuries" from, the Plant.[10] In fact, at least some of BCA's representatives even acknowledged that they could not capture the views of which they complained on a digital camera in a way that would objectively show what they were complaining about.[11]

Not only are the representatives' allegations highly subjective, their testimony about these allegations is not entirely consistent and, in some instances, does not even conclusively link their complaints with the Plant. For example, some of the representatives testified about odors that they

---

[9] To provide an extreme example, suppose everyone in Laramie, Wyoming save one person, did not consider plumes at the Plant to be a problem. Could a citizen's suit be mounted? MCC submits the answer is "No."

[10] *See e.g.,* Wilbert Deposition, pp. 29, 31; Strayer Deposition, pp. 41-42.

believe to be from emissions at the Plant, [12] while one of the representatives testified that she does not regularly smell odors that she attributes to Plant emissions. [13]

As for visible emissions from the Plant, the representatives were inconsistent in their descriptions. Some of them described the emissions as primarily "white or slightly grayish"in color[14], while others described the color as "brown, sometimes blackish."[15] According to some of the representatives, the emissions were more visible at some times than others (although they could not provide specific dates)[16] while others did not note any visible distinctions.[17] One of the representatives even claimed to be concerned about steam from the Plant, even though steam is not subject to any of the regulations at issue in this lawsuit.[18]

The often-conflicting testimony of BCA's representatives is anything but clear, direct, and free from contradiction. It also reflects that the representatives' perceptions of their injuries are colored by their attitudes toward emissions that cause them to believe that they are "injured" even by emissions that are clearly permitted. *See Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) (stating

---

[11] *See* Wilbert Deposition, pp. 8-9; Strayer Deposition, p. 37.

[12] Strayer Deposition, pp. 28-29.

[13] del Rio Deposition, pp. 12-13.

[14] *Id.* p. 10; Barlow Deposition, p. 17.

[15] Strayer Deposition, p. 15.

[16] *Id.* p. 18.

[17] Wilbert Deposition, p. 14.

[18] *Id.* pp. 14-15.

that "[i]t is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions").

Attached to this Supplemental Response as Exhibit F is the Seaton Declaration. Mr. Seaton testifies that he has lived and worked in Laramie for over 50 years, and that he is familiar with the areas in and around Laramie that are referenced by BCA's representatives in their declarations. Seaton Declaration, ¶¶ 3-5. According to Mr. Seaton, has not been injured by any sights or smells from the Plant and, in fact, rarely even notices any emissions from the Plant. *Id.* ¶ 5. Mr. Seaton testifies that he is not concerned about his health based on any operations at the Plant, and that the Plant has not impaired in any way his activities or enjoyment of the natural areas in and around Laramie. *Id.* ¶ 8.

The Seaton Declaration and the testimony of BCA's representatives at their depositions raise fact questions concerning the issue of whether the BCA representatives' alleged injuries are actually reasonable. As a consequence, BCA cannot conclusively establish the "injury-in-fact" element of its standing claim and is not entitled to summary judgment.

## D.
### BCA HAS NOT PROVED THAT ANY ALLEGED INJURIES ARE "FAIRLY TRACEABLE" TO THE CHALLENGED ACTIONS OF MCC

The second element of Article III standing that BCA must satisfy is the requirement that the alleged injuries be "fairly traceable" to the challenged conduct of MCC. BCA's claims in this case are based on alleged excess emissions from the Plant. MCC is permitted to emit particulate matter

from its Plant, provided those emissions do not exceed certain thresholds. BCA does not, and cannot, claim that *all* emissions from the Plant constitute permit violations.[19]

Before an alleged injury can be "fairly traceable" to a violation, there must be a showing that a violation has occurred.[20] *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 557 (5th Cir. 1996) (to establish standing, plaintiffs must show a discharge of pollutants in concentrations greater than allowed by its permit); *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 72 (3rd Cir. 1990) (stating that a plaintiff in a Clean Water Act case must show that the defendant has "discharged some pollutant in concentrations greater than allowed by its permit" to satisfy the "fairly traceable" element of Article III standing); *Natural Resources Defense Council, Inc. v. Texaco Refining & Marketing, Inc.*, 800 F. Supp. 1, 9 (D. Colo. 1992), *aff'd in part and rev'd in part on other grounds*, 2 F.3d 493 (3d Cir. 1993).

Where, as here, a plaintiff is trying to establish standing as a matter of law, it must prove that violations exist as a matter of law. If, on the other hand, a plaintiff is responding to a motion to dismiss or a motion for summary judgment, it need only allege violations, in the first instance, or show disputed facts about alleged violations, in the second instance. Here, there is *no* evidence in

---

[19] BCA acknowledges in its Complaint that MCC is entitled by permit to emit particulate matter at the Plant. BCA's claims in this case are based solely on alleged emissions in excess of permit limits.

[20] Even if there were some evidence of excess emissions, BCA, as the summary judgment movant, would have to show, as a matter of law, that the alleged exceedances were actually permit violations. *See Cedar Point Oil Co.*, 73 F.3d at 557. MCC has never admitted, in its pleadings or otherwise, that it violated any applicable permits. Even if there were a showing of excess emissions, that alone would not establish permit violations. *See Cedar Point Oil Co.*, 73 F.3d at 557. There are many situations in which permit limits do not apply, including, for example, periods of startup, shutdown and/or malfunction. See Operating Permit No. 30-098, pertinent provisions of which are attached as Exhibit G. To show that a permit violation occurred, BCA would have to establish that there were unexcused excess emissions at a time when permit limits were in effect. BCA has not even come close to making that showing in this case.

BCA's Summary Judgment Motion that, as a matter of law, MCC violated air permit. In fact, there is no evidence as to what the permitted limits are.

Of course, to establish standing as a matter of law, not only must violations exist (and BCA has not made that demonstration), but also any violations must have caused injuries about which Plaintiffs complain.

> [Satisfying the "fairly traceable" element of Article III standing] will require more than showing a mere exceedance of a permit limit. Thus if a plaintiff has alleged some harm, that the waterway is unable to support aquatic life, for example, but failed to show that defendant's effluent contains pollutants that harm aquatic life, then plaintiffs would lack standing.

*Public Interest Research Group of New Jersey, Inc.*, 913 F.2d at 72-73. In other words, BCA must establish the required link between violations and the injuries its representatives claim. This type of nexus is required in numerous Article III standing cases. *See Cache Valley Elec. Co. v. State of Utah Dep't of Transp.*, 149 F.3d 1119, 1123 (10th Cir. 1998); *Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590, 593-94 (10th Cir. 1996); *Klaver Constr. Co. v. Kansas Dep't of Transp.*, 211 F. Supp 2d. 1296, 1302 (D. Kan. 2002).

In its Summary Judgment Motion, BCA cites cases that do not require association representatives to prove that their observations occurred on the exact dates when specific permit violations occurred. *See, e.g., Texans United for a Safe Economy*, 207 F.3d at 792-93; *Sierra Club v. Tri-State Generation and Transmission Assoc., Inc.*, 173 F.R.D. 275, 280 (D. Colo. 1997). It is obvious from their depositions that BCA's representatives cannot link their alleged injuries with any purported dates of violation. While that fact alone may not necessarily be fatal to BCA's standing claims, there is a more fundamental problem that goes beyond the inability to provide exact dates.

In reviewing the testimony of BCA's representatives, it is apparent that the representatives' complaints relate to the Plant in general rather than any alleged violations at the Plant that are the subject of this lawsuit.[21]   In other words, the representatives would have the same complaints if they believed that the Plant was operating at all times within its permit requirements.[22]   They could not identify any time periods during which any emissions from the Plant were worse than at other times,[23] and they even complained about steam emissions that are not covered by the permits.[24] Because the member representatives' alleged "injuries" do not appear to relate in any manner to any permit violations at the Plant, they cannot establish as a matter of law that their alleged injuries are "fairly traceable" to any permit violations.

There is another fundamental disconnect between BCA's claims and its representatives' alleged injuries.  The representatives primarily complain about the *appearance* of the plume at the Plant, while the permit limits that are the subject of BCA's claims do not exist to enhance visual aesthetics.  Instead, they exist solely as indicators of excessive particulate emissions.  *See* Operating Permit No. 30-098, Appendix A.  The test to determine whether the existence of a plume suggests particulate emissions *might* be excessive is a visual test.[25]   It is not surprising that BCA's representatives cannot determine whether the Plant is operating within its emission limits, because

---

[21] *See, e.g.,* Wilbert Deposition, pp. 15-16.

[22] *Id.*

[23] *See, e.g.,* Barlow Deposition, p. 18; Strayer Deposition, p. 18.

[24] Wilbert Deposition, pp. 14-15.

[25] The method for determining compliance as set forth in the operating permit is EPA Reference Method 9, which involves a visual observation of the plume.  Operating Permit No. 30-098, Appendix A.

EPA regulations require that the visual test to determine if particulate emissions *might* be excessive must be conducted by a "qualified observer."[26] If it takes an "expert" to visually determine whether emissions are within applicable limits, then it is clear that non-experts (such as BCA's representatives) cannot visually make that distinction. It follows, then, that alleged "visual injuries" typically would not result from any alleged excess emissions because any such emissions would generally not be detectable by the untrained human eye.

The same is true of any odors that form the basis of the BCA representatives' complaints. BCA's representatives cannot testify as to when the odors were present.[27] One of the representatives even testified that she does not regularly smell any odors that she attributes to emissions from the Plant.[28] As a consequence, BCA cannot establish as a matter of law that any odors of which they complain are fairly traceable to any alleged excess emissions at the Plant.

Finally, as for the representatives' concerns about their health, there is no summary judgment evidence to establish any link between any alleged excess emissions from the Plan and any alleged health concerns. Further, the representatives each admitted in their depositions that they have not suffered any ill health that they can fairly attribute to the Plant, and that they have not even visited their physicians to discuss any alleged health concerns related to emissions from the Plant.[29] Under

---

[26] A "qualified observer" is defined in 40 C.F.R. Part 60 App. A-4, Method 9 (2004).

[27] *See e.g.,* Strayer Deposition, pp. 28-29; Barlow Deposition, p. 18.

[28] del Rio Deposition, pp. 12-13.

[29] Wilbert Deposition, p. 29; Barlow Deposition, p. 25; Strayer Deposition, p. 32; del Rio Deposition, pp. 16, 22.

the circumstances, they cannot conclusively establish a link between health-related issues or

concerns and the Plant.

### E.
### BCA HAS NOT PROVED THAT IT IS LIKELY THAT ANY ALLEGED INJURIES WILL BE REDRESSED BY A FAVORABLE DECISION

The third and final element BCA must show to establish standing is that the relief it seeks in

this lawsuit will be likely to redress its representatives' alleged injuries. BCA has also failed to make

that showing in this case.

"Traditionally, redressability and traceability overlap as two sides of a causation coin."

*Cache Valley Elec. Co. v. State of Utah Dept. of Transp.*, 149 F.3d 1119, 1123 (10th Cir. 1998)

(quoting *Dynalantic Corp. v. Department of Defense*, 115 F.3d 1012, 1017 (D.C. Cir. 1997)). This

characterization makes a good deal of sense, because an injury that is not caused by certain conduct

will not go away simply because that conduct is curtailed.

In this case, BCA seeks both civil penalties for alleged past violations and injunctive relief. It

must demonstrate standing separately for each form of relief sought. *See, e.g., Lyons*, 461 U.S. at

109 (finding that plaintiff had standing to pursue damages but not injunctive relief); *Lewis v. Casey*,

518 U.S. 343, 358 n.6 (1996) (stating that "standing is not dispensed in gross").

Turning first to BCA's claim for civil penalties arising from alleged past violations, the

Supreme Court has expressly held that civil penalties do not redress any injury a citizen plaintiff has

allegedly suffered from past violations. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83,

106-107 (1998). Any civil penalties collected as a result of this action would be paid directly into

the U.S. Treasury rather than to BCA. As a consequence, a payment of civil penalties related to this case would not provide any recompense to BCA for its alleged "injuries".

The Supreme Court has recently clarified that private citizens may have standing to seek civil penalties where there are ongoing violations based on the deterrent effect of penalties to abate such continuing violations. *Laidlaw Envtl. Servs.*, 528 U.S. at 185-88. Unlike the present case, the *Laidlaw* case did not involve a summary judgment motion by the plaintiffs to establish standing. As a consequence, the plaintiffs in that case were only required to provide some evidence to support each element of standing, but were not required to conclusively establish each element. By the time of the opinion in the *Laidlaw* case, there had been evidence presented and actual findings that the defendant had, in fact, engaged in violations that were continuing at the time the lawsuit was filed.

The procedural posture of the present case is substantially different. It is plaintiff BCA that is the summary judgment movant. To be entitled to summary judgment, BCA must satisfy the burden of proof for a summary judgment movant. In this case, there is no evidence that there were any past violations, much less that any alleged violations are continuing. BCA cannot meet its heavy burden for summary judgment by providing nothing more than their allegations of continuing injury. Based on the fact that BCA has not established any alleged continuing violations, it has failed to establish that its representatives alleged injuries will be redressed by civil penalties. *See Steel Co.*, 523 U.S. at 106-07.

BCA's request for summary judgment on standing related to its claim for injunctive relief must also fail for the same reason. There is no evidence of any past violations or continuing violations, so there is no showing that there is anything to redress. Even though BCA's

representatives apparently allege that they continue to suffer alleged "injuries" related to the Plant, they have never shown that any such alleged continuing injuries are the result of any violations. MCC is permitted to have emissions from the Plant within certain limitations. The Court cannot properly order MCC to abate all emissions from its Plant or properly impose any emissions requirements that are stricter than those set forth in MCC's operating permits. Because there is no showing of any violations of an ongoing nature to be corrected by any requested injunctive relief, BCA has failed to establish standing on its claim for injunctive relief.

## V.
## CONCLUSION

The current request for the Court to decide standing is not triggered by a motion to dismiss or a defensive motion for summary judgment filed by MCC. Instead, it is triggered by an offensive summary judgment motion to establish its standing as a matter of law. BCA has failed to make the showing it is required to make as a summary judgment movant. Denying the Summary Judgment Motion is not a conclusion that BCA may not have standing. It is instead a recognition that BCA has yet to *prove* standing.

Based on the foregoing, Defendant Mountain Cement Company respectfully requests that this Court in all things deny the Motion for Partial Summary Judgment as to Standing filed by Plaintiffs Biodiversity Conservation Alliance and Sierra Club in this case.

Respectfully submitted,

Philip A. Nicholas
Jason M. Tangeman
ANTHONY, NICHOLAS,

TANGEMAN & YATES, LLC
170 North Fifth Street
PO Box 0928
Laramie, WY 82073-0928
(307) 742-7140
(307) 742-7160 Fax

James B. Harris
Becky L. Jolin
Steven R. Baggett
Thompson & Knight, L.L.P
1700 Pacific, Suite 3300
Dallas, TX 75201
214-969-1102
214-880-3274 Fax

Attorneys for Defendant Mountain Cement
Company

## CERTIFICATE OF SERVICE

I, Jason M. Tangeman, certify that a copy of the above and foregoing pleading was served on Plaintiffs by hand delivery and by placing a copy of the same in the U.S. Mail, postage prepaid and addressed as follows on ____ 13 ʲᵉ____, 2005:

Reed Zars
Attorney at Law
910 Kearney Street
Laramie, WY 82070

Jason M. Tangeman

EXH A

## EXHIBIT A

Defendant objects to Plaintiffs' "facts," as set forth in its Motion for Partial Summary Judgment as follows:

1.      Defendant objects to Plaintiffs' proposed fact ¶ 4 for lack of foundation. Plaintiffs have not established that Connie Wilbert breathes the pollution plume coming from the smokestacks. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions. Additionally, Defendant objects to Plaintiffs' use of the picture attached to Connie Wilbert's Declaration as Attachment 1 for lack of foundation. Plaintiffs have not established who took the picture, the date the picture was taken, where it was taken from, or if it accurately depicts what the scene looked like on that date.

2.      Defendant objects to Plaintiffs' proposed fact ¶ 5 for lack of foundation. Plaintiffs have not established Sierra Club's interest nor how their interest would be furthered. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

3.      Defendant objects to Plaintiffs' proposed fact ¶ 6 for lack of foundation, assuming facts not in evidence, and conclusion. Plaintiffs have not established that the emission is a violation of Defendants' permit, have not established that the plume has any odor, have not established any times or dates when these events allegedly occured, have not established Ms. Wilbert's recreational, health, or aesthetic interests, and have not established how the emissions injured whatever Ms. Wilbert's interests may be. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

4.      Defendant objects to Plaintiffs' proposed fact ¶ 7 for lack of foundation, assuming facts not in evidence, and conclusion. Plaintiffs have not established that the emissions are violations, when Ms. Wilbert has seen these supposedly dirty and unpleasant plumes, how or why Ms. Wilbert is startled, whether she is depressed, or if her "injuries" are caused by emissions that are in violation of Mountain Cement's permits. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions..

5.      Defendant objects to Plaintiffs' proposed fact ¶ 8 for lack of foundation, assuming facts not in evidence, and conclusion. Once again, Plaintiffs have not established that the emissions are violations of Mountain Cement's permits, when the plume has passed across town, when Ms. Wilbert has passed near the plant, whether her children have breathed the plume, or that the plume is unhealthy. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions..

6.      Defendant objects to Plaintiffs' proposed fact ¶ 10 for lack of foundation, assuming

*Exhibit A, page 1*

EXHIBIT

A

facts not in evidence, and conclusion. Plaintiffs have not established Biodiversity Conservation Alliance's purposes. Plaintiffs have not provided sufficient evidence that Mr. Strayer is an expert to testify as to the effects of air pollution on plants, animals, and humans. Plaintiffs have not established that Mountain Cement has emissions in violation of its permits, or that the emissions cause adverse affects to Biodiversity Conservation Alliance's members. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

7.      Defendant objects to Plaintiffs' proposed fact ¶ 11 for lack of foundation, assuming facts not in evidence, and conclusion. Plaintiffs have not established that Mr. Strayer is adversely affected by emissions from the Laramie Plant, that Mountain Cement's emissions are in violation of its permits, if or when Mr. Strayer has observed emissions from Mountain Cement Company that are in violation of its permits, or when the plume has blown to the green-belt causing Mr. Strayer to avoid the area. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

9.      Defendant objects to Plaintiffs' proposed fact ¶ 12 for lack of foundation and assuming facts not in evidence. Plaintiffs have not established who took the picture, when the picture was taken, where the picture was taken from, or if the picture accurately reflects the scene on the day it was taken. Furthermore, Plaintiffs have not established if the emissions are violations of Mountain Cement's operating permits. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

10.      Defendant objects to Plaintiffs' proposed fact ¶ 13 for lack of foundation, assuming facts not in evidence, and conclusion. Plaintiffs have not established that the smell comes from Mountain Cement's emissions, that Mr. Strayer has breathed the emissions, that Mountain Cement's emissions are in violation of its operating permits, what Mr. Strayer's health, recreational, or aesthetic interests are, or whether his "injuries" to these interests are caused by emissions in violation of Mountain Cement's permits. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

11.      Defendant objects to Plaintiffs' proposed fact ¶ 14 for lack of foundation and assuming facts not in evidence. Plaintiffs have not established that Mountain Cement's emissions violate its operating permits. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

12.      Defendant objects to Plaintiffs' proposed fact ¶ 15 for lack of foundation and assuming facts not in evidence. Plaintiffs have not established that Mountain Cement's emissions are in violation of its operating permit, that Ms. Barlow has observed violating emissions, or that violating emission are the cause of Ms. Barlow's troubles or degrade the beauty of the Laramie Valley. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

*Exhibit A, page 2*

13.     Defendant objects to Plaintiffs' proposed fact ¶ 16 for lack of foundation, assuming facts not in evidence, and conclusions. Plaintiffs have not established that Mountain Cement's emissions are above permitted levels, that any emissions are beyond legal limits, or that emissions are the cause of safety issues. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

14.     Defendant objects to Plaintiffs' proposed fact ¶ 17 for lack of foundation and assuming facts not in evidence. Plaintiffs have not established that the cause of any smell is from Mountain Cement's emissions, or that the emissions are in violation of Mountain Cement's operating permits. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

15.     Defendant objects to Plaintiffs' proposed fact ¶ 18 for lack of foundation, assuming facts not in evidence, and conclusion. Plaintiffs have not established that Mountain Cement is "dumping pollution into our air in larger amounts than its permit allows." Plaintiffs have not established that Mountain Cement's emissions are harmful to their health. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

16.     Defendant objects to Plaintiffs' proposed fact ¶ 19 for lack of foundation and assuming facts not in evidence. Plaintiffs have not established that Mountain Cement is violating its operating permits. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

17.     Defendant objects to Plaintiffs' proposed fact ¶ 20 for lack of foundation, assuming facts not in evidence, and conclusion. Plaintiffs have not established that Mountain Cement emissions are "excessive" or in violation of its operating permit, or that the emissions affect Ms. Martinez del Rio's family's health. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

18.     Defendant objects to Plaintiffs' proposed fact ¶ 21 for lack of foundation, assuming facts not in evidence, and conclusion. Plaintiffs have not established that Mountain Cement discharges any set amount of pollutants into the air or that any emissions are violations of Mountain Cement's operating permits. The Declaration upon which Plaintiffs' rely is vague, conclusory, and lack the facts needed to support their conclusions.

19.     Defendant objects to Plaintiffs' proposed fact ¶ 24 for lack of foundation and assuming facts not in evidence. Contrary to Plaintiff's allegation, Mountain Cement did not make such an admission in its Answer.

20.     Defendant objects to Plaintiffs' proposed fact ¶ 26 for irrelevancy. What other company's or plants have done concerning emissions equipment or why they have done it, is

*Exhibit A, page 3*

irrelevant to whether or not Mountain Cement has violated its operating permit. Furthermore, the Wyoming Department of Environmental Quality has determined that Mountain Cement's Electrostatic Precipitator is BACT and Wyoming Department of Environmental Quality has permitted Mountain Cement to us an Electrostatic Precipitator.

21.    Defendant objects to Plaintiffs' proposed fact ¶ 27 for irrelevancy, assuming facts not in evidence, and lack of foundation. Plaintiffs have not established why Mountain Cement has a baghouse on its Kiln #1. Furthermore, the fact that Mountain Cement has a baghouse on Kiln #1 is irrelevant to whether or not Mountain Cement is violating its operating permit at Kiln #2 or at its Clinker Coolers.

*Exhibit A, page 4*

**EXHIBIT B**

If Defendants' objections are granted, the following are the undisputed facts that remain:

1.    Mountain Cement's Laramie Plant is located approximately three miles south of Laramie, Wyoming. The Laramie Plant manufactures Portland cement using two coal-fired kilns and associated equipment.

2.    Mountain Cement's Kiln #1 has a rated production capacity of 600 tons of product per day. Kiln #2 has a rated production capacity of 1,500 tons of product per day.

3.    Mountain Cement is a wholly-owned subsidiary of Eagle Materials, Inc., a Dallas, Texas based corporation. Eagle Materials, with over $500,000,000 in sales in 2004, also owns cement manufacturing plants in Nevada, Texas and Illinois. See, Defendants Corporate Disclosure Statement.

4.    The COMs in the smokestack at the Laramie Plant monitor visible emissions that can be seen by the naked eye after the emissions exit the stack. The emissions identified by the COMs at Mountain Cement can contribute to a visible plume emanating from the smokestacks, and these emissions can contribute to a reduction in visibility in the area.

5.    Connie Wilbert is a Laramie resident and member of the Sierra Club.

6.    Bob Strayer is a Laramie resident and member of the Biodiversity Conservation Alliance, and lives within three miles of the Laramie Plant.

7.    Michele Barlow is a Laramie resident and a member of the Sierra Club and Biodiversity Conservation Alliance.

8.    Ms. Wilbert, Mr. Strayer, and Ms. Barlow are concerned about their health.

Philip A. Nicholas
Mitchell H. Edwards
Anthony, Nicholas, Tangeman & Yates, LLC
170 N. Fifth Street
P.O. Box 0928
Laramie, WY 82073
(307) 742-7140
(307) 742-7160 Fax

James B. Harris
Becky L. Jolin
Thompson & Knight, L.L.P
1700 Pacific, Suite 3300
Dallas, TX 75201
214-969-1102
214-880-3274 Fax

Attorneys for Defendant Mountain Cement Company

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **Biodiversity Conservation Alliance and Sierra Club,** | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 04CV 361-B |
| **v.** | ) ) | |
| **Mountain Cement Company,** | ) ) | |
| Defendant. | ) | |

### AFFIDAVIT OF PHILIP A. NICHOLAS

I, Philip A. Nicholas, deposes and says as follows:

1.     At all times relevant to this proceeding, I have been an attorney with the law firm of Anthony, Nicholas, Tangeman & Yates, LLC, counsel for Defendant Mountain Cement Company. I make the statements in this Affidavit based upon my personal knowledge, and I am competent to testify regarding the matters set forth herein.

2.     Biodiversity Conservation Alliance filed its Complaint against Mountain Cement Company on December 23, 2004.

3.     I am a member of the Wyoming Legislature, and during the months of January, February, and March I was serving in Wyoming my public capacity.

*Affidavit of Philip A. Nicholas – Page 1*


EXHIBIT
C

4. On March 22, 2005, the initial pretrial conference was held before Magistrate Judge William C. Beaman. At that conference a schedule was set concerning discovery and trial. The Discovery Cutoff Date and Dispositive Motion Deadline is July 8, 2005.

5. On March 3, 2005 Plaintiffs served their Initial Disclosures and Notification on Defendant. In their Initial Disclosures, Plaintiffs for the first time made Defendants aware of the members that Plaintiffs were representing.

6. On March 30, 2005 Plaintiffs served their Motion for Partial Summary Judgment on Standing along with supporting Declarations from Plaintiffs' members.

7. As a result of this case being recently filed, Defendant recently being made aware of Plaintiffs member representatives, my legislative service, and my schedule I not been able to take the depositions of Plaintiffs' member representatives: Ms. Wilbert, Mr. Strayer, or Ms. Martinez del Rio.

8. The affidavits of Plaintiffs' members are highly subjective and contain matter which is vague, conclusory, without foundation. The Plaintiffs members are in sole possession of many of the facts they allege in their affidavits, and Defendant can not respond to such matter without taking the depositions of the Plaintiffs' Declarants.

Dated this _15_ day of April, 2005.

_____
Philip A. Nicholas

State of Wyoming          )
                         ) ss.
County of Albany          )

Subscribed and sworn before me by Mr. Philip A. Nicholas on this _15_ day of April, 2005.

Witness my hand and official seal.

_____
Notary Public

My commission expires: _____



ANGELA R. SANFORD-NOTARY PUBLIC
County of Albany   State of Wyoming
My Commission Expires July 9, 2008

*Affidavit of Philip A. Nicholas – Page 2*

EXH B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---------------------------------------------------------
BIODIVERSITY CONSERVATION ALLIANCE
and SIERRA CLUB,

    Plaintiffs,

  vs.      Case No. 04-CV-361-B

MOUNTAIN CEMENT COMPANY,

    Defendant.
---------------------------------------------------------


DEPOSITION OF CONNIE WILBERT
Taken in behalf of Defendant

12:38 a.m., Tuesday
May 3, 2005


    PURSUANT TO NOTICE, the deposition of CONNIE

WILBERT was taken in accordance with the applicable

Federal Rules of Civil Procedure at the offices of

Anthony, Nicholas, Tangeman & Yates, LLC, 170 N. Fifth

Street, Laramie, Wyoming, before Kathy J. Mullivan, a

Registered Professional Reporter, and a Notary Public in

and for the State of Wyoming.



**EXHIBIT**

B

Page 2

```
 1                    A P P E A R A N C E S
 2    For the Plaintiffs:          MR. REED ZARS
                                   Attorney at Law
 3                                 910 Kearney Street
                                   Laramie, Wyoming  82070
 4
      For the Defendant:           MR. STEVEN R. BAGGETT
 5                                 Attorney at Law
                                   THOMSON & KNIGHT, LLP
 6                                 1700 Pacific Avenue
                                   Suite 3300
 7                                 Dallas, Texas  75201

 8                                 MR. JASON TANGEMAN
                                   Attorney at Law
 9                                 ANTHONY, NICHOLAS, TANGEMAN
                                   & YATES, LLC
10                                 170 N. Fifth Street
                                   P. O. Box 0928
11                                 Laramie, Wyoming  82073
```

## I N D E X

13   DEPOSITION OF CONNIE WILBERT:     PAGE
    Direct - Mr. Baggett     3
14   Cross - Mr. Zars     34

## E X H I B I T S

| No. | Description | Identified |
| --- | --- | --- |
| 9 | Amended Notice of Deposition Duces Tecum | 6 |
| 10 | Declaration | 32 |

(Exhibits bound separately.)

1                        P R O C E E D I N G S

2                        (Deposition proceedings commenced

3                        12:38 p.m., May 3, 2005.)

4                        CONNIE WILBERT,

5    called as a witness on behalf of the Defendant, being

6    first duly sworn, testified as follows:

7                        DIRECT EXAMINATION

8        Q.    (BY MR. BAGGETT)  Miss Wilbert, my name, again,

9    is Steve Baggett.  I represent the defendant, Mountain

10   Cement Company, in this lawsuit.  Do you understand that?

11       A.    Yes.

12       Q.    Okay.  Have you ever given a deposition before?

13       A.    No, I haven't.

14       Q.    I'm sure you had an -- some opportunity to talk

15   with your attorney beforehand about sort of this process

16   and how it works, but basically what we're doing here is

17   we're sort of taking a recorded statement.  I'll ask you

18   questions.  You'll answer the questions.  The court

19   reporter's taking down your testimony and it can be used

20   in court as though we were in a trial or in a hearing

21   before the judge.  It will be put down in a transcript

22   that can be read in court and otherwise used in court

23   proceedings.

24              So that the court reporter can get a good

25   transcript, it's very important that you respond audibly

1    on more than one occasion?

2        A.    I'm trying to remember now.  It's been probably

3    a couple months ago.

4                    MR. ZARS:  Just answer the question, if you

5    can.

6                    THE DEPONENT:  I'm sorry.  I'm not sure.

7        Q.    (BY MR. BAGGETT)  Okay.

8        A.    I think only one, but it could have been two.

9        Q.    And you think it was about a couple months ago

10   that you took the pictures?

11       A.    Yes.

12       Q.    Was it -- let's see, would it have been during

13   the month of March?

14       A.    I couldn't say accurately.  I'm sorry.

15       Q.    Do you know about how many pictures you took?

16       A.    Three or four.

17       Q.    What were you trying to depict in those

18   photographs or what were you trying to show?

19       A.    I was trying to show what I saw which was a

20   plume of smoke coming from the cement plant stacks and

21   then spreading out horizontally.

22       Q.    About how many pictures did you take that day?

23       A.    I would say three or four.

24       Q.    And you no longer have those, correct?

25       A.    No.

a8c38fd9-8ad7-49bb-8afd-8517f82e5fc6

1      Q.     And why did you delete those?

2      A.     Because when I looked at the photographs, they

3 did not show accurately what I had seen.

4      Q.     And you don't have any other photographs or

5 negatives of photographs, correct?

6      A.     No, right.

7      Q.     Do you have any logs or diaries related to the

8 events or statements in your declaration?

9      A.     No.

10     Q.     Do you have any medical records for any sort of

11 health-related illnesses that you would associate with

12 MCC's Laramie plant?

13     A.     No.

14     Q.     Do you have any documents, records, files,

15 communications, related to the events and statements

16 contained in your declaration?

17     A.     No.

18     Q.     Are you a member of any sort of environmental

19 groups?

20     A.     Yes, I'm a member of the Sierra Club.

21     Q.     Any others?

22     A.     My husband and I, I think, have a joint

23 membership in the Audubon Society.  I believe that we're

24 still members of the National Wildlife Federation,

25 although I'm not sure that membership is current.  I'd

1    Q.    What is it -- is there anything -- do you have

2  any concerns about those emissions from a visual

3  standpoint, from what you see?

4    A.    Yes.

5    Q.    What is it you see that concerns you?

6    A.    I -- it disturbs me to see the plume of smoke

7  coming out of the stacks at Mountain Cement.  Sometimes

8  when the weather conditions are right, that plume spreads

9  out horizontally and stretches amazingly long distances up

10  the valley or down the valley or both, that is, to the

11  north and south.  I greatly value the -- the clean

12  environment that we're lucky to have here in Laramie, in

13  particular, and Wyoming in general.  And it disturbs me to

14  see that polluted air, that dirtiness in the air.  I don't

15  want to see our air dirty like that.  I don't like looking

16  across our valley and not being able to clearly see the

17  hills on the other side of it.

18    Q.    Is it fair to say that -- that any emissions

19  from that plant are disturbing to you?

20    A.    I would say when I see a white cloud of what I

21  assume is steam coming up from the stacks, that dissipates

22  right above the stacks, that is less disturbing to me than

23  when I see a cloud come up and accumulate in the air,

24  which is often the case.

25    Q.    You used the phrase less disturbing to describe

a8c38fd9-8ad7-49bb-8afd-8517f82e5fc6

1    the steam.   Is steam disturbing to you at all?

2         A.    Yes.

3         Q.    How is that?

4         A.    I'm certainly not an expert on air pollution,

5    but I have read articles that indicate that steam can

6    carry quite a few minute particles which are damaging to

7    the environment in one way and another.  So I don't

8    believe that simply because it appears that it's only

9    steam coming out of the stacks that it's harmless.  I

10   don't make that assumption.

11        Q.    All right.  And the other plume that you see

12   coming out of the stacks, you're very disturbed by; is

13   that correct?

14        A.    Yes.

15        Q.    Is there any time that you've seen any plume

16   coming out of the stacks that you haven't been disturbed

17   by?

18        A.    No.

19        Q.    So your concern is really with any emissions at

20   all of any sort of particulate matter coming out of the

21   stacks, correct?

22        A.    When I can see the emissions, that concerns me,

23   yes.

24        Q.    If you can see them at all, it concerns you,

25   correct?

1     A.    Yes.

2     Q.    Okay.  You had mentioned seeing plumes coming

3   out of the stacks, do you always see plumes coming out of

4   the stacks?

5     A.    No.

6     Q.    How often do you see the plumes coming out of

7   the stacks?

8     A.    It's difficult for me to quantify this, because

9   I don't keep a log.  I have not kept a diary, I have not

10   documented anything in terms of numbers of times or

11   specific dates.  I am hesitant to guesstimate a

12   percentage, because I'm not sure that I'm comfortable

13   doing that.  I would say sometimes when I see the plant,

14   there is no visible material coming out of the stacks, and

15   other times when I see the plant there is a visible cloud

16   of steam and/or smoke or polluted material coming out of

17   the stacks.

18     Q.    And -- but as you sit here today, you can't say

19   when you see that and when you don't see it and you don't

20   have any specific dates or anything for measuring?

21     A.    No, I don't.

22     Q.    Do you remember when the last time was that you

23   saw it?

24     A.    I think it was -- let me think, two mornings

25   ago, early in the morning.

a8c38fd9-8ad7-49bb-8afd-8517f82e5fc8

1    Q.    Can you see the plume from your house?

2    A.    No.

3    Q.    Can you see the -- and you also can't see the

4    part -- when it stretches out over the valley, you can't

5    see that from your house; is that correct?

6    A.    I can't see that in the sense I can't tell for

7    sure it's coming from the plant.  I can sometimes from my

8    house, through the trees, see clouds or the plume, but I

9    can't tell from my house that -- that that -- in the sky

10   that I see is coming from the plant.  That's not visible

11   from my house.

12   Q.    Is there anything that you see other than the

13   plume that spreads out -- that sometimes spreads out over

14   the valley that comes out of the stacks that concerns you?

15   I'm just talking about visually what you see with your

16   eyes at this point.

17   A.    Anything related to the plant that I have

18   seen --

19   Q.    Yes.

20   A.    -- that concerns me?

21   Q.    Yes.

22   A.    I would say occasionally I have seen, when we've

23   had windy conditions, they seem to have a lot of loose

24   material out there that blows and is -- can be dense

25   sometimes.  I've certainly seen that.

1      A.    I can carry on.

2      Q.    That's fine.

3      A.    Okay.

4      Q.    And Bob -- to your recollection Bob Strayer is

5  the only person you've really discussed the issue of

6  emissions from the plant with?

7      A.    Yes.

8      Q.    No one else in your neighborhood has complained

9  to you about it?

10     A.    No.

11     Q.    What is your educational background?

12     A.    I have a Bachelor's degree in zoology and botany

13  and I have a Master's degree in zoology.

14     Q.    Where did you get those degrees?

15     A.    University of Wyoming.

16     Q.    Are you generally a healthy person?

17     A.    Yes.

18     Q.    Have you had any health problems that you

19  associate with any emissions from the plant?

20     A.    No.

21     Q.    And you haven't been to a doctor to discuss any

22  sort of health-related issues associated -- that you

23  associate with the plant, correct?

24     A.    That's correct, I have not.

25     Q.    And other than changing your bike route or every

1    A.   Uh-huh.  Well, I've been there and I've left.

2    Q.   Okay.  Was it because of what you smelled when

3  you were there?

4    A.   Yes.

5    Q.   And it's that same odor we've been discussing

6  before?

7    A.   Yes.

8    Q.   Did anybody else leave the greenhouse, that you

9  know of, on the days that you left because of that odor?

10    A.   No.

11    Q.   Have you ever been there at a time when anyone

12  else has left because of any concerns about any emissions

13  from the plant?

14    A.   No one has ever told me they have done so when

15  I've been there.

16    Q.   Do you know the owners of that greenhouse?

17    A.   No.

18    Q.   Other than changing your bike route or not

19  biking and leaving the greenhouse early once or twice,

20  anything else that you've been curtailed from doing as a

21  result of any emissions at the plant?

22    A.   No.

23    Q.   Okay.  And you understand -- do you understand

24  that the plant has a permit that enables the plant to emit

25  certain particulates?  Is that your understanding?

Page 32

1      A.    My understanding is that under their permit they

2  can emit up to a certain level, yes.

3      Q.    Are you able to distinguish, visually or

4  otherwise, yourself whether emissions from the plant are

5  less than those levels or whether you think they exceed

6  the levels?

7      A.    No.

8      Q.    Are you concerned about your health even during

9  the times when the plant emissions are within the levels

10  that they are permitted for under the permit?

11      A.    I have no way of knowing, as I just said, when

12  the plant is exceeding its limits.

13              MR. BAGGETT:  Okay.  Go off the record for

14  a second.

15              (Deposition proceedings recessed

16                  1:37 p.m. to 1:39 p.m.)

17              MR. BAGGETT:  Okay.  Back on the record.

18      Q.    (BY MR. BAGGETT)  Miss Wilbert, do you know a

19  Carol Garbut?

20      A.    No.

21      Q.    Rose Rasmussen?

22      A.    Nope.

23      Q.    Ed Rasmussen?

24      A.    No.

25              (Deposition Exhibit No. 10

1              marked for identification.)

2      Q.     Show you what has been marked as Deposition

3 Exhibit Number 10.  Have you seen that document before?

4      A.     Yes.

5      Q.     Is that a true and correct copy of your

6 declaration in this case?

7      A.     Yes.

8      Q.     And it bears your signature and dated March 1,

9 2005?

10     A.     Yes.

11     Q.     Is this a document you prepared or someone else

12 prepared that you signed?

13     A.     I prepared this.

14     Q.     Okay.  You wrote all the words on it yourself?

15     A.     Yes, I did.

16     Q.     Okay.  Were you asked at some point to prepare a

17 declaration for this lawsuit?

18     A.     Yes.

19     Q.     When were you first asked to do that?

20     A.     Sometime soon before this was -- this was done.

21 I don't remember exactly.

22     Q.     Just sometime in a couple or two or three weeks

23 before?

24     A.     I believe it was earlier than that.

25     Q.     Who asked you to do that?

a8c38fd9-8ad7-49bb-8afd-8517f82e5fc6

1    A.    I honestly don't remember exactly who asked me.

2  We were discussing the situation and I indicated that I

3  was interested in being involved in it as a member of the

4  Sierra Club.  It probably was Reed Zars who explained the

5  process of what we needed to go through and that I would

6  need to prepare a deposition.

7    Q.    Yeah, I was going to say don't get into any

8  discussions that you've had with him, because he's your

9  attorney and we've got privilege issues associated with

10  that.

11           MR. BAGGETT:  I'll pass the witness.

12           MR. ZARS:  Okay.  I just have one question

13  on the -- on the greenhouse.

14                    CROSS-EXAMINATION

15    Q.    (BY MR. ZARS)  I'm not sure I heard this

16  exactly correctly, but it seemed to come out that

17  when you had said you had left on several occasions

18  when the pollution from the Mountain Cement plant was

19  too much, and then you were asked whether you knew of

20  anyone else who had left, and I think you said no, do

21  you know whether anyone else had, in fact, left or on

22  what do you base your information on what other people

23  may or may not have done?

24           MR. BAGGETT:  I'm going to object to that

25  question based on form, because I think it mischaracterizes

a8c38fd9-8ad7-49bb-8afd-8517f82e5fc6

Page 37

1                    DEPONENT'S CERTIFICATE

2

3           I, CONNIE WILBERT, do hereby certify that I

4    have read the foregoing transcript of my testimony

5    consisting of 36 pages taken on May 3, 2005, and that the

6    same is a full, true and correct record of my deposition.

7

8

9

10                              _____
                                CONNIE WILBERT

11

12        (  ) No changes        (  ) Changes attached

13

14           Subscribed and sworn to before me this

15    _____ day of _____, 200_.

16

17

18

19

20                              _____
                                Notary Public

21

22    My commission expires:

23

24

25

**WYOMING REPORTING SERVICE, INC.**
**1-800-444-2826**

a8c38fd9-8ad7-49bb-8afd-8517f82e5fc6

Page 38

1                     C E R T I F I C A T E

2

3

4             I, KATHY J. MULLIVAN, a Registered Professional

5    Reporter and a Notary Public of the State of Wyoming, do

6    hereby certify that the aforementioned witness was by me

7    first duly sworn to testify to the truth, the whole truth,

8    and nothing but the truth;

9             That the foregoing transcript is a true record

10   of the testimony given by the said deponent, together with

11   all other proceedings herein contained.

12            IN WITNESS WHEREOF, I have hereunto set my hand

13   and affixed my Notarial Seal this _____ day of _____,

14   200_.

15

16

17

18                       _____
                              KATHY J. MULLIVAN
19                       Registered Professional Reporter

20   My commission expires April 5, 2007.

21

22

23

24

25

a8c38fd9-8ad7-49bb-8afd-8517f82e5fc6

EXH C

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

--------------------------------------------------------

BIODIVERSITY CONSERVATION ALLIANCE
and SIERRA CLUB,

          Plaintiffs,

     vs.               Case No. 04-CV-361-B

MOUNTAIN CEMENT COMPANY,

          Defendant.

--------------------------------------------------------

DEPOSITION OF MICHELE BARLOW
Taken in behalf of Defendant

9:33 a.m., Tuesday
May 3, 2005

PURSUANT TO NOTICE, the deposition of MICHELE

BARLOW was taken in accordance with the applicable Federal

Rules of Civil Procedure at the offices of Anthony,

Nicholas, Tangeman & Yates, LLC, 170 N. Fifth Street,

Laramie, Wyoming, before Kathy J. Mullivan, a Registered

Professional Reporter, and a Notary Public in and for the

State of Wyoming.

EXHIBIT

tabbies

C

WYOMING REPORTING SERVICE, INC.
1-800-444-2826

8052dfce-a57d-4499-85db-1d3d54ee05f9

1                    A P P E A R A N C E S

2    For the Plaintiffs:          MR. REED ZARS
                                  Attorney at Law
3                                 910 Kearney Street
                                  Laramie, Wyoming  82070
4

     For the Defendant:           MR. STEVEN R. BAGGETT
5                                 Attorney at Law
                                  THOMSON & KNIGHT, LLP
6                                 1700 Pacific Avenue
                                  Suite 3300
7                                 Dallas, Texas  75201

8                                 MR. JASON TANGEMAN
                                  Attorney at Law
9                                 ANTHONY, NICHOLAS, TANGEMAN
                                  & YATES, LLC
10                                170 N. Fifth Street
                                  P. O. Box 0928
11                                Laramie, Wyoming  82073

12                         I N D E X

13   DEPOSITION OF MICHELE BARLOW:                    PAGE

14   Direct - Mr. Baggett                               3
     Cross - Mr. Zars                                  40
15   Redirect - Mr. Baggett                            42

16

17                       E X H I B I T S

18   No.               Description              Identified

19   1      Declaration                              14

20   2      Requests for Production                  27

21   3      Photo                                    30

22   4      Photo                                    30

23   5      Map                                      36

24           (Exhibits bound separately.)

25

WYOMING REPORTING SERVICE, INC.
1-800-444-2826

8052dfce-a57d-4499-85db-1d3d54ee05f9

1                    P R O C E E D I N G S

2              (Deposition proceedings commenced

3              9:33 a.m., May 3, 2005.)

4                    MICHELLE BARLOW,

5    called as a witness on behalf of the Defendant, being

6    first duly sworn, testified as follows:

7                    DIRECT EXAMINATION

8         Q.    (BY MR. BAGGETT)   Good morning, Miss Barlow.

9         A.    Good morning.

10        Q.    We met a little bit earlier.  Let me reintroduce

11   myself for the record.  I'm Steve Baggett.  I'm here today

12   representing Mountain Cement Company, who is the defendant

13   in this lawsuit.  Do you understand that?

14        A.    I do.

15        Q.    Have you ever given a deposition before?

16        A.    I have not.

17        Q.    Okay.  Have you ever testified in court before?

18        A.    I have not.

19        Q.    I'm sure you've had an opportunity to speak with

20   your counsel, Mr. Zars, about depositions and what we're

21   doing here today, basically.

22             Let me just go over sort of a few ground rules

23   that will help make this go a little more smoothly.  If

24   you don't understand a question I'm asking, please be sure

25   to ask me to repeat it or rephrase it, because we want to

8052dfce-a57d-4499-85db-1d3d54ee05f9

Page 14

1      Q.     (BY MR. BAGGETT)   How far away is your house

2   from the Mountain Cement Company plant that is the subject

3   of this lawsuit?

4      A.     I've never calculated the mileage.  As the crow

5   flies, I would guess it's approximately two and a half

6   miles.  By the road, between three and four.

7      Q.     Could you see the plant from your house?

8      A.     I cannot.

9      Q.     Are there obstructions that would keep you from

10  seeing it?

11     A.     Yes.

12     Q.     Trees, other buildings, that sort of thing?

13     A.     Trees and other buildings.

14     Q.     You recall signing a declaration in connection

15  with that case?

16     A.     I do.

17     Q.     Is it a declaration that you drafted or did

18  someone else draft it and present it to you for signature?

19     A.     I drafted the declaration.

20                         (Deposition Exhibit No. 1

21                         marked for identification.)

22     Q.     I show you Deposition Exhibit Number 1, ask you

23  if you've seen that document before.

24     A.     I have.

25     Q.     Is that a true and correct copy of your

8052dfce-a57d-4499-85db-1d3d54ee05f9

Page 17

1    Q.    Are there times when it's -- when it's better

2    and times when it's worse or are you concerned all the

3    time?

4    A.    I'm concerned when I see large volumes of

5    pollution emitted, more than when I am concerned -- more

6    than my level of concern when I see smaller volumes

7    emitted.

8    Q.    When you say large volumes of pollution, can you

9    describe what you're talking about, what you -- what you

10   see and what you consider to be a large volume of

11   pollution?

12   A.    I can.  I often see what appears to be a large

13   white cloud coming directly out of the stack.  And

14   subsequent to that, on occasion, a brown haze lingers

15   above the plant.

16   Q.    How often do you see a large white cloud emitted

17   out of the stacks?

18   A.    I don't know.

19   Q.    Can you think of a specific date that you've

20   seen the large white cloud that you've just discussed that

21   concerns you?

22   A.    Yesterday I saw a large white cloud that I just

23   mentioned.

24   Q.    Some days it's smaller and some days it's

25   larger?

8052dfce-a57d-4499-85db-1d3d54ee05f9

1     A.    That's correct.

2     Q.    Yesterday was a day that was larger?

3     A.    I can't remember.

4     Q.    Any other days that you specifically recall that
5  you saw a larger white cloud?

6     A.    I don't keep a log and I don't keep a diary of
7  when I see the large clouds versus medium clouds versus
8  small clouds.

9     Q.    So you don't specifically remember when it's
10 worse and when it's better; is that correct?

11    A.    Yeah, I don't have a log of that information.

12    Q.    There are two stacks at the plant; is that
13 correct?

14    A.    Yes, that's what I observe.

15    Q.    Do you see clouds coming out of each of them?

16          MR. ZARS:  Can I hold up for one second?
17 We're using the term cloud that I take to mean a cloud in
18 the sky.  Can you clarify what you're talking about when
19 you say cloud, please?

20          MR. BAGGETT:  I think it was her
21 terminology.

22    Q.    (BY MR. BAGGETT)  I -- you know what a plume is?

23    A.    I do.

24    Q.    You understand that term --

25    A.    Sure.

8052dfce-a57d-4499-85db-1d3d54ee05f9

1    Q.    -- as people use it?

2          Is that what you're referring to when you refer

3    to a cloud?

4    A.    Yes.  When I say the word cloud, I mean plume.

5    Q.    Do you see plumes coming out of both stacks?

6    A.    I do.

7    Q.    And when you see the large white cloud or the

8    large white plume, as you would describe it, is that the

9    combination of what's coming out of both of those stacks

10   or is it coming out of one or another?

11   A.    The plume that's the most -- I guess the largest

12   plume comes out of the northern most stack, a smaller

13   plume is -- comes out of the south stack.

14   Q.    And do those plumes sort of come together and

15   make a bigger plume?

16   A.    I don't know.

17   Q.    And is -- the plume that you're talking about,

18   that you see that -- that troubles you from I think you

19   said the northern stack, is it the size of the plume that

20   troubles you, how big it is?

21   A.    Yes.  It's the size and it's other factors.

22   Q.    What other factors other than the size?

23   A.    The brown haze that lingers after the white

24   component of the plume disappears.

25   Q.    Anything else?

1      A.      I cannot smell the odors from the truck stops at
2  my house.
3      Q.      But are you in the area where you can smell
4  those from time to time?
5      A.      I occasionally do go by truck stops.
6      Q.      Are you concerned about the air pollution from
7  the trucks?
8      A.      As a general matter, yes.
9      Q.      Have you ever complained to any of the trucking
10  companies or truck stops about the odors emitted from
11  truck exhaust?
12      A.      I have not complained to truck stops.
13      Q.      To your knowledge, has any of the groups that
14  you've been a member of made such a complaint?
15      A.      To my knowledge, no.
16      Q.      Are you a healthy person?
17      A.      Yes.
18      Q.      Do you have any health complaints that you
19  attribute to what you see or what you smell that you
20  believe comes from the plant?
21      A.      I do not have any health complaints that I know
22  can be traced at this point in time to the Mountain Cement
23  plant, but I cannot predict what future health impacts may
24  result from the pollution.
25      Q.      Have you visited a doctor to discuss any of

1   these concerns that you have?

2        A.    I have not.

3        Q.    Okay.  Were you involved at all in the process

4   for permit approval of the plant back in the -- I guess

5   the 1980s?

6        A.    I was not involved in permit approval.

7        Q.    Did you live here at the time?

8        A.    I did not.

9        Q.    Back in --

10        A.    I did not live in Laramie in the 1980s.

11        Q.    Okay.  Do you understand that the plant is

12   allowed, by permit, to emit a certain -- to emit a certain

13   level of clouds or plumes?

14        A.    I do understand that the plant is allowed to

15   emit pollutants.

16        Q.    Do you have a problem or a concern with what the

17   plant is allowed by permit to emit?

18        A.    I do not have concern with the allowable

19   emission limits.

20        Q.    Have you ever complained about the allowable

21   emission limits?

22        A.    I have not complained about those limits.

23        Q.    Do you know anyone who works at the plant?

24        A.    I do not.

25        Q.    Or do you know anyone who used to work there?

8052dfce-a57d-4499-85db-1d3d54ee05f9

Page 45

1                       DEPONENT'S CERTIFICATE

2

3           I, MICHELE BARLOW, do hereby certify that I

4    have read the foregoing transcript of my testimony

5    consisting of 44 pages taken on May 3, 2005, and that the

6    same is a full, true and correct record of my deposition.

7

8

9

10                                    _____

                                      MICHELE BARLOW

11

12        (  ) No changes       (  ) Changes attached

13

14          Subscribed and sworn to before me this

15   _____ day of _____, 200_.

16

17

18

19

20                                    _____

                                      Notary Public

21

22   My commission expires:

23

24

25

8052dfce-a57d-4499-85db-1d3d54ee05f9

Page 46

1                    C E R T I F I C A T E

2

3

4          I, KATHY J. MULLIVAN, a Registered Professional

5   Reporter and a Notary Public of the State of Wyoming, do

6   hereby certify that the aforementioned witness was by me

7   first duly sworn to testify to the truth, the whole truth,

8   and nothing but the truth;

9          That the foregoing transcript is a true record

10  of the testimony given by the said deponent, together with

11  all other proceedings herein contained.

12          IN WITNESS WHEREOF, I have hereunto set my hand

13  and affixed my Notarial Seal this _____ day of _____,

14  200_.

15

16

17

18                    _____
                              KATHY J. MULLIVAN
19                       Registered Professional Reporter

20  My commission expires April 5, 2007.

21

22

23

24

25

8052dfce-a57d-4499-85db-1d3d54ee05f9

EXH D

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

------------------------------------------------------------

BIODIVERSITY CONSERVATION ALLIANCE
and SIERRA CLUB,

        Plaintiffs,

vs.                Case No. 04-CV-361-B

MOUNTAIN CEMENT COMPANY,

        Defendant.

------------------------------------------------------------


DEPOSITION OF BOB STRAYER
Taken in behalf of Defendant

10:58 a.m., Tuesday
May 3, 2005


        PURSUANT TO NOTICE, the deposition of BOB

STRAYER was taken in accordance with the applicable

Federal Rules of Civil Procedure at the offices of

Anthony, Nicholas, Tangeman & Yates, LLC, 170 N. Fifth

Street, Laramie, Wyoming, before Kathy J. Mullivan, a

Registered Professional Reporter, and a Notary Public in

and for the State of Wyoming.



EXHIBIT

D

WYOMING REPORTING SERVICE, INC.
1-800-444-2826

8ec94510-0e71-4fb0-b9e1-f5f7324d1d35

Page 2

1                    A P P E A R A N C E S

2   For the Plaintiffs:          MR. REED ZARS
                                 Attorney at Law
3                                910 Kearney Street
                                 Laramie, Wyoming  82070
4

    For the Defendant:           MR. STEVEN R. BAGGETT
5                                Attorney at Law
                                 THOMSON & KNIGHT, LLP
6                                1700 Pacific Avenue
                                 Suite 3300
7                                Dallas, Texas  75201

8                                MR. JASON TANGEMAN
                                 Attorney at Law
9                                ANTHONY, NICHOLAS, TANGEMAN
                                 & YATES, LLC
10                               170 N. Fifth Street
                                 P. O. Box 0928
11                               Laramie, Wyoming  82073

12                       I N D E X

13  DEPOSITION OF BOB STRAYER:                      PAGE

14  Direct - Mr. Baggett                              3

15

                       E X H I B I T S
16  No.                Description         Identified

17  6      Requests for Production             36

18  7      Declaration                         42

19  8      Map                                 44

20

21

                (Exhibits bound separately.)
22

23

24

25

WYOMING REPORTING SERVICE, INC.
1-800-444-2826

8ec94510-0e71-4fb0-b9e1-f5f7324d1d35

1               P R O C E E D I N G S

2               (Deposition proceedings commenced

3               10:58 a.m., May 3, 2005.)

4               BOB STRAYER,

5    called as a witness on behalf of the Defendant, being

6    first duly sworn, testified as follows:

7               DIRECT EXAMINATION

8        Q.    (BY MR. BAGGETT)  Good morning, Mr. Strayer.  My

9    name again is Steve Baggett.  I represent Mountain Cement

10   Company in this lawsuit.  Do you understand that?

11       A.    Uh-huh.

12       Q.    Okay.  Have you ever given a deposition before?

13       A.    Yes.

14       Q.    How many times have you been deposed?

15       A.    Well, I just one that I can remember.

16       Q.    How long ago was that?

17       A.    It's probably about three or four years ago.

18       Q.    What kind of case was it in?

19       A.    It had to do with my work.  I can't remember the

20   exact legal issue, but it was related to my work.

21       Q.    Okay.  What sort of work do you do?

22       A.    I work at the Peak Wellness Center.  It's a

23   mental health center.

24       Q.    And what do you do there?

25       A.    I'm a program manager and therapist.

1    Q.    What's the BLM?

2    A.    Bureau of Land Management.

3    Q.    What sort of complaints would Biodiversity have

4  had against the Bureau of Land Management?

5    A.    Land management decisions.

6    Q.    Like what people do with their property and that

7  sort of thing?

8    A.    What uses the public property is put to.  Bureau

9  of Land Management is a public program.

10    Q.    You understand that this lawsuit is about the

11  Mountain Cement Company plant in Laramie and emissions

12  from that plant, is that your understanding?

13    A.    Yes.

14    Q.    Visually, would you describe to me what you see

15  that you're concerned about at the plant.

16    A.    I see on occasion brown, sometimes blackish

17  apparently smoke coming off the plume that leaves the --

18  the smokestacks at the plant.  I have seen considerable

19  dust moving in the direction as of -- as well as the --

20  the darkened smoke plume blowing away from the plant at

21  times.  I have seen brownish sort of layer when the air is

22  quiet in the Laramie River valley, a brownish sort of

23  layer of cloud like that is coming from the plume from the

24  plant, sort of covers the part of the valley and Laramie,

25  the city.

1    Q.    Okay.  And you said you've seen it several times

2  a month.  What do you mean by several times a month?

3  Is it more than five times a month?

4    A.    Sometimes more than five times a month.  I don't

5  keep track of exactly when I see it, note that.

6    Q.    So you don't have any journal or haven't kept

7  track of any specific date when you've actually seen any

8  of these things that we're discussing?

9    A.    No.

10    Q.    Okay.  When is the last time you saw this brown

11  or blackish smoke coming off the plume?

12    A.    It would have been last week.

13    Q.    Is there a particular day last week that you

14  remember seeing it?

15    A.    I'm not remembering a particular day, no.

16    Q.    And you remember about how long it had been

17  before you had seen it that you had seen it before that?

18    A.    No.

19    Q.    Have you noticed that basically since you've

20  moved to the area in 1997?

21    A.    I don't know if I noticed it immediately, but

22  probably within the next year or two after moving here.

23    Q.    And does it -- does it appear -- does what it

24  look like -- is its appearance now consistent with its

25  appearance when you first noticed it soon after you moved

1    Q.    Yes.

2    A.    No.

3    Q.    Other than visually, do you have any other sort

4  of perception of any emissions from the plant?

5    A.    Yes.

6    Q.    How else do you perceive emissions from the

7  plant?

8    A.    I've smelled an odor from the plant.

9    Q.    What does the odor that you've described smell

10  like?

11    A.    It's hard to describe.  It's a musky, dusty odor

12  is, I guess, what I would say.

13    Q.    How often do you smell that odor?

14    A.    Occasionally when I'm outside.

15    Q.    You smell it occasionally when you're at your

16  house?

17    A.    No.

18    Q.    Where do you smell it?  Where are you when you

19  smell it?

20    A.    When I'm walking or hiking downwind from the

21  cement plant.

22    Q.    When was the last time you smelled it?

23    A.    I don't remember.

24    Q.    Would it have been within the last month?

25    A.    Could have been.  I don't remember exactly.

8ec94510-0e71-4fb0-b9e1-f5f7324d1d35

1    Q.    It wouldn't have been within the last week?

2    A.    No.

3    Q.    And if you can, do you know how many -- about

4  how many times you have smelled the odor that you're

5  describing?

6    A.    The number of times?

7    Q.    Right.

8    A.    No.

9    Q.    Do you know about how many times a year you've

10  smelled it?

11    A.    I don't remember.

12    Q.    You don't have any sort of record of when you

13  smelled the odor that you're describing or anything like

14  that?

15    A.    No.

16          MR. ZARS:  I'm sorry to interrupt you.  Can

17  we take a brief break?

18          MR. BAGGETT:  Sure.

19          (Deposition proceedings recessed

20          11:47 a.m. to 11:54 a.m. )

21          MR. BAGGETT:  Mr. Strayer, back on the

22  record.

23    Q.    (BY MR. BAGGETT)  We were talking about the

24  smell that you had smelled.  Is there any particular time

25  of the year that you've noticed that you tend to smell the

1      Q.    Are you in good health?

2      A.    Yes.

3      Q.    Have you had any sort of health problems or

4   health effects that you attribute to any emissions from

5   the plant?

6      A.    No.

7      Q.    Have you gone to see a doctor about any sort of

8   condition that you attribute to any emissions from the

9   plant?

10     A.    No.

11     Q.    Do you have any concerns associated with your

12   health as a result of emissions from the plant?

13     A.    Yes.

14     Q.    What are those concerns?

15     A.    I understand that there is pollution coming from

16   the plant.  And I understand that pollution is not healthy

17   for people to breathe, and I'm concerned about my health

18   in that regard.

19     Q.    You've never gone and talked to a doctor about

20   that or anything --

21     A.    No.

22     Q.    -- have you?

23     A.    No.

24     Q.    And do you have an understanding as to what you

25   believe is being emitted from the plant that's harmful to

1        Q.    I'll draw your attention to the last page of all

2   the pages that are stapled together, page 5, Requests for

3   Production.  Let me ask you, first of all, have you

4   brought any documents or anything here with you today?

5        A.    No.

6        Q.    And let me go through these and just make sure

7   that you don't have any responsive documents.  Do you have

8   any documents, records or files related to MCC's Laramie

9   plant?

10       A.    No.  Not in my possession, no.

11       Q.    Have you taken any pictures or do you have any

12  pictures that were taken by others concerning the MCC's

13  Laramie plant?

14       A.    I have taken pictures with a digital camera, but

15  they didn't turn out to represent what I was -- you know,

16  what I was seeing, so I just erased them from the camera.

17       Q.    So you don't have --

18       A.    I don't have --

19       Q.    -- anything at all?

20       A.    No.

21       Q.    They're just gone?

22             When did you take those pictures?

23       A.    Sometime during the last few months.  I don't

24  remember exact dates.

25       Q.    Not within the last month?

1  plant; is that correct?

2      A.    Yes.

3      Q.    Are you able to distinguish between what you see

4  and smell between any time you believe that the emissions

5  are within the requirements and any time you believe

6  they're outside the requirements?

7      A.    No.

8      Q.    Have you spoken with any of your neighbors about

9  any of these issues, the visual issues associated with the

10 plant, the smells that you associate with the plant, this

11 lawsuit or anything related to the claims in this lawsuit,

12 have you spoken about any of that with any of your

13 neighbors?

14     A.    Not the lawsuit.  I think I've probably

15 mentioned or complained about the -- what I was seeing and

16 smelling.

17     Q.    Have any of them complained to you about that?

18     A.    Not that I remember.  I should say Connie

19 Wilbert is -- lives two houses down from me, so she's --

20 you know, I certainly have spoken with her about that --

21     Q.    Right.

22     A.    -- and probably about everything that you

23 mentioned.

24     Q.    But you don't recall any of your other neighbors

25 complaining about the site or the smell that you associate

1   with the plant?

2       A.    No.

3       Q.    Do you attribute any of the -- any of the

4   brownish layer of cloud that you see that you've described

5   previously to the truck stop or to any vehicle emissions?

6       A.    Any of it, is that your question?

7       Q.    Right.

8       A.    Not that I know of.  I don't know.

9       Q.    Why not?

10      A.    Because it looks to me like it comes from the

11  plume of the cement plant, and I have no reason to think

12  that it's coming from anywhere else.

13      Q.    But you don't know one way or the other; is that

14  correct?

15      A.    Correct.

16              MR. BAGGETT:  Mark that.  Actually, there's

17  multiple copies of this.

18                  (Deposition Exhibit No. 7

19                  marked for identification.)

20      Q.    (BY MR. BAGGETT)  Show you what has been marked

21  as Deposition Exhibit Number 7.  It says at the top

22  Declaration of Bob Strayer.  Have you seen this document

23  before?

24      A.    Yes.

25      Q.    And does your signature appear on it?

8ec94510-0e71-4fb0-b9e1-f5f7324d1d35

Page 48

1                    DEPONENT'S CERTIFICATE

2

3           I, BOB STRAYER, do hereby certify that I have

4    read the foregoing transcript of my testimony consisting

5    of 47 pages taken on May 3, 2005, and that the same is a

6    full, true and correct record of my deposition.

7

8

9

                                    _____
10                                   BOB STRAYER

11

12        ( ) No changes        ( ) Changes attached

13

14           Subscribed and sworn to before me this

15    _____ day of _____, 200__.

16

17

18

19

                                    _____
20                                   Notary Public

21

22   My commission expires:

23

24

25

8ec94510-0e71-4fb0-b9e1-f5f7324d1d35

Page 49

## C E R T I F I C A T E

1

2

3

4        I, KATHY J. MULLIVAN, a Registered Professional

5  Reporter and a Notary Public of the State of Wyoming, do

6  hereby certify that the aforementioned witness was by me

7  first duly sworn to testify to the truth, the whole truth,

8  and nothing but the truth;

9        That the foregoing transcript is a true record

10  of the testimony given by the said deponent, together with

11  all other proceedings herein contained.

12        IN WITNESS WHEREOF, I have hereunto set my hand

13  and affixed my Notarial Seal this _____ day of _____,

14  200_.

15

16

17

18        _____
                KATHY J. MULLIVAN
             Registered Professional Reporter

19

20  My commission expires April 5, 2007.

21

22

23

24

25

8ec94510-0e71-4fb0-b9e1-f5f7324d1d35

EXH E

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

--------------------------------------------------------

BIODIVERSITY CONSERVATION ALLIANCE
and SIERRA CLUB,

                    Plaintiffs,

         vs.                        Case No. 04-CV-361-B

MOUNTAIN CEMENT COMPANY,

                    Defendant.

--------------------------------------------------------


DEPOSITION OF MARTHA MARTINEZ DEL RIO
Taken in behalf of Defendant

1:50 p.m., Tuesday
May 3, 2005


         PURSUANT TO NOTICE, the deposition of MARTHA

MARTINEZ DEL RIO was taken in accordance with the

applicable Federal Rules of Civil Procedure at the offices

of Anthony, Nicholas, Tangeman & Yates, LLC, 170 N. Fifth

Street, Laramie, Wyoming, before Kathy J. Mullivan, a

Registered Professional Reporter, and a Notary Public in

and for the State of Wyoming.


**EXHIBIT**

tabbies

E

Page 2

1                        A P P E A R A N C E S

2    For the Plaintiffs:           MR. REED ZARS
                                   Attorney at Law
3                                  910 Kearney Street
                                   Laramie, Wyoming  82070
4
     For the Defendant:            MR. STEVEN R. BAGGETT
5                                  Attorney at Law
                                   THOMSON & KNIGHT, LLP
6                                  1700 Pacific Avenue
                                   Suite 3300
7                                  Dallas, Texas  75201

8                                  MR. JASON TANGEMAN
                                   Attorney at Law
9                                  ANTHONY, NICHOLAS, TANGEMAN
                                   & YATES, LLC
10                                 170 N. Fifth Street
                                   P. O. Box 0928
11                                 Laramie, Wyoming  82073

12                         I N D E X

13   DEPOSITION OF MARTHA MARTINEZ DEL RIO:            PAGE

14   Direct - Mr. Baggett                               3

15
                         E X H I B I T S
16   No.                  Description            Identified

17   11    Requests for Production                      16

18   12    Declaration                                  18

19

20

21               (Exhibits bound separately.)

22

23

24

25

64d690e8-590f-4163-8a70-3a46c75bb37c

Page 3

1                    P R O C E E D I N G S

2                    (Deposition proceedings commenced

3                    1:50 p.m., May 3, 2005.)

4                    MARTHA MARTINEZ DEL RIO,

5     called as a witness on behalf of the Defendant, being

6     first duly sworn, testified as follows:

7                         DIRECT EXAMINATION

8          Q.    (BY MR. BAGGETT)   Have you ever given a

9     deposition before, Miss Del Rio?

10         A.    No, I have not.

11         Q.    Okay.  I'm sure you've had an opportunity to

12    discuss a little bit with your lawyer sort of the

13    deposition process beforehand.  The court reporter's going

14    to be taking down your testimony, I'm going to ask you

15    questions, you're going to answer them, court reporter's

16    going to make a written record --

17         A.    Okay.

18         Q.    -- of your testimony that can be used at court

19    for any purpose, as though you were testifying at trial in

20    front of a judge and jury.

21               It's very important, because there's going to be

22    a written transcript of this, that you respond to all my

23    questions audibly.

24         A.    Okay.

25         Q.    So, you know, if your answer to a question is

64d690e8-590f-4163-8a70-3a46c75bb37c

1    against Mountain Cement Company based on emissions from

2    its plant in Laramie, correct?

3         A.    Yes, I do.

4         Q.    Can you see the plant from your house?

5         A.    Yes.

6         Q.    Do you have any specific concerns about

7    emissions from the plant?

8         A.    Yes.

9         Q.    Let's talk about visually what you see.  I mean,

10   do you have any concerns about what you see at the plant?

11        A.    On a daily basis, there is usually exhaust

12   coming from one or both of the smokestacks.

13        Q.    What does the exhaust look like?

14        A.    It's either white or slightly grayish color.

15        Q.    Is it any other color other than white or

16   slightly grayish?

17        A.    Occasionally it's darker gray.

18        Q.    Do you see the exhaust, as you call it, coming

19   from the smokestacks every single day?

20        A.    Some days it's not running -- or there's no

21   exhaust.

22        Q.    Okay.  The days there's no exhaust, is it

23   because you believe there's nothing -- it's not running

24   that day?

25        A.    That's what I assume.

64d690e8-590f-4163-8a70-3a46c75bb37c

Page 12

1      A.    No.

2      Q.    All right.  Anything you've noticed, other than

3  just the exhaust that you've described?  Have you --

4      A.    Can you --

5      Q.    That's not a good question.  Strike that.

6            I'll call the exhaust coming out a plume.  Is

7  there -- is there anything you notice that happens to the

8  plume or --

9      A.    We use the plume daily to gauge which way the

10  wind is blowing, so we'll often wake up, look out and know

11  what to wear by which way the wind is blowing.

12      Q.    So you see that plume almost every day?

13      A.    Yes.  Yep.

14      Q.    Is there -- aside from the way it looks, is

15  there any other way that you perceive the emissions from

16  the plant?  Do you smell anything?

17      A.    We tend to not be directly downwind from the

18  predominant wind.

19      Q.    Have you ever smelled anything you believe is

20  coming from the plant?

21      A.    An acrid smell at our home, no, but last summer,

22  there were some large fires just to the west side of the

23  plant and the wind changed and our neighborhood was

24  inundated in smoke, which was quite smelly, so I would

25  assume, at the same time with the stack blowing, we would

1    have gotten all the smokes from there.  That fire burned

2    about a month before it was put out.

3         Q.    And you smelled smoke from the fire, correct?

4         A.    Correct.

5         Q.    Did you smell anything other than -- that you

6    could identify other than smoke from the fire?

7         A.    No.

8         Q.    Have you ever smelled -- other than at your

9    house, have you ever smelled anything that you believe to

10   be attributed to emissions from the plant?

11        A.    To give you a specific day, I would not be able

12   to give you one, no.

13        Q.    Does the exhaust or the plume coming from the

14   stack obstruct your view at all of anything?

15        A.    It's an eyesore on the view, but it doesn't --

16   occasionally, if it's blowing into the east range of

17   hills, there will be a haze along that east hill line and

18   obstruct that view.

19        Q.    Does that happen very often?

20        A.    Fortunately not too often.

21        Q.    And when you say it obstructs the view, does --

22   it doesn't completely block the view, does it?

23        A.    Not the entire view, just a portion of the

24   hills.

25        Q.    And you can see what's behind it, just --

Page 15

1   with the smoke from that fire, you've otherwise engaged in

2   all the activities?

3       A.      Yes.

4       Q.      You would otherwise engage in?

5       A.      Yes.

6       Q.      Do you have any health concerns associated with

7   the plant?

8       A.      After reading the contents of the emissions, I

9   have health concerns now.

10      Q.      Do you have an understanding of what is in the

11  emissions from the plant that you're concerned about

12  healthwise?

13      A.      I do.

14      Q.      What is your understanding?

15      A.      My understanding is that occasionally there are

16  large emissions of particularly mercury that I'm worried

17  about and I know that is a health concern.

18      Q.      Anything else?

19      A.      I'd have to review the report.  I just remember

20  being particularly alarmed by the mercury emissions.

21      Q.      Who provided with you that report?

22      A.      That came through a report through Reed.

23      Q.      Who prepared the report that you're talking

24  about, do you know?

25      A.      I believe Reed prepared it, but I don't know.

64d690e8-590f-4163-8a70-3a46c75bb37c

1      MR. ZARS:  This is attorney-client at this
2  point.

3      MR. BAGGETT:  Right.

4      MR. ZARS:  It's set out in the complaint as
5  well.

6      MR. BAGGETT:  Okay.

7  Q.   (BY MR. BAGGETT)  Did you have any concern
8  before you read the report?

9  A.   No.

10  Q.   Have you -- have you felt what you consider to
11  be any sort of health effects that you've had as a result
12  from any emissions from the plant?

13  A.   No.

14  Q.   You haven't visited a doctor with any sickness
15  or illness that you attribute to that?

16  A.   Other than persistent colds and flus, no.

17              (Deposition Exhibit No. 11
18              marked for identification.)

19  Q.   I'll show you what has been marked as Deposition
20  Exhibit Number 11.

21  A.   Okay.

22  Q.   Ask you, have you seen this document before?

23  A.   These -- no.

24  Q.   Okay.  Well --

25  A.   Well, I have, actually.  I've received some

64d690e8-590f-4163-8a70-3a46c75bb37c

1    A.    That is correct.

2    Q.    And you signed it on or about January 19, 2005?

3    A.    That is correct.

4    Q.    At one point were you approached to provide a

5    declaration for this lawsuit?

6    A.    I was approached about two weeks approximately

7    before this date.

8    Q.    Did you prepare this declaration or did someone

9    else prepare it and --

10   A.    I prepared this.

11   Q.    Okay.  Who approached you to prepare a

12   declaration?

13   A.    Connie Wilbert.

14   Q.    And did she tell you why you needed -- or why

15   she wanted you to prepare a declaration?

16   A.    She mentioned that there was a lawsuit possibly

17   in the works and asked me to write the declaration.

18   Q.    Okay.  Do you know anybody who works at Mountain

19   Cement Company's Laramie plant?

20   A.    I know a couple who work there.  And I should

21   clarify, when Connie asked me to write my declaration, I

22   said I really need to know more before I will sign or

23   write a declaration, which is when I got the document.

24   Q.    That's when you got the document you were

25   talking about?

64d690e8-590f-4163-8a70-3a46c75bb37c

1     Q.    And do you understand that the plant is

2   permitted to emit a certain level of particulates?

3     A.    Yes.

4     Q.    Are you able, based on anything that you see, to

5   distinguish between the times you believe that it's within

6   the limits and the times that you may believe that it's

7   outside the limits?

8     A.    By visual context, no.

9              MR. BAGGETT:  Okay.  Go off the record.

10             (Deposition proceedings recessed

11             2:15 p.m. to 2:19 p.m.)

12             MR. BAGGETT:  Back on the record.

13    Q.    (BY MR. BAGGETT)  Miss Martinez Del Rio, how

14  close do you live to MCC's Laramie plant?

15    A.    I'm approximating 2 miles.

16    Q.    And do you have a clear and unobstructed view of

17  it?

18    A.    Yes.

19    Q.    And how often do you see the plant?  Every day?

20    A.    Every day.

21    Q.    You're not attributing -- earlier you mentioned

22  that you have colds and flus and that sort of thing.

23  You're not attributing those to anything at the plant are

24  you?

25    A.    That is correct.

Page 24

DEPONENT'S CERTIFICATE

    I, MARTHA MARTINEZ DEL RIO, do hereby certify that I have read the foregoing transcript of my testimony consisting of 23 pages taken on May 3, 2005, and that the same is a full, true and correct record of my deposition.

_____
MARTHA MARTINEZ DEL RIO

    (  ) No changes       (  ) Changes attached

    Subscribed and sworn to before me this _____ day of _____, 200__.

_____
Notary Public

My commission expires:

Page 25

1                    C E R T I F I C A T E

2

3

4          I, KATHY J. MULLIVAN, a Registered Professional

5    Reporter and a Notary Public of the State of Wyoming, do

6    hereby certify that the aforementioned witness was by me

7    first duly sworn to testify to the truth, the whole truth,

8    and nothing but the truth;

9          That the foregoing transcript is a true record

10   of the testimony given by the said deponent, together with

11   all other proceedings herein contained.

12         IN WITNESS WHEREOF, I have hereunto set my hand

13   and affixed my Notarial Seal this _____ day of _____,

14   200_.

15

16

17

18                    _____
                           KATHY J. MULLIVAN
19                    Registered Professional Reporter

20   My commission expires April 5, 2007.

21

22

23

24

25

64d690e8-590f-4163-8a70-3a46c75bb37c

EXH F

Philip A. Nicholas
Jason M. Tangeman
Anthony, Nicholas, Tangeman & Yates, LLC
170 N. Fifth Street
P.O. Box 0928
Laramie, WY 82073
(307) 742-7140
(307) 742-7160 Fax

James B. Harris
Becky L. Jolin
Steven R. Baggett
Thompson & Knight, L.L.P
1700 Pacific, Suite 3300
Dallas, TX 75201
214-969-1102
214-880-3274 Fax

Attorneys for Defendant Mountain Cement Company

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Biodiversity Conservation Alliance and Sierra Club, | ) ) ) | |
| Plaintiffs, | ) | Case No. 04CV 361-B |
| vs. | ) ) | |
| Mountain Cement Company, | ) ) | |
| Defendant. | ) | |

## DECLARATION OF MICHAEL D. SEATON

I, Michael D. Seaton declare that the following statements are true and correct to the best of my knowledge, and that they are based on my personal experience.

1. I currently live with my family in Laramie, Wyoming. I have been a resident of Laramie since 1950. I have a wife and our house is located within three (3)miles of Mountain Cement Company's Cement Plant (the "Plant".)

2. My place of employment is Mountain Cement Company.

**DECLARATION OF MICHAEL D. SEATON — PAGE 1**



3. I travel to the Plant five or six days out of every week and drive on US Highway 287 to visit Colorado or other southern destinations. I frequently hike, bike, walk and run in an area from my home to areas along the Laramie River and Mountain Cement Company's Employee Park. I have visited the Hutton Lake National Wildlife Refuge south of the Plant, and drive daily on Fort Sanders Road, which goes by the Plant.

4. I have recreated along the Laramie River and have viewed and enjoyed wildlife along the area. I have also been to the Sherman Mountains and the Medicine Bow National Forest on many occasions.

5. I am familiar with the location of the Plant, and see the plumes from the stacks at the Plant. At no time has any emission from the Plant obstructed my view of any area in any significant degree. I have not had to curtail any activities as a result of any emissions from the Plant.

6. I have not suffered any ill health that I attribute to any emissions from the Plant, and I am not concerned that any emissions from the Plant would pose any risk of harm to me or my family.

7. I have never smelled anything from the Plant that I have found to be any more unpleasant or offensive than auto exhaust and other emissions that may occur anywhere.

8. The Plant in no way impairs my view or enjoyment of any wilderness areas anywhere around Laramie, and it never has. Further, I am not concerned about the effect any emissions from the Plant would have on any of the natural areas in

and around Laramie.  They seem to me to be as beautiful now as they were  years ago.

DATED this 13th day of June, 2005.

*Michael D Seaton*

Michael D. Seaton

The above and foregoing Declaration was subscribed and sworn to before me by Michael D. Seaton on the 13th day of June, 2005.

Witness my hand and official seal.

ESTHER SUAZO-NOTARY PUBLIC
County of Albany
State of Wyoming
My Commission Expires May 17, 2006

*Esther Suazo*

Notary Public

My Commission Expires: _____

**DECLARATION OF MICHAEL D. SEATON — PAGE 3**

EX H G

# AIR QUALITY DIVISION
## CHAPTER 6, SECTION 3
# OPERATING PERMIT

## WYOMING DEPARTMENT OF ENVIRONMENTAL QUALITY
### AIR QUALITY DIVISION
**122 West 25th Street**
**Cheyenne, Wyoming 82002**



### PERMIT NO. 31-098

Issue Date: **March 15, 2004**
Expiration Date: **June 2, 2008**
Effective Date: **March 15, 2004**
Replaces Permit No.: **30-098**

In accordance with the provisions of W.S. §35-11-203 through W.S. §35-11-212 and Chapter 6, Section 3 of the Wyoming Air Quality Standards and Regulations,

**Mountain Cement Company**
**Section 17, Township 15 North, Range 73 West**
**Albany County, Wyoming**

is authorized to operate a stationary source of air contaminants consisting of emission units described in this permit. The units described are subject to the terms and conditions specified in this permit. All terms and conditions of the permit are enforceable by the State of Wyoming. All terms and conditions of the permit, except those designated as not federally enforceable, are enforceable by EPA and citizens under the Act. A copy of this permit shall be kept on-site at the above named facility.

_____
Dan Olson, Administrator
Air Quality Division

_____
Date   3/15/04

_____
John V. Corra, Director
Department of Environmental Quality

_____
Date   3/16/04

**EXHIBIT**
tabbies
G

permit through administrative amendment.

(b)    Opacity from each raw material, clinker, or finished product storage bin; conveying system transfer point; bagging system; and bulk loading or unloading system, shall be monitored as specified below. This includes the following units: R-111A, R-230 if used, K-207-1, K-207-2, K-410, CKD Spout, K1-783, K-224, K-438, K-274, F-405, F-406, B-808, F-580, F-694, B-875, B-870, B-816-A, B-816-B, B-823, B-860, B-865, and B-882.

    (i)    The permittee shall conduct a 1-minute visible emissions test of each affected source described in (b) above, in accordance with Method 22 of Appendix A to 40 CFR Part 60. The test must be conducted while the source is in operation.

    (ii)    The frequency of testing shall be at least monthly initially, then as specified in Subpart LLL §63.1350(a)(4).

    (iii)    If the affected source is a conveying system transfer point in a building, the permittee shall monitor in accordance with Subpart LLL §63.1350(a)(4)(vi) and (vii).

    (iv)    If visible emissions are observed during any Method 22 test, the permittee must begin, within one hour, a six minute test of opacity in accordance with Method 9 of Appendix A to 40 CFR Part 60.

    (v)    If the affected source is subject to condition F14(b) or (c) and is monitored in accordance with Method 22, then compliance with condition F14(b) and (c) shall be considered compliance with Subpart LLL §63.1350(a)(4) and the requirements of condition P63-LLL3(b)(i) through (iv).

(c)    Opacity from the kilns (K1-710, K-401) shall be monitored as specified in Subpart LLL §63.1350(c). Compliance with conditions F3(b) and F11(a) is considered compliance with §63.1350(c).

(d)    Opacity from the clinker coolers (K1-880A/B, K-515/K541-1) shall be monitored as specified in Subpart LLL §63.1350(d). Compliance with condition F12(a) and (b) is considered compliance with §63.1350(d).

(e)    Opacity from raw and finish mill sources shall be monitored as specified in Subpart LLL §63.1350(e). Compliance with condition F14(a) is considered compliance with §63.1350(e).

(f)    For dioxin/furan emissions, the permittee shall install, calibrate, maintain, and operate continuous monitors to record the temperature of the gases at the inlet to the kiln #1 baghouse and the kiln #2 precipitator, and comply with all other requirements in Subpart LLL §63.1350(f) for the temperature monitoring system. The temperature monitoring systems shall be considered continuous monitoring systems (CMSs) for purposes of compliance with Subpart LLL.

(g)    The permittee shall inspect the components of the combustion system of each kiln (K1-710, K-401) at least once per year.

(h)    Monitoring data from the COMs and CMSs shall be reduced in accordance with Ch 5, Sec 3(j)(vii).

(i)    The permittee shall meet all other applicable monitoring requirements as specified in Subpart LLL §63.1350 and WAQSR Ch 5, Sec 3(j).

(P63-LLL4)    OPERATION & MAINTENANCE REQUIREMENTS [WAQSR Ch 5, Sec 3(h)(iv)(A)(I) and (II), Sec 3(i)(iii), and Sec 3(j)]

(a)    At all times, including periods of startup, shutdown, and malfunction, the permittee shall operate and maintain the affected sources, including associated air pollution control equipment, in a manner consistent with good air pollution control practices for minimizing emissions at least to the levels required by Subpart LLL.

(b)    Malfunctions shall be corrected as soon as practicable after their occurrence in accordance with the startup, shutdown, and malfunction plan required in condition P63-LLL5 of this permit.

(c)    The permittee must keep the necessary parts for routine repairs of the COM and CMS equipment readily available.

(d)    Except for system breakdowns, out-of-control periods, repairs, maintenance periods, calibration checks, and zero (low-level) and high-level calibration drift adjustments, all CMSs and COMs shall be in continuous operation. All COMs shall complete a minimum of one cycle of sampling and analyzing for each successive ten-second period and one cycle of data recording for each successive six-minute period.

(e)     The permittee shall develop and implement a COM and CMS quality control program.

    (i)     The permittee shall develop, and upon request submit to the Administrator in accordance with condition G4, a site-specific performance evaluation test plan for approval upon request. The plan shall be developed according to the procedures in WAQSR Ch 5 Sec 3(i)(iii)(B) and 3(j)(v).

    (ii)    The performance evaluation test shall be conducted as described in Ch 5 Sec 3(j)(v)(D).

    (iii)   Each quality control program shall include, at a minimum, a written protocol that meets the requirements of Ch 5 Sec 3(j)(iv)(B).

    (iv)    The permittee shall keep these written procedures for the life of the affected source or until the source is no longer subject to Ch 5 Sec 3.

(f)     Additional COM and CMS requirements are specified in Ch 5 Sec 3(j)(iii) and (iv).

(P63-LLL5)     STARTUP, SHUTDOWN, & MALFUNCTION PLAN [WAQSR Ch 5, Sec 3(h)(iv)(C)]

(a)     The permittee shall maintain and implement a written startup, shutdown, and malfunction plan (SSMP) that describes, in detail, procedures for operating and maintaining the source during periods of startup, shutdown, and malfunction, and a program of corrective action for malfunctioning process and air pollution control equipment used to comply with Subpart LLL. The plan shall identify all routine or otherwise predictable COM and CMS malfunctions.

(b)     During periods of startup, shutdown, and malfunction, the permittee shall operate and maintain the affected sources (including associated air pollution control equipment) in accordance with the procedures specified in the SSMP developed under paragraph (a) of this condition.

(c)     When actions taken by the permittee during a startup, shutdown, or malfunction (including actions taken to correct a malfunction) are consistent with the procedures specified in the SSMP, the permittee shall keep records for that event that demonstrate the procedures specified in the plan were followed. These records may take the form of a "checklist," or other effective form of recordkeeping, that confirms conformance with the SSMP for that event.

(d)     If an action taken by the permittee during a startup, shutdown, or malfunction (including an action taken to correct a malfunction) is not consistent with the procedures specified in the SSMP, the permittee shall record the actions taken for that event.

(e)     The permittee shall keep the written SSMP on record to be made available for inspection, upon request, by the Administrator for the life of each affected source or until the affected source is no longer subject to the provisions of Chapter 5, Section 3. In addition, if the SSMP is revised, the permittee shall keep previous (i.e., superseded) versions of the SSMP on record, to be made available for inspection, upon request, by the Administrator, for a period of 5 years after each revision to the plan.

(f)     To satisfy the requirements of this condition to develop a SSMP, the permittee may use the affected source's standard operating procedures (SOP) manual, or an Occupational Safety and Health Administration (OSHA) or other plan, provided the alternative plans meet all the requirements of Chapter 5, Section 3 and are made available for inspection when requested by the Administrator.

(g)     If the SSMP fails to address or inadequately addresses an event that meets the characteristics of a malfunction but was not included in the SSMP at the time the permittee developed the plan, the permittee shall revise the SSMP within 45 days after the event to include detailed procedures for operating and maintaining the source during similar malfunction events and a program of corrective action for similar malfunctions of process or air pollution control equipment.

(P63-LLL6)     GENERAL RECORDKEEPING REQUIREMENTS [40 CFR 63 Subpart LLL §63.1355 and WAQSR Ch 5, Sec 3(l)(ii) and (iii)]

(a)     The permittee shall maintain files of all information (including all reports and notifications) required by Subpart LLL and Chapter 5, Section 3 recorded in a form suitable and readily available for expeditious inspection and review. The files shall be retained for at least 5 years following the date of each occurrence, measurement, maintenance, corrective action, report, or record. At a minimum, the most recent 2 years of data shall be retained on site at the facility. The remaining 3 years of data may be retained off site. Such files may be maintained on microfilm, on a computer, on computer

# APPENDIX A

WAQSR Section 22 Subpart F

Permit No. 30-098

Subpart F - Standards of Performance for Portland Cement Plants

Sec 60.60  Applicability and designation of affected facility.

(a)  The provisions of this subpart are applicable to the following affected facilities in portland cement plants: Kiln, clinker cooler, raw mill system, finish mill system, rawmill dryer, raw material storage, clinker storage, finished product storage, conveyor transfer points, bagging and bulk loading and unloading systems.

(b)  Any facility under paragraph (a) of this section that commences construction or modification after August 17, 1971, is subject to the requirements of this subpart.

[42 FR 37936, July 25, 1977]

Sec 60.61  Definitions.

As used in this subpart, all terms not defined herein shall have the meaning given them in the Act and in Subpart A of this part.

(a)  Portland cement plant means any facility manufacturing portland cement by either the wet or dry process.

(b)  Bypass means any system that prevents all or a portion of the kiln or clinker cooler exhaust gases from entering the main control device and ducts the gases through a separate control device.  This does not include emergency systems designed to duct exhaust gases directly to the atmosphere in the event of a malfunction of any control device controlling kiln or clinker cooler emissions.

(c)  Bypass stack means the stack that vents exhaust gases to the atmosphere from the bypass control device.

(d)  Monovent means an exhaust configuration of a building or emissions control device (e.g., positive-pressure fabric filter) that extends the length of the structure and has a width very small in relation to its length (i.e., length to width ratio is typically greater than 5:1).  The exhaust may be an open vent with or without a roof, louvered vents, or a combination of such features.

[36 FR 24877, Dec. 23, 1971, as amended at 39 FR 20793, June 13, 1974; 53 FR 50363, Dec. 14, 1988]

Sec 60.62  Standard for Particulate Matter.

(a)  On and after the date on which the performance test required to be conducted by §60.8 is completed, no owner or operator subject to the provisions of this subpart shall cause to be discharged into the atmosphere from any kiln any gases which:

(1)  Contain particulate matter in excess of 0.15 kg per metric ton of feed (dry basis) to the kiln (0.30 lb per ton).

(2)  Exhibit greater than 20 percent opacity.

(b)  On and after the date on which the

performance test required to be conducted by §60.8 is completed, no owner or operator subject to the provisions of this subpart shall cause to be discharged into the atmosphere from any clinker cooler any gases which:

(1)  Contain particulate matter in excess of 0.050 kg per metric ton of feed (dry basis) to the kiln (0.10 lb per ton).

(2)  Exhibit 10 percent opacity, or greater.

(c)  On and after the date on which the performance test required to be conducted by §60.8 is completed, no owner or operator subject to the provisions of this subpart shall cause to be discharged into the atmosphere from any affected facility other than the kiln and clinker cooler any gases which exhibit 10 percent opacity, or greater.

[39 FR 20793, June 14, 1974, as amended at 39 FR 39874, Nov. 12, 1974; 40 FR 46258, Oct 6, 1975]

Sec 60.63  Monitoring of operations.

(a)  The owner or operator of any portland cement plant subject to the provisions of this part shall record the daily production rates and kiln feed rates.

(b)  Except as provided in paragraph (c) of this section, each owner or operator of a kiln or clinker cooler that is subject to the provisions of this subpart shall install, calibrate, maintain, and operate in accordance with §60.13 a continuous opacity monitoring system to measure the opacity of emissions discharged into the atmosphere from any kiln or clinker cooler.  Except as provided in paragraph (c) of this section, a continuous opacity monitoring system shall be installed on each stack of any multiple stack device controlling emissions from any kiln or clinker cooler.  If there is a separate bypass installed, each owner of operator of a kiln or clinker cooler shall also install, calibrate, maintain, and operate a continuous opacity monitoring system on each bypass stack in addition to the main control device stack.  Each owner or operator of an affected kiln or clinker cooler for which the performance test required under §60.8 has been completed on or prior to December 14, 1988, shall install the continuous opacity monitoring system within 180 days after December 14, 1988.

(c)  Each owner or operator of a kiln or clinker cooler subject to the provisions of this subpart using a positive-pressure fabric filter with multiple stacks, or a negative-pressure fabric filter with multiple stacks, or an electrostatic precipitator with multiple stacks may, in lieu of installing the continuous opacity monitoring system required by §60.63 (b), monitor visible emissions at least once per day by using a certified visible emissions observer.  If the control device exhausts gases through a monovent, visible emission observations in lieu of a continuous opacity monitoring system are required.  These observations shall be taken in

accordance with EPA Method 9.  Visible emissions shall be observed during conditions representative of normal operation.  Observations shall be recorded for at least three 6-minute periods each day.  In the event that visible emissions are observed for a number of emission sites from the control device with multiple stacks, Method 9 observations shall be recorded for the emission site with the highest opacity.  All records of visible emissions shall be maintained for a period of 2 years.

(d)  For the purpose of reports under §60.65, periods of excess emissions that shall be reported are defined as all 6-minute periods during which the average opacity exceeds that allowed by §60.62 (a)(2) or §60.62 (b)(2).

(e)  The provisions of paragraphs (a), (b), and (c) of this section apply to kilns and clinker coolers for which construction, modification, or reconstruction commenced after August 17, 1971.

(Approved by the Office of Management and Budget under control number 2060-0025.)

[36 FR 24877, Dec. 23, 1971, as amended at 53 FR 50363, Dec. 14, 1988]

Sec 60.64  Test Methods and procedures.

(a)  In conducting the performance tests required in §60.8, the owner or operator shall use as reference methods and procedures the test methods in appendix A of this part or other methods and procedures as specified in this section, except as provided in §60.8 (b).

(b)  The owner or operator shall determine compliance with the particulate matter standard in §60.62 as follows:

(1)  The emission rate (E) of particulate matter shall be computed for each run using the following equation:

$$E = (cs \ Q_{sd}) \ / \ (P \ K)$$

where:

$E$ = emission rate of particulate matter, kg/metric ton (lb/ton) of kiln feed.

$cs$ = concentration of particulate matter, g/dscm (g/dscf).

$Q_{sd}$ = volumetric flow rate of effluent gas, dscm/hr (dscf/hr).

$P$ = total kiln feed (dry basis) rate, metric ton/hr (ton/hr).

$K$ = conversion factor, 1000 g/kg (453.6 g/lb).

(2)  Method 5 shall be used to determine the particulate matter concentration (cs) and the volumetric flow rate ($Q_{sd}$) of the effluent gas.  The sampling time and sample volume for each run shall be at least 60 minutes and 0.85 dscm (30.0 dscf) for the kiln and at least 60 minutes and 1.15 dscm (40.6 dscf) for the clinker cooler.

(3)  Suitable methods shall be used to determine the kiln feed rate (P), except fuels,

for each run. Material balance over the production system shall be used to confirm the feed rate.

(4) Method 9 and the procedures in §60.11 shall be used to determine opacity.

[54 FR 6666, Feb.14, 1989]

Sec 60.65 Recordkeeping and reporting requirements.

(a) Each owner of operator required to install a continuous opacity monitoring system under §60.63 (b) shall submit reports of excess emissions as defined in §60.63 (d). The content of these reports must comply with the requirements in §60.7 (c). Notwithstanding the provisions of §60.7 (c), such reports shall be submitted semiannually.

(b) Each owner or operator monitoring visible emissions under §60.63 (c) shall submit semiannual reports of observed excess emissions as defined in §60.63 (d).

(c) Each owner or operator monitoring visible emissions under §60.63 (c) shall submit semiannual reports of the malfunction information required to be recorded by §60.7 (b). These reports shall include the frequency, duration and cause of any incident resulting in deenergization of any device controlling kiln emissions or in the venting of emissions directly to the atmosphere.

(d) The requirements of this section remain in force until and unless the Agency, in delegating enforcement authority to a State under section 111 (c) of the Clean Air Act, 42 U.S.C. 7411, approves reporting requirements or an alternative means of compliance surveillance adopted by such States. In that event, affected sources within the State will be relieved of the obligation to comply with this section, provided that they comply with the requirements established by the State.

(Approved by the Office of Management and Budget under control number 2060-0025)

[53 FR 50364, Dec. 14, 1988]

Sec 60.66 Delegation of authority.

(a) In delegating implementation and enforcement authority to a State under section 111 (c) of the Act, the authorities contained in paragraph (b) of this section shall be retained by the Administrator and not transferred to a State.

(b) Authorities which will not be delegated to States: No restrictions.

[53 FR 50364, Dec. 14, 1988]