FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

**JUN 2 0 2005**

Stephan Harris, Clerk
Cheyenne

Reed Zars (Wyo. Bar No. 6-3224)
Attorney at Law
910 Kearney Street
Laramie, Wyoming 82070
307-745-7979
307-745-7999 (FAX)

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| BIODIVERSITY CONSERVATION ALLIANCE and SIERRA CLUB, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  04CV 361-B |
| | ) | |
| MOUNTAIN CEMENT COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFFS' COMBINED MOTION AND MEMORANDUM
### IN SUPPORT OF THEIR MOTION
### FOR PARTIAL SUMMARY JUDGMENT TO ESTABLISH
### DEFENDANT'S LIABILITY FOR KILN #2 OPACITY VIOLATIONS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs

Biodiversity Conservation Alliance and Sierra Club ("plaintiffs") respectfully submit this

memorandum and accompanying exhibits in support of their motion for partial summary

judgment to establish defendant Mountain Cement Company's ("Mountain Cement")

liability for thousands of opacity air pollution violations at its cement plant in Laramie, Wyoming.

## I. INTRODUCTION

Plaintiffs seek partial summary judgment on the first cause of action in their complaint to establish that Mountain Cement has violated, and continues to violate, its federally enforceable air pollution permit and the Clean Air Act, 42 U.S.C. § 7401 et seq., by discharging pollutants from its cement plant in Albany County, Wyoming, in excess of established permit limits.

In particular, Mountain Cement's federally enforceable air pollution permits prohibit the discharge of pollutants from Kiln #2 at the Laramie Plant with an opacity (or plume density) greater than twenty percent. According to Mountain Cement's own continuous stack opacity monitors, Mountain Cement has violated the 20 percent opacity limit at Kiln #2 at least 15,480 times between October 1, 1999 and March 31, 2005.

Because there is no dispute as to any material fact regarding such violations, partial summary judgment to establish Mountain Cement's violations as alleged in plaintiffs' first cause of action should issue forthwith.

If this Court grants partial summary judgment to plaintiffs as to these violations, the issues remaining to be decided with respect to the first cause of action in the complaint would be the nature and timing of injunctive relief and the assessment of a civil penalty payable to the government.

## II. PROCEDURAL BACKGROUND

On October 22, 2004, pursuant to the citizen suit 60-day notice provision of the federal Clean Air Act at 42 U.S.C. § 7604(b)(1)(a), plaintiffs notified in writing the Administrator of the Environmental Protection Agency ("EPA"), the Wyoming Department of Environmental Quality ("DEQ"), and defendant Mountain Cement of alleged air pollution emission violations at the Laramie Plant and plaintiffs' intent to sue. **Exhibit A.**

After the passage of more than 60 days from the date of its notice letter, plaintiffs filed their complaint in this matter on December 23, 2004. On February 1, 2005, Mountain Cement answered the complaint. Mountain Cement's answer admits that Mountain Cement received plaintiffs' October 22, 2004 notice letter, Answer, ¶ 4, that more than 60 days passed between the postmark date of the notice letter and the filing date of plaintiffs' complaint, Answer, ¶ 5, and that venue is proper in this Court, Answer, ¶ 3.

On March 30, 2005, plaintiffs moved for partial summary judgment to establish their standing to bring this action. Mountain Cement responded to plaintiffs' standing motion on June 13, 2005.

## III. FACTS

**Statement of Undisputed Material Facts**

1.      Mountain Cement Company, a wholly-owned subsidiary of the Texas company Eagle Materials, Inc., operates a portland cement plant located approximately three miles south of Laramie, Wyoming ("Laramie Plant"). The Laramie Plant manufactures portland cement using two coal-fired kilns and associated equipment. Answer, ¶¶ 12-14.

2.      Eagle Materials, Inc., is a full or partial owner of three other cement plants located in La Salle, Illinois, Buda, Texas, and Fernley, Nevada. Eagle Materials had revenues of $616.5 million in 2004. Eagle Materials has sold out its cement production capacity for the last 19 years. Between 2004 and 2005, Eagle Materials' net earnings rose from $102.1 to $158.1 million, an increase of over 35 percent. Expert Report of Jonathan Shefftz, **Exhibit B**, p. 9.

3.      Kiln #1 at the Laramie Plant has a rated capacity of 600 tons per day of clinker, Kiln #2 has a rated capacity of 1,500 tons per day of clinker.  Answer, ¶ 15.

4.      In 1996 DEQ issued a Notice of Violation to Mountain Cement for exceeding the particulate matter emission limit at Kiln #1.  At that time Mountain Cement used electrostatic precipitators (ESPs) to reduce particulate matter emissions from both Kiln #1 and Kiln #2. June 5, 1996 NOV, **Exhibit C**.  To correct the excess particulate problem at Kiln #1 Mountain Cement agreed to the entry of a Compliance

-4-

Order that required Mountain Cement to replace Kiln #1's ESP with a baghouse. July 2, 1996 Compliance Order, **Exhibit D.**

5.    Although Kiln #2 is over twice the size of Kiln #1, and has over twice the amount of particulate matter emissions, Mountain Cement has not replaced the ESP with a baghouse at Kiln #2 as it did at Kiln #1. Over the past five years emissions from Kiln #2 have exceeded the 20 percent opacity limit at a rate 75 times that of Kiln #1. Expert Report of Bill Wilson, **Exhibit E,** p. 3.

6.    On June 2, 1998, the DEQ issued Operating Permit No. 30-098 to Mountain Cement. Answer, ¶ 30; **Exhibit F.** Operating Permits in Wyoming are issued for a period of five years. 42 U.S.C. § 7661a(b)(5)(B). On March 15, 2004, DEQ issued a second operating permit to Mountain Cement, Operating Permit No. 31-098. Answer, ¶ 30; **Exhibit G.**

7.    The opacity of pollution discharged from Kiln #2 at the Laramie Plant is recorded by Mountain Cement on a continuous basis (except for monitor downtime) by a continuous opacity monitor (COM)[1] located in the smoke stack of Kiln #2. Permit 30-098 condition (F15), p. 12; Permit 31-098, condition (F11), p. 9. **Exhibits F and G.**

---

[1] A COM scientifically determines opacity by passing a beam of light from one side of the stack to the other. The less light that makes it to a sensor on the other side, the greater the opacity. 40 C.F.R. Part 60, App. B, Spec. 1. According to EPA, "[t]ransparent stack emissions that do not attenuate light will have an opacity of zero percent. Opaque stack emissions that attenuate all of the visible light will have a transmittance of zero percent or an opacity of 100 percent." Id.

8.     The COMs that measure the opacity of emissions from Kiln #2 at the Laramie Plant are located and certified consistent with the requirements found at 40 C.F.R. § 60, App. B, Performance Specification 1. Answer, ¶ 48.

9.     The opacity data from the COMs is retained in a computer at the Laramie Plant. Answer, ¶ 49.

10.     The data from the COM in the Kiln #2 smokestack show that emissions have exceeded 20 percent every calendar quarter over the last five years. The opacity of emissions from Kiln #2 have exceeded 20 percent at Kiln #2 thousands of times in the last five years. During these times, Mountain Cement's COMs show opacity readings that exceed 20 percent over four times the limit, or that are over 80 percent opacity. Answer, ¶ 50.

11.     After exceeding its opacity limit at Kiln #2 for over 15 hours in January of 2002, Mountain Cement's Environmental Manager, Bill Sansing, stated that "[t]hese emissions are not acceptable and we will be in trouble if we cannot correct this situation. The neighbors certainly notice these episodes and are perfectly within their rights to complain to the DEQ and EPA." January 25, 2002 Sansing Memo, **Exhibit H**.

12.     The Mountain Cement COMs record the average opacity of air pollutant emissions from the Laramie Plant in six-minute intervals, except for periods of monitor downtime. Answer, ¶ 46

13.     Pursuant to Operating Permit No. 30-098, condition (F31), and Operating

-6-

Permit No. 31-098, condition (F25), Mountain Cement is required to submit on a quarterly basis a written report to DEQ that discloses each period of time in which emissions of pollutants from Laramie Plant exceed the applicable standard ("excess emission reports"). **Exhibits F** and **G**.

14.     **Exhibit I** contains true and accurate excerpts of Mountain Cement's quarterly excess emission reports for Kiln #2 and the clinker coolers from the fourth quarter of 1999 through the first quarter of 2005.

15.     Mountain Cement has certified as true, accurate, and complete its excess emission data. For example, see **Exhibit I**, p. 449.

16.     From October 1, 1999 through March 31, 2005, Mountain Cement exceeded the 20 percent, 6-minute average opacity limit for Kiln #2 in Permits 30-098 and 31-098 at least 15,480 times. Mountain Cement Kiln #2 Excess Emission Summary, **Exhibit J**.

17.     "Emergency" and "Abnormal Conditions and Equipment Malfunction" are the only exceptions to the Kiln #2 opacity limit set forth in Mountain Cement's permits. **Exhibits F** and **G**, conditions (G17) and (G21).

18.     To establish the affirmative defense of an emergency, abnormal condition or equipment malfunction Mountain Cement must demonstrate that it provided notice to DEQ of such an event within 24 hours. **Exhibits F** and **G**, conditions (G17) and (G21).

19.     During the period from October 1, 1999 through March 31, 2005,

Mountain Cement only provided notice of 231 6-minute periods of excess opacity at Kiln #2 that it claimed were caused by an emergency, abnormal condition or equipment malfunction. **Exhibit J**, p. 3  Plaintiffs are not alleging that these 231 periods are violations of the 20 percent opacity limit.

20.     Mountain Cement's permits do not include any provision that states opacity exceedences that occur less than 5% of the time are not excused. **Exhibits F and G.**

21.     Mountain Cement's permits do not include a defense for excess emissions caused by startup or shutdown. **Exhibits F and G.**  Even if all excess opacity emissions during startup and shutdown events are excluded, however, they only account for 3,033 excess opacity readings of the 15,480 at Kiln #2. **Exhibit J**, p. 3.

22.     The duration of continuous excess opacity readings at the Laramie Plant can run for several hours. For example, on December 14, 1999, Mountain Cement reported that emissions from Kiln #2 exceeded 20 percent opacity for 6.3 hours, with the highest reading during that period of 85.9 percent – over four times the legal limit. **Exhibit I**, p. 9. In speed limit terms, this would be equivalent to driving over 300 miles per hour on Interstate 80.

23.     More recently, after this case was filed, Mountain Cement's opacity monitor at Kiln #2 recorded over two hours of excess opacity readings – with a maximum 6-minute average reading of 92.2 percent – during the afternoon of December

-8-

28, 2004. Mountain Cement did not report this event as an emergency, abnormal

condition, or malfunction, only stating it was caused by "lost auxiliary equipment."

**Exhibit I,** p. 509.

24.     On February 16, 2000, DEQ informed Mountain Cement that 197.6 hours

of excess opacity readings that occurred between December 2nd and December 21st, 1999,

were not excused as abnormal conditions or equipment malfunctions. According to

DEQ, the excess emissions were caused by "unfinished maintenance" and therefore were

not excusable. **Exhibit K.**

25.     On March 17, 2005, DEQ and Mountain Cement entered into a Consent

Decree that required Mountain Cement to pay a $42,500 penalty to resolve opacity

violations at Kiln #2 that occurred between the second quarter of 2001 and the second

quarter of 2002. **Exhibit L.** These violations were alleged in DEQ's complaint of

December 17, 2004. **Exhibit M.** Plaintiffs are not seeking a penalty in this action for

Mountain Cement's Kiln #2 opacity violations during this period.

26.     According to EPA, the twenty percent opacity limit applicable to

Mountain Cement is meant to reduce emissions of hazardous air pollutants. "The rule . . .

limits emissions of opacity (a surrogate pollutant for particulate matter and toxic metals)

from the kiln, clinker cooler and materials handling facilities." May 14, 1999 EPA Fact

Sheet, **Exhibit N,** p. 2; 40 C.F.R. Part 63, Subpart LLL.  Consequently, the excessive

particulate matter and other pollutants emitted into the Laramie Valley as a result of

Mountain Cement's opacity violations are harmful to human health and the environment. *See also, Sierra Club v. Costle*, 657 F.2d 298, 313 (D.C. Cir. 1981).

## IV.  ARGUMENT

Partial summary judgment should be entered in favor of plaintiffs on their first cause of action in their complaint because there is no reasonable dispute over the fact that Mountain Cement has discharged pollutants into the atmosphere of the Laramie Valley in violation of its Permits 30-098 and 31-098 and the Clean Air Act.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Rule 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995); *Yumukoglu v. Provident Life & Accident Ins. Co.*, 131 F. Supp. 2d 1215, 1221 (D.N.M. 2001).  Summary judgment regarding violations of the Clean Air Act has been found to be particularly appropriate where a defendant's own air pollution monitoring results demonstrate liability. *St. Bernard Citizens for Envt'l Quality, et al. v. Chalmette Refining, L.L.C.*, 354 F.Supp. 2d 697, 706-707 (E.D. La. 2005); *Sierra Club v. Public Service Company of Colorado, Inc.*, 894 F. Supp. 1455 (D. Colo. 1995); *Friends of the Earth v. Potomac Electric Power Company*, 419 F. Supp. 528 (D.D.C. 1976).

**A.      Partial Summary Judgment Should Be Granted to Establish
Mountain Cement's Liability for Opacity Violations at Kiln #2.**

As demonstrated below, partial summary judgment should be granted to establish

the elements of plaintiffs' affirmative case with respect to the first cause of action.  These

elements are: (1) the opacity limit in Permits 30-098 and 31-098 for emissions from

Kiln #2 is 20 percent on a six minute average, (2) compliance with the 20 percent opacity

limit in Mountain Cement's permits is determined by Mountain Cement's continuous

opacity monitors, and (3) Mountain Cement's continuous opacity monitor data show

thousands of violations of the 20 percent limit for which there is no exception.

1.      Plaintiffs Are Entitled To Partial Summary Judgment To
Establish That the Opacity of Pollution from Kiln #2  Shall
Not be Greater than 20 Percent.

First, partial summary judgment should be granted to establish that Mountain

Cement Operating Permit No. 30-098, condition (F3)(a), and Mountain Cement Permit

No. 31-098, condition (F3)(b), prohibit the emission of visible pollutants from the smoke

stack of Kiln #2 that exhibit greater than 20 percent opacity.  **Exhibit F**, p. 8; **Exhibit G**,

p. 6.  According to Permit 30-098 at condition (F3)(a):

Visible emissions from the #1 and #2 kiln stacks (Source #1 & #2) shall
not exhibit greater than 20 percent opacity.

*Id.*, **Exhibit F**, p. 8.  Similarly, Permit No. 31-098 at condition (F3)(b) states:

The 6 minute average opacity from the #1 and #2 kiln stacks (K1-710 and
K-401) for any 6 minute block period shall not exceed 20 percent opacity.

-11-

*Id.*, **Exhibit G**, p. 6.

Pursuant to the Clean Air Act at 42 U.S.C. § 7661a(a), "[a]fter the effective date

of any permit program approved or promulgated under this subchapter, it shall be

unlawful for any person to violate any requirement of a permit issued under this

subchapter." Wyoming's operating permit program was approved by EPA on February

22, 1999.  64 Fed. Reg. 8523 (Feb. 22, 1999); Answer, ¶ 25.

According to Mountain Cement's Permit 31-098, "[a]ll terms and conditions of

the permit, except those designated as not federally enforceable, are enforceable by EPA

and citizens under the Act." **Exhibit G**, p. 2.  Because the 20 percent opacity limit in

Mountain Cement's permits is an "emission standard or limitation" as defined in the

Clean Air Act at 42 U.S.C §7604(f)(1), (3), and (4), it can be enforced by plaintiffs in this

action pursuant to the Clean Air Act's citizen suit provision at 42 U.S.C. § 7604(a)(1).

As shown below, because there is no genuine dispute of material fact that

Mountain Cement is required by its permit to monitor the opacity of its emissions, and

because Mountain Cement's own evidence shows thousands of violations of the opacity

limit, partial summary judgment to establish Mountain Cement's liability for such

violations should be granted.

2.   Plaintiffs Are Entitled To Partial Summary Judgment to Establish that
     Opacity Data from Mountain Cement's Continuous Opacity Monitors
     May Be Used to Establish Violations of the 20 Percent Opacity Limit.

Second, partial summary judgment should be granted to establish that Mountain

Cement Permits 30-098 and 31-098 require Mountain Cement to monitor the opacity of

its emissions, and that Mountain Cement's monitor data is to be used to establish

violations.

Mountain Cement is required by condition (F15) in Permit No. 30-098, and

conditions (F11)(a) and (F12) in Permit No. 31-098 to monitor the opacity of emissions

discharged from Kiln #2 at the Laramie Plant. **Exhibit F**, p. 13; Exhibit **G**, pp. 9-10.

The continuous opacity monitor that measures emissions from Kiln #2 is located and

certified consistent with the requirements found at 40 C.F.R. § 60, App. B, Performance

Specification 1.  Answer, ¶ 48.

Pursuant to Mountain Cement Permit No. 30-098, condition (F31), and Permit

No. 31-098, conditions (F25) and (P63-LLL8), Mountain Cement is required to submit

on a quarterly basis a written report to DEQ that discloses each six-minute period of time

in which emissions of pollutants from Kiln #2 exceed the applicable opacity standard

("excess emission reports"). **Exhibit F**, p.16; **Exhibit G**, p. 14.  Pertinent sections of

these reports are attached as **Exhibit I**.

Mountain Cement's permits also require the company to certify that the monitor

data in its quarterly reports is "true, accurate and complete." **Exhibit F**, condition (G4),

p. 21; **Exhibit G**, condition (G4), p. 28. The obligation to submit true and complete self-monitoring results is fundamental to the effective implementation and enforcement of the Wyoming Quality Act and the Clean Air Act. 42 U.S.C. § 7661c(c) and WAQSR Ch. 6, Section 3(c)(iv).

Furthermore, any person who submits false or inaccurate monitoring data is subject to criminal penalties. Pursuant to Article 9 of the Wyoming Environmental Quality Act:

> Any person who knowingly makes any false statement, representation or certification in any application, record, report, plan or other document filed or required to be maintained under this act or who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under this act, shall upon conviction, be fined not more than ten thousand dollars ($10,000.00) per day for each violation or imprisoned for not more than one (1) year, or both.

Wyo. Stat. § 35-11-901(k). The Clean Air Act also provides for criminal penalties for making "any false material statement, representation, or certification in . . . any notice, application, record, report, plan, or other document required pursuant to this chapter. . . ." 42 U.S.C. § 7413(c)(2)(A). *United States v. Louisiana Pacific Corp.*, 908 F. Supp. 835, 840 (D. Colo. 1995), app. dismissed, 106 F.3d 345 (10th Cir. 1997) (criminal prosecution involving false opacity reporting under the Clean Air Act).

Because Mountain Cement is required by law to determine and report the opacity of its air pollutant emissions on a continuous basis, reports that show opacity readings in excess of permit limits can be used to demonstrate Mountain Cement's liability for

violations. *St. Bernard Citizens for Envt'l Quality, et al. v. Chalmette Refining, L.L.C.*, 354 F.Supp. 2d 697, 706-707 (E.D. La. 2005); *Sierra Club v. Public Service Company of Colorado, Inc.*, 894 F. Supp. 1455, 1461 (D. Colo. 1995); *Friends of the Earth v. Potomac Electric Power Co.*, 419 F. Supp. 528, 533 (D.D.C. 1976). Similarly, in the Clean Water Act context, a defendant's water pollution monitoring results constitute admissions sufficient to establish liability.[2] *U.S. v. Brittain*, 931 F.2d 1413, 1416 (10th Cir. 1991); *Atlantic States Legal Foundation v. Tyson Foods, Inc.*, 897 F.2d 1128, 1135 (11th Cir. 1990); *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109, 1115 n.8 (4th Cir. 1988); *Sierra Club v. Union Oil of California*, 813 F.2d 1480, 1492 (9th Cir. 1987); *U.S. v. Gulf States Steel, Inc.*, 54 F. Supp. 2d 1233, 1241 (N.D. Ala. 1999); *U.S. v. Smithfield Foods, Inc.*, 965 F. Supp. 769, 783 (E.D. Va. 1997); *U.S. v. Sheyenne Tooling & Mfg. Co., Inc.*, 952 F. Supp. 1420, 1421 (D.N.D. 1996); *United States v. CPS Chemical Co., Inc.*, 779 F. Supp. 437 (E.D. Ark. 1991); *Natural Res. Defense Council v. Texaco Refining*, 719 F. Supp. 281 (D.Del. 1989), *vacated, in part, on other grounds*, 906 F.2d 934 (3d Cir. 1990).

The results of Mountain Cement's continuous opacity monitoring, certified by Mountain Cement as true, accurate and complete under threat of criminal penalty,

---

[2]  "Where a facility's own reports establish that it is not in compliance with its permit, these reports can be used by a plaintiff in a CAA [Clean Air Act] citizen suit to prove a CAA violation, just as Water Discharge Self-Monitoring Reports (DMRs) have long been utilized as conclusive proof of permit violations by plaintiffs suing companies under the citizens suits provisions of the Clean Water Act (CWA)." Vinal, "Proof of Wrongful Emission of Air Pollutants Under Clean Air Act," 37 P.O.F.3d 501 §7.

demonstrate that the Laramie Plant has been in significant non-compliance with its permits' 20 percent opacity limit for years.

3.    Plaintiffs Are Entitled To Partial Summary Judgment to Establish that Between the 4th Quarter of 1999 Through the 1st Quarter of 2005, Mountain Cement Violated the Opacity Limit at Laramie Plant at Least 15,480 Times.

Finally, partial summary judgment should be granted to establish that Mountain Cement's continuous opacity monitor data shows that Mountain Cement has violated the 20 percent opacity limit thousands of times at Kiln #2. Mountain Cement's violations of the applicable 6-minute, 20 percent opacity limit are set forth in Mountain Cement's quarterly reports beginning with the fourth quarter of 1999 through the first quarter of 2005. **Exhibit I**. Opacity readings in excess of 20 percent on a six minute average are set forth in columns titled "Maximum Excess Emissions" or "Average Opacity (%)" in these reports. Mountain Cement's violations of the 20 percent opacity limit each quarter at Kiln #2, taken from the reports in **Exhibit I**, are summarized in **Exhibit J**.

Accordingly, Mountain Cement has violated the 20 percent opacity limit between October 1, 1999 and March 31, 2005 at Kiln #2 15,480 times. **Exhibit J**, p. 3. Therefore plaintiffs respectfully move for partial summary judgment with respect to 15,480 violations of the 20 percent opacity limit at Kiln #2.

**B.    Mountain Cement's Expected Defenses Should Be Rejected As a Matter of Law.**

Mountain Cement is expected to claim that some of its opacity violations are excused as emergencies, abnormal conditions or equipment malfunctions, and by other

exceptions not set forth in its permit. Mountain Cement may also argue that its penalty

settlement with DEQ regarding five calendar quarters of opacity violations in 2001 and

2002 precludes plaintiffs' action for injunctive relief and a civil penalty regarding 22

calendar quarters of opacity violations between 1999 and 2005. These defenses fail as a

matter of law and should be rejected.

1.    Mountain Cement Can Not Meet its Burden to Prove Emergency or
      Malfunction Defenses.

Mountain Cement's expected defense that its opacity violations should be

excused as emergencies, abnormal conditions or equipment malfunctions is fatally

flawed because Mountain Cement did not timely report that any of the excess opacity

readings at issue in this case were caused by emergencies, abnormal conditions or

equipment malfunctions. See **Exhibit J**, bottom row.[3]  In fact, Mountain Cement

affirmatively reported that none of the excess opacity readings at issue in this case were

caused by such events. **Exhibit I**, pp. 30, 40, 65, 83, 101, 142, 203, 259, 290, 311, 338,

364, 380, 403, 428, 451, 472, 501 and 524.

According to its permits at Condition (G17):

The permittee may seek to establish that noncompliance with a
technology-based emission limitation under this permit was due to an
emergency, as defined in Ch 6, Sec 3(l)(i) of the WAQSR.[4]  To do so, the

---

[3]  Plaintiffs do not allege in this action that the excess opacity emissions Mountain
Cement timely reported as being caused by malfunctions, and that were excused by DEQ,
are violations. These periods are shown in **Exhibit I** at pp. 7, 21 and 49.

[4]  According to WAQSR Ch 6, Sec 3(l)(i), an "emergency" means

permittee shall demonstrate the affirmative defense of emergency through properly signed, contemporaneous operating logs, or other relevant evidence that:

    (a)    an emergency occurred and that the permittee can identify the cause(s) of the emergency;

    (b)    the permitted facility was, at the time, being properly operated;

    (c)    during the period of the emergency the permittee took all reasonable steps to minimize levels of emissions that exceeded the emissions standards, or other requirements in this permit;

    (d)    *the permittee submitted notice of the emergency to the Division within one working day of the time when emission limitations were exceeded due to the emergency. This notice must contain a description of the emergency, any steps taken to mitigate emissions, and corrective actions taken.*

**Exhibit F**, p. 24; **Exhibit G**, p. 31 (emphasis added).

To establish a defense of abnormal condition or equipment malfunction a similar 24-hour notice is required. According to Permit condition (G21):

Emissions in excess of established regulation limits as a direct result of malfunction or abnormal conditions or breakdown of a process, control or related operating equipment beyond the control of the person or firm owning or operating such equipment shall not be deemed to be in violation of such regulations, *if the Division is advised of the circumstances within*

---

[footnote continued] any situation arising from sudden and reasonably unforeseeable events beyond the control of the source, including acts of God, which situation requires immediate corrective action to restore normal operation, and that causes the source to exceed a technology-based emission limitation under the permit, due to unavoidable increases in emissions attributable to the emergency. An emergency shall not include noncompliance to the extent caused by improperly designed equipment, lack of preventative maintenance, careless or improper operation, or operator error.

> *24 hours of such malfunction[5] and a corrective program acceptable to*
> *the Division is furnished.*

**Exhibit F**, p. 24; **Exhibit G**, p 31 (emphasis added).

To the extent Mountain Cement wanted to avail itself of the emergency, abnormal condition or equipment malfunction defense to excuse an excess opacity reading at Kiln #2, it therefore was required by its permits to submit a report to DEQ within 24 hours of such reading. Because Mountain Cement decided over the last five years not to claim that its excess opacity emissions at Kiln #2 at issue in this case were caused by emergency or malfunction, and in fact decided to report affirmatively at the end of each quarter that each of the excess opacity readings during that quarter were *not* the result of any emergency, abnormal condition or equipment malfunction, it may not now assert these defenses.

In an identical reporting requirement under the Clean Water Act, evidence of a timely filed report is a procedural prerequisite to establishing an "upset" defense. Thus in *Student Public Interest Research Group, Inc. v. P.D. Oil*, 627 F. Supp. 1074, 1087 (D.N.J. 1986), aff'd in part, rev'd in part at *Student Public Interest Research Group, Inc. v. Powell Duffryn Terminals*, 913 F.2d 64, 76 n.20 (3rd Cir. 1990), the court rejected the

---

[5] The term "malfunction" is defined at WAQSR Chapter 5, Section 2(e)(i) as:

any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions.

defendant's belated upset defense due to the defendant's failure to submit timely reports.

According to the court:

> Defendant has provided no evidence that satisfies any of these requirements for any particular permit violation alleged by plaintiffs. Instead, defendant broadly asserts that all of its permit violations qualify as upsets. EPA's regulations do not permit this type of blanket defense. They require that defendant demonstrate through relevant evidence that each upset is 'an exceptional incident' and meets all the other requirements of the regulation. For example, EPA's regulations require that the defendant show that it provided EPA and NJDEP with 24-hour notice. Defendant's upset defense is defective as a matter of law as to all of its violations on this ground alone.

Because the prompt "emergency" reporting requirements in the applicable Wyoming and Clean Air Act regulations require proof of notification before the defense will apply, WAQSR Ch. 6, Sec. 3(l) and Ch. 1, Sec. 5, and 40 C.F.R. § 70.6(g)(3)(iv) (2004), and because these provisions are virtually identical to the applicable Clean Water Act regulations for establishing an "upset" at 40 C.F.R. § 122.41(n)(3)(iii) (2004), court decisions interpreting the latter apply with equal force to the former.

In sum, Mountain Cement can not satisfy its burden to demonstrate that each period of excess opacity set forth in **Exhibits I** and **J** was caused by an emergency or malfunction because Mountain Cement has already has stated it did not experience any emergencies or malfunctions and, as a consequence, did not provide the requisite 24-hour notification.

Even if the court were to allow Mountain Cement to avoid the 24-hour notification requirement, it is apparent from the quarterly excess emission reports that Mountain Cement would be unable to carry its burden of proof to demonstrate the other

elements of these defenses.

For example, in its excess emission report for the second quarter of 2000, Mountain Cement provides no explanation of corrective actions taken to prevent recurrence of its excess emissions. **Exhibit I**, pp. 31-33. This is an essential element of the 24-hour notification requirement. Permit Conditions (G17) and (G21).

From the highly repetitious nature of the "Cause Code" listings in its quarterly reports it is also apparent that Mountain Cement's excess opacity events are neither sudden nor infrequent. These also are necessary elements of the emergency and malfunction defenses. Permit Conditions (G17) and (G21). Due to the persistent and perennial nature of the pollution control equipment problems at Kiln #2, rather than re-type the same reason over and over again, Mountain Cement adopted a time-saving measure. In its reports Mountain Cement types a "B" to describe "excess emissions occurring during a period when the control equipment (Baghouse, Precipitator, etc.) was not functioning properly," and a "C" for "excess emissions occurring when there has been a problem with process such as a plug in the raw mill." **Exhibit I**, p 28. These generic descriptions, repeatedly applied to explain excess emissions across many years, show a pattern of similar problems at Kiln #2 that have never been corrected. See, as examples, **Exhibit I**, pp. 8-10; 22-23; 31-33; 41-42; 50-52; 66-68; 84-89. In other words, Mountain Cement's quarterly reports show that its excess opacity emissions at Kiln #2 are not sudden and infrequent, but rather are expected and unremitting. As such, they are not excused. Permit Conditions (G17) and (G21).

2.      Mountain Cement Can Not Meet its Burden to Prove a Startup and
        Shutdown Defense.

As to Mountain Cement's expected startup and shutdown defense, there is no

such defense set forth in its permits.  Where defenses to the emission limits in its permit

have been expressly stated no additional defenses may be implied.

This is consistent with the maxim *expressio unius est exclusio alterius;* once

exceptions to a general prohibition are described, no others may be implied.  *United*

*States v. Smith*, 499 U.S. 160, 167 (1991); *Parker v. Independent Sch. Dist. No. 1-003*, 82

F.3d 952, 956 (10th Cir. 1996).  In the context of environmental permits, once a permit is

issued and the time for appeal has expired (such as is the case here), adding defenses

after the fact is not allowed.  *Natural Res. Defense Council v. Texaco Refining*, 719 F.

Supp. 281, 289 (D.Del. 1989) (upset defense not available where not stated in permit),

*vacated, in part, on other grounds*, 906 F.2d 934 (3d Cir. 1990).  Therefore Mountain

Cement's expected argument that, in addition to its permits' express defenses for

emergencies and malfunctions, a startup and shutdown defense should be implied, is

without support.

Even if Mountain Cement is allowed a startup and shutdown defense, it must

prove at a minimum the existence and duration of each period, that each claimed startup

and shutdown was not caused by inadequate control equipment or poor maintenance, and

that the excess emissions during these periods were otherwise unavoidable.

3.      Mountain Cement Can Not Prove It Has a 5% Safe Harbor Defense.

Mountain Cement's Answer claims that "opacity exceedences that occur less than

5% of the time are not violations of any clean air law, regulation or permit." Answer,

p. 10. However, there is no five percent exception in Mountain Cement's permits nor,

for that matter, in any "clean air law [or] regulation" that applies to the Laramie Plant.

**Exhibits F** and **G**.

That DEQ generally has not brought enforcement actions against Mountain

Cement until opacity violations exceed five percent of the operating time in a quarter (or

approximately 1,000 violations) does not mean that Mountain Cement's excess opacity

readings between zero and one thousand are not themselves violations.

    4.    <u>Mountain Cement Can Not Prove Its "Diligent Prosecution" Defense.</u>

Finally, Mountain Cement's expected claim that plaintiffs' action is precluded

because of Mountain Cement's 2005 penalty settlement with DEQ for five calendar

quarters of opacity violations at Kiln #2 in 2001 and 2002 is without merit.[6]

Pursuant to the Clean Air Act at 42 U.S.C. 7604(b)(1)(B):

> No [citizen suit] action may be commenced . . . (B) if the Administrator
> [or EPA] or State has commenced and is diligently prosecuting a civil
> action in a court of the United States or a State to require compliance with
> the standard, limitation or order [that is the subject of such action] . . .

First, the March 17, 2005 Consent Decree between DEQ and Mountain Cement

does not require Mountain Cement to perform any injunctive relief. **Exhibit L**. The

Consent Decree only requires Mountain Cement to pay a $42,500 penalty for excess

opacity emissions at Kiln #2 that took place during the first, second and third quarters of

---

    [6] Plaintiffs are not seeking a penalty in this action for the Kiln #2 opacity
violations resolved by DEQ's 2005 Consent Decree.

2001, and the first and second quarters of 2002. **Id**, p. 4; December 17, 2005 Complaint,

**Exhibit M**, p. 3, ¶ 19. Because the 2005 DEQ-Mountain Cement Consent Decree only

resolves Mountain Cement's past penalty liability for discrete Kiln #2 opacity violations

in 2001 and 2002, and does not "require compliance" with the opacity limit at Kiln #2 in

the future, Section 7604(b)(1)(B) of the Clean Air Act does not preclude this action.

Second, the 2005 Consent Decree does not address Mountain Cement's Kiln #2

excess opacity penalty liability for violations that occurred in the fourth quarter of 1999,

all quarters of 2000, the first quarter of 2001, the third and fourth quarters of 2002, all

quarters of 2003 and 2004, and the first quarter of 2005. Because the Consent Decree

does not resolve Mountain Cement's violations during these periods plaintiffs' action is

not precluded.

Third, the 2005 Consent Decree does not address Mountain Cement's liability for

particulate matter violations at Kiln #2 (plaintiffs' second cause of action), and for

clinker cooler opacity violations (plaintiffs' third cause of action) and thus does not

require compliance with these limits.

Fourth, the 2005 Consent Decree does not establish that Mountain Cement has

been violating the opacity limit at Kiln #2. Mountain Cement agreed to pay the penalty

"without admitting liability." **Exhibit L**, p. 4. Because plaintiffs' action seeks a

declaration that Mountain Cement has been violating and continues to violate its permit

this action is not precluded.

## V. CONCLUSION

For the reasons set forth above, partial summary judgment finding Mountain

Cement liable for thousands of opacity violations at Kiln #2 should issue forthwith.

There is no dispute but that Mountain Cement has violated, and continues to violate, the

20 percent opacity limit at Kiln #2. Mountain Cement having no valid defense to these

violations, partial summary judgment should issue as a matter of law. A proposed order

is attached.

Respectfully submitted,

DATED this *20th* day of June, 2005.

BIODIVERSITY CONSERVATION ALLIANCE
and SIERRA CLUB, Plaintiffs

Reed Zars
Attorney at Law
910 Kearney Street
Laramie, WY 82070
307-745-7979
307-745-7999 (fax)

**EXHIBITS TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING
OPACITY VIOLATIONS AT KILN #2**

Exhibit A:      October 22, 2004 60-day notice letter.

Exhibit B:      June 13, 2005 Expert Report of Jonathan Shefftz.

Exhibit C:      June 5, 1996 DEQ Notice of Violation to Mountain Cement.

Exhibit D:      July 2, 1996 DEQ Compliance Order.

Exhibit E:      June 13, 2005 Expert Report of Bill Wilson

Exhibit F:      June 2, 1998 DEQ Operating Permit No. 30-098.

Exhibit G:      March 15, 2004 DEQ Operating Permit No. 31-098

Exhibit H:      January 25, 2002 Sansing Memo

Exhibit I:      Mountain Cement Quarterly Excess Emission Reports from 4th Quarter
                1999 through 1st Quarter 2005, excerpts.

Exhibit J:      Kiln #2 Excess Emission Summary.

Exhibit K:      February 16, 2000 DEQ letter refusing to excuse excess opacity
                emissions.

Exhibit L:      March 17, 2005 DEQ v. Mountain Cement Consent Decree.

Exhibit M:      December 17, 2005 DEQ v. Mountain Cement Complaint

Exhibit N:      May 14, 1999 EPA Fact Sheet regarding HAPs from Cement Plants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _20th_ day of June, 2005, I caused to be hand delivered to Mr. Nicholas, and mailed to Mr. Harris, a copy of Plaintiffs' Combined Motion and Memorandum for Partial Summary Judgment to Establish Liability for Kiln #2 Opacity Violations, and Plaintiffs' Proposed Findings of Fact, Conclusions of Law and Order with respect to such combined motion and memorandum, at the following addresses:

Philip Nicholas
Anthony, Nicholas et al.
170 N. 5th Street
P.O. Box 0928
Laramie, WY 82073

James Harris
Thompson & Knight, LLP
1700 Pacific, Suite 3300
Dallas, TX 75201

_Reed Zars_
Reed Zars

Attachments/Exhibits
too
voluminous to scan