FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

JUN 2 0 2005

Stephan Harris, Clerk
Cheyenne

Reed Zars (Wyo. Bar No. 6-3224)
Attorney at Law
910 Kearney Street
Laramie, Wyoming 82070
307-745-7979
307-745-7999 (FAX)

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| BIODIVERSITY CONSERVATION ALLIANCE and SIERRA CLUB, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 04CV 361-B ) |
| MOUNTAIN CEMENT COMPANY, | ) ) |
| Defendant. | ) |

### PLAINTIFFS' PROPOSED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW REGARDING
### THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT TO ESTABLISH
### DEFENDANT'S LIABILITY FOR KILN #2 OPACITY VIOLATIONS

Plaintiffs Biodiversity Conservation Alliance and Sierra Club ("plaintiffs")

respectfully submit their proposed findings of fact and conclusions of law regarding their

motion for partial summary judgment to establish Mountain Cement's liability for

opacity violations at Kiln #2.

-1-

A.    Findings of Fact.

1.    Mountain Cement Company, a wholly-owned subsidiary of the Texas company Eagle Materials, Inc., operates a portland cement plant located approximately three miles south of Laramie, Wyoming ("Laramie Plant"). The Laramie Plant manufactures portland cement using two coal-fired kilns and associated equipment. Answer, ¶¶ 12-14.

2.    Eagle Materials, Inc., is a full or partial owner of three other cement plants located in La Salle, Illinois, Buda, Texas, and Fernley, Nevada. Eagle Materials had revenues of $616.5 million in 2004. Eagle Materials has sold out its cement production capacity for the last 19 years. Between 2004 and 2005 Eagle Materials' net earnings rose from $102.1 to $158.1 million, an increase of over 35 percent. Expert Report of Jonathan Shefftz, **Exhibit B**, p. 9.

3.    Kiln #1 at the Laramie Plant has a rated capacity of 600 tons per day of clinker, Kiln #2 has a rated capacity of 1,500 tons per day of clinker. Answer, ¶ 15.

4.    In 1996 DEQ issued a Notice of Violation to Mountain Cement for exceeding the particulate matter emission limit at Kiln #1. At that time Mountain Cement used electrostatic precipitators (ESPs) to reduce particulate matter emissions from both Kiln #1 and Kiln #2. June 5, 1996 NOV, **Exhibit C**. To correct the excess particulate problem at Kiln #1 Mountain Cement agreed to the entry of a Compliance Order that required Mountain Cement to replace Kiln #1's ESP with a baghouse. July 2,

-2-

1996 Compliance Order, **Exhibit D**.

5.      Kiln #2 is over twice the size of Kiln #1, and has over twice the amount of particulate matter emissions.  Mountain Cement has not replaced the ESP with a baghouse at Kiln #2 as it did at Kiln #1.  Over the past five years emissions from Kiln #2 have exceeded the 20 percent opacity limit at a rate 75 times that of Kiln #1.  Expert Report of Bill Wilson, **Exhibit E**, p. 3.

6.      On June 2, 1998, the DEQ issued Operating Permit No. 30-098 to Mountain Cement.  Answer, ¶ 30; **Exhibit F**.  Operating Permits in Wyoming are issued for a period of five years.  42 U.S.C. § 7661a(b)(5)(B).  On March 15, 2004, DEQ issued a second operating permit to Mountain Cement, Operating Permit No. 31-098.  Answer, ¶ 30; **Exhibit G**.

7.      The opacity of pollution discharged from Kiln #2 at the Laramie Plant is recorded by Mountain Cement on a continuous basis (except for monitor downtime) by a continuous opacity monitor (COM)[1] located in the smoke stack of Kiln #2.  Permit 30-098 condition (F15), p. 12; Permit 31-098, condition (F11), p. 9.  **Exhibits F and G**.

8.      The COMs that measure the opacity of emissions from Kiln #2 at the

---

[1]  A COM scientifically determines opacity by passing a beam of light from one side of the stack to the other.  The less light that makes it to a sensor on the other side, the greater the opacity.  40 C.F.R. Part 60, App. B, Spec. 1.  According to EPA, "[t]ransparent stack emissions that do not attenuate light will have an opacity of zero percent.  Opaque stack emissions that attenuate all of the visible light will have a transmittance of zero percent or an opacity of 100 percent."  Id.

Laramie Plant are located and certified consistent with the requirements found at 40

C.F.R. § 60, App. B, Performance Specification 1. Answer, ¶ 48.

9.     The opacity data from the COMs is retained in a computer at the Laramie

Plant. Answer, ¶ 49.

10.    The data from the COM in the Kiln #2 smokestack show that emissions

have exceeded 20 percent every calendar quarter over the last five years. The opacity of

emissions from Kiln #2 have exceeded 20 percent at Kiln #2 thousands of times in the

last five years. During these times, Mountain Cement's COMs show opacity readings

that exceed 20 percent over four times the limit, or that are over 80 percent opacity.

Answer, ¶ 50.

11.    After exceeding its opacity limit at Kiln #2 for over 15 hours in January of

2002, Mountain Cement's Environmental Manager, Bill Sansing, stated that "[t]hese

emissions are not acceptable and we will be in trouble if we cannot correct this situation.

The neighbors certainly notice these episodes and are perfectly within their rights to

complain to the DEQ and EPA." January 25, 2002 Sansing Memo, **Exhibit H**.

12.    The Mountain Cement COMs record the average opacity of air pollutant

emissions from the Laramie Plant in six-minute intervals, except for periods of monitor

downtime. Answer, ¶ 46

13.    Pursuant to Operating Permit No. 30-098, condition (F31), and Operating

Permit No. 31-098, condition (F25), Mountain Cement is required to submit on a

-4-

quarterly basis a written report to WDEQ that discloses each period of time in which emissions of pollutants from Laramie Plant exceed the applicable standard ("excess emission reports"). **Exhibits F** and **G**.

14. **Exhibit I** contains true and accurate excerpts of Mountain Cement's quarterly excess emission reports for Kiln #2 and the clinker coolers from the fourth quarter of 1999 through the first quarter of 2005.

15. Mountain Cement has certified as true, accurate, and complete its excess emission data. **Exhibit I**.

16. From October 1, 1999 through March 31, 2005, Mountain Cement exceeded the 20 percent, 6-minute average opacity limit for Kiln #2 in Permits 30-098 and 31-098 at least 15,480 times. Mountain Cement Kiln #2 Excess Emission Summary, **Exhibit J**.

17. "Emergency" and "Abnormal Conditions and Equipment Malfunction" are the only exceptions to the Kiln #2 opacity limit set forth in Mountain Cement's permits. **Exhibits F** and **G**, conditions (G17) and (G21).

18. To establish the affirmative defense of an emergency, abnormal condition or equipment malfunction Mountain Cement must demonstrate that it provided notice to DEQ of such an event within 24 hours. **Exhibits F** and **G**, conditions (G17) and (G21).

19. During the period from October 1, 1999 through March 31, 2005, Mountain Cement only provided notice of 231 6-minute periods of excess opacity at

Kiln #2 that it claimed were caused by an emergency, abnormal condition or equipment malfunction. **Exhibit J**, p. 3

20.     Mountain Cement's permits do not include any provision that states opacity exceedences that occur less than 5% of the time are not excused. **Exhibits F** and **G**.

21.     Mountain Cement's permits do not include a defense for excess emissions caused by startup or shutdown. **Exhibits F** and **G**. Even if all excess opacity emissions during startup and shutdown events are excluded, however, they only account for 3,033 excess opacity readings of the 15,480 at Kiln #2. **Exhibit J**, p. 3.

22.     The duration of continuous excess opacity readings at the Laramie Plant can run for several hours. On December 14, 1999, Mountain Cement reported that emissions from Kiln #2 exceeded 20 percent opacity for 6.3 hours, with the highest reading during that period of 85.9 percent – over four times the legal limit. **Exhibit I**, p. 9.

23.     Mountain Cement's opacity monitor at Kiln #2 recorded over two hours of excess opacity readings – with a maximum 6-minute average reading of 92.2 percent – during the afternoon of December 28, 2004. Mountain Cement did not report this event as an emergency, abnormal condition, or malfunction, only stating it was caused by "lost auxillary equipment." **Exhibit I**, p. 509.

24.     On March 17, 2005, DEQ and Mountain Cement entered into a Consent

Decree that required Mountain Cement to pay a $42,500 penalty to resolve opacity

violations at Kiln #2 that occurred between the second quarter of 2001 and the second

quarter of 2002. **Exhibit K**. These violations were alleged in DEQ's complaint of

December 17, 2004. **Exhibit L**.

25.     Mountain Cement's 2005 Consent Decree with DEQ that required it to

pay a penalty of $42,500 for Kiln #2 opacity violations does not require Mountain

Cement to perform any injunctive relief.

26.     The 2005 Consent Decree does not address Mountain Cement's Kiln #2

excess opacity penalty liability for violations that occurred in the fourth quarter of 1999,

all quarters of 2000, the first quarter of 2001, the third and fourth quarters of 2002, all

quarters of 2003 and 2004, and the first quarter of 2005.

27.     Mountain Cement did not timely report that any of the excess opacity

readings at issue in this case were caused by emergencies, abnormal conditions or

equipment malfunctions. **Exhibit J**, bottom row. Mountain Cement affirmatively

reported that none of the excess opacity readings at issue in this case were caused by such

events. **Exhibit I**, pp. 30, 40, 65, 83, 101, 142, 203, 259, 290, 311, 338, 364, 380, 403,

428, 451, 472, 501 and 524.

B.     Conclusions of Law

1.     Mountain Cement Permit No. 30-098, condition (F3)(a), and Mountain

Cement Permit No. 31-098, condition (F3)(b), prohibit the emission of visible pollutants

from the smoke stack of Kiln #2 that exhibit greater than 20 percent opacity.  **Exhibit F**, p. 8; **Exhibit G**, p. 6.

2.      Pursuant to the Clean Air Act at 42 U.S.C. § 7661a(a), "[a]fter the effective date of any permit program approved or promulgated under this subchapter, it shall be unlawful for any person to violate any requirement of a permit issued under this subchapter." Wyoming's operating permit program was approved by EPA on February 22, 1999. 64 Fed. Reg. 8523 (Feb. 22, 1999); Answer, ¶ 25.

3.      According to Mountain Cement's Permit 31-098, "[a]ll terms and conditions of the permit, except those designated as not federally enforceable, are enforceable by EPA and citizens under the Act." **Exhibit G**, p. 2. Because the 20 percent opacity limit in Mountain Cement's permits is an "emission standard or limitation" as defined in the Clean Air Act at 42 U.S.C §7604(f)(1), (3), and (4), it can be enforced by plaintiffs in this action pursuant to the Clean Air Act's citizen suit provision at 42 U.S.C. § 7604(a)(1).

4.      Mountain Cement is required by condition (F15) in Permit No. 30-098, and conditions (F11)(a) and (F12) in Permit No. 31-098 to monitor the opacity of emissions discharged from Kiln #2 at the Laramie Plant. **Exhibit F**, p. 13; Exhibit **G**, pp. 9-10.

5.      Pursuant to Mountain Cement Permit No. 30-098, condition (F31), and Permit No. 31-098, conditions (F25) and (P63-LLL8), Mountain Cement is required to

submit on a quarterly basis a written report to DEQ that discloses each six-minute period of time in which emissions of pollutants from Kiln #2 exceed the applicable opacity standard ("excess emission reports").  **Exhibit F**, p.16; **Exhibit G**, p. 14.

6.      Mountain Cement's permits also require the company to certify that the monitor data in its quarterly reports is "true, accurate and complete."  **Exhibit F**, condition (G4), p. 21; **Exhibit G**, condition (G4), p. 28.

7.      Because Mountain Cement is required by law to determine and report the opacity of its air pollutant emissions on a continuous basis, reports that show opacity readings in excess of permit limits can be used to demonstrate Mountain Cement's liability for violations. *St. Bernard Citizens for Envt'l Quality, et al. v. Chalmette Refining, L.L.C.*, 354 F.Supp. 2d 697, 706-707 (E.D. La. 2005); *Sierra Club v. Public Service Company of Colorado, Inc.*, 894 F. Supp. 1455, 1461 (D. Colo. 1995); *Friends of the Earth v. Potomac Electric Power Co.*, 419 F. Supp. 528, 533 (D.D.C. 1976).

8.      As shown by **Exhibits I and J**, Mountain Cement has violated the applicable 6-minute, 20 percent opacity limit at Kiln #2 beginning with the fourth quarter of 1999 through the first quarter of 2005.

9.      Mountain Cement has violated the 20 percent opacity limit between October 1, 1999 and March 31, 2005 at Kiln #2 15,480 times.  **Exhibit J**, p. 3.

10.      In order to prove a defense of emergency, abnormal condition or equipment malfunction regarding any excess opacity reading, Mountain Cement would

-9-

have to have submitted a report to DEQ within 24 hours of any such reading.  **Exhibit F**,

p. 24; **Exhibit G**, p 31.  Because Mountain Cement decided over the last five years not to

claim  that its excess opacity emissions at Kiln #2 at issue in this case were caused by

emergency or malfunction, and in fact decided to report affirmatively at the end of each

quarter that each of the excess opacity readings during that quarter were *not* the result of

any emergency, abnormal condition or equipment malfunction, it may not now assert

these defenses.

     11.    For each excess opacity reading that Mountain Cement did not provide an

explanation of corrective actions taken to prevent a recurrence, the emergency, abnormal

conditions and malfunction defenses will not be allowed.  Permit Conditions (G17) and

(G21).

     12.    All excess opacity readings that are not sudden and infrequent, but are

repetitive and frequent, are not excused.  Permit Conditions (G17) and (G21).

     13.    There is no startup or shutdown defense provided in Mountain Cement's

permits.  Pursuant to the maxim *expressio unius est exclusio alterius;* once exceptions to

a general prohibition are described, no others may be implied.  *United States v. Smith*,

499 U.S. 160, 167 (1991); *Parker v. Independent Sch. Dist. No. I-003*, 82 F.3d 952, 956

(10th Cir. 1996).  Once a permit is issued and the time for appeal has expired (such as is

the case here), adding defenses to that permit is not allowed.  *Natural Res. Defense*

*Council v. Texaco Refining*, 719 F. Supp. 281, 289 (D.Del. 1989) (upset defense not

available where not stated in permit), *vacated, in part, on other grounds*, 906 F.2d 934
(3d Cir. 1990).

14.     Similarly, there is no five percent exception in Mountain Cement's
permits or, for that matter, in any "clean air law [or] regulation" that applies to the
Laramie Plant. **Exhibits F** and **G**.

15.     Plaintiffs' action is not precluded by the Clean Air Act at 42 U.S.C.
Section 7604(b)(1)(B) as a result of a 2005 Consent Decree between DEQ and Mountain
Cement. This is because the Consent Decree (a) does not require Mountain Cement to
perform any injunctive relief, **Exhibit K**, (b) only requires Mountain Cement to pay a
$42,500 penalty for excess opacity emissions at Kiln #2 that took place during the first,
second and third quarters of 2001, and the first and second quarters of 2002, (c) does not
address, or purport to address, opacity violations that occurred in the fourth quarter of
1999, all quarters of 2000, the first quarter of 2001, the third and fourth quarters of 2002,
all quarters of 2003 and 2004, and the first quarter of 2005, (d) only resolves Mountain
Cement's past penalty liability for discrete Kiln #2 opacity violations in 2001 and 2002,
and does not "require compliance" with the opacity limit at Kiln #2 in the future, (e) does
not address Mountain Cement's liability for particulate matter violations at Kiln #2
(plaintiffs' second cause of action), and for clinker cooler opacity violations (plaintiffs'
third cause of action), and (f) does not establish that Mountain Cement has been violating
the opacity limit at Kiln #2.

C.    Order

It is therefore Ordered and Adjudged that plaintiffs' motion for partial summary judgment to establish Mountain Cement's liability for opacity violations at Kiln #2 is hereby granted.

_____
UNITED STATES DISTRICT JUDGE

Respectfully submitted,

DATED this 20th day of June, 2005.

BIODIVERSITY CONSERVATION ALLIANCE and SIERRA CLUB, Plaintiffs

_____
Reed Zars
Attorney at Law
910 Kearney Street
Laramie, WY 82070
307-745-7979
307-745-7999 (fax)