Philip A. Nicholas
Jason M. Tangeman
Anthony, Nicholas, Tangeman & Yates, LLC
170 N. Fifth Street
P.O. Box 0928
Laramie, WY 82073
(307) 742-7140
(307) 742-7160 Fax

James B. Harris
Steven R. Baggett
Becky L. Jolin
Thompson & Knight, L.L.P
1700 Pacific, Suite 3300
Dallas, TX 75201
214-969-1102
214-880-3274 Fax

Attorneys for Defendant Mountain Cement Company

DEFENDANT'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.   C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| Biodiversity Conservation Alliance and Sierra Club, | ) ) ) |
| Plaintiffs, | ) Case No. 04CV 361-B |
| v. | ) |
| Mountain Cement Company, | ) ) |
| Defendant. | ) |

## AFFIDAVIT OF DAN OLSON
## WYOMING DEPARTMENT OF ENVIRONMENTAL QUALITY

STATE OF WYOMING    )
                        )ss.
County of Laramie       )

Dan Olson, being first duly sworn, deposes and says as follows:

1.      I am over the age of 21 and fully competent to make this affidavit.

2.      The facts and matters stated herein are within my personal knowledge, and are true and correct.

**AFFIDAVIT OF DAN OLSON**



3.      I am the Administrator for the Wyoming Department of Environmental Quality, Division of Air Quality (WDEQ-AQD).

4.      As the Administrator of WDEQ-AQD, my duties are defined by Wyoming Statutes § 35-11-110 titled "Powers of Administrators of the Divisions."

5.      I received a Bachelor of Sciences degree in Mechanical Engineering from the University of Wyoming in 1967. I then went to work for the Idaho Engineering Laboratory where I engaged in nuclear water reactor safety research.  I received my Master's Degree in Mechanical Engineering from the University of Idaho in 1975.   I worked at the Idaho Engineering Laboratory in Idaho for 15 years.

6.      In 1982 I returned to Wyoming and began teaching physics at Laramie County Community College.  I began working for DEQ in 1988. I stopped teaching at LCCC in 1996 when my state duties became too busy to continue teaching.

7.      My first job with DEQ was as a compliance officer reviewing inspection reports of inspectors in the field and making recommendations to the Administrator whether or not to take enforcement action based upon those compliance reports.

8.      I was promoted to Program Manager for the State of Wyoming's Title V Operating Permit Program in 1994.   The Title V Operating Permit Program is a congressionally mandated program requiring all major sources of pollution to have a single operating permit addressing all of their applicable requirements.

9.      Wyoming currently has approximately 160 major sources under its Title V Operating Permit Program.   Those sources include refineries, large gas plants, large compressor stations, coal fired facilities and a single cement plant located south of Laramie, Wyoming.

**AFFIDAVIT OF DAN OLSON**                                                                 2

10.    In 1997 I was promoted to Administrator of WDEQ-AQD and have served in that capacity since that time. As Administrator I am responsible for all aspects of the State of Wyoming's Air Quality Program, both technical and administrative.

11.    I am responsible for approving air quality permits for any kind of source receiving a permit from WDEQ-AQD.

12.    I am responsible for recommending whether the State of Wyoming will take enforcement action under the Air Quality Article to the Wyoming Environmental Quality Act found at Wyoming Statutes §§ 35-11-201 to 35-11-214 (Act) and the Wyoming Air Quality Standards and Regulations promulgated by the Department of Environmental Quality (Regulations).

13.    WDEQ-AQD has 59 authorized full time employees to enforce the Act and Regulations. Besides myself, the following personnel are directly responsible for overseeing different parts of Mountain Cement's operations:

> District 1 Engineer, presently Glenn Spangler;
> Compliance Program Manager, presently Robert P. Gill;
> NSR Program Manager, presently Bernie Daily; and
> Operating Permit Program Manager, presently Mike Stoll.

14.    WDEQ-AQD has been regulating the Laramie cement plant now operated by Mountain Cement Company since the adoption of the Act. Several WDEQ-AQD employees are familiar with the Laramie cement plant and its operations.

15.    From June 2, 1998 through March 14, 2004, Mountain Cement Company's Portland cement plant located South of Laramie, Wyoming was subject to Wyoming Air Quality Operating Permit No. 30-098.

16.    From March 15, 2004 to present the cement plant has been subject to Wyoming Air Quality Operating Permit No. 31-098.

**AFFIDAVIT OF DAN OLSON**                                              3

17.    Mountain Cement operates two rotary cement kilns at its facility which manufacture Portland cement. Kiln #1 is a rotary cement kiln constructed in the 1920's. Kiln #2 is a more recent and larger capacity rotary kiln constructed in the 1970's. Both Kiln #1 and Kiln #2 have been modified from how they were originally constructed or operated.

18.    Operating Permit No. 30-098 identifies Kiln #2 as source No. 2, and Operating Permit No. 31-098 identifies Kiln #2 as source K-401.

19.    Both of Mountain Cement Company's Air Quality Operating Permits limit emissions to the atmosphere from the Kiln #2 stack and the stack for the clinker coolers.

20.    Both permits specify that opacity from the Kiln #2 stack is not to exceed 20%.

21.    In Operating Permit No. 30-098, that condition is found in *The Facility Specific Permit Conditions* provision F3(a), as well as in the *New Source Performance Standards Subpart F Requirements* (NSPS-F1) to the permit. (See pages 15 and 19 to that Permit.)

22.    In Operating Permit No. 31-098, that condition is found in *The Facility Specific Permit Conditions* provision F3(b), as well as the *National Emission Standards for Hazardous Air Pollutants Subpart LLL Requirements* (NESHAPS Subpart LLL) section P63-LLL1 to the permit. (See pages 6 and 17 to that Permit.)

23.    The sources of both conditions regulating the opacity of the discharge stack emissions in both permits are State and Federal Regulations.

24.    With respect to Operating Permit No. 30-098, the relevant Federal Regulation is subpart F of 40 C.F.R., Part 60, which was incorporated into the Wyoming

**AFFIDAVIT OF DAN OLSON**                                                          4

Air Quality Standards and Regulations in Section 22, Subpart F. When the State of Wyoming renumbered the Wyoming Air Quality Standards and regulations, the provisions in Section 22 became Chapter 5, Section 2.

25.     Subpart F incorporates Subpart A of 40 C.F.R. Part 60. The State of Wyoming has incorporated those provisions into Chapter 5, Section 2 of the Wyoming Air Quality Standards and Regulations.

26.     With respect to Operating Permit 31-098, the relevant Federal Regulation is 40 C.F.R., Part 63, Subpart LLL, which has been incorporated into the Wyoming Air Quality Standards and Regulations in Chapter 5, Section 3.

27.     Subpart LLL of 40 C.F.R., Part 63, incorporates a number of general provisions found in Part 63 of 40 C.F.R. into Subpart LLL. The state of Wyoming has incorporated those provisions into Chapter 5, Section 3, of the Wyoming Air Quality Standards and Regulations.

28.     The purpose of the foregoing background is to make clear that the State of Wyoming intended that the opacity conditions in Operating Permits 30-098 and 31-098 be construed consistent with the regulatory provisions from which they are derived. Stated another way, the Federal Regulations described in Paragraphs 24, 25, 26, and 27 are considered to be part of the Operating Permit to which they apply.

29.     It is the position of the State of Wyoming that those portions of 40 C.F.R., Part 60 that have been incorporated into the Wyoming Air Quality Standards and Regulations Chapter 5, Section 2 provide that during periods of start up, shut down, and malfunction, exceedances of the 20% discharge stack opacity standard are excused in accordance with  the applicable subpart.

30.     Likewise, the portions of 40 C.F.R., Part 63 that have been incorporated into the Wyoming Air Quality Standards and Regulations at Chapter 5, Section 3 provide that the exceedances of the opacity standard of Operating Permit 31-098 are excused in accordance with the applicable subpart during periods of start up, shut down, and malfunction.

31.     The WDEQ-AQD does, however, review all opacity exceedance reports.

32.     It is and has been a practice of WDEQ-AQD since 1999 to follow EPA's High Priority Violations policy for all major sources.  Consistent with EPA's HPV practice, since 1999 so long as opacity exceedances as measured by a continuous opacity monitoring system occur less than 5% of the operating time in any one quarter and less than 3% of the operating time in two consecutive quarters, the State of Wyoming has exercised its enforcement discretion and not brought an administrative or judicial enforcement action.

33.     Where opacity exceedances are greater than those thresholds it is the practice of the WDEQ-AQD to issue a Notice of Violation, to seek financial penalties, and if necessary, to obtain relief directing a permittee to come into compliance.

34.     WDEQ-AQD determines compliance with particulate matter limits for Mountain Cement based on Method 5 stack sampling.

35.     Between December of 1999 and the present, Kiln #2 at the Mountain Cement plant exceeded the enforcement thresholds in Paragraph 32 in five quarters.  The State of Wyoming issued Notice of Violation No. 3405-02 (NOV) to Mountain Cement on September 3, 2002 to address those exceedances.  During that same time period, the stack for the clinker coolers did not exceed the enforcement thresholds in Paragraph 32.

In response to that NOV, Mountain Cement was required to achieve compliance at an acceptable emission rate. After an acceptable emission rate was achieved by Mountain Cement, the State of Wyoming initiated enforcement action against Mountain Cement to address penalties for those exceedances. That enforcement action was resolved in a Consent Decree dated March 21, 2005, entered by the Second Judicial District Court, Albany County, State of Wyoming in the matter titled *People of the State of Wyoming v. Mountain Cement Company* and filed as Civil Action No. 29380 (the "Enforcement Action").

36. Consistent with its practice, WDEQ-AQD used its enforcement discretion and chose not to include in the Enforcement Action exceedances that were below EPA's HPV policy.

37. In calculating the penalty approved by the Second Judicial District Court in the Consent Order entered in the Enforcement Action, WDEQ-AQD did not factor in exceedances below EPA's HPV policy.

38. In the case of Mountain Cement's Kiln No. 2 and the stack for the clinker coolers, the WDEQ-AQD believes all exceedances requiring an enforcement action have been resolved.

39. At the time of permitting or permit modification, WDEQ-AQD determines whether additional or different pollution control devices are required in conjunction with the completion of a BACT review.

**AFFIDAVIT OF DAN OLSON**

7

Dated this _29_ day of July, 2005.

Dan Olson

State of Wyoming          )
                          )
County of Laramie         )

Subscribed and sworn before me by Dan Olson on this _29_ day of July, 2005.

Witness my hand and official seal.

Notary Public

My commission expires: _April 28, 2008_

DONNA BEHOUNEK · NOTARY PUBLIC
COUNTY OF LARAMIE          STATE OF WYOMING
MY COMMISSION EXPIRES APR. 28, 2008

**AFFIDAVIT OF DAN OLSON**                                    **8**

Philip A. Nicholas
Jason M. Tangeman
Anthony, Nicholas, Tangeman & Yates, LLC
170 N. Fifth Street
P.O. Box 0928
Laramie, WY 82073
(307) 742-7140
(307) 742-7160 Fax

James B. Harris
Steven R. Baggett
Becky L. Jolin
Thompson & Knight, L.L.P
1700 Pacific, Suite 3300
Dallas, TX 75201
214-969-1102
214-880-3274 Fax

Attorneys for Defendant Mountain Cement Company

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Biodiversity Conservation Alliance and | ) | |
| Sierra Club, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 04CV 361-B |
| v. | ) | |
| Mountain Cement Company, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF THOMAS R. KEELER, TRK ENGINEERING SERVICES, INC.

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS | ) |
| | )ss. |
| County of Middlesex | ) |

Thomas R. Keeler, being first duly sworn, deposes as says as follows:

    1.    I am over the age of 21 and fully competent to make this affidavit.

    2.    The facts and matters stated herein are within my personal

knowledge, and are true and correct.

**AFFIDAVIT OF THOMAS R. KEELER**             1



EXHIBIT

D

3.      I have specific expertise in the operation and maintenance of electrostatic precipitators (ESPs). I am currently President of TRK Engineering Services Inc., a consulting service group specializing in ESPs and their application in numerous industrial settings. I am also manager of, and a lecturer with, Precipitator Seminars, which has been conducting seminars on the operation and maintenance of electrostatic precipitators for the past 15 years. I am an electrical engineer with over 25 years experience in the particulate removal field, including 5 years as a field service engineer for Environmental Elements Corporation, an original equipment suppler of ESPs. I have been a speaker at the 1994 & 1998 World Mining Exposition in Chile. I have been a panelist at several of the ESP/FF (Fabric Filter) Round Table Forums.

4.      I am the editor and one of the authors of the new EPRI (Electric Power Research Institute) "ESP Maintenance Guide" completed in February 2003. This manual will set the standards for ESP maintenance for many years to come. In 2003 and 2004 I conducted a series of web-based ESP maintenance seminars for EPRI, the first of its kind.

5.      I earned my Bachelors of Science Degree in Electrical Engineering from Lehigh University in 1979.

6.      I have personal knowledge of the ESP that controls emissions from Kiln #2 at the Mountain Cement Company (MCC) plant in Laramie, Wyoming. The first time TRK Engineering worked at the plant was December 16 –22, 1999 where we helped the plant during an unscheduled shutdown. Beginning in March 2000 and continuing through 2005, my company, TRK Engineering, performed

**AFFIDAVIT OF THOMAS R. KEELER**                                                                 **2**

annual inspections and maintenance on the ESP for Kiln #2 during the outages. I have visited MCC's plant on five occasions during annual outages and for on-line inspections and tuning of the ESP controls while Kiln #2 is operating.

7.     I have reviewed the quarterly excess opacity reports for MCC's Kiln #2 that MCC submitted to the Wyoming Department of Environmental Quality beginning with the fourth quarter of 1999 through the fourth quarter of 2004. These quarterly reports include a cause and corrective action taken for each period of excess opacity.

8.     I have also reviewed the following documents:

- MCC's quarterly reports from the 4th Quarter of 1999 to the 4th Quarter of 2004.

- Biodiversity Conservation Alliance and Sierra Club Complaint.

- Answer of Mountain Cement Company to the Complaint.

- Wyoming Air Quality Standards and Regulations Chapter 5 - National Emission Standards

- Electrical Maintenance History Records 12/94 – 2/02

- Mechanical Maintenance History Records 12/94 – 2/02

- Electric Shop Logs 9/16/02

- Electric Shop Logs 2/11/04

- Daily Instrument log 2001

- Kiln #2 Opacity- Explanation for Exceedance 2002

- Kiln #2 Opacity- Explanation for Exceedance 2003

**AFFIDAVIT OF THOMAS R. KEELER**                                                          **3**

- TRK Engineering/Precipitator Seminar's "Operations and Maintenance Seminar Reference Material on Electrostatic Precipitation", Jacob Katz & Thomas Keeler, rev. 2004.

- Appendix A of the "Operation and Maintenance Manual for Electrostatic Precipitators", EPA/625/1-85/017, September 1985

- "Electrostatic Precipitator Maintenance Guide" EPRI (E21376), February 2003.

- "The Art of Electrostatic Precipitation" Jacob Katz, PE, 1979.

- TRK Engineering Outage Reports Reference Number MC010622

- TRK Engineering Outage Reports Reference Number MC020413

- TRK Engineering Outage Reports Reference Number MC030410

- TRK Engineering Outage Reports Reference Number MC040401

9.     During a visit to the MCC plant on June 7 and 8, 2005, I inspected the ESP and visited with MCC's plant manager, Mike Meysing, and environmental manager, Bill Sansing, to obtain a better understanding of MCC's description of the causes listed in its quarterly excess emission reports.

10.     I have also reviewed the 2002 and 2003 Kiln #2 explanation of opacity exceedance forms that MCC's operators in the control room fill out when there is excess opacity from Kiln 2. These forms identify the cause and corrective action taken of each period of excess opacity.

11.     I have reviewed the National Emissions Standards in the Wyoming Air Quality Standards and Regulations, and am familiar with the definitions of "startup", "shutdown", and "malfunction" in WASRQ Chapter 5, Sections 2 and 3. Malfunctions are defined by the State of Wyoming as any sudden, infrequent, and

not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. All of the malfunctions listed on the MCC quarterly reports would be considered infrequent and none of the unknown malfunctions contributed to more than 0.08% of the total excess opacities (see attachment #1). Additionally, there was no repetitive contribution of any of the malfunction causes from quarter to quarter.

12.    The MCC quarterly reports from the 4th Quarter of 1999 to the 4th Quarter of 2004 demonstrate that 99.92 % of the excess opacity experienced by MCC during that period can be related to a startup, shutdown, malfunction or other excused causes. Prior to the 3rd Quarter of 2002 MCC identified the causes of excess opacity based on the standard form found in the Chapter 5 - National Emission Standards Wyoming Air Quality Standards and Regulations (Attachment #2). These regulations require documentation to identify the excess opacity only as a Startup/Shutdown, Control Equipment Problems, Process Problems, Other Known Problems, and Unknown Causes. Starting in the 3rd Quarter of 2002 MCC began to categorize causes of excess opacity in greater detail in an effort to better identify the causes of excess emission incidents to improve operations and reduce the number of occurrences of excess opacity. Causes of excess opacity after the 3rd Quarter of 2002 were identified as attributable to one or more of the following:

| Item # | Cause of Excess Opacity | Description* |
|---|---|---|
| 1 | Kiln start up | Start putting feed into kiln. Includes cold startup and hot startup. (fuel feed but no kiln feed) |
| 2 | Kiln shut down | Stop rotation of kiln; stop kiln fuel feed |
| 3 | Raw mill start up | Start up of raw mill |
| 4 | Raw mill shut down | Shut down of raw mill |
| 5 | Opacity increased while starting up | Includes start up of  ID fan, precipitator fans, |

|  | auxiliary equipment | elevators and conveyors, other equipment |
|---|---|---|
| 6 | Erratic feed rate | Bridging or plugging of kiln feed system |
| 7 | Erratic fuel rate | Bridging or plugging of fuel feed system |
| 8 | Plugged system | Preheat tower plug or kiln ring formation |
| 9 | Broken dust collector bag(s) | Broken baghouse bags |
| 10 | Electrical malfunction in precipitator | Trip of AVC controls or rapper controls in ESP |
| 11 | Mechanical malfunction in precipitator | Breakage of internal components (plates, hammer, wire) or hopper plugs |
| 12 | Lost auxiliary equipment | Shutdown or malfunction of ID fan, precipitator fan, elevator or conveyor, or other equipment |
| 13 | Lost spray tower exit temperature control | Problem with spray system: water sprays, pumps, solenoids, etc. |
| 14 | Working in/on process system | Shutdown for repairs caused by a malfunction |
| 15 | Working in/on pollution control equipment | Full or partial shutdown for repairs caused by a malfunction |
| 16 | Fan output began ramping up or down | Plug in system or oscillation caused by electrical problem or system pluggage (item #8). |
| 17 | Process/ID fan malfunctioned or shut down  unexpectedly | Could be any process fan that has a malfunctioned |
| 18 | Malfunction of sprays at spray tower | Malfunction of spray nozzles/lances |
| 19 | Process gas temperature was out of optimum range | Caused by Item # 18 or # 13 |
| 20 | Electrical surge / outage / power bump | External power source caused tripping of plant equipment |
| 21 | Unknown cause | Excess emission event that self-corrects before the cause can be identified. |
| 22 | Dirty monitor lens | Monitor failure |
| 23 | Monitor failed or began sending erroneous data | Monitor failure |
| 24 | Other cause | Excess emission event that self-corrects before the cause can be identified. |
| 25 | WDEQ/ADQ – approved precipitator inlet temperature test | Received WDEQ waiver of emission limits for MACT test |

*Note: The above descriptions are not on the quarterly reports.  These descriptions
were provided by plant personnel during the site visit on June 7 & 8, 2005 to help
clarify and better understand the events that caused increased opacity levels.

13.     The above classified causes (other than unknown) used by MCC on
their newer quarterly reports are in my opinion all considered a startup, shutdown
and/ or malfunction of the kiln system equipment.  The unknown causes (#21 &
#24) listed above were minimal, averaging .08% of the operating time over the 5-

year review period.  The unknown causes typically occurred and rapidly self corrected.  Their short duration did not provide enough time to identify the cause of the events that caused increased opacity levels.

14.    The above causes can be categorized into startup, shutdown or malfunctions (SSM) as follows:

Startup/Shutdown

- Kiln start up
- Raw mill start up
- Opacity increased while starting up auxiliary equipment
- Kiln shut down
- Raw mill shut down
- Lost auxiliary equipment
- Working in/on process system
- Working in/on Pollution Control Equipment

Malfunction

- Erratic feed rate
- Erratic fuel rate
- Plugged system
- Broken dust collector bag(s)
- Electrical malfunction in precipitator
- Mechanical malfunction in precipitator
- Lost spray tower exit temperature control
- Fan output began ramping up or down
- Process/ID Fan malfunctioned or shut down unexpectedly
- Malfunction of sprays at spray tower
- Process gas temperature was out of optimum range
- Electrical surge / outage / power bump
- Control Equipment Problems
- Dirty monitor lens
- Monitor failed or began sending erroneous data

Unknown or Excused Causes

- Unknown cause
- Other cause
- WDEQ/ADQ - Approved Precipitator Inlet Temperature Test

15. The use of the categorical breakdown of excess opacity causes starting in the 3rd Quarter of 2002 allowed the plant to take a proactive step towards reducing excess opacities. The excess opacity periods for Kiln #2 have decreased steadily from 2002 to 2004; in 2002 the annual total was 4.03% of the operating hours, in 2003 the annual total was 2.60% of the operating hours, and in 2004 the annual total was 1.75% of the operating hours. (See attachment #1)

16. The Wyoming & Federal Regulations do state that "Failures that are caused in part by poor maintenance or careless operation are not malfunctions." (see attachment #2) In the review of the maintenance logs and the annual outage reports the plant has been performing all required routine preventative maintenance (PM) on the Kiln #2 system equipment and has been upgrading systems to improve reliability of the equipment. The maintenance logs show that MCC is performing daily, weekly, and monthly maintenance as required for the ESP. The plant has performed the required annual maintenance on the ESP and has made improvements to the ESP during each annual outage. These improvements have included flow modifications to improve the temperature distribution in the ESP, the installation of a new ESP data management system, and a new rapper panel. All of these improvements represent proactive measures to reduce stack opacity and what would be considered more than routine maintenance to the ESP.

17. Based on the information reviewed, my experience and expertise with this ESP, and ESPs at other similar plants, in my opinion MCC has been operating the ESP and Kiln System correctly and performing the proper maintenance to the ESP and Kiln System. The identified causes of the excess

opacity that occurred are normal to Kiln operation and startups, shutdowns, and/or malfunctions of the Kiln #2 system equipment.

18.     I prepared as Attachment #1 a table of excess opacity using data from the quarterly reports that MCC submitted to the Wyoming Department of Environmental Quality covering periods from December 23, 1999 through the fourth quarter of 2004 (the review period).  Of the 1,300.3 hours of excess opacity during the review period, it is my opinion that 97.5 percent of the excess opacity periods, or 1,268.3 hours (or 12,683 six-minute periods) are identified as being caused by startup, shutdown, malfunction or other excused causes.  The 2.5 percent of excess opacity periods for Kiln #2 that are identified as unknown causes represent only 32.0 hours (or 320-six-minute periods) of excess opacity from December 23, 1999 through fourth quarter 2004.

19.     I have reviewed the chart of excess opacity at MCC that is identified as Exhibit J to Plaintiffs' Motion for Partial Summary Judgment to Establish Defendant's Liability for Opacity Violations.  Exhibit J reports there were 15, 480 six-minute periods of excess opacity from Kiln 2.  That total is wrong because Exhibit J includes all excess opacity in the 4th quarter of 1999, not just those from December 23-31 of 1999, and all excess opacity in the 1st quarter of 2005 after Plaintiffs filed their suit.  Further, Exhibit J has calculation errors in three quarters, the 4th quarter of 1999, 1st quarter of 2000, and the 4th quarter of 2000.  Therefore, the correct number of six-minute periods of excess opacity from December 23, 1999 through December 31, 2004 is 13,003, not 15,480.

Dated this 28 of July, 2005.

_____
Thomas R. Keeler


Commonwealth of Massachusetts    )
                                 )
County of Middlesex              )

    Subscribed and sworn to before me by Thomas R. Keeler on this 28 day of July, 2005.

    Witness my hand and official seal.

_____
Notary Public

My commission expires: 3/27/09

SHARON A. PICCOLO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
March 27, 2009


**AFFIDAVIT OF THOMAS R. KEELER**

# Attachment #1

# Summary of Quarterly Excess Opacity Reports

# SUMMARY OF KILN #2 QUARTERLY EXCESS OPACITY REPORTS - MOUNTAIN CEMENT, LARAMIE, WY

| Item # | Kiln #2 Summary of the Quarterly Excess Opacity Reports — Cause Code | 12/23-3/1 | Q1-2000 | Q2-2000 | Q3-2000 | Q4-2000 | Q1-2001 | Q2-2001 | Q3-2001 | Q4-2001 | Q1-2002 | Q2-2002 | Q3-2002 | Q4-2002 | Q1-2003 | Q2-2003 | Q3-2003 | Q4-2003 | Q1-2004 | Q2-2004 | Q3-2004 | Q4-2004 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Operating Hours | 216.00 | 1726.70 | 2054.50 | 1893.00 | 2127.60 | 2017.60 | 1851.20 | 2092.08 | 2049.85 | 1970.68 | 1857.32 | 2105.40 | 2103.30 | 1844.30 | 2138.63 | 2025.73 | 2023.00 | 2012.70 | 2169.70 | 2012.70 | 2012.70 | 40333.27 |
| | CMS Downtime Hours | 54.45 | 3.60 | 7.70 | 0.64 | 0.04 | 1.30 | 1.30 | 27.40 | 51.70 | 78.80 | 7.70 | 8.30 | 35.60 | 7.70 | 18.10 | 4.00 | 3.10 | 14.40 | 14.40 | 3.10 | 6.40 | 411.55 |
| | % of CMS Downtime | 25.21 | 0.21 | 0.37 | 0.04 | 0.00 | 0.06 | 0.07 | 1.31 | 2.52 | 4.00 | 0.41 | 0.38 | 0.39 | 3.69 | 0.85 | 0.20 | 0.15 | 0.72 | 0.72 | 0.15 | 0.32 | 48.30 |
| | Total Reportable Hours | 161.55 | 1717.10 | 2046.80 | 1882.20 | 2127.60 | 2016.59 | 1730.60 | 2064.58 | 1998.15 | 1891.88 | 1849.62 | 2097.10 | 2067.70 | 1836.60 | 2120.53 | 2021.73 | 2019.90 | 1998.30 | 2158.30 | 2009.60 | 2006.30 | 39927.12 |
| 1 | Kiln start up | | | | | | | 5.10 | 2.20 | 2.30 | 7.40 | 14.50 | 3.60 | 2.30 | 4.60 | 3.60 | 0.00 | 0.40 | 4.20 | 1.70 | 4.70 | 1.40 | 5.90 |
| 3 | Raw mill start up | | | | | | | | | | 0.00 | | 0.50 | | 0.30 | | 0.40 | | 0.60 | | | | 1.40 |
| 5 | Opacity increased while starting up auxiliary equipment | | 0.40 | | | | | | | | 1.50 | | 0.50 | 0.30 | 3.60 | | 0.40 | 0.40 | | 0.40 | | 1.10 | 9.70 |
| 2 | Kiln shut down | | | | | | | | | | 7.40 | | 0.50 | 0.90 | 0.30 | | 0.40 | 0.60 | | 0.80 | | 3.80 | 12.30 |
| 4 | Raw mill shut down | | | | | | | | | | 0.00 | | 0.00 | | 3.00 | | 1.10 | 10.30 | | 1.10 | | 17.40 | 66.60 |
| 12 | Lost auxiliary equipment | | | | | | | | | | 0.00 | | 2.50 | 0.90 | 4.90 | | 0.70 | 5.30 | | 0.10 | | 6.90 | 22.10 |
| 14 | Working in/on process system | | | | | | | | | | 15.50 | | 12.00 | 21.40 | 1.20 | | 4.10 | 2.70 | | 4.50 | | 1.00 | 63.90 |
| 15 | Working in/on Pollution Control Equipment | | | | | | | | | | 0.00 | | 1.50 | 1.70 | 0.00 | | 7.10 | 11.30 | | 0.00 | | 6.90 | 28.50 |
| A | Startup/Shutdown — Total | 0.00 | 0.40 | 0.00 | 0.00 | | | 27.20 | 24.00 | 16.90 | 29.50 | 37.20 | 22.10 | 48.40 | 17.30 | 22.10 | 45.50 | 11.70 | 24.10 | 24.10 | 28.10 | 37.80 | 403.10 |
| A | % Total | 0.00 | 0.02 | 0.00 | 0.00 | | | 1.36 | 1.16 | 0.89 | 1.40 | 1.77 | 0.94 | 2.34 | 0.94 | 1.04 | 2.25 | 0.38 | 1.21 | 1.30 | 1.30 | 1.88 | 1.01 |
| 6 | Ermic feed rate | | | | | | | | | | 3.70 | 0.90 | 0.70 | 0.50 | 0.20 | 0.60 | 0.80 | 0.00 | 0.00 | 0.40 | 0.00 | 0.60 | 8.70 |
| 7 | Ermic fuel rate | | | | | | | | | | 0.00 | 0.00 | 0.00 | 0.10 | 0.10 | 0.00 | 0.60 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.60 |
| | % Total | | | | | | | | | | 0.50 | 0.00 | 0.00 | 0.40 | 0.00 | 0.10 | 7.30 | 17.00 | 0.40 | 0.10 | 1.20 | 1.20 | 32.80 |
| 8 | Plugged system | | | | | | | | | | 0.00 | 0.00 | 0.00 | 0.70 | 0.00 | 0.00 | 5.00 | 17.00 | 0.00 | 0.00 | 0.70 | 0.00 | 0.70 |
| 9 | Broken dust collector bag(s) | | | | | | | | | | 0.00 | 5.10 | 0.00 | 0.00 | 2.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13.30 |
| 10 | Electrical malfunction in precipitator | | | | | | | | | | 0.00 | 0.00 | 0.50 | 0.30 | 0.00 | 0.10 | 0.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.90 |
| 11 | Mechanical malfunction in precipitator | | | | | | | | | | 0.00 | 11.30 | 0.00 | 10.50 | 3.80 | 0.00 | 1.90 | 1.90 | 0.00 | 0.30 | 0.20 | 0.20 | 28.10 |
| 13 | Lost spray tower exit temperature control | | | | | | | | | | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.20 | 0.00 | 0.10 | 0.00 | 0.10 | 0.10 | 0.10 | 0.40 |
| 16 | Fan output began ramping up or down | | | | | | | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.30 | 0.00 | 1.50 | 0.00 | 0.30 | 0.00 | 0.00 | 2.10 |
| 17 | Process/ID Fan malfunctioned or shut down unexpectedly | | | | | | | | | | 0.00 | 0.00 | 1.60 | 6.00 | 2.10 | 0.00 | 0.70 | 0.00 | 0.00 | 4.90 | 0.00 | 4.90 | 8.40 |
| 18 | Malfunction of sprays at spray tower | | | | | | | | | | 0.50 | 0.00 | 0.00 | 3.60 | 2.20 | 0.00 | 13.30 | 0.00 | 0.00 | 0.00 | 0.60 | 0.60 | 12.50 |
| 19 | Process gas temperature was out of optimum range | | | | | | | | | | 1.50 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 6.00 | 0.00 | 6.00 | 28.10 |
| 20 | Electrical surge / outage / power bump | | | | | | | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 |
| 22 | Dirty monitor lens | | | | | | | | | | 0.00 | 0.00 | 1.50 | 0.30 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 |
| 23 | Monitor failed or began sending erroneous data | | | | | | | | | | 0.00 | | | | | | | | | | | | |
| B | Control Equipment Problems — Total | 0.00 | 11.00 | | 4.80 | 0.00 | 6.80 | 65.40 | 35.99 | 76.70 | | | | | | | | | | | | | 408.90 |
| B | % Total | 1.00 | 5.90 | 23.70 | 8.29 | | 35.30 | 70.10 | 63.19 | 38.10 | | | | | | | | | | | | | 297.49 |
| C | Process Problems | 0.00 | 0.30 | 3.56 | 2.90 | 7.20 | 9.50 | 0.50 | 0.00 | 1.60 | | | | | | | | | | | | | 25.50 |
| D | Other Known Problems | 1.00 | 17.20 | 32.00 | 11.10 | 38.20 | 51.60 | 136.00 | 119.00 | 141.00 | 10.60 | 16.90 | 23.30 | 16.20 | 7.20 | 24.50 | 22.00 | 33.80 | 41.60 | | 41.60 | | 838.30 |
| | Malfunction — Total | 0.82 | 1.00 | 1.56 | 0.59 | 1.80 | 2.56 | 7.86 | 5.78 | 7.45 | 3.25 | 0.90 | 1.13 | 0.56 | 0.34 | 1.21 | 1.09 | 0.62 | 2.06 | 1.12 | 2.04 | 3.28 | 2.13 |
| | % Total | | | | | | | | | | 0.50 | 0.50 | 0.50 | 0.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 2.50 |
| 21 | Other cause | 1.70 | 1.80 | 1.30 | 1.50 | 4.20 | 4.60 | 1.40 | 1.40 | 0.40 | 1.50 | 0.00 | 1.70 | 1.20 | 0.10 | 1.20 | 1.50 | 0.10 | 0.50 | | 0.50 | | 32.00 |
| 24 | Unknown Causes | 1.05 | 0.00 | 0.08 | 0.08 | 4.72 | 0.23 | 0.39 | 0.07 | 0.02 | 0.07 | 0.07 | 0.08 | 0.07 | 0.00 | 0.06 | 0.07 | 0.08 | 0.02 | | 0.02 | | 0.70 |
| E | Unknown Causes — % Total | | | | | | | | | | | | | | | | | | 6.90 | | | | 6.90 |
| 25 | Other Excused Causes | 2.70 | 19.20 | 33.30 | 20.05 | 58.10 | 2.88 | 154.80 | 144.40 | 157.99 | 41.60 | 56.10 | 73.40 | 28.70 | 36.50 | 71.30 | 33.60 | 45.10 | 42.00 | 26.40 | 41.00 | | 130.00 |
| | Other Excused Causes — % Total | 1.67 | 1.12 | 1.63 | 1.06 | 2.88 | | 8.94 | 6.99 | 8.35 | 1.97 | 2.88 | 3.55 | 1.56 | 1.71 | 3.52 | 1.67 | 1.32 | 1.95 | | 2.04 | | 0.33 |
| Total | Total Reportable Hours | 161.55 | | | | | 7809.93 | | | 7945.49 | | | | | 8040.65 | | | 8182.80 | | | | | 39922.12 |
| Total | Total Duration of Excess Opacity (hours) | 2.70 | 7723.70 | | | | 56.90 | | | 531.90 | | | | | 209.60 | | | 143.70 | | | | | 1320.90 |
| % Total | % of Excess Opacity per Reportable Hours | 1.67 | 1.58 | | | | 6.43 | | | 4.03 | | | | | 2.60 | | | 1.75 | | | | | 3.38 |

# Attachment #2

# Pages From

# Chapter 5 - National Emissions Standards

# Wyoming Air Quality Standards and Regulations

TABLE OF CONTENTS

CHAPTER 5 - NATIONAL EMISSION STANDARDS

WYOMING AIR QUALITY STANDARDS AND REGULATIONS

Section 1.    Introduction to national emission standards . . . . . . . . . . . . . . . . . . . . . . 5-1
Section 2.    New source performance standards . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-1
Section 3.    National emission standards for hazardous air pollutants . . . . . . . . . . . . 5-37

i

Section 1.  Introduction to national emission standards.

*(a)*  This Chapter incorporates emission control regulations developed by the Environmental Protection Agency for specific source categories.  The State of Wyoming, Air Quality Division adopts these Federal Regulations in order to maintain administrative authority with regards to the standards.  Section 2 contains New Source Performance Standards (NSPS) which regulate criteria pollutant emissions from specific categories of new sources. Section 3 contains National Emission Standards for Hazardous Air Pollutants (NESHAP) which regulate hazardous air pollutant emissions from specific categories of new and existing sources.

Section 2.  New source performance standards.

*(a)*  *General:*  The U.S. Environmental Protection Agency regulations on Standards of Performance for New Stationary Sources, designated in Chapter 5, Section 2(b) and as amended by the word or phrase "substitutions" given in Chapter 5, Section 2(c), are incorporated into these regulations.  The specific documents containing the complete text of the regulations are found in 40 CFR part 60, as revised and published as of July 1, 2001.  The specific documents containing the complete text of the reference test and monitoring methods, performance specifications for continuous monitors, procedures for determination of emission rate change, specifications for emission inventory information requirements, quality assurance requirements for CEM's, and labeling guidance to manufacturers of new residential wood heaters are found in 40 CFR part 60, Appendices A, B, C, D, F, and I respectively, as revised and published as of July 1, 2001.

*(b)*  *Designated standards of performance:*  The following Standards of Performance, as revised and published as of July 1, 2001, not including any later amendments, are adopted by reference.  Copies of Standards of Performance can be obtained from the Department of Environmental Quality, Division of Air Quality, 122 W.  25th Street, Cheyenne, Wyoming 82002.

| | |
|---|---|
| 40 CFR part 60, Subpart D - | Standards of Performance for Fossil-Fuel-Fired Steam Generators for Which Construction is Commenced After August 17, 1971 |
| 40 CFR part 60, Subpart Da - | Standards of Performance for Electric Utility Steam Generating Units for Which Construction is Commenced After September 18, 1978 |
| 40 CFR part 60, Subpart Db - | Standards of Performance for Industrial-Commercial-Institutional Steam Generating |

5-1

*"Issuance"* of an operating permit will occur, in accordance with Chapter 6, Section 3.

*"Malfunction"* means any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions.

*"Monitoring device"* means the total equipment, required under the monitoring of operations sections, used to measure and record (if applicable) process parameters.

*"Nitrogen oxides"* means all oxides of nitrogen except nitrous oxide, as measured by test methods set forth in this part.

*"One-hour period"* means any 60-minute period commencing on the hour.

*"Opacity"* means the degree to which emissions reduce the transmission of light and obscure the view of an object in the background.

*"Operating permit"* or *"Part 70 permit"* means any permit or group of permits covering a source under Chapter 6, Section 3 that is issued, renewed, amended or revised pursuant to Chapter 6, Section 3.

*"Owner or operator"* means any person who owns, leases, operates, controls, or supervises an affected facility or a stationary source of which an affected facility is a part.

*"Particulate matter"* means any finely divided solid or liquid material, other than uncombined water, as measured by the reference methods specified under each subpart, or an equivalent or alternative method.

*"Permit program"* means the comprehensive State operating permit system established pursuant to Title V of the Act (42 U.S.C. 7661) and regulations in Chapter 6, Section 3.

*"Proportional sampling"* means sampling at a rate that produces a constant ratio of sampling rate to stack gas flow rate.

*"Reactivation of a very clean coal-fired electric utility steam generating unit"* means any physical change or change in the method of operation associated with the commencement of commercial operations by a coal-fired utility unit after a period of discontinued operation where the unit:

5-11

(A)  has not been in operation for the two-year period prior to the enactment of the Clean Air Act amendments of 1990, and the emissions from such unit continue to be carried in the permitting authority's emissions inventory at the time of enactment;

(B)  was equipped prior to shut-down with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than 85 percent and a removal efficiency for particulates of no less than 98 percent;

(C)  is equipped with low-NO$_x$ burners prior to the time of commencement of operations following reactivation; and

(D)  is otherwise in compliance with the requirements of the Clean Air Act.

*"Reference method"* means any method of sampling and analyzing for an air pollutant as specified in the applicable subpart.

*"Repowering"* means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the Administrator of EPA, in consultation with the Secretary of Energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste reduction relative to the performance of technology in widespread commercial use as of November 15, 1990. Repowering shall also include any oil and/or gas-fired unit which has been awarded clean coal technology demonstration funding as of January 1, 1991, by the Department of Energy.

*"Run"* means the net period of time during which an emission sample is collected. Unless otherwise specified, a run may be either intermittent or continuous within the limits of good engineering practice.

*"Shutdown"* means the cessation of operation of an affected facility for any purpose.

*"Six-minute period"* means any one of the 10 equal parts of a one-hour period.

*"Standard"* means a standard of performance proposed or promulgated under this part.

*"Standard conditions"* means a temperature of 293°K (68°F) and a

pressure of 101.3 Kilopascals of Hg (29.92 in. of Hg).

*"Start-up"* means the setting in operation of an affected facility for any purpose.

*"State"* means the Wyoming Air Quality Division which has been delegated authority to implement:

(A)  the provisions of this Section; and/or

(B)  the permit program established under 40 CFR part 70.

*"Stationary source"* means any building, structure, facility, or installation which emits or may emit any air pollutant.

*"Volatile organic compounds"* means any organic compound which participates in atmospheric photochemical reactions; or which is measured by a reference method, an equivalent method, an alternative method, or which is determined by procedures specified under any subpart.

*(ii)  Abbreviations:*

| | |
|---|---|
| A | ampere |
| A.S.T.M. | American Society for Testing and Materials |
| Btu | British thermal unit |
| cal | calorie |
| CdS | Cadmium sulfide |
| cfm | cubic feet per minute |
| CO | carbon monoxide |
| $CO_2$ | carbon dioxide |
| °C | degree Celsius (centigrade) |
| °F | degree Fahrenheit |
| °K | degree Kelvin |
| °R | degree Rankine |
| dscm | dry cubic meter(s) at standard conditions |
| dscf | dry cubic feet at standard conditions |
| eq | equivalents |
| g | gram(s) |
| gal | gallon(s) |
| g eq | gram equivalents |
| gr | grain(s) |
| HCl | hydrochloric acid |
| Hg | mercury |

way relieve the owner or operator of responsibility for compliance with other applicable sections of these regulations. The permit requirements of Chapter 6, Section 2 are specifically applicable to affected facilities subject to the requirements of this Section.

### (g) Notification and Recordkeeping:

(i) Any owner or operator subject to the provisions of this section shall furnish the Administrator written notification as follows:

(A) A notification of the date construction (or reconstruction as defined under Chapter 1, Section 3) of an affected facility is commenced postmarked no later than 30 days after such date. This requirement shall not apply in the case of mass-produced facilities which are purchased in completed form.

(B) A notification of any physical or operational change to an existing facility which may increase the emission rate of any air pollutant to which a standard applies, unless that change is specifically exempted under an applicable subpart or in Chapter 5, Section 2(k). This notice shall be postmarked 60 days or as soon as practicable before the change is commenced and shall include information describing the precise nature of the change, present and proposed emission control systems, productive capacity of the facility before and after the change, and the expected completion date of the change. The Administrator may request additional relevant information subsequent to this notice.

(C) A notification of the date upon which demonstration of the continuous monitoring system performance commences in accordance with Chapter 5, Section 2(j)(iii). Notification shall be postmarked not less than 30 days prior to such date.

(D) A notification of the anticipated date for conducting the opacity observations required by Chapter 5, Section 2(i)(v) of this part. The notification shall be postmarked not less than 30 days prior to such date.

(E) A notification that continuous opacity monitoring system data results will be used to determine compliance with the applicable opacity standard during a performance test required by Chapter 5, Section 2(h) in lieu of Method 9 observation data as allowed by Chapter 5, Section 2(i)(v)(D). This notification shall be postmarked not less than 30 days prior to the date of the performance test.

(ii) Any owner or operator subject to the provisions of this part shall maintain records of the occurrence and duration of any start-up, shutdown, or malfunction in the operation of an affected facility; any malfunction of the air pollution control equipment; or any periods during which a continuous monitoring system or monitoring device is inoperative.

(iii) Each owner or operator required to install a continuous monitoring system

5-15

(CMS) or monitoring device shall submit an excess emissions and monitoring systems performance report (excess emissions are defined in applicable subparts) and/or a summary report form (see paragraph E of this section) to the Administrator semiannually, except when: more frequent reporting is specifically required by an applicable subpart; or the CMS data are to be used directly for compliance determination, in which case quarterly reports shall be submitted; or the Administrator, on a case-by-case basis, determines that more frequent reporting is necessary to accurately assess the compliance status of the source.  All reports shall be postmarked by the 30th day following the end of each calendar half (or quarter, as appropriate).  Written reports of excess emissions shall include the following information:

       (A)  The magnitude of excess emissions computed in accordance with Chapter 5, Section 2(j)(viii), any conversion factor(s) used, and the date and time of commencement and completion of each time period of excess emissions.  The process operating time during the reporting period.

       (B)  Specific identification of each period of excess emissions that occurs during start-ups, shutdowns, malfunctions of the affected facility.  The nature and cause of any malfunction (if known), the corrective action taken or preventative measures adopted.

       (C)  The date and time identifying each period during which the continuous monitoring system was inoperative except for zero and span checks and the nature of the system repairs or adjustments.

       (D)  When no excess emissions have occurred or the continuous monitoring system(s) have not been in operative, repaired, or adjusted, such information shall be stated in the report.

       (E)  The summary report form shall contain the information and be in the format shown in Form B unless otherwise specified by the Administrator.  One summary report form shall be submitted for each pollutant monitored at each affected facility.

       (I)  If the total duration of excess emissions for the reporting period is less than 1 percent of the total operating time for the reporting period and CMS downtime for the reporting period is less than 5 percent of the total operating time for the reporting period, only the summary report form shall be submitted and the excess emission report described in paragraph (iii) of this subsection need not be submitted unless requested by the Administrator.

       (II)  If the total duration of excess emissions for the reporting period is 1 percent or greater of the total operating time for the reporting period or the total CMS downtime for the reporting period is 5 percent or greater of the total operating time for the reporting period, the summary report form and the excess emission report described in paragraph (iii) of this subsection shall both be submitted.

Form B
**EXCESS EMISSION SUMMARY REPORT**

| Emission Data Summary | | CMS Performance Summary | |
|---|---|---|---|
| I. Duration of Excess Emissions in Reporting Period Due to: | | I. CMS Downtime in Reporting Period Due to: | |
| A.  Startup/Shutdown | ____ | A.  Monitor Equipment Malfunctions | ____ |
| B.  Control Equipment Problems | ____ | B.  Non-Monitor Equipment Malfunctions | ____ |
| C.  Process Problems | ____ | C.  Quality Assurance Calibration | ____ |
| D.  Other Known Causes | ____ | D.  Other Known Causes | ____ |
| E.  Unknown Causes | ____ | E.  Unknown Causes | ____ |
| II.  Total Duration of Excess Emission | ____ | II.  Total CMS Downtime | ____ |
| III.  Total Duration of Excess Emissions x 100 divided by Total Source Operating Time minus Total CMS Downtime | ____ | III.  Total CMS Downtime x 100 divided by Total Source Operating Time | ____ |

**Total time of excess emission events due to emergency/abnormal operations_____.**

NOTE:
1.      Only report excess emissions which occur when the unit/process is operating.  Include all excess emissions in the Emission Data Summary including those excess emissions associated with startup/shutdown and those excess emissions associated with Chapter 1, Section 5 (Emergency/Abnormal) operations.  **Report times in hours for gaseous monitors and in tenths of an hour for opacity monitors.**  Include detailed excess emission information and causes in the Excess Emission Table (Form C).
2.      Only report CEM downtime which occurs while the unit/process is operating.  **Report time in hours to one decimal point.**  Include detailed CEM downtime and causes in the Monitor Outage Table (Form D).
3.      Include an explanation of what corrective actions were taken for total excess emissions or monitor downtime for the quarter (Emission Data Summary and CMS Performance Summary, Item III) greater than 5%.  **(See Instructions for further details.)**

On a separate page, describe any changes since last quarter in CMS, process or controls.  I certify that the information contained in this report is true, accurate, and complete.

Name
_____
Signature
_____
Title
_____
Date
_____

(A) Sampling ports adequate for test methods applicable to such facility. This includes:

(I) Constructing the air pollution control system such that volumetric flow rates and pollutant emission rates can be accurately determined by applicable test methods and procedures and;

(II) Providing a stack or duct free of cyclonic flow during performance tests, as demonstrated by applicable test methods and procedures;

(B) Safe sampling platform(s);

(C) Safe access to sampling platform(s);

(D) Utilities for sampling and testing equipment.

*(v)* Unless otherwise specified in the applicable subpart, each performance test shall consist of three separate runs using the applicable test method. Each run shall be conducted for the time and under the conditions specified in the applicable standard. For the purpose of determining compliance with an applicable standard, the arithmetic means of results of the three runs shall apply. In the event that a sample is accidentally lost or conditions occur in which one of the three runs must be discontinued because of forced shutdown, failure of an irreplaceable portion of the sample train, extreme meteorological conditions, or other circumstances, beyond the owner or operator's control, compliance may, upon the Administrator's approval, be determined using the arithmetic mean of the results of the two other runs.

*(i) Compliance with standards and maintenance requirements:*

*(i)* Compliance with standards in this part, other than opacity standards, shall be determined by performance tests established by Chapter 5, Section 2(h), unless otherwise specified in the applicable standard.

*(ii)* Compliance with opacity standards in this part shall be determined by conducting observations in accordance with Reference Method 9 in 40 CFR part 60, Appendix A or any alternative method that is approved by the EPA Administrator, or as provided in paragraph (v)(D) of this section. For purposes of determining initial compliance, the minimum total time of observations shall be 3 hours (30 6-minute averages) for the performance test or other set of observations (meaning those fugitive-type emission sources subject only to an opacity standard).

*(iii)* The opacity standards set forth in this part shall apply at all times except during periods of start-up, shutdown, malfunction, and as otherwise provided in the applicable

standard.

*(iv)* At all times, including periods of start-up, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions. Determination of whether acceptable operating and maintenance procedures are being used will be based on information available to the Administrator which may include, but is not limited to, monitoring results, opacity observations, review of operating and maintenance procedures, and inspection of the source.

*(v)* (A) For the purpose of demonstrating initial compliance, opacity observations shall be conducted concurrently with the initial performance test required in Chapter 5, Section 2(h) unless one of the following conditions apply. If no performance test under Chapter 5, Section 2(h) is required, then opacity observations shall be conducted within 60 days after achieving the maximum production rate at which the affected facility will be operated but no later than 180 days after initial start-up of the facility. If visibility or other conditions prevent the opacity observations from being conducted concurrently with the initial performance test required under Chapter 5, Section 2(h), the source owner or operator shall reschedule the opacity observations as soon after the initial performance test as possible, but not later than 30 days thereafter, and shall advise the Administrator of the rescheduled date. In these cases, the 30 day prior notification to the Administrator required in Chapter 5, Section 2(g)(i)(D) shall be waived. The rescheduled opacity observations shall be conducted (to the extent possible) under the same operating conditions that existed during the initial performance test conducted under Chapter 5, Section 2(h). The visible emissions observer shall determine whether visibility or other conditions prevent the opacity observations from being made concurrently with the initial performance test in accordance with procedures contained in reference Method 9 of 40 CFR part 60, Appendix A. Opacity reading of portions of plumes which contain condensed, uncombined water vapor shall not be used for purposes of determining compliance with opacity standards. The owner or operator of an affected facility shall make available, upon request by the Administrator, any records as may be necessary to determine the conditions under which the visual observations were made and shall provide evidence indicating proof of current visible observer emission certification. Except as provided in paragraph (v)(D) of this section, the results of continuous monitoring by transmissometer which indicate that the opacity at the time visual observations were made was not in excess of the standard are probative but not conclusive evidence of the actual opacity of an emission, provided that the source shall meet the burden of proving that the instrument used meets (at the time of the alleged violation) Performance Specification 1 in 40 CFR part 60, Appendix B, has been properly maintained and (at the time of the alleged violation) that the resulting data have not been altered in any way.

(I) The inability of an owner or operator to secure a visible emissions observer shall not be considered a reason for not conducting the opacity observations concurrent with the initial performance test.

5-21

(B) The owner or operator of an affected facility to which an opacity standard in this part applies shall conduct opacity observations in accordance with Chapter 5, Section 2(i)(ii), shall record the opacity of emissions, and shall report to the Administrator the opacity results along with the results of the initial performance test required under Chapter 5, Section 2(h).

(C) An owner or operator of an affected facility using a continuous opacity monitor (transmissometer) shall record the monitoring data produced during the initial performance test required by Chapter 5, Section 2(h) and furnish the Administrator a written report of the monitoring results along with Method 9 and Chapter 5, Section 2(h) performance test results.

(D) An owner or operator of an affected facility subject to an opacity standard may submit, for compliance purposes, continuous opacity monitoring system (COMS) data results produced during any performance test required under Chapter 5, Section 2(h) in lieu of Method 9 observation data. If an owner or operator elects to submit COMS data for compliance with the opacity standard, he shall notify the Administrator of that decision in writing, at least 30 days before any performance test required under Chapter 5, Section 2(h) is conducted. Once the owner or operator of an affected facility has notified the Administrator to that effect, the COMS data results will be used to determine opacity compliance during subsequent test required under Chapter 5, Section 2(h) until the owner or operator notifies the Administrator in writing to the contrary. For the purpose of determining compliance with the opacity standard during a performance test required under Chapter 5, Section 2(h) using COMS data the minimum total time of COMS data collection shall be averages of all 6-minute continuous periods within the duration of the mass emission performance test. Results of the COMS opacity determinations shall be submitted along with the results of the performance test required under Chapter 5, Section 2(h). The owner or operator of an affected facility using a COMS for compliance purposes is responsible for demonstrating that the COMS meets the requirements specified in Chapter 5, Section 2(j)(iii) of this part, that the COMS has been properly maintained and operated, and that the resulting data have not been altered in any way. If COMS data results are submitted for compliance with the opacity standard for a period of time during which Method 9 data indicates noncompliance, the Method 9 data will be used to determine opacity compliance.

(E) Upon receipt from an owner or operator of the written reports of the results of the performance tests required by Chapter 5, Section 2(h), the opacity observation results and observer certification required by Chapter 5, Section 2(i)(v)(A) and the COMS results, if applicable, the Administrator will make a finding concerning compliance with opacity and other applicable standards. If COMS data results are used to comply with an opacity standard, only those results are required to be submitted along with the performance test results required by Chapter 5, Section 2(h). If the Administrator finds that an affected facility is in compliance with all applicable standards for which performance tests are conducted in accordance with Chapter 5, Section 2(h) of this part but during the time such

5-22

performance tests are being conducted fails to meet any applicable opacity standard, he shall notify the owner or operator and advise him that he may petition the Administrator within 10 days of receipt of notification to make appropriate adjustment to the opacity standard for the affected facility. The notifications received requesting adjustments to the opacity standard of the affected facility will be forwarded to EPA for resolution.

(vi)  Special provisions set forth under an applicable subpart in 40 CFR part 60 shall supersede any conflicting provisions in this section.

(vii)  For the purpose of submitting compliance certifications or establishing whether or not a person has violated or is in violation of any standard in this section, nothing in this section shall preclude the use, including the exclusive use, of any credible evidence or information, relevant to whether a source would have been in compliance with the applicable requirements if the appropriate performance or compliance test or procedure had been performed.

(j)  Monitoring requirements:

(i) For the purposes of this section, all continuous monitoring systems required under applicable subparts shall be subject to the provisions of this section upon promulgation of performance specifications for continuous monitoring systems under 40 CFR part 60, Appendix B and, if the continuous monitoring system is used to demonstrate compliance with emission limits on a continuous basis, 40 CFR part 60, Appendix F, unless otherwise specified in an applicable subpart or by the Administrator.  Appendix F is applicable December 4, 1987.

(ii)  All continuous monitoring systems and monitoring devices shall be installed and operational prior to conducting performance tests under Chapter 5, Section 2(h). Verification of operational status shall, as a minimum, include completion of manufacturer's written requirements or recommendations for installation, operation, and calibration of the device.

(iii)  If the owner or operator of an affected facility elects to submit continuous opacity monitoring system (COMS) data for compliance with the opacity standard as provided under Chapter 5, Section 2(i)(v)(D), he shall conduct a performance evaluation of the COMS as specified in Performance Specification 1, 40 CFR part 60, Appendix B, before the performance test required under Chapter 5, Section 2(h) is conducted.  Otherwise, the owner or operator of an affected facility shall conduct a performance evaluation of the COMS or continuous emission monitoring system (CEMS) during any performance test required under Chapter 5, Section 2(h) or within 30 days thereafter in accordance with the applicable performance specification in 40 CFR part 60, Appendix B.  The owner or operator of an affected facility shall conduct COMS or CEMS performance evaluations at such other times as may be required by the Administrator.