

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

OCT - 6 2005

3:37pm
Stephan Harris, Clerk
Cheyenne

Reed Zars (Wyo. Bar No. 6-3224)
Attorney at Law
910 Kearney Street
Laramie, Wyoming 82070
307-745-7979
307-745-7999 (FAX)

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| BIODIVERSITY CONSERVATION ALLIANCE and SIERRA CLUB, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.  04CV 361-B |
| MOUNTAIN CEMENT COMPANY, | ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' PRETRIAL BRIEF

Plaintiffs herein provide their Pretrial Brief in this Clean Air Act citizen enforcement

action. The central issue in this case is whether Mountain Cement's certified continuous opacity

monitor (COM) data show that Mountain Cement has violated, and is in violation of, federally-

enforceable emission limits at its cement plant in Albany County, Wyoming. Other issues

include (1) whether plaintiffs have standing to bring this action, (2) whether plaintiffs' pre-suit

-1-

notice letter was sufficient, (3) whether partial state enforcement bars plaintiffs' action, (4) plaintiffs' request for injunctive relief to remedy Mountain Cement's violations, and (5) the amount of a civil penalty Mountain Cement should pay for its violations.

Cross motions for summary judgment are pending before the court regarding Mountain Cement's liability for emission limit violations, plaintiffs' standing, the sufficiency of plaintiffs' notice letter, and Mountain Cement's state enforcement bar defense.

Plaintiffs intend to show at trial that Mountain Cement's own monitoring data show thousands of violations of the applicable opacity and particulate matter limits at the Laramie plant since 1999. Plaintiffs will therefore ask the court to to issue a permanent injunction that prohibits Mountain Cement from the violating the Clean Air Act in the future, and to assess a civil penalty against Mountain Cement for its violations of the Clean Air Act in the past.

## I.  PLAINTIFFS' CASE

A.     Plaintiffs' Prima Facie Liability Case.

Plaintiffs have the initial burden to establish a prima facie case in this air pollution enforcement action brought pursuant to the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604. The elements of that case are:

- Pre-suit notice. Pursuant to 42 U.S.C. § 7604(b) and 40 C.F.R. § 54.3(b) plaintiffs provided at least 60-days prior written notice regarding the alleged violations.

-2-

- Plaintiffs' standing.  Plaintiffs have standing to bring this action because they have members who have been injured in fact by air pollution from Mountain Cement's Laramie plant, because those injuries are causally related to Mountain Cement's air pollution violations, and because those injuries can be redressed by the injunctive and civil penalty relief they request.

- Mountain Cement is a corporation and thus is a "person" within meaning of the Clean Air Act at 42 U.S.C. § 7602(e) and § 7604(a).  Mountain Cement is therefore a proper defendant in this citizen suit action.

- Plaintiffs must come forward with evidence that indicates mountain Cement is in violation of an "emission standard or limitation."  42 U.S.C. § 7604(a)(1).  The opacity and particulate matter limits in Mountain Cement's operating permits that are applicable to Kiln #2 and the Clinker Coolers are "emission standard[s] or limitation[s]" within the meaning of 42 U.S.C. § 7604(a)(1) and (f).

**1.   Plaintiffs' Pre-suit Notice.**

Plaintiffs will show at trial, if necessary, that their pre-suit notice letter complies with the requirements found in the Clean Air Act at 42 U.S.C. 7604(b) and related regulations at 40 C.F.R. § 54.3(b).  There is no dispute that plaintiffs sent a notice letter, that it was received by Mountain Cement, and that at least 60 days elapsed between the date of the notice letter and the date this action was commenced.  **Trial Exhibit 1**; Answer, ¶¶ 3, 4.  That the letter itself was

legally sufficient is demonstrated by reference to the applicable regulations and the language of the letter.

According to 40 C.F.R. § 54.3(b):

> Notices to the Administrator, States, and alleged violators regarding violation of an emission standard or limitation or an order issued with respect to an emission standard or limitation, shall include sufficient information to permit the recipient to identify the specific standard, limitation or order which has allegedly been violated, the activity alleged to be in violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name and address of the person giving the notice.

As more fully shown in plaintiffs' August 22, 2005 response to defendant's motion for summary judgment on this issue, plaintiffs' notice letter easily complies with the requirements above. The letter was sent to Mountain Cement, the state of Wyoming and EPA. The letter contained sufficient information to permit the recipient to identify the alleged violations, including the specific permit conditions being violated and the location and dates of the violations. The letter contained the full name and addresses of the persons giving notice. **Trial Exhibit 1**.

     **2.**     **Plaintiffs' Standing.**

Plaintiffs will show at trial, if necessary, that they have standing to bring this action. According to the Supreme Court, standing is demonstrated by the plaintiff by showing "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision."). *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC),*

*Inc.*, 528 U.S. 167, 180 (2000).  Plaintiffs Biodiversity Conservation Alliance and Sierra Club

have "standing to bring suit on behalf of [their] members when [their] members would otherwise

have standing to sue in their own right, the interests at stake are germane to the organization[s']

purpose[s], and neither the claim asserted nor the relief requested requires the participation of

individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181, citing *Hunt v. Washington State*

*Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs intend to demonstrate their standing to bring this action through their exhibits

and the testimony of members who live and work in the Laramie area and who are adversely

affected by pollutant discharges from Mountain Cement.  Plaintiffs' standing testimony is

expected to follow the declarations of plaintiffs' members that were filed in support of plaintiffs'

March 30, 2005 motion for partial summary judgment on the issue of standing.  Testimony from

Bill Wilson regarding redressability may also be used.

Plaintiffs' demonstration of injury-in-fact does not depend on evidence of adverse health

effects.  In *Laidlaw*, for example, the Supreme Court found injury-in-fact in the Clean Water Act

context based on the affidavit testimony of one of the plaintiff's members that a river "looked

and smelled polluted." *Laidlaw* at 181-82.  In the recent Clean Air Act citizen suit of *St. Bernard*

*Citizens for Environmental Quality et al. v. Chalmette Refining, L.L.C.*, 2005 U.S. Dist. LEXIS

1605, *13 (E.D. La., 2005), the court held at summary judgment that "plaintiffs need not show, as [the defendant] appears to contend, that they suffer a bodily injury caused by the pollution. Rather, plaintiffs can demonstrate a cognizable injury by showing that they breathe and smell polluted air." See also, *Texans United for a Safe Economy v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (smelling sulfurous fumes from refinery sufficient to establish standing); *L.E.A.D. Group of Berks v. Exide Corp.*, 1999 U.S. Dist. LEXIS 2672, *41-44 (E.D. Pa. 1999) ("odors and visibility problems" related to lead smelting facility sufficient to establish standing).

Plaintiffs' demonstration that their injuries are "fairly traceable" to the challenged emissions from Mountain Cement are based on direct observations. This is sufficient under established law. In *Texans United for a Safe Economy v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792-93 (5th Cir. 2000), a citizen suit under the Clean Air Act, "direct observations of smoke" and exposure to sulfurous odors was sufficient to link the defendant's challenged air pollutant emissions with the plaintiff's injuries. The linkage in *Texans United*, however, did not need to be exact. "No relevant case law supports Crown's argument that Texans United must connect the exact time of their injuries with the exact time of an alleged violation by Crown." *Id.* at 793.

In the Clean Air Act case of *Sierra Club v. Tri-State Generation and Transmission Assoc., Inc.*, 173 F.R.D. 275, 280 (D. Colo. 1997), the court likewise held that causation was

established if it is shown that air pollution "emissions impair [plaintiff's] members' ability to breathe clean air and view natural scenery and wildlife."

In other words, to establish the "fairly traceable" element of standing, plaintiffs here need only show that the challenged pollutants discharged from Mountain Cement's Laramie Plant cause or contribute to the types of injuries alleged by plaintiffs' members. As the Court noted in *Laidlaw*:

> We see nothing "improbable" about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms.

528 U.S. at 184-5. *See also Sierra Club v. Cedar Point Oil*, 73 F.3d 546, 558 (5th Cir. 1996), *cert. denied*, 519 U.S. 811 (1996) ("Given the number of entities discharging chemicals into Galveston Bay, it would be virtually impossible for any of plaintiff's members to trace his injuries to [defendant's] discharge in particular. Rather, it is sufficient for plaintiffs to show that [defendant's] discharge of produced water contributes to the pollution that impairs [plaintiff's] use of the bay.").

Mountain Cement admits that "the pollutants identified by the COMs at the Laramie Plant can contribute to a visible plume emanating from the smokestacks, and these pollutants can also contribute to a reduction in visibility in the area." Answer, ¶ 53. Accordingly, because the plume and haze-related injuries suffered by plaintiffs' members are directly traceable to

Mountain Cement's pollutant discharges and are of the type related to excess opacity violations, they are therefore sufficient to establish the causation element of standing.

A decision in plaintiffs' favor will redress, at least in part, the injuries to plaintiffs' members. Therefore, plaintiffs meet the redress ability element of standing.

Plaintiffs' complaint seeks declaratory, injunctive, and civil penalty relief to prevent future opacity and particulate matter violations at the Laramie Plant. Preventing excess pollutant discharges will certainly redress, at least in part, plaintiffs' injuries, thereby meeting the redressability element of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Catron County Bd. of Comm'n v. United States Fish and Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996); *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996). Unlike the "fairly traceable" requirement, which addresses the connection between the plaintiff's injury and the defendant's conduct, redressability focuses on the connection between the plaintiff's injury and the judicial relief sought. *Public Interest Research Group v. Powell Duffryn Terminals*, 913 F.2d 64, 73 (3d Cir. 1990), *cert. denied*, 498 U.S. 1109 (1991).

### 3.    Plaintiffs' Demonstration of Mountain Cement's Permit Violations

Plaintiffs intend to establish their prima facie case for each of their causes of action using Mountain Cement's own continuous monitor data that show Mountain Cement has violated its permits' pollution limits from October 22, 1999 through the second quarter of 2005.[1] The

---

[1] As more fully discussed in Section II of this brief, Mountain Cement carries the burden of
(continued...)

applicable pollution limits, and the evidence showing the violations of those limits, are described below.

      a.    <u>20 Percent Opacity Limit at Kiln #2</u>

      Plaintiffs' first cause of action alleges that Mountain Cement has violated, and continues to violate, the 20 percent opacity limit at Kiln #2. Mountain Cement Permit No. 30-098, condition (F3)(a), and Mountain Cement Permit No. 31-098, condition (F3)(b), prohibit the emission of visible pollutants from the smoke stack of Kiln #2 that exhibit greater than 20 percent opacity. **Trial Exhibit 4**, p. 8; **Trial Exhibit 5**, p. 6. According to Permit 30-098 at condition (F3)(a):

> Visible emissions from the #1 and #2 kiln stacks (Source #1 & #2) shall not exhibit greater than 20 percent opacity.

*Id.*, **Trial Exhibit 4**, p. 8. Similarly, Permit No. 31-098 at condition (F3)(b) states:

> The 6 minute average opacity from the #1 and #2 kiln stacks (K1-710 and K-401) for any 6 minute block period shall not exceed 20 percent opacity.

*Id.*, **Trial Exhibit 5**, p. 6.

      According to Mountain Cement's Permit 31-098, "[a]ll terms and conditions of the permit, except those designated as not federally enforceable, are enforceable by EPA and citizens

---

[1](...continued)
showing any of the excess opacity readings are excused because the burden of proof falls on the party who "claims the benefits of an exception to the prohibition of a statute." *United States v. First City National Bank*, 386 U.S. 361, 366 (1967).

under the Act." **Trial Exhibit 5**, p. 2.  Because the 20 percent opacity limit in Mountain

Cement's permits is an "emission standard or limitation" as defined in the Clean Air Act at 42

U.S.C §7604(f)(1), (3), and (4), it can be enforced by plaintiffs in this action pursuant to the

Clean Air Act's citizen suit provision at 42 U.S.C. § 7604(a)(1).

Proof of 20 Percent Opacity Limit Violations at Kiln #2[2]

Plaintiffs will show at trial that Mountain Cement has violated the 20 percent opacity

limit applicable to Kiln #2 on thousands of occasions over the last five years.  Mountain

Cement's violations are shown by Mountain Cement's own monitoring data described below.

Mountain Cement is required to monitor the opacity of pollution discharged from Kiln #2

at the Laramie Plant on a continuous basis (except for monitor downtime) using a continuous

opacity monitor (COM)[3] located in the smoke stack of Kiln #2.  Permit 30-098 condition (F15),

p. 12; Permit 31-098, condition (F11), p. 9.  **Trial Exhibits 4** and **5.**

---

[2]  Mountain Cement's witness Mr. Thomas Keeler concedes that 320 opacity readings in excess of 20 percent at Kiln #2 from the fourth quarter of 1999 through the fourth quarter of 2004 are not excused.  Keeler Report, ¶ 3, August 15, 2005.  Accordingly, the issue at trial with respect to plaintiffs' first cause of action is not whether there have been opacity violations at Kiln #2, but rather how many violations have occurred since 1999.

[3]  A COM scientifically determines opacity by passing a beam of light from one side of the stack to the other.  The less light that makes it to a sensor on the other side, the greater the opacity.  40 C.F.R. Part 60, App. B, Spec. 1.  According to EPA, "[t]ransparent stack emissions that do not attenuate light will have an opacity of zero percent.  Opaque stack emissions that attenuate all of the visible light will have a transmittance of zero percent or an opacity of 100 percent."  *Id.*

Pursuant to Operating Permit No. 30-098, condition (F31), and Operating Permit No. 31-098, condition (F25), Mountain Cement is also required to submit on a quarterly basis a written report to DEQ that discloses each period of time in which emissions of pollutants from Laramie Plant exceed the applicable standard ("excess emission reports" or "EERs"). **Trial Exhibits 4 and 5**.

Mountain Cement's own EERs show that Mountain Cement has violated the 20 percent opacity limit at Kiln #2 on thousands of occasions. Each quarterly EER sets forth each six-minute period in the quarter in which the average opacity from Kiln #2 exceeded 20 percent. **Trial Exhibit 7**. Trial Exhibit 7 contains Mountain Cement's EERs for Kiln #2 from the fourth quarter of 1999 through the second quarter of 2005. **Id**.

The continuous opacity monitor readings that exceeded 20 percent in Mountain Cement's EERs, and the reasons Mountain Cement provided for those excess readings, are summarized in **Trial Exhibit 8**. The total number of six-minute readings greater than 20 percent opacity for all 23 quarters for each of the causes identified by Mountain Cement are shown in the far right column. The column farthest to the right also shows grand totals of: (1) all six-minute opacity readings that were greater than 20 percent, (2) all six-minute opacity readings that were greater than 20 percent excluding startup and shutdown-related emissions, and (3) all six-minute opacity readings that Mountain Cement claimed were caused by an emergency or abnormal condition ("malfunction").

At trial plaintiffs will seek a finding that all excess opacity readings shown in **Trial Exhibits 7 and 8**, except those expressly identified by Mountain Cement as having been caused by startup or shutdown, or excused by DEQ as a malfunction, are violations of the 20 percent opacity limit applicable to Kiln #2.

      b.     29.3 Pound Per Hour Particulate Matter Limit Violations at Kiln #2

Plaintiffs' second cause of action alleges that Mountain Cement has violated, and continues to violate, the 29.3 pound per hour particulate matter limit at Kiln #2. Pursuant to condition (F5)(a) in Mountain Cement's Permit No. 30-098 and Permit No. 31-098, particulate matter emissions from Kiln #2 may not exceed 29.30 pounds per hour. **Trial Exhibit 4,** p. 8, and **Trial Exhibit 5,** p. 8.

      Proof of 29.3 Pound Per Hour Particulate Matter Limit Violations at Kiln #2

Plaintiffs will show at trial that Mountain Cement has violated the 29.3 pound per hour particulate matter limit at Kiln #2 on numerous occasions. The evidence of these violations is shown by Mountain Cement's continuous opacity monitoring data in **Trial Exhibits 7 - 9,** applying Mountain Cement's correlation between opacity and hourly particulate matter emissions found in Mountain Cement's "Compliance Assurance Monitoring" (CAM) in its permit. **Trial Exhibit 5**, p. 73.

According to Mountain Cement's Permit 31-098, condition (C1)(b)(ix), "For particulate emissions from the #1 and #2 kiln stacks, the permittee shall assess compliance with condition

-12-

F5(a) [the 29.3 pound per hour particulate matter limit] by conducting the testing required by condition F8 and the CAM required by condition F11." **Exhibit 5**, p. 25. Thus Mountain Cement's CAM opacity-to-particulate matter correlation described above may be used to determine compliance.

Mountain Cement's permit also states that "Determinations of compliance or violations of this permit are not restricted to the monitoring requirements listed in paragraph (b) of this condition; other credible evidence may be used." **Trial Exhibit 5**, Permit 31-098, condition (C1)(f), p. 26. Thus even if Mountain Cement's CAM plan is found not to be a "monitoring requirement," despite its name, any credible evidence may be used to establish violations. This permit provision is based on WAQSR Chapter 1, Section 6(a) that states:

> For the purpose of submitting compliance certifications or establishing whether or not a person has violated or is in violation of any standard in the Wyoming state implementation plan, nothing in the Wyoming state implementation plan shall preclude the use, including the exclusive use, of any credible evidence or information relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test or procedure had been performed.

According to Mountain Cement's CAM plan, Mountain Cement is in compliance with the 29.3 pound per hour particulate matter emission limit applicable to Kiln #2 as long as emissions from Kiln #2 do not exceed 20 percent opacity over a period of one hour or more. **Exhibit 5**, p. 73. Mountain Cement established its opacity-to-particulate matter correlation for Kiln #2 using EPA Method 5 stack tests to determine particulate matter emissions and simultaneous

-13-

continuous opacity monitoring data to determine the opacity of emissions. Thus Mountain Cement's opacity data constitutes credible evidence of what a three-hour EPA Method 5 stack test would show if conducted over the same period.

Therefore plaintiffs will use Mountain Cement's continuous opacity monitoring data, applying the opacity-to-particulate matter correlation established by Mountain Cement, to demonstrate that emissions from Kiln #2 at the Laramie Plant have exceeded 29.3 pounds per hour for hundreds of hours in the last five years. Plaintiffs' **Trial Exhibit 13** identifies periods of three hours or more where the average opacity of pollution discharged from Kiln #2 was greater than 25 percent. Plaintiffs' exhibits and expert testimony will show that, had a Method 5 stack test been performed during these same periods, it is more likely than not particulate matter emissions would have been measured in excess of 29.3 pounds per hour.

The burden of establishing any exception to compliance with the 29.3 pound per hour limit is Mountain Cement's.

 c. <u>10 Percent Opacity Limit at Clinker Coolers</u>

Plaintiffs' third cause of action alleges that Mountain Cement has violated, and continues to violate, the 10 percent opacity limit at the clinker coolers. Mountain Cement Permit No. 30-098, condition (F7), and Mountain Cement Permit No. 31-098, condition (F12)(b), prohibit the emission of visible pollutants from the clinker coolers that exhibit greater than 10 percent

opacity. **Trial Exhibit 4**, pp. 9-10; **Trial Exhibit 5**, p. 10. According to Permit 31-098 at condition (F12)(b):

> If the average opacity for any 6-minute block period exceeds 10 percent this shall constitute a violation.

*Id.*, **Trial Exhibit 5**, p. 10.

Proof of 10 Percent Opacity Limit Violations at Clinker Coolers

As with Mountain Cement's violations of the 20 percent opacity limit at Kiln #2 above, plaintiffs intend at trial to use Mountain Cement's continuous opacity monitor data to show that Mountain Cement has violated the 10 percent opacity limit thousands of times at the clinker coolers. Mountain Cement's violations of the applicable 6-minute, 10 percent opacity limit are set forth in Mountain Cement's quarterly reports beginning with the fourth quarter of 1999 through the second quarter of 2005. **Trial Exhibit 7**. Opacity readings in excess of 10 percent on a six minute average are set forth in columns titled "Maximum Excess Emissions" or "Average Opacity (%)" in these reports. Mountain Cement's violations of the 10 percent opacity limit each quarter at the clinker coolers, taken from the reports in **Trial Exhibit 7**, are summarized in **Trial Exhibit 12.**

The burden of establishing any exception to compliance with the 10 percent opacity limit at the clinker coolers is Mountain Cement's.

B.    Plaintiffs' Request for a Permanent Injunction

Pursuant to the citizen suit provision of the Clean Air Act, this court has been expressly empowered by Congress to order prompt compliance with emission limitations established under the Clean Air Act.  Pursuant to 42 U.S.C. § 7604(a):

> The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce [] an emission standard or limitation . . .

Because the Clean Air Act establishes a regime of strict liability, *United States v. Harford Sands, Inc.*, 575 F. Supp. 733, 735 (D. Md. 1983), if this court finds that Mountain Cement is violating its permit emission limits, an order requiring Mountain Cement finally to comply with the law should issue forthwith.

The rule in the Tenth Circuit is that if "the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown." *Mical Communications v. Sprint Telemedia*, 1 F.3d 1031, 1035 (10th Cir. 1993), quoting from, *Atchison, Topeka and Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 259 (10th Cir. 1981).  In other words, after a finding of liability, there is no need to show irreparable harm for an injunction to issue.  "[W]hen actual success on the merits is shown, the inquiry is over and a party is entitled to relief as a matter of law irrespective of the amount of irreparable injury which may be shown." *Multnomah Legal Services Workers Union v. Legal Services Corp.*, 936 F. 2d

-16-

1547, 1553 (9th Cir. 1991), quoting from *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir.

1988). Similarly, in *Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273 (7th Cir. 1992), the

Seventh Circuit ruled that irreparable harm is no longer an issue once success on the merits is

established:

> [W]hen . . . the issue is whether to grant a permanent injunction, not whether to
> grant a temporary one, the burden is to show that damages are inadequate, not that
> the denial of the injunction will work irreparable harm. "Irreparable" in the
> injunction context means not rectifiable by the entry of a final judgment.
> [citations omitted.] It has nothing to do with whether to grant a permanent
> injunction, which, in the usual case anyway, **is** the final judgment. The use of
> "irreparable harm" or "irreparable injury" as synonyms for inadequate remedy at
> law is a confusing usage. It should be avoided.

Id. at 275 (emphasis in original).

This court's authority to enjoin Mountain Cement's ongoing violations of the Clean Air

Act is beyond question. As the Second Circuit held in *Friends of the Earth v. Carey*, 535 F.2d

165, 178 (2d Cir. 1976), "[t]he plaintiffs' right under the [Clean Air] Act to seek [] an

enforcement order is beyond challenge." Thus, where the plaintiff has shown violations of a

federally-enforceable emission limit, as in this case, "the district court is obligated . . . to issue

appropriate orders for its enforcement." *Id.* at 173.

The Supreme Court has held that where a defendant is responsible for a long-standing

pattern of statutory violations, the district court should order:

> that relief it considers necessary to secure prompt compliance with the Act. That
> relief can include, but is not limited to, an order of immediate cessation.

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). Thus although district courts are not

"mechanically obligated to grant an injunction for every violation of law," *Id.* at 313, where

environmental injury is likely, "the balance of harms will usually favor the issuance of an

injunction to protect the environment" because "[e]nvironmental injury, by its nature, can seldom

be adequately remedied by money damages and is often permanent or at least of long duration,

i.e. irreparable." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

After the Supreme Court's ruling in *Amoco*, courts also have held that in cases brought by

a private attorney general on behalf of the public, as here, a balancing of the equities is rarely

required. Thus:

> it has been held that when the plaintiff is a governmental entity, or private
> attorney general, and the activity may endanger public health, injunctive relief is
> proper without undertaking a balancing of the equities. [citation omitted.]
> Likewise, in cases of public health legislation, the emphasis in balancing the
> equities shifts from irreparable injury to concern for the general public interest.

*United States v. Production Plated Plastics, Inc.*, 762 F. Supp. 722, 728 (W.D. Mich. 1991),

*aff'd*, 955 F.2d 45 (6th Cir. 1992), cert. denied, 506 U.S. 820 (1992). See also, *United States v.*

*Richlyn Laboratories, Inc.*, 822 F. Supp. 268, 271 (E.D. Pa. 1993) (in governmental or private

attorney general action to protect public health, "injunctive relief is proper without undertaking a

balancing of the equities.")

Finally, the enforcement of a federal statute such as the Clean Air Act is presumed to be

in the public interest. Thus in *Securities Industries Assoc. v. Board of Governors of the Federal*

*Reserve System*, 628 F. Supp. 1438, 1443 (D.D.C. 1986), the court issued an injunction

prohibiting commercial banks from promoting the sale of securities in violation of federal law.

The court articulated the appropriate standard as follows:

> A review of the various cases makes clear that, where federal statutes are violated,
> the guiding principle for determining the propriety of equitable relief is whether
> an injunction is necessary to effectuate the congressional purpose behind the
> statute. Put another way, in such cases, the equities to be balanced are not simply
> those of the private litigants, but also the interests of the public as defined by
> Congress.

Because the violation at issue implicated "the core concerns underlying the statute," an injunction

was necessary "to make a declared policy of Congress effective." *Id.* at 1444, citing *United*

*States v. City of San Francisco*, 310 U.S. 16, 31 (1940).

In a nutshell, a permanent injunction should issue when a private attorney general such as

plaintiffs here prevail in demonstrating ongoing violations of a statute meant to protect the public

and there is no adequate remedy at law.

A Permanent Injunction Is Necessary to Effect the Purposes of the Clean Air Act.

The central purpose of the Clean Air Act, as stated by Congress, is "to protect and

enhance the quality of the Nation's air resources so as to promote the public health and welfare

and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). To that end, the Clean

Air Act requires sources to comply with technology-based emission limitations: "The maximum

use of available means of preventing and controlling air pollution is essential to the elimination

of new pollution problems while cleaning up existing sources." S. Rep. No. 1196, 91st Cong., 2d Sess. at 16.

Plaintiffs respectfully request that the court issue an order requiring Mountain Cement to come into full and continuing compliance with the opacity and particulate matter limits in its permit in the most expeditious manner possible.

C.     Plaintiffs' Request for a Civil Penalty Assessment

Plaintiffs also request that this court assess against Mountain Cement a substantial civil penalty for each and every violation of the applicable opacity and particulate matter requirements demonstrated at trial.

Pursuant to the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a), the Court is authorized "to apply any appropriate civil penalties . . ." Violations of the Clean Air Act between January 30, 1997 and March 14, 2004 carry a maximum civil penalty of $27,500 per day for each violation. 40 C.F.R. § 19.2; 42 U.S.C. § 7413(b); 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701. Violations of the Clean Air Act from March 15, 2004 to the present carry a maximum civil penalty of $32,500 per day for each violation. 40 C.F.R. § 19.2; 69 Fed. Reg. 7121 (February 13, 2004). The penalties should be directed to finance air compliance and enforcement activities, as provided for by 42 U.S.C. § 7604(a) and 42 U.S.C. § 7604(g)(1).

When assessing a civil penalty under the Clean Air Act, "courts generally presume that the maximum penalty should be imposed." *United States v. B & W Investment Properties*, 38

F.3d 362, 368 (7th Cir. 1994), cert. denied, 514 U.S. 1126 (1995); *United States v. Midwest Suspension and Brake*, 824 F. Supp. 713, 735 (E.D. Mich. 1993), *affirmed,* 49 F.3d 1197 (6th Cir. 1995); *United States v. A. A. Mactal Constr. Co.*, 1992 U.S. Dist. LEXIS 21790, *6 (D. Kan. 1992).

Starting the penalty assessment analysis with a presumption that the statutory maximum should be imposed is appropriate given that the general purposes of a civil penalty under the Clean Air Act are retribution, deterrence, and restitution. *United States v. Vista Paint Corp.*, 1999 U.S. Dist. LEXIS 22129, *30 (S.D. Calif. 1996); *Tull v. United States*, 481 U.S. 412, 422 (1987). In determining a civil penalty, the court "should give effect to the major purpose of a civil penalty: deterrence." *Vista Paint* at 2028; *United States v. T & S Brass and Bronze Works, Inc.*, 681 F. Supp. 314, 322, (D.S.C. 1988), affirmed in relevant part, 865 F.2d 1261 (4th Cir. 1988).

The extent to which the maximum penalty should be reduced, if at all, is to be determined applying the Clean Air Act's penalty assessment factors set forth in Section 113(e), 42 U.S.C. § 7413(e). *United States v. Midwest Suspension and Brake*, 824 F. Supp. at 735. The factors are:

> the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence, payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation.

42 U.S.C. § 7413(e)(1).

-21-

After evaluating these factors, the determination of the amount of a civil penalty is within

the discretion of the court. *United States v. Louisiana-Pacific Corp.*, 682 F. Supp 1141, 1163 (D.

Colo. 1988); *United States v. Anacorp National Services, Inc.*, 516 F.2d 198, 202 (2nd Cir.

1975); *United States Envtl. Prot. Agency v. Environmental Waste Control, Inc.*, 917 F.2d 327,

335 (7th Cir. 1991), *cert. denied*, 499 U.S. 975; *United States v. B & W Investment Properties*, 38

F.3d 362 (7th Cir. 1994). The court need not give equal weight to each statutory criteria in

assessing a civil penalty. *Louisiana-Pacific Corp.*, *supra*.

In this case, the court should begin by applying the maximum statutory penalty of

$27,500 and $32,500, as applicable, for each and every violation of the applicable opacity and

particulate matter limits found in Mountain Cement's permits.

Plaintiffs will show through exhibits and testimony from witnesses that Mountain Cement

should be assessed a significant civil penalty for its air pollution violations. The civil penalty

should not just recover the economic benefit that Mountain Cement enjoyed by not investing in

pollution control equipment that would have prevented its violations, but also a sufficient amount

in addition to its economic benefit to ensure compliance into the future.

"Section 113(e) requires courts to consider the economic benefit which the violator

achieved through noncompliance with the regulations. The significance of including this factor is

that unless the violator is fined an amount at least as great as the economic gain it enjoyed in not

complying with the regulations, the statute serves little deterrent value." *United States v. A. A.*

*Mactal Constr. Co.*, 1992 U.S. Dist. LEXIS 21790 *7 (D. Kan. 1992). Indeed, "economic

benefit should serve as the floor below which the maximum civil penalty should not be

mitigated." *Id.*

The determination of economic benefit is susceptible to several different methods of

calculation. As the Third Circuit Court of Appeals observed, "Precise economic benefit to a

polluter may be difficult to prove. The Senate Report accompanying the 1987 amendment that

added the economic benefit factor to section 309(d) [of the Clean Water Act] recognized that a

reasonable approximation of economic benefit is sufficient to meet the plaintiff's burden on this

factor." *PIRG v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 80 (3d Cir. 1990), cert. denied,

498 U.S. 1109 (1991).[4]  Specifically, the Senate Report provides that "the determination of

economic benefit or other factors will not require an elaborate or burdensome evidentiary

showing. Reasonable approximations of economic benefit will suffice." S. Rep. No. 50, 99th

Cong., 1st Sess. 25 (1985).

---

[4]Although this opinion is examining legislative history regarding the Clean Water Act, the
discussion is still informative given the close relationship between the Clean Water and Clean
Air Acts. See *United States v. Dell'Aquilla*, 150 F.3d 329, 338 (3rd Cir. 1998) (finding the Clean
Air Act and Clean Water Act are *in pari materia* with respect to penalty assessment criteria); see
also *United States v. Stauffer Chemical Co.*, 684 F.2d 1174 (6th Cir. 1982), *aff'd*, 464 U.S. 165
(1984).

## II. Defendant's Defenses

Mountain Cement carries the burden of showing any of the excess opacity readings are excused because the burden of proof falls on the party who "claims the benefits of an exception to the prohibition of a statute." *United States v. First City National Bank*, 386 U.S. 361, 366 (1967). In the Clean Air Act case of *Anderson v. Farmland Industries, Inc.*, 70 F.Supp.2d 1218 (D. Kan. 1999), the court held that the defendant has the burden of proving any claim of malfunction that would excuse a violation of a regulatory limit. *Id.* at 1225-26. See also, *Ekotek Site PRP Committee v. Self*, 932 F. Supp. 1319, 1322-23 (D. Utah 1996) (petroleum exclusion in CERCLA properly characterized as a statutory exception which must be proved by party claiming its benefit); *Guilder v. Bauer*, 865 F.Supp. 492, 495 (N.D. Ill. 1994) (discrimination exemption for owner occupied dwelling in Fair Housing Act must be demonstrated by "those who claim the benefit."); *Alabama Power Co. v. Tennessee Valley Authority*, 948 F.Supp. 1010, 1024 (N.D. Ala. 1996) (utility company must prove existence of service area exemption in statute).

A.    Regulatory Exceptions Defense

There are several rules of construction that should inform the court's analysis of Mountain Cement's claims that any exceptions apply to its opacity and particulate matter violations. First, as stated elsewhere in this brief, once exceptions to a general prohibition are described, no others may be implied. *United States v. Smith*, 499 U.S. 160, 167 (1991); *Parker v.*

*Independent Sch. Dist. No. 1-003*, 82 F.3d 952, 956 (10th Cir. 1996); *Alabama Power Co. v.*

*Tennessee Valley Authority*, 948 F. Supp. 1010, 1024 (N.D. Ala. 1996). This maxim alone

should be sufficient to reject Mountain Cement's timeworn claim that there is a five percent

exception to opacity compliance. There is none. And none should be allowed.

Second, as the court held in *Signal Capital Corp. v. Eastern Marine Management*, 899 F.

Supp. 1167 (S.D.N.Y. 1995):

> a statutory exception must be strictly construed so that the major policy
> underlying the legislation is not defeated. Exceptions extend only so far as their
> language fairly warrants, and all doubts should be resolved in favor of the general
> provision rather than the exception.

Further, "statutory exceptions are to be strictly construed so as to prevent the exception from

swallowing the rule." *United States v. Luna*, 768 F. Supp. 705, 708 (N.D. Cal. 1991); *A.H.*

*Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945). Finally, "where words of exception are used,

they are to be strictly construed to limit the exception." *Signal Capital Corp.* at 1170, fn 3.

Consistent with the rules of construction set forth above, the following are examples of

exception claims made by Mountain Cement that should be rejected as a matter of law.

1.      24 Hour Notice of Malfunctions is Required.

Mountain Cement incorrectly claims that notice within 24 hours of any malfunction is not

required to establish a malfunction defense. Because 24-hour notice is an essential element to

-25-

the defense, and because Mountain Cement did not provide such notice with respect to the violations at issue in this case, Mountain Cement's malfunction defense should be rejected..[5]

According to Mountain Cement's permits at condition (G21):

Emissions in excess of established regulation limits as a direct result of malfunction or abnormal conditions or breakdown of a process, control or related operating equipment beyond the control of the person or firm owning or operating such equipment shall not be deemed to be in violation of such regulations, *if the Division is advised of the circumstances within 24 hours of such malfunction*[6] *and a corrective program acceptable to the Division is furnished.*

**Trial Exhibit 4**, p. 24; **Trial Exhibit 5**, p 31 (emphasis added).

To the extent Mountain Cement wanted to avail itself of the emergency, abnormal condition or equipment malfunction defense to excuse an excess opacity reading at Kiln #2 or the clinker coolers, it therefore was required by its permits to submit a report to DEQ within 24 hours of such reading. Because Mountain Cement decided over the last five years not to claim that its excess opacity emissions at Kiln #2 and the clinker coolers at issue in this case were caused by emergency or malfunction, and in fact decided to report affirmatively at the end of

---

[5] Plaintiffs do not allege in this action that the excess opacity emissions Mountain Cement timely reported as being caused by malfunctions, and that were excused by DEQ, are violations.

[6] The term "malfunction" is defined at WAQSR Chapter 5, Section 2(e)(i) as:

any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions.

each quarter that each of the excess opacity readings during that quarter were *not* the result of any

emergency, abnormal condition or equipment malfunction, it may not now assert these defenses.

        In an identical reporting requirement under the Clean Water Act, evidence of a timely

filed report is a procedural prerequisite to establishing an "upset" defense. Thus in *Student*

*Public Interest Research Group, Inc. v. P.D. Oil*, 627 F. Supp. 1074, 1087 (D.N.J. 1986), aff'd in

part, rev'd in part at *Student Public Interest Research Group, Inc. v. Powell Duffryn Terminals*,

913 F.2d 64, 76 n.20 (3rd Cir. 1990), the court rejected the defendant's belated upset defense due

to the defendant's failure to submit timely reports. According to the court:

> Defendant has provided no evidence that satisfies any of these requirements for
> any particular permit violation alleged by plaintiffs. Instead, defendant broadly
> asserts that all of its permit violations qualify as upsets. EPA's regulations do not
> permit this type of blanket defense. They require that defendant demonstrate
> through relevant evidence that each upset is 'an exceptional incident' and meets
> all the other requirements of the regulation. For example, EPA's regulations
> require that the defendant show that it provided EPA and NJDEP with 24-hour
> notice. Defendant's upset defense is defective as a matter of law as to all of its
> violations on this ground alone.

Because the prompt malfunction reporting requirements in the applicable Wyoming regulations

require proof of notification before the defense will apply, WAQSR Ch. 6, Sec. 3(l) and Ch. 1,

Sec. 5, and because these provisions are virtually identical to the applicable Clean Water Act

regulations for establishing an "upset" at 40 C.F.R. § 122.41(n)(3)(iii) (2004), court decisions

interpreting the latter apply with equal force to the former.

Mountain Cement's claim that 24-hour notice is not required to establish a malfunction therefore should be rejected.

    2.    <u>No Five Percent Non-Compliance Exception.</u>

Mountain Cement's Answer claims that "opacity exceedences that occur less than 5% of the time are not violations of any clean air law, regulation or permit." Answer, p. 10. However, there is no five percent exception in Mountain Cement's permits nor, for that matter, in any "clean air law [or] regulation" that applies to the Laramie Plant. **Trial Exhibits 4** and **5**. According to the rules of construction set forth above, where express exceptions are provided for in Mountain Cement's permits, no additional exceptions should be added by implication or otherwise. *Parker v. Independent Sch. Dist. No. I-003*, 82 F.3d 952, 956 (10th Cir. 1996).

    3.    <u>No State Action Bar.</u>

Mountain Cement's defense that plaintiffs' action should be barred because of Mountain Cement's 2005 penalty settlement with DEQ for five calendar quarters of opacity violations at Kiln #2 in 2001 and 2002 should be rejected.[7]

Pursuant to the Clean Air Act at 42 U.S.C. 7604(b)(1)(B):

> No [citizen suit] action may be commenced . . . (B) if the Administrator [or EPA] or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation or order [that is the subject of such action] . . .

---

[7] Plaintiffs are not seeking a penalty in this action for the Kiln #2 opacity violations addressed by DEQ's 2005 Consent Decree.

First, DEQ's December 17, 2004 complaint, and its March 17, 2005 consent decree with Mountain Cement, neither seek nor require Mountain Cement to perform any injunctive relief. **Trial Exhibits 21** and **22**. The Consent Decree only requires Mountain Cement to pay a $42,500 penalty for excess opacity emissions at Kiln #2 that took place during the first, second and third quarters of 2001, and the first and second quarters of 2002. **Trial Exhibit 21**, p. 4; Trial Exhibit 19, p. 3, ¶ 19. Because the 2005 DEQ-Mountain Cement Consent Decree only resolves Mountain Cement's past penalty liability for discrete Kiln #2 opacity violations in 2001 and 2002, and does not "require compliance" with the opacity limit at Kiln #2 in the future, Section 7604(b)(1)(B) of the Clean Air Act does not preclude this action.

Second, the 2005 Consent Decree does not address Mountain Cement's Kiln #2 excess opacity penalty liability for violations that occurred in the fourth quarter of 1999, all quarters of 2000, the first quarter of 2001, the third and fourth quarters of 2002, all quarters of 2003 and 2004, and the first quarter of 2005. Because the Consent Decree does not resolve Mountain Cement's violations during these periods plaintiffs' action is not precluded.

Third, the 2005 Consent Decree does not address Mountain Cement's liability for particulate matter violations at Kiln #2 (plaintiffs' second cause of action), and for clinker cooler opacity violations (plaintiffs' third cause of action) and thus does not require compliance with these limits.

Fourth, the 2005 Consent Decree does not establish that Mountain Cement has been violating the opacity limit at Kiln #2. Mountain Cement agreed to pay the penalty "without admitting liability." **Trial Exhibit 22**, p. 4. Because plaintiffs' action seeks a declaration that Mountain Cement has been violating and continues to violate its permit this action is not precluded.

Respectfully submitted,

DATED this _6TH_ day of October, 2005.

BIODIVERSITY CONSERVATION ALLIANCE
and SIERRA CLUB, Plaintiffs

_Reed Zars_

Reed Zars
Attorney at Law
910 Kearney Street
Laramie, WY 82070
307-745-7979
307-745-7999 (fax)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the ___6TH___ day of October, 2005, I caused to be mailed to Mr. Nicholas and Mr. Harris, a copy of Plaintiffs' Trial Brief to the following addresses:

Philip Nicholas                     Jim Harris
Anthony, Nicholas et al.            Thompson & Knight, LLP
170 N. 5th Street        1700 Pacific, Suite 3300
P.O. Box 0928                       Dallas, TX 75201
Laramie, WY 82073

_Reed Zars_

Reed Zars

-30-

## PLAINTIFFS' TRIAL EXHIBITS

Exhibit 1:      Plaintiffs' October 22, 2004 60-day notice letter.

Exhibit 2:      June 5, 1996 DEQ Notice of Violation to Mountain Cement.

Exhibit 3:      July 2, 1996 DEQ Compliance Order.

Exhibit 4:      Mountain Cement's June 2, 1998 DEQ Operating Permit No. 30-098.

Exhibit 5:      Mountain Cement's March 15, 2004 DEQ Operating Permit No. 31-098.

Exhibit 6:      January 25, 2002 Sansing Memo.

Exhibit 7:      Mountain Cement Quarterly Excess Emission Reports from 4th Quarter 1999
                through 2nd Quarter 2005, excerpts.

Exhibit 8:      Kiln #2 Opacity Violations Summary.

Exhibit 9:      Mountain Cement daily opacity sheets 4th quarter 1999 - 2nd quarter 2001.

Exhibit 10:     February 16, 2000 DEQ letter refusing to excuse excess opacity emissions.

Exhibit 11:     May 14, 1999 EPA Fact Sheet regarding HAPs from Cement Plants.

Exhibit 12:     Clinker Cooler Excess Emission Summary.

Exhibit 13:     Kiln #2 Particulate Matter Violations.

Exhibit 14:     June 12, 2005 Expert Report of Bill Wilson and attachments thereto.

Exhibit 15:     June 12, 2005 Expert Report of Jonathan Shefftz and attachments thereto.

Exhibit 16:     July 29, 2005 Supplemental Expert Report of Bill Wilson and attachments thereto.

Exhibit 17:     September 13, 2005 Expert Rebuttal Report of Jonathan Shefftz.

Exhibit 18:     September 17, 2005 Expert Rebuttal Report of Bill Wilson.

Exhibit 19:    Supplemental Affidavit of Dan Olson, August 15, 2005, and exhibit attached thereto.

Exhibit 20:    EPA's HPV Policy and Workbook.

Exhibit 21:    December 17, 2004 Wyoming v. Mountain Cement complaint.

Exhibit 22:    March 17, 2005 Wyoming v. Mountain Cement consent decree.

Any Exhibit sponsored by Mountain Cement, and any exhibit for rebuttal purposes.

## PLAINTIFFS' TRIAL WITNESSES

1.    Lay Witnesses.

The following witnesses are prepared to testify regarding plaintiffs' standing in this

action. The testimony of these witnesses is expected to follow the testimony they have provided

in their declarations and depositions.

Connie Wilbert, 705 S. 22nd St., Laramie, WY 82070.
Michele Barlow, 718 S. 5th St., Laramie, WY 82070.
Bob Strayer, 719 S. 22nd St., Laramie, WY 82070.
Martha Martinez del Rio, 2430 Douglas Dr., Laramie, WY 82070.

2.    Expert Witnesses.

The following expert witnesses are prepared to testify on matters set forth in their expert

reports, any supplemental reports, and any rebuttal reports.

Bill Wilson, P.E., 7247 Brennans Dr.
Dallas, TX 75214

Jonathan S. Shefftz, Senior Associate, Industrial Economics, Incorporated
2067 Massachusetts Avenue, Cambridge MA 02140

3.      Mountain Cement Witnesses

Plaintiffs may call one or more of the following witnesses from Mountain Cement

regarding the identified issues and matters covered in their depositions:

William Sansing, Environmental Manager.  To authenticate documents, describe
pollution monitoring systems and reporting at Laramie Plant, explain DEQ enforcement actions,
describe nature and type of Kiln and clinker emissions from Mountain Cement.

Mike Meysing, Plant Manager.  To authenticate documents, describe potential measures
to reduce opacity and particulate matter emissions.

4.      DEQ Witnesses.

Plaintiffs may call one or more of the following witnesses from Wyoming DEQ regarding

the identified issues:

Dan Olson.  To authenticate documents, describe positions set forth in his two affidavits
filed in this action, provide DEQ interpretation of permit terms, describe background of state's
enforcement of environmental requirements at Mountain Cement's Laramie Plant.

Glen Spangler or Bob Gill.  To authenticate documents, describe positions set forth in
Mr. Olson's two affidavits filed in this action, provide DEQ interpretation of permit terms,
describe background of state's enforcement of environmental requirements at Mountain
Cement's Laramie Plant.

5.      Defendant's Witnesses and Rebuttal Witnesses.

Plaintiffs reserve the right to call any witness sponsored by Mountain Cement, and any

witness for rebuttal purposes.

-33-