Philip A. Nicholas
Jason M. Tangeman
Anthony, Nicholas, Tangeman & Yates, LLC
170 N. Fifth Street
P.O. Box 0928
Laramie, WY 82073
(307) 742-7140
(307) 742-7160 Fax

James B. Harris
Becky L. Jolin
Steven R. Baggett
Thompson & Knight, L.L.P
1700 Pacific, Suite 3300
Dallas, TX 75201
214-969-1102
214-880-3274 Fax

Attorneys for Defendant Mountain Cement Company

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Biodiversity Conservation Alliance and Sierra Club, | ) ) ) | |
| Plaintiffs, | ) | Case No. 04CV 361-B |
| v. | ) | |
| Mountain Cement Company, | ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S AMENDED WITNESS DESIGNATION AND EXHBIBIT LIST

Defendant Mountain Cement Company ("Mountain Cement") files this Amended Witness Designation in accordance with the Court's direction at the Final Pretrial Conference held on October 13, 2005.

## I.   WITNESSES

### A. Persons Who Will Testify

Mountain Cement will call the following witnesses live at the trial of this case:

Stuart Tomlinson
Mountain Cement Company
5 Sandcreek Road
Laramie, Wyoming 82070

307-745-4879

Mr. Tomlinson is the President of Mountain Cement Company. He is expected to testify about how Mountain Cement's Laramie plant operates. He will explain his testimony using a video tape of the Cement plant prepared by Sam Trautman. The video can be downloaded by following the instructions found at http://www.adventurevids.com/mtn_cmt/download.htm. He will testify that Mountain Cement Company is a Nevada corporation, which owns the Laramie, Wyoming cement plant along with shipping terminals in Denver, Colorado, North Platte, Nebraska, Rock Springs, Wyoming and Salt Lake City Utah.

Mr. Tomlinson will also be called to explain the time lapse video of Mountain Cement's stacks that can be downloaded by following the instructions found at http://www.adventurevids.com/mtn_cmt/download.htm. He will explain to the jury the difference between attached and detached plums, the length of plumes when Mountain Cement's stack gasses exceed the 20% opacity. He will explain steam plumes and how they are caused. He will explain the actions taken by Mountain Cement's Kiln Operators when an exceedance occurs, and explain Mountain Cement's Start-up, Shutdown and Malfunction procedures.

He will testify about Mountain Cement's efforts to maintain its pollution control equipment, when the equipment is maintained, how the equipment is maintained, and the annual budget for its maintenance. He will testify that Mountain Cement works hard to be a good corporate citizen in Laramie, Wyoming where it employs nearly 130 persons to run its operations. The company cares about its employees and the community.

He will testify that Mountain Cement strives to maintain full compliance with all environmental laws, including those that govern air quality. Compliance with environmental laws is a full time effort, and requires routine and continuous efforts by Mountain Cement. Mountain Cement is committed to continuous improvement to insure its full compliance with state and federal environmental laws. Mountain Cement has committed sufficient resources to its preventative maintenance program to insure that its ESP works in full compliance with all environmental laws and that the cement plant operates within the parameters of its permit. Those resources include the employment of independent, unrelated, nationally recognized experts to perform annual preventative maintenance on the ESP.

He may testify, depending on rulings on the motions *in limine*, that Mountain Cement Company has been a subsidiary of Eagle Materials since early 2004. Prior to that time,

DEFENDANT'S AMENDED WITNESS DESIGNATION AND EXHIBIT LIST - Page 2

Mountain Cement was a wholly owned subsidiary of Centex Construction Company, Inc. Mountain Cement is a separate, independent operating company with its own governing board of Directors. It has its own individual Federal Tax I.D. number. It maintains its own separate books and records, employs its own accounting staff, and maintains its separate accounting and data processing system, and books and records.

He may testify about his experience with the operations of various cement plants with ESPs and bag houses. He may testify that they are both Best Available Control Technology, and that both technologies have their advantages and disadvantages. He will testify that Mountain Cement's Laramie cement plant is an older cement plant modernized by Mountain Cement and the substantial renovations that took place at the cement plant to insure its compliance with all environmental laws. Eagle Materials has continued the efforts to modernize and maintain the cement plant. He will testify about the current cement shortage in Wyoming and surrounding states and the impact on that shortage if Mountain Cement had to reduce and stop production.

> Mike Meysing
> Mountain Cement Company
> 5 Sandcreek Road
> Laramie, Wyoming  82070
> 307-745-4879

Mr. Meysing has been deposed and will testify about all matters contained in his deposition. He will testify that Mountain Cement received Notice of Violation (NOV) Docket No. 3405-02 from DEQ-AQD for air quality violations. He will testify that Mountain Cement undertook immediate and expensive corrective action to fully respond to DEQ-AQD's NOV and concerns. Mr. Meysing will testify that the NOV was issued shortly after his arrival at Mountain Cement. He fully investigated the problems and employed nationally recognized experts to inspect and recommend repairs and/or maintenance for the ESP. He will testify about all material contained in the December 18, 2002, letter from Bruce Ballinger to DEQ-AQD, which includes Mountain Cement's response and corrective action to the NOV.

He will also testify about operational issues related to the plant, plant maintenance, malfunctions, environmental issues associated with the plant, and Mountain Cement's dealings with the DEQ. He will discuss in the manner in which startup shutdowns and malfunctions are identified and cared for at the plant and how they are reported to the state. He will testify about the report forms submitted to the state and how they identify startups, shutdowns, and malfunctions and why such reports are acceptable to the state.

Dan Olson, Administrator
Wyoming Department of Environmental Quality
Division of Air Quality
122 West 25th Street, Herschler Building
Cheyenne, Wyoming 82002
307-777-7391

Mr. Olson is expected to testify concerning the state's enforcement policies related to opacity and particulate matter, and the state's most recent notice of violation and enforcement action filed against Mountain Cement, and its resolution. Much of the substance of Mr. Olson's testimony is generally set forth in his affidavits previously filed with the Court. In addition, Mr. Olson will be asked, and is expected to testify as follows:

That he received a notice letter on behalf of Biodiveristy and he chose not to take any action because the state believed it had already addressed any opacity exceedances that might have been described in a letter. The state believed and continues to believe that it has taken all necessary enforcement action against MCC.

Biodiversity's letter expressed concerns about opacity and particulate matter, and the State believed and continues to believe that it has diligently and continuously enforced all laws regulating opacity and particulate with respect to MCC.

Under MCC's Permit 30-098, in effect from March of 1999 through March of 2004, the reference test method for establishing a violation of opacity limits is Method 9, not continuous opacity monitoring ("COMS") data.

Permit 30-098 required MCC to generate continuous opacity monitor data. COMS monitors opacity continually, while Method 9 measures opacity periodically, COMS will identify more exceedances than Method 9. Use of COMS data presented new issues for DEQ-AQD because of the continuous data produced from such units. It is unlikely that any manufacturing plant can operate in full compliance with all opacity and emission standards 100% of the time.

DEQ exercises its discretion in enforcing State and Federal air quality laws. DEQ refers to and generally follows EPA's high priority violation policy when determining how to exercise its enforcement discretion. Consistent with the EPA HPV policy, DEQ does not generally prosecute exceedances occurring less than 5% of the time during any quarter, and less than 3% of the time in two consecutive quarters (referred to as the 5% Rule).

DEFENDANT'S AMENDED WITNESS DESIGNATION AND EXHIBIT LIST - Page 4

DEQ-AQD has uniformly applied and enforced, without exception, the 5% rule to sources with continuous monitoring. The 5% Rule takes into account many factors including: (1) the limited enforcement resources of the state; (2) the complexity of plants with continuous monitoring, raising the probability of unavoidable mechanical failure; (3) the age of plants with continuous monitoring, making maintenance more difficult; (4) the fact that continuous monitoring identifies more exceedances than non-continuous (periodic) monitoring and not all sources in the state have continuous monitoring; and (5) that no matter how well run a plant is, it is unlikely that it will meet air emission standards 100% of the time.

If a permit includes NSPS and NESHAPS technology provisions providing that certain permit limits do not apply during periods of start-up, shut-down, or malfunction (SSM), it is not necessary to provide 24 hours notice to the state to be covered by such provisions. It is necessary to provide notice of all SSMs in quarterly excess emission reports submitted to DEQ. By providing 24-hour notice, an operator may be entitled to a ruling from DEQ that the abnormal condition or malfunction event was unavoidable and should not be calculated into the plants' quarterly "Total Duration of Excess Emission."    The 24-hour notice requirement is not determinative of what constitutes a start-up, shutdown or malfunction under WAQSR Ch. 5, § 2(i)(iii).

MCC provided notice of start-up, shut-down and malfunction periods in its quarterly excess emission reports.

Individual regional engineers are given discretion to develop with plants a method for reporting excess emissions. The general policy is set out in a DEQ-AQD letter dated October 31, 1997.

Permit 30-098 and 31-098 for MCC's plant contain NSPS and MACT provisions, providing that certain permit limits do not apply during periods of start-up, shut-down, or malfunction.

DEQ did not intend that the opacity limits in Permit 31-098 be more stringent than the opacity limits in Permit 30-098.

DEQ does not use the CAMS Graph to establish violations of particulate matter standards.

That DEQ has not incorporated EPA's HPV policy as part of the state SIP. However, DEQ does use the HPV policy as a guideline for exercising its discretion in enforcement of all air quality permits issued by the State of Wyoming.

Industry in Wyoming can reasonably assume that the DEQ will rely on the 5% Rule in exercising its enforcement discretion.

Allowing recovery of penalties and the imposition of an injunction for exceedances that the state does not enforce would be inconsistent with the 5% Rule followed by DEQ and would reverse DEQ's longstanding and relied upon practice.

That DEQ's NOV issued to MCC, its enforcement action, and subsequent settlement with MCC could have included all exceedances, including those quarters with exceedances below the 5% Rule, but DEQ intentionally omitted those exceedances. MCC requested they be explicitly included, but the DEQ refused to do so, because DEQ believed those exceedances did not warrant enforcement action and because specifically inserting them would suggest DEQ would seek to enforce exceedances below the 5% Rule thresholds in contravention of DEQ's longstanding practice.

That DEQ is satisfied with the current performance of the MCC plant with respect to opacity and does not believe penalties or a change in pollution control devices is necessary.

That DEQ believes that MCC has made good faith efforts to comply with its permit requirements.

He will describe how permit limits are established in Wyoming.

He will provide an overview of the current and immediately preceding permits for MCC's plant.

> Thomas R. Keeler
> TRK Engineering Services, Inc.
> 95 Clarks Farm Road
> Carlisle, MA  01741
> 978-287-0550

Mr. Keeler is expected to testify as an expert witness as set forth in his report attached to Defendant's Pretrial Memorandum. In particular, he is expected to opine:

1.    That of the 5,475 opacity exceedances at Kiln #2 at issue in this lawsuit, 5,119 occurred during a malfunction period;

2.    That an electrostatic precipitator is the most appropriate pollution control device for Kiln #2;

3.    That installing a new pollution control device for Kiln #2 can be accomplished with little or no loss of production.

Mr. Keeler will provide the basis for and how he reached those opinions consistent with what is set forth in his expert report.

Ralph L. Roberson
RMB Consulting & Research, Inc.
5104 Bur Oak Circle
Raleigh, NC  27612
919-510-0376

Mr. Roberson is expected to testify as an expert witness as set forth in his expert report attached to Defendant's Pretrial Memorandum.  In particular, he is expected to opine that:

1.    Data from the continuous opacity monitoring system is not credible evidence of opacity violations of a periodic standard which is the opacity standard under Mountain Cement Company's air permit 30-098;

2.    The use of a continuous opacity monitoring system to establish opacity violations results in an opacity limit more stringent than an opacity limit for violations that are based on Reference Test Method 9, unless a de minimus level is establish; and

3.    A "CAMS" graph, which is part of Mountain Cement Company's air permit 31-098, but not part of air permit 30-098, is not credible evidence to show violations of a particulate matter emission standard, and even if it were, Plaintiffs have not properly used the data from that graph.

Mr. Roberson will provide the basis for and how he reached those conclusions consistent

with what is set forth in his expert report.

> Roger Brower
> Zephyr Environmental Corp.
> 5300 Dorsey Hall Drive, Suite 200
> Ellicott City, MD  21042
> 410-312-7907

Mr. Brower is expected to testify as an expert witness consistent with his expert report attached to Defendant's Pretrial Memorandum.  In particular, he is expected to opine that:

1.    That since October 23, 1999, there have been no violations of the National Ambient Air Quality Standards for the Laramie area, and but one exceedance during that time, and that the air is safe to breathe, even for the most sensitive populations;

2.    That the United States Environmental Protection Agency and the state of Wyoming consider electrostatic precipitators and baghouses to be equivalent control technologies, that is, both are equally acceptable to control particulate emissions;

3.    That since October 27, 1999, the Reference Test Method used to determine if Mountain Cement Company's plant is in compliance with limits on the amount of particulate matter it can release has shown no violations; and

4.    The nature of opacity and how it decreases as you move away from a stack.

Mr. Brower will provide the basis for and how he reached these opinions consistent with what is set forth in his expert report.

> Dale Jensen
> PriceWaterhouse Coopers, LLP
> 1670 Broadway, Suite 1000
> Denver, CO  80202
> 720-931-7343

Mr. Jensen is expected to testify as an expert witness consistent with his expert report attached to Defendant's Pretrial Memorandum.  In particular, he is expected to opine that:

1.    That Mountain Cement did not derive any economic benefit from any alleged

non-compliance with its permits, and that the economic benefit model shows a net economic detriment of $12,895.00.

Mr. Jensen will provide the basis for and how he reached these conclusions consistent with what is set forth in his expert report.

## B. Persons Who May Testify

In addition to the above witnesses that Mountain Cement will call at trial, Mountain Cement may call the following witnesses live:

William Sansing, Ph.D.
Mountain Cement Company
5 Sandcreek Road
Laramie, Wyoming 82070
307-745-4879

Dr. Sansing is the environmental manager at the plant. Dr. Sansing has been deposed and may be called to testify about all matters covered in his deposition.

He has also provided an affidavit in this matter that was been filed with MCC's Final Pretrial Memorandum. He may further testify about the matters covered by his affidavit.

Dr. Sansing may be called to provide the necessary foundation for MCC's various business records and exhibits, as a custodian of records for Mountain Cement.

Dr. Sansing may be called to explain all quarterly reports filed on behalf of Mountain Cement since he took over the role of environmental manager. He will testify that he met, and continues to meet with, DEQ engineers on a regular basis. That he developed the quarterly report with input from DEQ's Glenn Spangler and following the October 31, 1997 policy letter issued by DEQ-AQD. He will testify concerning MCC's compliance with its air quality permit, and how MCC reports excess emissions in order to comply with its quarterly reporting.

Dr. Sansing will testify that the quarterly reports used by MCC were either a DEQ form or a form that was reviewed by and approved by Glenn Spangler. Dr. Sansing will further testify that Glenn Spangler agreed that the manner in which MCC completed the DEQ quarterly excess emissions form and the MCC form provided proper notice of startups, shutdowns and malfunctions.

Dr. Sansing will further testify that MCC understood that the information contained in the quarterly excess emissions reports had to be truthful and accurate. He will testify as to the

DEFENDANT'S AMENDED WITNESS DESIGNATION AND EXHIBIT LIST - Page 9

number of exceedances associated with the clinker cooler stack and how many of those occurred during startups, shutdown or malfunctions.

> Frank Plumber
> Foreman
> Ashgrove Cement Company
> Arkansas
> 870-542-3280 (direct)
> 870-542-6217 (main line)

Mr. Plumber may be called to testify about his personal knowledge concerning State of Wyoming Department of Environmental Quality, Air Quality Division, Notice of Violation, Docket No. 2751-96, issued on June 5, 1996. If called, he is expected to testify that the No. 1 Kiln ESP was rebuilt incident to returning Kiln No. 1 to production. The ESP operated properly for three days, and then began malfunction. The Kiln was operated at a reduced capacity during the 90-day startup period in an effort to diagnose the ESP malfunction. Mountain Cement evaluated repairing the ESP, retrofitting the ESP with baghouse components, and installing a new baghouse. Mountain Cement made an internal decision to replace the collector plates in the ESP housing with baghouse components after evaluating the cost to repair the ESP and the unexpected dust loading of kiln gases passing through the No. 1 Kiln. DEQ-AQD issued a Notice of Violation and Order on June 5, 1996, requiring that Mountain Cement explore and implement improvements to the Kiln No. 1 ESP in order to achieve compliance with its Operating Permit. On June 21, 1996, Mountain Cement advised DEQ that it was electing to retrofit the ESP with a jet pulse baghouse. After Mountain Cement advised DEQ-AQD of its decision to retrofit its ESP with jet pulse baghouse components, DEQ-AQD issued a Compliance Order on July 6, 1996, requiring that Mountain Cement develop a compliance plan for converting its No. Kiln 1 ESP to a baghouse, and directing that the Kiln be shut down no later than December 27, 1996, to complete the conversion. It was later determined that the ESP components were installed incorrectly and that the internal collecting plates were damaged during startup. Mountain Cement was advised that the ESP could be repaired and that it would work correctly, but the decision had already been made to convert the ESP to a baghouse. The matter was finally resolved through *People of the State of Wyoming v. Mountain Cement,* filed as Civil Action 26454, in the Second Judicial District Court, Albany County, State of Wyoming.

> Rick Wilson

DEFENDANT'S AMENDED WITNESS DESIGNATION AND EXHIBIT LIST - Page 10

Acting Production Manager
Production Foreman
Mountain Cement
5 Sandcreek Road
Laramie, Wyoming  82070
307-745-4879

Mr. Wilson is a Production Manager who was employed by Monolith Portland Cement Company-Wyoming and later by Mountain Cement.  He may be called to testify about his observations regarding the extensive and continuous capital improvements made by Mountain Cement beginning in 1986.  Those improvements include the modernization of the No 2 Kiln, the installation of a new raw material processing system and covered raw material storage.  The improvements included substantial modifications to the No. 2 Kiln pyroprocessing system clinker cooler system, and covered storage for clinker.  All of these modifications were costly, time consuming and have resulted in much cleaner cement plant.

He may be called to testify about the production employees' responsibilities for monitoring kiln emissions, and all corrective action to be taken when there are excessive emissions.  He will testify that Kiln Operators are trained to watch for and observe the kiln and clinker cooler stack opacities and to take corrective action immediately upon discovery of an excess exceedance.  He will testify about all types of corrective action taken by Kiln Operators. He will testify that Mountain Cement's Kiln Operators are all experienced and conscientious employees that take their job seriously.  He will testify that the Kiln Operators take immediate action to comply with Mountain Cement's SSM plan immediately upon discovering an excess emission event.

He will provide testimony concerning various issues related to the history of the Plant, including but not limited to emission control issues and dealings with state and federal regulators.

Bob Kersey, Chief Chemist
Mountain Cement
5 Sandcreek Road
Laramie, Wyoming  82070
307-745-4879

Mr. Kersey may testify concerning all matters relating to raw feed rates and raw materials used at the Plant.

Robert P. Gill
Air Qualify Division Compliance Program Manager
Department of Environmental Quality
Division of Air Quality
122 West 25th Street, Herschler Building
Cheyenne, Wyoming 82002
307-777-7391

Mr. Gill may be called to provide testimony concerning DEQ's enforcement practices and policies, Mountain Cement's air permits, the Wyoming Air Quality Program, and the issuance and resolution of notices of violation issued to Mountain Cement by state authorities.

If called, he will testify that DEQ's engineers are trained to review all quarterly reports made out by companies regulated by DEQ. The engineer is responsible for looking for any unusual matters, red flags, and evaluating the quarterly reports against the EPA HPV policy. He will explain the HPV policy and the reasons why DEQ follows that policy.

He will then testify that in the event the engineer finds anything requiring the attention of DEQ, or possible enforcement action of DEQ, the engineer is trained and required to prepare a report of his concerns to Mr. Gill. Mr. Gill then evaluates the information along with the applicants' permit and all relevant EPA policies, including the HPV policy. After evaluating all relevant information, Mr. Gill then provides either a written or oral report to the Administrator of the DEQ-AQD who makes the final determination of what action to take against the plant.

Mr. Gill will testify that he is familiar with Mountain Cement and that he has been involved in all DEQ action to enforce Mountain Cement's permit. He will testify regarding what exceedances DEQ chose to enforce, and what exceedances it elected not to enforce. He will testify about the reasons why DEQ enforces permits the way it does. He will testify that DEQ uniformly enforces its policy state wide, and that DEQ has always taken its responsibilities seriously. He will testify that he has referred to the Administrator for action all violations he deems necessary for enforcement action.

Glenn Spangler
District I Engineer
Department of Environmental Quality
Division of Air Quality
122 West 25th Street, Herschler Building
Cheyenne, Wyoming 82002
307-777-7391

Mr. Spangler may be called to provide testimony concerning DEQ's enforcement

practices and policies, Mountain Cement's air permits, the Wyoming Air Quality Program, and the issuance and resolution of notices of violation issued to Mountain Cement by state authorities.

If called, he will testify that he is trained to review all quarterly reports made out by Mountain Cement. He is responsible for looking for any unusual matters, red flags, and evaluating the quarterly reports against the EPA HPV policy. He will explain his understanding of the HPV policy.

He will then testify that in the event he finds anything in Mountain Cement's quarterly reports requiring the attention of DEQ, or possible enforcement action of DEQ, he reports his concerns to Mr. Gill. Mr. Gill then evaluates the information along with the applicants' permit and all relevant EPA policies, including the HPV policy. After evaluating all relevant information, Mr. Gill then provides either a written or oral report to the Administrator of the DEQ-AQD who makes the final determination of what action to take against the plant. Mr. Gill or the Administrator may or may not ask him for a recommendation.

He will testify that he investigates and responds to all citizen complaints regarding Mountain Cement, and follows up any complaints with Mountain Cement. If he determines that any citizens' complaints require action, he follows the same procedure outlined above.

Mr. Spangler will testify that he is familiar with Mountain Cement and that he has been involved in all DEQ action to enforce Mountain Cement's permit. He will testify regarding what exceedances DEQ chose to enforce, and what exceedances it elected not to enforce.

He will testify that DEQ uniformly enforces its policy state wide, and that DEQ has always taken its responsibilities seriously. He will testify that he has referred to the Mr. Gill and the Administrator for action all violations he deems necessary for enforcement action. He may also testify as a certified Method 9 observer about the opacity of plumes depicted on MCC's time lapse Exhibit.

> Michael D. Seaton
> Mountain Cement
> 5 Sandcreek Road
> Laramie, Wyoming 82070
> 307-745-4879

Mr. Seaton may be called to testify on issues related to alleged injury-in-fact for Biodiversity's standing claims. Mr. Seaton has given an affidavit which has been filed in this matter, he may be called to testify about all matters covered in his affidavit.

Philip A. Nicholas
Anthony, Nicholas, Tangeman & Yates, LLC
170 N. Fifth Street
P.O. Box 0928
Laramie, WY 82073
(307) 742-7140

Mr. Nicholas may testify as an expert witness concerning the reasonableness of any attorneys' fees sought by Biodiversity.

Sam Trautman
556 N. 10th Street
Laramie, WY 82072

Unless otherwise agreed upon by the parties, Mr. Trautman may be called solely as a foundation witness in regard to Mountain Cement Company's demonstrative video exhibits. Specifically, Mr. Trautman is a videographer and photographer who has taken video/pictures of the cement plant.

## II.    EXHIBITS

Mountain Cement intends to offer the following exhibits at trial in this case:

A.    Permit No. 30-098

B.    Permit No. 31-098

C.    Excerpts from Mountain Cement's Quarterly Excess Emission Reports from 4th Quarter of 1999 through 2nd Quarter of 2005.

D.    DEQ's Notice of Violation dated September 3, 2002

E.    December 18, 2002 letter to Glenn Spangler from Bruce Ballinger

F.    Summary of Excess Opacity at Clinker Coolers (Attachment 2 to Sansing Affidavit)

G.    Expert Witness Report of Thomas R. Keeler, TRK Engineering Services, Inc.

H.    Summary of Quarterly Excess Opacity Reports (Attachment #1 to Keeler Report)

I.     Pages from Chapter 5, National Emission Standards, Wyoming Air Quality Standards
       and Regulations (Attachment #2 to Keeler Report)

J.     Appendix A, EPA Manual ESP Applications in the Cement Industry (Attachment #3 to
       Keeler Report)

K.     Summary of Average Hourly Opacity > 20% (Attachment #4 to Keeler Report)

L.     Resume for Thomas Keeler (Attachment #5 to Keeler Report)

M.     Expert Report of Roger Brower on Behalf of Defendant

N.     Results of Searching U.S. EPA's RACT/BACT/LAER Clearinghouse database for
       permitting /PSD/BACT decisions relating to Portland cement kilns using ESPs for
       particulate matter control (Attachment A to Brower Report)

O.     Florida Rock Industries draft permit no. 0010087-013-AC, PSD-FL-350 (Attachment B
       to Brower Report)

P.     Best Available Control Technology Determination (BACT), Florida Rock Industries, Inc.
       Newberry Plant, PSD-FL-350, Air Permit 0010087-013-AC, Alachua County, Page BD-
       15 (Attachment C to Brower Report).

Q.     Listing of stack test reports (Attachment D to Brower Report)

R.     Results from stack tests on September 3, 2004 and November 25, 2003 (Attachment E to
       Brower Report)

S.     U.S. EPA Green Book (attainment status) for Wyoming particulate matter attainment
       status (Attachment F to Brower Report)

T.     Summary of $PM_{10}$ ambient monitoring in Laramie, Wyoming for 1999 through 2004
       (Attachment G to Brower Report)

U.     U.S. EPA Air Quality System Report for 2002 for Site ID 56-001-0801 (Attachment H to
       Brower Report)

V.    WDEQ Air Quality Division Facility Inspection Report — FY 2004 for Mountain
      Cement Company (September 13, 2004 inspection) (Attachment I to Brower Report)

W.    U.S. EPA memo entitled "Areas Affected by PM-10 Natural Events (Attachment J to
      Brower Report)

X.    Mountain Cement Company's Fourth Quarter, 2002 Excess Emissions Report, Kiln #2
      Form C, page 8 (Attachment K to Brower Report)

Y.    Mountain Cement Company's Third Quarter, 2002 Excess Emissions Report, Kiln #2
      Form C, pages 3-4 (Attachment L to Brower Report)

Z.    U.S. EPA Air Quality System Report for 2002 for Site IDs 56-001-0801 and 56-001-
      0800 (Attachment M to Brower Report)

AA.   Resume of Roger Brower and references of authored/co-authored technical papers
      (Attachments N and O to Brower Report)

BB.   Expert Report of Ralph L. Roberson

CC.   Frequency Distribution of Opacity Data (Appendix A to Roberson Report) Graphs (two)

DD.   Resume of Ralph L. Roberson

EE.   Expert Report of Dale R. Jensen, CPA

FF.   Calculations for BEN Model (Attachment B to Jensen Report)

GG.   Resume of Dale R. Jensen (Attachment C to Jensen Report)

HH.   Results of Method 5 particulate matter monitoring tests for Mountain Cement's plant

II.   Notice letter from Biodiversity dated October 22, 2004

JJ.   Complaint filed by the DEQ in Wyoming State Court on December 17, 2004

KK.   Consent Decree entered in the DEQ action on March 21, 2005

LL.     Documents related to installation of baghouse

MM.     Provisions concerning opacity and particulate matter limits (Tab A in Mountain Cement's summary judgment notebook)

NN.     Provisions concerning testing to determine if violations exist (Tab B in Mountain Cement's summary judgment notebook)

OO.     Provisions concerning monitoring for compliance with limits (Tab C in Mountain Cement's summary judgment notebook)

PP.     Startup, Shutdown and Malfunction Provisions (Tab D in Mountain Cement's summary judgment notebook)

QQ.     Summary of Kiln 2 alleged opacity exceedances (Tab G in Mountain Cement's summary judgment notebook)

RR.     Summary of Clinker Cooler alleged opacity exceedances (Tab H in Mountain Cement's summary judgment notebook)

SS.     Summary of opacity exceedances at Kiln #2

TT.     Summary of opacity excesses at Clinker Cooler Stack

UU.     Sheets identifying the causes and corrective actions for malfunctions.

VV.     Animation of baghouse operation

WW.     Animation of electrostatic precipitator operation

XX.     Satellite photograph of cement plant and Laramie, with monitoring locations and homes of Plaintiffs' representatives

YY.     Satellite photographs of cement plant and the surrounding area

ZZ.     Layout of the Mountain Cement Company Plant

AAA.    Photographs of plumes with different opacities

BBB.   Time lapse photography of the Mountain Cement Plant from _____ to _____

CCC.   Aerial photograph of the Mountain Cement Plant

DDD.   Oblique aerial photographs of the Mountain Cement Company Plant

EEE.   DVD of operations at the Mountain Cement Company Plant

FFF.   Material flow and air flow diagram for Kiln #1 and Kiln #2

GGG.   Graph of particulate matter and opacity

HHH.   Graph of particulate matter and opacity with uncertainty bands

In addition to the foregoing exhibits, Mountain Cement may offer additional exhibits for demonstrative purposes, many of which are still in the process of being prepared. Mountain Cement reserves the right to offer or otherwise use any exhibits listed by Biodiversity. Mountain Cement also reserves the right to offer any other exhibits for rebuttal purposes.

DATED this 20th day of October, 2005.

Philip A. Nicholas
Jason M. Tangeman
ANTHONY, NICHOLAS,
TANGEMAN & YATES, LLC
170 North Fifth Street
PO Box 0928
Laramie, WY 82073-0928
(307) 742-7140
(307) 742-7160 Fax

James B. Harris
Becky L. Jolin
Steven R. Baggett
Thompson & Knight, L.L.P
1700 Pacific, Suite 3300
Dallas, TX 75201
214-969-1102
214-880-3274 Fax

Attorneys for Defendant Mountain Cement Company

## CERTIFICATE OF SERVICE

*Mitchell Edwards*

I, ~~Philip A. Nicholas~~, certify that a copy of the above and foregoing pleading was served on Plaintiffs by placing a copy of the same in the U.S. Mail, postage prepaid and addressed as follows on the _____*20th*_____ day of October, 2005:

Reed Zars
Attorney at Law
910 Kearney Street
Laramie, WY 82070

Jason M. Tangeman