FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

OCT 2 4 2005

Stephan Harris, Clerk
Cheyenne

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

BIODIVERSITY CONSERVATION          )
ALLIANCE and SIERRA CLUB,          )
                                   )
      Plaintiffs,                  )
                                   )
          vs.                      )    Case No. 04-CV-361-B
                                   )
MOUNTAIN CEMENT COMPANY,           )
                                   )
      Defendant.                   )

---

## ORDER ON FINAL PRETRIAL CONFERENCE

---

On Thursday, October 13, 2005, pursuant to Federal Rule of Civil Procedure 16, the final pretrial conference in this matter was held before the Honorable Clarence A. Brimmer, United States District Judge.  Reed Zars appeared as counsel for Plaintiffs. James Harris and Philip Nicholas appeared as counsel for Defendant. After reviewing the parties' final pretrial memoranda and hearing the parties' pretrial statements, the Court took the following action:

### A.   JURISDICTION AND PARTIES

Plaintiff Biodiversity Conservation Alliance ("BCA") is a nonprofit conservation organization based in Laramie, Wyoming.  BCA is dedicated to the protection of wildlife, fish, plants and the

lands which support wildlife, fish, and plants.  BCA brings this action on behalf of its members, who reside throughout southeastern Wyoming.  Plaintiff Sierra Club is a national citizens organization dedicated to protecting natural resources, including clean air and water.  Sierra Club brings this suit on behalf of its members, who reside in Wyoming and other parts of the country.  Defendant Mountain Cement Company ("Mountain Cement") is a Nevada corporation authorized to do business in Wyoming and currently operates a cement manufacturing plant in Laramie, Wyoming.  Mountain Cement is a wholly-owned subsidiary of Eagle Materials, Inc., a Texas-based corporation.

Plaintiffs bring this suit pursuant to 28 U.S.C. § 1331 (federal question statute) and 42 U.S.C. § 7604(a) (Clean Air Act citizen suit provision).   The jurisdiction of the Court is disputed.  Venue is proper under 28 U.S.C. § 1391 and 42 U.S.C. § 7604(c).

## B.    GENERAL NATURE OF THE CLAIMS

Plaintiffs bring this citizen enforcement suit under the Clean Air Act ("CAA"), alleging that Defendant has violated, and continues to violate, its CAA operating permits by (1) exceeding the opacity limit on the Kiln #2 Stack; (2) exceeding the opacity

2

limit on the Clinker Cooler Stack, and (3) exceeding the particulate limit on the Kiln #2 Stack. Plaintiffs contend that such violations have been occurring since October 23, 1999.

Plaintiffs argue that the violations, both opacity and particulate matter, can be shown by the continuous opacity monitor system ("COMS") data. Plaintiffs allege that such data may be used directly to show opacity non-compliance, and the data is "credible evidence" of particulate matter violations under both permits.

Plaintiffs claim that their members have suffered aesthetic, odor, and health related injuries as a result of the excess emissions from Defendant's plant. Plaintiffs claim that this suit will redress, at least in part, the injuries. Therefore, according to Plaintiffs, they have standing to bring this suit.

Plaintiffs also maintain that the State does not have a safe harbor rule in effect, only an enforcement discretion policy. Plaintiffs also contend that the State has not prosecuted Defendant's opacity exceedances at Kiln #2 which occur less than five percent of the time in any one quarter and less than three percent of the time in two consecutive quarters. The State also has not sought injunctive relief to address such exceedances. Plaintiffs contend that such exceedances are violations of

3

Defendant's permits and the CAA.   Thus, according to Plaintiffs, they are not estopped from bringing this citizen enforcement action.

While Plaintiffs do not allege here that exceedances caused by startup and shutdown of the kiln system are violations, Plaintiffs argue that all other exceedances may only be excused by the Court or the State of Wyoming Department of Environmental Quality ("DEQ") if they were reported within 24 hours to DEQ, and a corrective action plan was provided.   Plaintiffs allege that Defendant did not report any of the exceedances at issue in this case as malfunctions within the prescribed time period, nor did Defendant provide a corrective action plan to DEQ.

Plaintiffs also claim that they have given adequate pre-suit notice to Defendant.   In Plaintiffs' view, their notice only needs to give Defendant enough information to determine the dates of the violations.   The notice does not need to list the specific dates.

In response, Defendant contends that most of the opacity and particulate matter exceedances occurring during the time period in question were caused by startup, shutdown, or malfunction and, therefore, do not constitute violations.   Defendant contends that it is not required to report the malfunctions within 24 hours and

4

that it reported such events in the quarterly reports to the State.

Defendant also claims that those opacity exceedances which do not qualify for the startup, shutdown, or malfunction exception fall within the safe harbor for opacity exceedances provided by the State of Wyoming Department of Environmental Quality ("DEQ"). Defendant argues that such a rule does exist and that it is legal and valid under the CAA.

Defendant also argues that all of the violations cannot be established by the COMS data.  According to Defendant, opacity violations under Permit 30-098 and all of the particulate matter violations must be established by using a different testing method. Specifically, Defendant argues that Method 5 must be used to determine particulate matter violations and Method 9 must be utilized to detect opacity violations under Permit 30-098.

Defendant next asserts that the opacity claims in this suit are precluded by a state enforcement action initiated by the DEQ in December of 2004.  In addition, Defendant argues that the state court suit precludes the opacity claims in this suit under the doctrine of *res judicata*.

Additionally, Defendant contends that the Plaintiffs did not give them adequate notice under the CAA.  Mountain Cement claims

that the notice must state the specific dates of the violations and that the notice letter sent by Plaintiffs does not contain such information.   Defendant also claims that the notice is inadequate because it fails to identify the standard being violated and claims particulate matter violations that differ from those presently being claimed by Plaintiffs.   Thus, Defendant argues that this Court lacks subject-matter jurisdiction.

Finally, Mountain Cement avers that Plaintiffs cannot establish Article III standing.   According to Defendant, none of the Plaintiffs have injuries in fact, which is required for federal jurisdiction.

## C.   UNCONTROVERTED AND STIPULATED FACTS

The following facts are established by admissions in the pleadings or by stipulation of counsel at the pretrial conference:

1. Mountain Cement owns and operates a 2-kiln cement plant outside of Laramie, Wyoming.

2. Among the stacks authorized to release particulate matter at that plant is one associated with Kiln #2 and another stack associated with the clinker cooler.

3. From June 2, 1999 through March 14, 2004, emissions from the Plant were subject to Operating Permit No. 30-098.

6

4.    Operating  Permit  No.  30-098  provides  that  "Visible
      emissions from the #1 and #2 kiln stacks (Source #1 & #2)
      shall not exhibit greater than 20 percent opacity."

5.    The source of the opacity limit in Operating Permit No.
      30-098 is the New Source Performance Standards ("NSPS").

6.    Operating  Permit  No.  30-098  incorporates  Wyoming  Air
      Quality Standards and Regulations ("WAQSR"), Chapter 5,
      § 2(i)(iii) of the NSPS.

7.    Operating Permit No. 30-098 requires compliance with the
      NSPS.

8.    WAQSR,  Chapter  5,  § 2(i)(iii)  of  the  NSPS  states  as
      follows: "Compliance with the Opacity Standards in this
      part shall apply at all times except during periods of
      startup,  shutdown,  or  malfunction,  and  as  otherwise
      provided in the applicable standard."

9.    From March 15, 2004 to the present, emissions from the
      Plant have been subject to Operating Permit No. 31-098.

10.   The source of the opacity limit in Operating Permit No.
      31-098 is the National Emission Standards for Hazardous
      Air Pollutants ("NESHAPS").

11.   Operating Permit No. 31-098 provides that "[t]he 6 minute

average opacity from the #1 and #2 kiln stacks (K1-710 and K-401) for any 6 minute block period shall not exceed 20 percent."

12. Operating Permit No. 31-098 incorporates WAQSR, Chapter 5, § 3(h)(vii)(A) of the NESHAPS.

13. Operating Permit No. 31-098 requires compliance with the NESHAPS.

14. WAQSR, Chapter 5, § 3(h)(vii)(A) of the NESHAPS states as follows: "The opacity and visible emission standards set forth in this section shall apply at all times except during periods of startup, shutdown, and malfunctions, and as otherwise specified in the applicable subpart."

15. Operating Permit No. 30-098 and Operating Permit No. 31-098 both require Mountain Cement to submit quarterly excess emission reports to the DEQ that identify "each period of excess emissions that occurs during startups, shutdowns, or malfunctions of Kilns No. 1 and No. 2, the nature and cause of any malfunction, and the corrective action taken or preventative measures adopted."

16. Operating Permit No. 30-098 and Operating Permit No. 31-098 both state that "[e]missions in excess of established

8

regulation limits as a direct result of malfunction or abnormal conditions or breakdown of a process, control or related operating equipment beyond the control of the person or firm owning or operating such equipment shall not be deemed to be in violation of such regulations, if the Division is advised of the circumstances within 24 hours of such malfunction and a corrective program acceptable to the Division is furnished."

17. The term "malfunction is defined at WAQSR Chapter 5, § 2(e)(I) as: "any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions."

18. The opacity limits set forth in Mountain Cement's operating permits do not apply during periods of startup or shutdown.

19. The source of the particulate matter limits for Kiln #2 in Operating Permit No. 30-098 is the NSPS.

20. Operating Permit No. 30-098 incorporates WAQSR, Chapter 5, § 2(h)(iii).

21.  WAQSR, Chapter 5, § 2(h)(iii) states as follows:
     "Operations during periods of startup, shutdown, and
     malfunction shall not constitute representative
     conditions for the purpose of a performance test, nor
     shall emissions in excess of the applicable emissions
     limit during periods of startup, shutdown, and
     malfunction be considered a violation of the applicable
     emissions limit, unless otherwise specified in the
     applicable standard."

22.  The source of the particulate matter limits for Kiln #2
     in Operating Permit No. 31-098 is the NESHAPS.

23.  Operating Permit No. 31-098 incorporates WAQSR, Chapter
     5, § 3(h)(v)(A) and (h)(vii)(A).

24.  WAQSR, Chapter 5, § 3(h)(v)(A) and (h)(vii)(A) state as
     follows: "The non-opacity emission standards set forth in
     this part shall apply at all times except during periods
     of startup, shutdown and malfunction, and as otherwise
     specified in an applicable subpart."

25.  The particulate matter limits set forth in Mountain
     Cement's operating permits do not apply during periods of
     startup or shutdown.

26.  In determining whether an emission source is in
     compliance with a particulate matter standard, the DEQ
     can use a test called the Method 5 test.

27.  The Method 5 test requires taking representative samples
     of stack gases over three sampling runs of at least an
     hour in length, weighing the dust captured in each
     sampling run, then converting that amount to a pounds-
     per-hour figure based upon the measured volume of the
     stack gases that are released during the sampling run.
     If the average pounds per-hour-figure of the three runs
     is higher than the permit limit, then a violation exists.

28.  Method 5 tests have not shown an exceedance of permit
     limits.

29.  From October 1, 1999 to December 31, 2004, the ambient
     air sampling conducted one day per week has shown
     National Ambient Air Quality Standards for Particulate
     Matter have been met in Laramie during every test except
     one.

30.  On December 17, 2004, the State of Wyoming sued Mountain
     Cement alleging exceedances of certain operating permit
     limits.

31.   On March 21, 2005, the suit initiated by the State was settled through a Consent Decree.

32.   Any opacity exceedances at the stack for Kiln #2 during the second, third, and fourth quarters of 2001 and the first and second quarters of 2002, are not to be considered in connection with any relief sought in this lawsuit.

33.   Opacity exceedances occurring at the Kiln #2 stack during start-up and shut-down and the during the second, third, and fourth quarters of 2001, and the first and second quarters of 2002, cannot be used to evaluate whether the particulate matter standard for the Kiln #2 stack has been violated.

34.   Any opacity exceedances that occur at the Kiln #2 stack during a bonafide malfunction period cannot be used in evaluating whether the particulate matter standard for the Kiln #2 stack has been violated.

**D.   CONTESTED ISSUES OF FACT**

The contested issues of fact remaining for decision are:

1.    Whether Plaintiffs have suffered an injury-in-fact due to any alleged illegal conduct of Mountain Cement that is

12

redressable by the Court, sufficient to confer standing to maintain this action.

2.     Whether Defendant has violated the applicable opacity and particulate matter limits.

3.     Whether certain opacity exceedances reported by Mountain Cement were due to malfunctions.

4.     Whether it is the policy and practice of the DEQ to not take enforcement action for opacity exceedances measured by a COMS as long as the exceedances occur less than 5% of the operating time in any one quarter and less than 3% of the operating time in two consecutive quarters (known as the "Safe Harbor" or "five percent rule").

5.     Whether a penalty should be imposed for any alleged past opacity or particulate matter violations.

6.     Whether Plaintiffs' letter dated October 22, 2004, is adequate to confer subject-matter jurisdiction on this Court under 42 U.S.C. § 7604(b)(1)(A).

**E.     CONTESTED ISSUES OF LAW**

The contested issues of law, in addition to those implicit in the foregoing issues of fact, are:

1.     Whether Biodiversity Conservation Alliance or Sierra Club

13

have standing to maintain this action under Article III.

2.    Whether the operating limits on opacity and particulate matter are applicable during periods of malfunction.

3.    Whether Mountain Cement is required to provide notice to the Wyoming DEQ-HQD within 24 hours of a malfunction in order to have any opacity or particulate matter exceedance excused.

4.    Whether, under Operating Permit No. 30-098, compliance with the opacity standard for the Kiln #2 Stack and the Clinker Cooler Stack can be established solely by COMS data.

5.    Whether Mountain Cement is entitled to rely on the Safe Harbor or five percent rule.

6.    Whether both permits require that compliance with the particulate matter standard be determined solely by an EPA Method 5 stack test.

7.    Whether COMS data can be used to measure the mass emission rate of particulate matter and stack gases.

8.    Whether the compliance assurance monitoring ("CAM") plan in Operating Permit No. 31-098, and in particular the CAMS graph that is part of that plan, also applies to

Operating Permit No. 30-098.

9.   Whether the State of Wyoming's enforcement action against
     Mountain Cement precludes the Court from exercising
     jurisdiction over the opacity claims involving the Kiln
     #2 Stack.

10.  Whether the Consent Decree entered in the state
     enforcement suit precludes all of Plaintiffs' claims
     involving alleged opacity violations at the Kiln #2 Stack
     under the doctrine of *res judicata*.

11.  Whether there are any continuing violations of opacity or
     particulate matter limits at the Kiln #2 Stack or the
     Clinker Cooler Stack.

12.  Whether there is a reasonable likelihood of irreparable
     harm related to any risk of future opacity or particulate
     matter violations at the Kiln #2 Stack, or risk of future
     opacity violations at the Clinker Cooler Stack.

13.  Whether the costs to Mountain Cement of installing a
     baghouse at the Kiln #2 Stack pursuant to any order for
     injunctive relief should be weighed against the public
     benefit and, if so, does it outweigh the public benefit.

14.  Whether entering an order requiring installation of a

15

baghouse on the Kiln #2 Stack would redress Plaintiffs'
complaints.

15.    Whether any civil penalties would be appropriate if the
       finder of fact determines that there have been past
       opacity or particulate matter violations of the operating
       permits and, if they are, the amount.

16.    Whether COMS data, if used to determine compliance with
       opacity standards, will result in more stringent opacity
       standards.

17.    Whether the proposed injunctive relief would adversely
       impact the public interest.

**F.    EXHIBITS**

The parties have listed and filed their exhibit lists with the
Court.  Those lists are incorporated by reference subject to the
Court's rulings on any motions in limine offered by the parties
prior to trial.

Any objections to admissibility of exhibits must, where
possible, be made at least three days before trial and the Court
must be notified of such objections.  Where possible, the
admissibility will be ruled on before trial and objections reserved
for the record.

16

At the time of trial, each counsel will furnish to the Court four copies (and one copy to each opposing counsel) of the list of all exhibits to be offered.

**G.   DEPOSITIONS**

Any party proposing to offer all or any portion of a deposition shall notify opposing counsel at least ten (10) days before trial of the offers to be made (unless the necessity for using the deposition develops unavoidably thereafter).   If objection is to be made, or if additional portions of a deposition are to be requested, opposing counsel will notify offering counsel at least five (5) days before trial of such objections or requests. If any differences cannot be resolved, the Court must be notified in writing of such differences at least three (3) days before trial.

**H.   DISCOVERY**

Discovery is complete.

**I.   WITNESSES**

The parties have listed and filed their witness lists with the Court.   The lists are hereby incorporated by reference.

Each party will give notice to the opposing party by 5:00 p.m. on each day of trial of the witnesses the party intends to call the

following day and the anticipated length of time the party will need to examine that witness.

**J.    PROPOSED JURY INSTRUCTIONS**

It is directed that proposed jury instructions be submitted to the Court by October 19, 2005, subject to the right of counsel to supplement such requests during the course of trial on matters that cannot be reasonably anticipated.  The proposed jury instructions shall be submitted in accordance with U.S.D.C.L.R. 51.1.

**K.    AMENDMENTS TO THE PLEADINGS**

There are no pending requests to amend the pleadings.

**L.    MODIFICATIONS-INTERPRETATION**

The Court prepared this Order after a conference at which counsel for the respective parties appeared.  Hereafter, this Order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice.  The pleadings will be deemed merged into this Order.  In the event of ambiguity of any provision of the Order, the Court and the parties may refer to the record of the final pretrial conference and to the pleadings for clarification.

**M.    TRIAL SETTING**

This matter is set for jury trial on October 24, 2005, at 9:30

a.m.  Motions in limine and other pretrial matters will be heard in chambers at 9:00 a.m. on the same day.

**N.   MEMORANDUM**

The estimated length of trial is five (5) days.    The possibility of settlement in this case is considered to be fair.

Dated this _____ day of October, 2005.

_____
UNITED STATES DISTRICT JUDGE